**1:18-cv-1873-CFC**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re Orexigen Therapeutics, Inc., *et al.*,

*Debtors.*

McKesson Corporation, Inc. and McKesson Specialty Arizona, Inc.,

*Appellants.*

v.

Orexigen Therapeutics, Inc., The Baupost Group Securities, L.L.C., EcoR1 Capital Fund, L.P., EcoR1 Capital Fund Qualified, L.P., Biotechnology Value Trading Fund OS, LP, BiotechnologyValue Fund LP, Biotechnology Value Fund II, LP, Investment 10, LLC, MSI BVF SPV LLC, and Roadrunner Co.,

*Appellees.*

On Appeal from the United States Bankruptcy Court for the District of Delaware;
*In re Orexigen Therapeutics, Inc., et al.,* Bankruptcy Case No. 18-10518 (KG); BAP No. 18-58

### APPELLANTS' OPENING BRIEF

OF COUNSEL:

**BUCHALTER**
A PROFESSIONAL CORPORATION
Jeffrey K. Garfinkle (*pro hac vice*)
Daniel H. Slate (*pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: (949) 760-1121
E-mail:  jgarfinkle@buchlater.com
E-mail:  dslate@buchalter.com

Dated:  January 30, 2019

**REED SMITH LLP**
Kurt F. Gwynne (No. 3951)
Jason D. Angelo (No. 6009)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
E-mail:  kgwynne@reedsmith.com
E-mail:  jangelo@reedsmith.com

*Counsel to Appellants McKesson Corporation and McKesson Specialty Arizona, Inc.*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED AND STANDARD OF REVIEW ........2

I.     STATEMENT OF THE CASE ......................................................3

II.    SUMMARY OF THE ARGUMENT ............................................14

III.   LEGAL ARGUMENT ...............................................................16

       A.    Introduction. ................................................................16

       B.    McKesson's Application Rights, and the Enforceability of Such
             Rights Are Governed by California Law. ...........................17

       C.    State Law Governs "Mutuality," and California Law Provides that a
             Subsidiary and its Parent Can Be Considered Together for Purposes of
             Mutuality. ...................................................................26

       D.    Section 553's Restrictions on Setoff Are Limited to the Context of
             Avoidance Actions. ......................................................30

IV.    CONCLUSION..........................................................................33

# TABLE OF AUTHORITIES

## Cases

*Butner v. United States*
    440 U.S. 48 (1979)..................................................................... *passim*

*County of Orange v. County of Orange*
    183 B.R. 609 (Bankr. C.D. Cal. 1995) ..........................................29

*Demarest v. Manspeaker*,
    498 U.S. 184 (1991)......................................................................25

*English v. Gen. Elec. Co.*
    496 U.S. 72 (1990)........................................................................25

*Erie Railroad Co. v. Tompkins*,
    304 U.S. 64 (1938)........................................................................22

*In re Bill Heard Enters., Inc.*
    438 B.R. 745 (Bankr. N.D. Ala. 2010) ..........................................28

*In re Brook Farms*
    70 B.R. 368 (Bankr. E. D. Wisc. 1987)..........................................31

*In re Calore Exp. Co., Inc.*
    288 F. 3d 22 (1st Cir. 2002)...........................................................29

*In re Czyzk*,
    297 B.R. 406 (Bankr. D.N.J. 2003) ...............................................28

*In re Elcona Homes Corp*.
    863 F. 2d 483 (7th Cir. 1988) .......................................................31

*In re Garden Ridge Corp.*
    338 B.R. 627 (Bankr. D. Del. 2006)..............................................28

*In re Lehman Brothers Inc*.
    458 B.R. 134 (Bankr. S.D.N.Y. 2011) ..........................................32

*In re MCB Fin. Grp., Inc.*
    No. 10-11176-WHD, 2011
    WL 8609454  (Bankr. N.D. Ga. Mar. 31, 2011) ...........................29

*In re SemCrude, L.P*
   399 B.R. 388 (Bankr. D. Del. 2009)........................................... 13, 20, 26, 31

*In re Sunset Aviation, Inc.*
   468 B.R. 641 (Bankr. D. Del. 2011)................................................................28

*Kaufman v. Chalk & Vermilion Fine Arts, LLC*
   31 F. App'x 206 (2d Cir. 2002)......................................................................28

*Levine v. Kenny (In re Flooring American, Inc.)*
   302 B.R. 403 (Bankr. N.D. Ga. 2003).............................................................29

*Meridian Bank v. Alten*,
   958 F.2d 1226 (3d Cir. 1992) ..........................................................................3

*Pa. State Emps.' Ret. Sys. v. Thomas (In re Thomas)*,
   529 B.R. 628 (Bankr. W.D. Pa. 2015).............................................................20

*Prudential Reinsurance Co. v. Superior Court*
   3 Cal. 4th 1118 (Cal. 1992) ..................................................................... 21, 29

*Sass v. Barclays Bank PLC (In re Am. Home Mortgage, Inc.)*
   501 B.R. 44 (Bank. D. Del., 2013) .................................................................32

*Westmoreland Human Opportunities v. Walsh*,
   246 F. 3d 233 (3d Cir. 2001) ............................................................................4

## Statutes

11 U.S.C. § 101 *et seq*..........................................................................................1

11 U.S.C. § 105(a) ..............................................................................................20

11 U.S.C. § 547.....................................................................................................30

11 U.S.C. § 548.....................................................................................................30

11 U.S.C. § 553 ............................................................................................ *passim*

11 U.S.C. § 553(a)(1)-(3)......................................................................................25

11 U.S.C. § 553(a)(3).............................................................................................31

28 U.S.C. § 1334(b) ...............................................................................................2

28 U.S.C. § 157(a) ...............................................................................................2

28 U.S.C. § 157(b)(1)...........................................................................................2

28 U.S.C. § 158(a)(1)............................................................................................2

## JURISDICTIONAL STATEMENT

This dispute and appeal center around whether the mere fact that an entity petitions for bankruptcy relief several years after that entity entered into a contract can be used to invalidate an express contractual provision allowing for application of funds related to mutual cross-obligations that, under applicable state law, are fully enforceable.  The contractual provision at issue provides:

> "VII.  General
>   …
> i. Notwithstanding anything to the contrary in this Agreement, each of McKesson Corporation and its affiliates is hereby authorized to set-off, recoup and apply any amounts owed by it to Manufacturer's [the Debtor's] affiliates against any all [*sic*] amounts owed by Manufacturer or its affiliates to any of McKesson Corporation or its affiliates, without prior written notice[.]"

The Bankruptcy Court erroneously found that 11 U.S.C. § 101 *et seq*. (the "**Bankruptcy Code**") overrides this contract provision which allows for application of funds related to mutual cross-obligations, even though (i) a bankruptcy was commenced almost two years after the time of negotiation, execution and delivery of the agreement, (ii) the entity that filed for bankruptcy expressly consented to the provision, (iii) the provision was and remains enforceable under applicable California law, and (iv) in light of the economic realities facing the debtor, the provision was reasonable and the debtor received substantial value in exchange.  (Appendix at A354 and A371.)

The matter arises in a case under title 11.  As a result, the Bankruptcy Court had jurisdiction over this matter and the judicial authority to enter into a final order pursuant to 28 U.S.C. §§ 1334(b), 157(a), and (b)(1).

The Opinion and the Order were each entered on the docket in the Bankruptcy Court on November 13, 2018.  The Notice of Appeal was timely docketed in the Bankruptcy Court on November 26, 2018.  As the Bankruptcy Court's Opinion and Order on appeal are final judgments, orders and decrees, the District Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED AND STANDARD OF REVIEW

*Issues on Appeal*:

1.    Whether state law governs setoff rights under section 553(a) of the Bankruptcy Code if a party has contractual application and setoff rights enforceable under applicable nonbankruptcy law.

2.    Whether section 553(a) of the Bankruptcy Code prevents a party from enforcing a direct contract claim against a debtor enforceable under applicable State law.

3.    Whether "mutuality" (which is not defined in the Bankruptcy Code) under section 553(a) of the Bankruptcy Code is determined by applicable nonbankruptcy law.

4.     Whether the right to application and setoff is a property right to be determined under applicable State law.

5.     Whether section 553(a) of the Bankruptcy Code evidences a "federal interest [that] requires a different result" such that rights enforceable under applicable nonbankruptcy law can be rendered unenforceable.

**Standard of review on appeal**:

The District Court reviews the legal conclusions of the Opinion *de novo*. *See Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992). Factual findings are reviewed for clear error. The Bankruptcy Court noted that "the material facts are relatively undisputed." (A349.) Here, because the Bankruptcy Court is correct that the material facts are "relatively undisputed," the *de novo* standard of review applies to this appeal.

## I.     STATEMENT OF THE CASE

This dispute is governed by application of the controlling Supreme Court decision, in *Butner v. United States*, 440 U.S. 48 (1979) ("**Butner**"). As the Supreme Court explained in *Butner*,

> "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' [Citation deleted]. The justifications for application of state law are not limited to ownership

3

> interests; they may apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property."  440 U.S. at 55

The term "property rights" includes rights under contracts.  *Westmoreland Human Opportunities v. Walsh*, 246 F. 3d 233, 242 (3d Cir. 2001) (definition of property "encompasses rights and interests arising from ordinary contractual relationships").  In the case at bar, the dispute centers on a contract provision that is enforceable under applicable state law (California).  Two years after the agreement in question was negotiated, executed and delivered, one of the contracting parties commenced a bankruptcy case and, along with its lenders, is now claiming that the provision is unenforceable under section 553 of the Bankruptcy Code.

Appellants contend that the provision is enforceable under state law, and there is no express "federal interest" that requires a different result.  Indeed, appellants assert that the federal interest requires a determination that the contractual provision is fully enforceable.  To rule otherwise would encourage the systemic inequities described in *Butner*.  It would increase contractual uncertainty, encourage forum shopping and allow a party to receive an undeserved "windfall" merely by the happenstance of bankruptcy.

**Statement of Facts.**

Appellants McKesson Corporation ("**McKesson**") and its wholly-owned subsidiary McKesson Specialty Arizona, Inc., through its business unit McKesson

Patient Relationship Solutions ("**MPRS**," and together with McKesson, the "**McKesson Entities**"), each negotiated, executed and delivered to Orexigen Therapeutics, Inc. a biopharmaceutical manufacturer (the "**Debtor**") an agreement that related to supporting the Debtor's efforts to market its sole product.

MPRS undertook to provide critically important (and costly) marketing services for the Debtor, while McKesson itself was a principal distributor of the product.  Because of the specialized nature of the services provided, the corporate relationship was evidenced by two agreements with the Debtor, one with the parent and one with its subsidiary.  In the ordinary course of things, McKesson, as a distributor, would owe considerable sums to the Debtor/manufacturer, and at the same time, MPRS, the subsidiary, was advancing substantial sums support the Debtor/manufacturer's direct point-of-sale marketing program, and at any point in time, would be owed considerable sums by the Debtor.

The Debtor, a recently formed company with very tenuous operating results, did not present a strong credit history.  To the contrary, the Debtor's track record was such that there were serious concerns about its creditworthiness.  In order to partially address those concerns, the parties included an express provision in one of the agreements that allowed for McKesson's obligation to the manufacturer to be available to satisfy the Debtor's obligations to MPRS.  In part based upon that provision, the McKesson Entities continued to provide critical marketing support

to the Debtor, even after the Debtor commenced a bankruptcy case.  As of the Petition Date, the McKesson Entities held a prepetition claim of approximately $9.1 million.  (A073.)

The Debtor was a biopharmaceutical drug manufacturer with a single product, Contrave® (the "**Product**") approved by the FDA, "as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in obese or overweight adults in the presence of at least one weight-related co-morbid condition."  (A003.)  In July of 2016, each of the McKesson Entities entered into an agreement with the Debtor toward marketing and distribution of the Product under the Debtor's LoyaltyScript® program.

On July 1, 2016, McKesson entered into a "Core Distribution Agreement" (as amended, the "**Distribution Agreement**").[1]  (A185.)  McKesson agreed to purchase the Product from time to time and maintain inventory levels sufficient to accommodate the Debtor's aggressive sales projections.  The Product was held in McKesson's regional warehouses and then shipped directly to pharmacies when needed to fill prescriptions.  (A185.)

Shortly thereafter, and effective as of July 15, 2016, MPRS entered into a "Master Services Agreement" (as amended, the "**Services Agreement**" and

---

[1]  The Bankruptcy Court erroneously stated the effective date of the Distribution Agreement was June 1st, 2016 rather than July 1st, 2016.  (A349.)

together with the Distribution Agreement, the "**McKesson Agreements**"). (A350.)   Under the Services Agreement, MPRS managed the Debtor's LoyaltyScript® program, giving patients access, through retail pharmacies at the point-of-sale, to an array of price discounts for the Product.  In order to facilitate those discounts, MPRS advanced millions of dollars each month to pay pharmacists for extending price discounts to retail customers.  (A185.)  The Debtor was required under the Services Agreement to reimburse MPRS on a periodic basis for the amounts advanced, based on monthly estimates that varied from approximately $3.0 million to approximately $8.7 million.   (A089.)   The reimbursement invoice from MPRS to the Debtor dated March 12, 2018 was for $6.3 million, and the Debtor did not make payment; instead, the Debtor commenced bankruptcy.  (A350-A351.)

Since its formation, the Debtor continually experienced losses and was "highly levered."  (A020.)   As of September 30, 2017, the Debtor had an accumulated deficit of more than $765 million and continued to incur losses. (A004.)  In fiscal year 2017, the Debtor recorded total net sales of less than $88 million, materially below projections and substantially below that necessary to provide cash flow sufficient to service debt, to pay its obligations to MPRS under the Service Agreement and to pay other recurring operating expenses.  (A017.)

Additionally, some ninety percent or more of the Product flowed through one of three distributors: AmerisourceBergen, Cardinal Healthcare, and McKesson. (A146.) Those three entities acted as both wholesalers and distributors of the Product. In fact, McKesson alone was responsible for the distribution of approximately 40% of the Product to pharmacies in the United States and elsewhere. (A146.) As a result of the Debtor's concentrated distribution strategy, at any particular time, the three wholesalers/distributors were also obligated to the Debtor for approximately 95% of the Debtor's domestic accounts receivable. (A146.)

In order to provide the Debtor with enhanced credit capacity while, at the same time trying to effectively manage the credit exposure associated with an entity that had such a questionable operating history and an extremely high concentration of receivables, the Debtor expressly agreed to allow McKesson or its affiliates to have certain enumerated rights set forth in the Distribution Agreement. In that agreement, the Debtor agreed that McKesson had the right to "set-off, recoup and apply amounts" owed between the Debtor on the one hand, and McKesson and its affiliates on the other (collectively, "**McKesson's Application Rights**"). Specifically, McKesson and the Debtor expressly agreed as follows:

> "VII. General
>
> …
>
> i. Notwithstanding anything to the contrary in this Agreement, [] McKesson Corporation … is hereby

> authorized to set-off, recoup and apply any amounts owed by it to Manufacturer's [the Debtor's] affiliates against any [and] all amounts owed by Manufacturer … to … McKesson Corporation …, without prior written notice[.]"  (A185)[2]

Stated another way, the Debtor agreed (in a bilateral contract with McKesson) that McKesson could apply moneys owed to the Debtor to satisfy obligations owed by the Debtor to either McKesson or its corporate affiliates.

With the additional protection accorded MPRS in light of McKesson's Application Rights, McKesson and its subsidiary, MPRS, were willing to extend substantial credit to support the Debtor's LoyaltyScript® program, understanding that if, for any reason, the Debtor failed to make payment under that program, at least McKesson and MPRS would be able to recover an amount equal to the amounts owed by McKesson to the Debtor.

On March 12, 2018 (the "**Petition Date**"), the Debtor failed to pay MPRS the $6.3 million due to be reimbursed for funds expended in supporting the Debtor's LoyaltyScript® program.  Instead, the Debtor commenced a bankruptcy case under chapter 11 (the "**Bankruptcy Case**") of the Bankruptcy Code.  Despite the Bankruptcy Case, in order to preserve the goodwill developed by the Debtor under the LoyaltyScript® program, MPRS continued to make advances under the

---

[2] In this quote of the governing contractual provision, appellants have elided certain words referencing McKesson's and the Debtor's affiliates.  Removing these ancillary words undeniably establishes the contractual mutuality between McKesson and the Debtor with respect to McKesson's contractual right to offset and apply debts owed both to McKesson and its affiliates.

Services Agreement, even after the Petition Date.  In fact, in the first three weeks after the Petition Date, MPRS advanced approximately $6.0 million to support and maintain the Debtor's LoyaltyScript® program.  (A074.)

At the time the Debtor commenced the Bankruptcy Case, MPRS already was owed approximately $9.1 million as a result of MPRS's financial support of the Debtor's LoyaltyScript® program, and McKesson owed the Debtor approximately $6.9 million for Product sold to McKesson.  (A089.)  If McKesson's Application Rights were acknowledged, then those amounts would have been netted, and the Debtor would have owed MPRS approximately $2.2 million.  The Debtor (and its lenders) balked at reimbursing MPRS through the exercise of McKesson's Application Rights.  Instead, the parties agreed to reserve all rights and work toward any feasible reorganization.

Immediately after the Bankruptcy Case was commenced, because of the critical nature of the LoyaltyScript® program, the Debtor sought and obtained funding from the DIP Lenders to continue the LoyaltyScript® program and replenish the reimbursement fund for MPRS.  (A073.)

The Debtor and the McKesson Entities then entered into several stipulations, each of which was approved by the Bankruptcy Court.  On April 3, 2018, the Debtor and MPRS entered into a stipulation (the "**April Stipulation**") to provide "adequate protection" for MPRS's interest in the Services Agreement to support

the Debtor's LoyaltyScript® program.   Under the April Stipulation, the Debtor agreed to make weekly advance payments of $1.675 million to MPRS (with monthly reconciliations) to replenish the "Reimbursement Fund" under the Services Agreement and provide for payment of a modest administrative fee. (A075.)  The April Stipulation was expressly without prejudice to any claims held by McKesson.  The April Stipulation was approved by a Bankruptcy Court Order entered on April 11, 2018.  (A084-A085.)

On May 8, 2018, the Debtor and each of the McKesson Entities entered into a second stipulation (the "**May Stipulation**") more specifically related to McKesson's Application Rights.   Under the terms of the May Stipulation (approved by a Bankruptcy Court Order entered on May 18, 2018) (A111-A112), while reserving all rights of application or offset (A112), McKesson agreed to pay to the Debtor the entire amount in dispute, more than $6.9 million (the "**Disputed Funds**"), in order to somewhat ease the Debtor's cash flow concerns.  That was the full amount the Debtor claimed to be owed under the Distribution Agreement. (A187.)

Finally, on July 19, 2018, in order to provide for resolution of issues related to the Disputed Funds, the McKesson Entities, the Debtor, and certain identified lenders entered into a third stipulation (the "**July Stipulation**"), approved by entry of a Bankruptcy Court Order on July 20, 2018.  The July Stipulation required the

11

Debtor, on enumerated conditions, to "segregate the amount of the Disputed Funds to be held pending resolution of McKesson's Disputed Rights as set forth" in the stipulation. (A141.) The conditions set forth in the July Stipulation were satisfied, and the Disputed Funds have been segregated, held pending final resolution of the issues between the parties.

On July 30, 2018, the McKesson Entities filed "McKesson's Motion for an Order Determining that McKesson Is Entitled to the Disputed Funds" (the "**Disputed Funds Motion**"). (A145.) The McKesson Entities also filed the "Declaration of Erin Beesley in Support of Motion for an Order Determining that McKesson Is Entitled to the Disputed Funds" (the "**Beesley Decl**."). (A184-A187.)

On August 21, 2018, certain lenders filed an "Opposition to Motion for an Order Determining that McKesson Specialty Arizona is Entitled to the Disputed Funds" (the "**Lenders' Opposition**") (A188-A224) and the Debtor filed "Debtor's Objection to McKesson's Motion for an Order Determining that McKesson Is Entitled to the Disputed Funds" (the "**Debtor's Objection**" and together with the Lenders' Opposition, the "**Objections**"). (A225-A249.) The Debtor also filed the "Declaration of Thomas P. Lynch in Support of Debtor's Objection to McKesson's Motion for an Order Determining that McKesson Is Entitled to the Disputed Funds." (A250-A253.)

On August 31, 2018, the McKesson Entities filed "McKesson's Reply in Support of Motion for an Order Determining that McKesson Is Entitled to the Disputed Funds." (A254-A279.)

Argument was heard on October 24, 2018. (A280-A347.) On November 13, 2018, the Bankruptcy Court issued an Order (A372) and the "**Opinion**." (A348-A371.) In the Opinion, the Bankruptcy Court denied the Disputed Funds Motion as an "impermissible" triangular setoff. In that determination, the Bankruptcy Court repeatedly referenced the analysis in *In re SemCrude, L.P.* 399 B.R. 388 (Bankr. D. Del. 2009) ("*SemCrude*") and other cases that "routinely held that triangular setoffs are impermissible in bankruptcy." *Id.* at 393. For the reasons set forth below, the McKesson Entities assert that *SemCrude* is distinguishable and therefore not determinative of the rights and obligations of the parties to the Distribution Agreement, and the enforceability of McKesson's Application Rights.

In the Opinion, the Bankruptcy Court also made the following factual findings:

(i)     "The parties do not dispute that McKesson had a prepetition setoff right pursuant to section VII.i of the Distribution Agreement. Because the Debtor and the Noteholders do not dispute McKesson's

prepetition setoff right under California law, the Court proceeds with the assumption that McKesson had such right."  (A354.)

(ii)   "The Court agrees that McKesson had a prepetition setoff right." (A363.)

(iii)   "It is only fair to consider McKesson to be a 'creditor' given the May and July Stipulations without which the Court would not deem McKesson to be a creditor."  (A357-A358.)

## II.   SUMMARY OF THE ARGUMENT

It is undisputed that in a bankruptcy case, state law determines "property rights" between the parties, including contract rights.  In 2016, the McKesson Entities agreed to support the Debtor's marketing efforts exercising two separate strategies:  (i) McKesson agreed to act as a wholesaler and distributor of products bought from the Debtor; and (ii) MPRS agreed to act as the facilitator of the Debtor's loyalty program that required MPRS to advance considerable sums for the benefit of that loyalty program with the Debtor required to reimburse MPRS on a frequent basis.  As is common in the business community, those two functions were set forth in separate agreements, but in one of the agreements the Debtor expressly authorized McKesson or its affiliates to set-off, recoup and apply any amounts owed by the Debtor to any McKesson affiliate.  The effect of that provision was to allow the "netting" of the obligations owed between the

14

McKesson or its affiliates on the one hand and the Debtor on the other.   The provision is enforceable under applicable State law.

However, the Bankruptcy Court erred in two distinct instances:  First, the Bankruptcy Court failed to consider applicable State law as to whether McKesson and the Debtor held "mutual" debts.  It is undisputed that since "mutuality" is not defined in the Bankruptcy Code, the Bankruptcy Court should look to applicable state law in determining the meaning of "mutual."

Second, the Bankruptcy Court erred and effectively imposed a federal gloss on the term "mutual."  (A367.)  With respect, the Bankruptcy Court is wrong in both instances.  First, under applicable State law, the obligations are "mutual," and second, no "federal gloss" should be imposed on that term.  By reason of the contract provision and application of California law, the Debtor was obligated to allow McKesson to apply sums owed by the Debtor to one McKesson affiliated entity.

Even if the Court believes that the Bankruptcy Code has some bearing on the enforceability of the express provisions of the otherwise fully valid agreements, the Bankruptcy Court's reliance on section 553(a) as an express prohibition of the relief requested by the McKesson Entities is misplaced.  That section simply does not say as much as the Bankruptcy Court says it does.  In fairness, the Bankruptcy Court's determination is supported by a large number of court decisions in the

Bankruptcy Court and elsewhere.  (A367) ("The Court refuses to read a contractual exception to strict mutuality allowing for triangular setoff in the face of contrary bankruptcy precedent and policy").  The McKesson Entities assert that the cases that support the Bankruptcy Court's determination are driven by a desire for a clear, bright-line test and ignore the direct contractual mutuality that exists between McKesson (as the creditor) and the Debtor, without addressing the important state law issues that would otherwise require analysis consistent with *Butner* and other controlling authority.

### III.   <u>LEGAL ARGUMENT</u>

#### A.   <u>Introduction.</u>

The question for the Court is whether a single provision in a written agreement—which was presumed by the Bankruptcy Court to be valid and enforceable under applicable State law—can be held to be not enforceable simply because one of the contracting parties commenced a bankruptcy case.

Even though the contract right had been expressly incorporated into one of the agreements between the parties, when it came time to assert McKesson's right to apply the affiliate's receivable, the Debtor, for the first time, claimed that such application was not allowed under the Bankruptcy Code, citing section 553(a).  For a number of reasons, the Debtor's reliance on that Bankruptcy Code section is misplaced.  Instead, McKesson must be allowed to exercise the direct contract

rights expressly set forth in the "Core Distribution Agreement," rights that were bargained-for and fully enforceable under applicable state law.

### B. McKesson's Application Rights, and the Enforceability of Such Rights Are Governed by California Law.

The Debtor expressly agreed that the Distribution Agreement is to be governed and construed in accordance with the laws of California, without regard to or application of conflict of law, rules or principles. Distribution Agreement, Section VII.b. (A229 n.8, A350.) As a result, California law governs the enforceability of McKesson's Application Rights.

As it does not rely upon state law, the Bankruptcy Court's Opinion is wrong as a matter of law and fails to follow the dictates of the United States Supreme Court, as expressed in *Butner*:

> "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' [Citation deleted]. The justifications for application of state law are not limited to ownership interests; they may apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property." 444 U.S. at 55.

The ruling in *Butner* makes at least two noteworthy points. First, property interests, which include contract rights, are determined by state law. Second, those interests should not be analyzed any differently because an interested party is in a

bankruptcy case, "[u]nless some federal interest requires a different result."  444 U.S. at 55.  Applying *Butner*'s ruling to the facts at bar, California law applies to construe the rights and obligations of the parties, including the enforceability of McKesson's Application Rights.   And in accord with *Butner*, California law controls, unless a "different result is required" as a result of an express "federal interest."

The Bankruptcy Court relied entirely upon section 553(a) of the Bankruptcy Code to evidence a "federal interest" that requires a different result.   (A366.) ("Congress in enacting section 553(a) recognized a federal interest. . . . Here, section 553(a)  is unambiguous in providing that a 'mutual debt' must be 'owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim against such creditor against the debtor that arose before the commencement of the case'. . .")

The Bankruptcy Court misinterpreted the plain language of section 553(a). As indicated above, section 553(a) specifically allows a creditor to offset the creditor's payable to the debtor against "*a claim of such creditor against the debtor*."  11 U.S.C. § 553(a) (emphasis added).  McKesson's Application Rights were contractual rights of offset that, in fact, gave McKesson "a *claim* against the debtor."   The Bankruptcy Code defines a "claim" as including a "right to payment," whether "legal" or equitable.   McKesson's Application Rights

constituted a "legal" (*i.e.,* contractual) "right to payment" by offset against the Debtor.  The fact that contractual setoff rights constitute a "claim" or "right to payment" is also evidenced by distinguishing offset, which permits affirmative recovery, from recoupment, which is merely a defense that does not permit affirmative recovery.

A recent decision of a bankruptcy judge from within the Third Circuit cogently explains the difference between setoff and recoupment and the fact that a demand to exercise a right of setoff under nonbankruptcy law constitutes a "claim":

> One significant difference between setoff and recoupment is that in the fight between reciprocal obligations, the doctrine of setoff is offensive in nature and can result in an affirmative judgment in favor of the party to whom the greater obligation is owed.  *See e.g., American Cent. Airlines v. Dep't of Transp. (American Cent. Airlines)*, 60 B.R. 587, 590 (Bankr. N.D. Iowa 1986)(setoff usually asserted to reduce claim but "defendant may be entitled to a judgment in his favor for any excess over and above creditor's claim against debtor."); *Styler v. Jean Bob Inc., (In re Concept Clubs, Inc.)*, 154 B.R. 581 , 585-586 (D. Utah 1993); *see also Stulz v. Boswell*, 307 Pa. Super. 515 , 453 A.2d 1006 , 1008 (Pa. Super. 1982).  Given the affirmative recovery nature of setoff, **a demand for setoff is a "debt" or "claim" in bankruptcy**.  *See e.g., Lee v. Schweiker*, 739 F.2d 870, 872 (3d Cir. 1984)("[s]etoff, in effect, elevates an unsecured claim to secured status . . ."); *In re Monongahela Rye Liquors*, 141 F.2d 864 , 869 (3d Cir. 1944)("[s]et-off rests upon a claim or demand based upon an independent cause of action."); *Cohen v. Sav. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 896 F.2d 54 (3d Cir. 1990)(setoff depends on existence of mutual debts and claims between creditor and debtor). Recoupment, on the other hand, is

> purely defensive in nature and is not an effort to collect a "debt"
> or "claim."

*Pa. State Emps.' Ret. Sys. v. Thomas (In re Thomas)*, 529 B.R. 628, 638 (Bankr. W.D. Pa. 2015) (emphasis added).

In the case at bar, the Bankruptcy Court effectively ignored McKesson's setoff rights under California law and implicitly did not consider those state law rights as giving rise to a "mutual" claim (or right to payment) against the Debtor. The failure to recognize that a right of setoff is a claim under the plain language of sections 553(a) and 105(a) of the Bankruptcy Code, the Bankruptcy Court erred as a matter of law (and conflated setoff and recoupment). That same legal error infected the *SemCrude* decision upon which the Bankruptcy Court relied. *See In re SemCrude*, 399 B.R. at 398 (erroneously concluding, contrary to Third Circuit law, that "a right to effect a setoff can never impose a 'right to payment,' it only can yield a right to pay less than one would otherwise have to pay.").

Thus, the Bankruptcy Court's reliance on the requirement in section 553(a) that a creditor seek to offset its payable to the debtor against "a <u>claim</u> of such creditor against the debtor" was misplaced because McKesson's Application Rights, as a matter of law, constituted a "claim" of McKesson against the Debtor.

Specifically, McKesson owes the Debtor for Product, and the Debtor owes McKesson under the application of McKesson's Application Rights. Since the Bankruptcy Court determined that (i) McKesson was a creditor of the Debtor

(A357-A358), and (ii) McKesson held a prepetition setoff right under California law (A354), the Bankruptcy Court erred as a matter of law in concluding that as a creditor, McKesson was not allowed to exercise McKesson's Application Rights.

In the Opinion, the Bankruptcy Court determines that McKesson's Application Rights are unenforceable based entirely his view of bankruptcy law, specifically section 553(a) of the Bankruptcy Code.   (A363-A364.)   The Bankruptcy Court criticized McKesson's reliance on *Prudential Reinsurance Co. v. Superior Court*, 3 Cal. 4th 1118 (Cal. 1992) ("***Prudential Reins.***"), the only case the McKesson Entities found in which the California Supreme Court even mentioned offset rights among subsidiaries.   The Bankruptcy Court noted that *Prudential Reins* referred to other decisions from other jurisdictions that did not agree with the dicta the McKesson Entities referenced.   (A364.)   With all due respect, the question is whether California law would allow for a contractual setoff, and other jurisdictions' agreement or disagreement should not influence this case any more than they would influence the California courts themselves.   *Prudential Reins.* is the only expression on the issue from the California Supreme Court, and courts must defer to it on the question.[3]   Moreover, there was no dispute between

---

[3]   In *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the Supreme Court held that in cases where state law provides the rule of decision, federal courts have a constitutionally rooted obligation to ascertain and apply "the law of the state."   The Supreme Court declared that "whether the law of the State shall be declared . . . by its highest court in a decision is not a matter of federal concern[.]"   *Id*. at 78.  Applying the *Erie* doctrine, federal courts must look to a

any of the parties regarding McKesson's contract rights under state law outside of bankruptcy.  Consequently, as the Bankruptcy Court expressly assumed due to the lack of such opposition, McKesson has a valid contract property interest preserved by *Butner*.

While section 553 of the Bankruptcy Code imposes certain defined restrictions in the bankruptcy context, a non-debtor party's contractual rights are preserved under the Bankruptcy Code.  There is no federal interest that would impose a federal gloss on the application of state law to these rights.  Recognizing that there are a large number of cases to the contrary (which do not address the Supreme Court's clear guidance in *Butner* and similarly-decided cases), McKesson maintains that the correct reading of section 553 is to conclude that the section does not create any federal right of setoff, nor does it interfere with McKesson's rights under California law and the enforceability of McKesson's Application Rights.  *See generally Butner*, 440 U.S. at 54 n.9 (creditor's rights under state law may be suspended only in the event of an "actual conflict with the system provided by [the Bankruptcy Code]").

First, McKesson's Application Rights do not raise any unique federal interests.  It should be noted that the McKesson Agreements involve only a parent

---

state's highest court in ascertaining state law.  Contrary to *Erie*, the Bankruptcy Court erred in considering non-California Supreme Court decisions.

and a wholly-owned subsidiary, each of which undertakes to support another entity (in this case, the Debtor) by providing completely integrated services (*i.e.*, management and logistical support for the Debtor's LoyaltyScript® Program, which promotes the distributed Product). In light of the business structures, one can posit that if any federal interests are affected in that context, recognition of McKesson's Application Rights better serves the federal interest of promoting patient care and safety by preserving medical distribution channels.

Second, the McKesson Entities acknowledge that the language of section 553(a) has been cited by a number of courts as providing exactly the "federal interest" required under *Butner*. The problem with that reliance, however, is that it is a circular analysis, and assumes that federal law governs. The Bankruptcy Court demonstrated this fundamental inconsistency by presuming that section 553 of the Bankruptcy Code includes substantive restrictions on otherwise legally enforceable creditors' state-law rights. Further, the case law-presumed substantive restrictions on such rights are constitutionally impermissible.

The lead-in sentence in section 553(a) reads in part as follows:

> "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except …"

On its face then, section 553(a) says that it (and indeed all of title 11) does not affect certain described offset rights involving mutual debts that are not acquired in the preference period or post-petition.  Section 553(a) is absolutely silent on the impact it may have on any other equitable offset and application rights, such as McKesson's Application Rights, which are enforceable under California law.

Contrary to binding Supreme Court and Third Circuit precedent, the Bankruptcy Court nevertheless read the prefatory language of section 553(a) as "unambiguous" (A366) and supporting its determination that impairs the ability of a creditor to enforce offset rights that are enforceable under state law.  With respect, the Bankruptcy Court implies that section 553(a) should be construed to read as follows:

> Any and all equitable rights of offset, whether or not such rights are enforceable under applicable state law, are void as to the debtor, except (i) only the right to offset debts that arose prepetition between the debtor and the original counterparty that have not been transferred by agreement or otherwise, and (ii) to the extent that—.

While that interpretation gives the courts a "bright line" test for enforceable offset rights, that is not a reasonable construction of the text of section 553(a).

On this issue, the Bankruptcy Court said "[w]hen statutory language is clear, 'judicial inquiry is complete.'  *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991)."  The McKesson Entities do not see a clear statement of intent that can be

construed to support the Bankruptcy Court's construction. The Appellees went even further, and referenced *English v. Gen. Elec. Co.*, 496 U.S. 72 (1990), for the proposition that "when Congress has made its intent known through explicit statutory language, the courts' task [to interpret the statute] is an easy one." The McKesson Entities do not see in section 553(a) how a reader can find the "explicit statutory language" that supports the reading as determined by the Bankruptcy Court.

Rather, in order to be "clear" and "explicit," the McKesson Entities contend that section 553(a) must be understood to mean what it says plainly:  that title 11 does **not** affect any creditor's rights except only as expressly provided.

The McKesson Entities assert that the only provisions in section 553(a) that expressly indicate unenforceability are the provisions in section 553(a)(1)-(3) (collectively, the "**Avoidance-Conforming Provisions**"). Nothing else in section 553 should be construed to provide that the exercise of any offset rights are impaired at all given the statute's explicit preservation of a specific type of state law right but for three expressly enumerated exceptions, none of which apply here. Nowhere in section 553, for example, is it expressed that offset rights that are enforceable under state law are not enforceable in the context of a bankruptcy. Without such an express provision, state law is determinative on issues that affect property rights, including what debts are considered "mutual."

**C.    State Law Governs "Mutuality," and California Law Provides that a Subsidiary and its Parent Can Be Considered Together for Purposes of Mutuality.**

In the Opinion, the Bankruptcy Court determined that "[a]s of the petition date, McKesson owed the Debtor $6,932,816.40 and the Debtor owed MPRS approximately $9,100,000.00." (A359.)  The Bankruptcy Court then describes McKesson's claim against the Debtor <u>not</u> as a straight contract claim, but as a "triangular setoff … impermissible under section 553(a)  without mutuality." (A360.)  But that analysis presumes that McKesson's Application Rights, as granted by the Debtor under the express terms of the Distribution Agreement, have no legal import, notwithstanding controlling California law to the contrary.

The Bankruptcy Court strayed further from *Butner*, however, and found that section 553 requires not just an enforceable right under applicable state law, but also inflicts on the creditor "the additional requirements imposed by section 553 [which are] well settled." (A358.) (quoting *SemCrude,* 399 B.R. at 393).  In order to meet this "federal" requirement, there must exist a "mutuality of debt" between the creditor and the debtor under federal law, regardless of whether "mutuality" exists under applicable state law. (A358.)  But even under any such additional "federal" requirement, the Bankruptcy Court failed to take into account the fact that such a mutual debt in fact exists between McKesson and the Debtor for two reasons.  As a threshold matter, such a "mutual debt" exists as a result of

26

McKesson's demand to enforce its contractual setoff claim (*i.e.*, McKesson's Application Rights) against the Debtor.

Two years before the Bankruptcy Case was commenced, the Debtor agreed in the Distribution Agreement to grant to McKesson the set of rights called McKesson's Application Rights.  Neither the Debtor nor the Lenders assert that the grant to McKesson of such rights is unenforceable under non-bankruptcy law.  And the Bankruptcy Court determined that McKesson's Application Rights were "enforceable" under state law.  (A348-A349, A354.)  Indeed, the grant of comparable rights among affiliates (such as McKesson and MPRS) is not uncommon.  As a result, without a clearly articulated federal interest that would be substantially and negatively impaired by recognition of McKesson's Application Rights, this Court should rely upon California law, and allow those rights to be enforced.

McKesson's Application Rights arise out of an agreement between McKesson and the Debtor.  On the one hand, McKesson owed the Debtor, and under a provision of the exact same agreement, the Debtor owed McKesson.  This should satisfy even the Bankruptcy Court's bright line rule.  Yet even though McKesson's Application Rights are fully enforceable *and* "mutual" under California law, the Bankruptcy Court ignored California law to find McKesson's

Assignment Rights to be unenforceable as not "mutual," imposing a federal gloss on that term.

Second, "mutual" goes undefined in the Bankruptcy Code, and setoff rights are therefore determined by applicable state, not bankruptcy law.[4]  Therefore, this Court should look to California state law in determining the meaning of "mutual," and under such law, such contract rights as "mutual."  Because state law governs the right to setoff and is preserved under section 553, controlling state law should be relied upon as to the conditions for setoff.  "Mutuality of obligations is determined by state law."  *In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006) (applying Texas law) (quoting *In re Czyzk*, 297 B.R. 406, 409 (Bankr. D. N.J. 2003)); *In re Sunset Aviation, Inc.*, 468 B.R. 641, 647 (Bankr. D. Del. 2011) ("the right of setoff requires mutuality between the debtor and the creditor *under the applicable state law*") (emphasis added); *In re Bill Heard Enters., Inc.*, 438 B.R. 745, 750 (Bankr. N.D. Ala. 2010) ("state law must be examined to determine whether mutuality exists"); *Levine v. Kenny (In re Flooring American, Inc.)*, 302 B.R. 403, 406 (Bankr. N.D. Ga. 2003) ("Whether mutuality exists is an issue of state law.") (applying Georgia law); *County of Orange v. County of*

---

[4]  Because the Bankruptcy Code does not define the term "mutuality," state law governs the meaning of that term.  *See, e.g.*, *Kaufman v. Chalk & Vermilion Fine Arts, LLC,* 31 F. App'x 206, 208 (2d Cir. 2002) (noting that "[b]ecause the Bankruptcy Code does not define 'interests in property,' state law controls").

*Orange*, 183 B.R. 609, 615 (Bankr. C.D. Cal. 1995) ("Mutuality is generally an issue of state law."); *see generally In re Calore Exp. Co., Inc.*, 288 F. 3d 22, 43 (1st Cir. 2002) ("Setoff is a creature of the common law, and therefore in most cases a question of state law"); *In re MCB Fin. Grp., Inc.*, No. 10-11176-WHD, 2011 WL 8609454, at *4 (Bankr. N.D. Ga. Mar. 31, 2011) ("application of section 553 to preserve a right of setoff presupposes the existence of a valid, prepetition right of setoff, the source of *which must be applicable nonbankruptcy law*.") (emphasis added).

Here, the Distribution Agreement is governed by California law, and therefore, this Court must first look to the California Supreme Court to determine setoff rights, including mutuality.  The California Supreme Court has articulated that if there is an express mutual agreement, then a corporate subsidiary can "be deemed a mutual debtor-creditor of the parent."  *Prudential Reins.*, 3 Cal. 4th at 1137.

The Distribution Agreement contains the requisite mutual agreement under *Prudential Reins.* such that McKesson and all of its corporate subsidiaries, including MPRS, are to be considered mutual so as to allow McKesson to exercise McKesson's Application Rights to "set-off, recoup, and apply any amounts owed" as the Debtor expressly agreed.  (A350.)  The Distribution Agreement expressly references the parties at issue here—the wholly owned subsidiary of McKesson.

McKesson's Application Rights do not involve any entity outside of the close family of entities that comprises the McKesson business enterprise and reflects the modern reality of corporate structures where a corporation could bring all activities within a single corporate entity but for a variety of tax, liability, and historical considerations utilizes wholly-owned subsidiaries for a variety of undertakings, especially in the context of the fully-integrated services provided by the closely-related McKesson Entities.

The parties to the Distribution Agreement reaffirmed governing California law by contractually providing that the related McKesson Entities should be treated as a single counterparty for purposes of setting off their claims against the Debtor and the Debtor's debts to MPRS and other McKesson affiliates, all of which relate to a fully-integrated product distribution and customer loyalty program.

### D. Section 553's Restrictions on Setoff Are Limited to the Context of Avoidance Actions.

There is no doubt that section 553(a) imposes material restrictions on a non-debtor party's state law rights.  For the most part, those restrictions relate to prepetition exercises of setoff rights in the context of avoidance actions.[5]  Such integration effectively limits common law offset as a way of avoiding otherwise avoidable prepetition transfers.  *See, e.g., In re Elcona Homes Corp.*, 863 F. 2d

---

[5]  It is not a coincidence that section 553 is in the same chapter of the Bankruptcy Code with other avoidance provisions, such as section 547 (Preferences) and section 548 (Fraudulent Transfers).

483, 487 (7th Cir. 1988) (buying a debt in order to claim offset rights "… is plainly evasive and easily rebuffed.  Indeed, it will normally violate 11 U.S.C. § 553(a)(3) which was added in 1978 to close a loophole that had allowed preferences in the form of set offs, and which forbids a set off where the debt was incurred within 90 days before bankruptcy, while the debtor was insolvent, and for the purposes of obtaining a set off against him.")  The court in *In re Brook Farms*, 70 B.R. 368 (Bankr. E. D. Wisc. 1987), noted "[t]he enactment of § 553 was an expression of the Congressional intent sanctioning the exercise of setoff as a permissible preference under certain circumstances."  70 B.R. at 372-73.

The impact of section 553 has been wrongly construed to impose restrictions on offset rights that, outside of a bankruptcy setting, are enforceable under applicable state law.  Those conditions have been described as "well settled" (*See, e.g.*, *SemCrude*, 399 B.R. at 393) and McKesson acknowledges that there are a large number of decisions that erroneously interpret section 553(a).  For example, a number of courts have read section 553(a) to require that "[i]n order to effect a setoff in bankruptcy, courts construing the Code have long held that the debts to be offset must be mutual, prepetition debts" that originated between the same parties. *See, e.g.*, *SemCrude*, 399 B.R. at 393-94 ("Because of the mutuality requirement in section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy.  Moreover, because each corporation is a separate entity from its

sister corporations absent a piercing of the corporate veil, a subsidiary's debt may not be set off against the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances.  Allowing a creditor to offset a debt it owes to one corporation against funds owed to it by another corporation—even a wholly-owned subsidiary—would thus constitute an improper triangular setoff under the Code."); *In re Lehman Brothers Inc.*, 458 B.R. 134, 139 (Bankr. S.D.N.Y. 2011) ("Contrary to the assertion by UBS that section 553 of the Bankruptcy Code 'is derived from, and preserves, common-law setoff rights, … the text of section 553 is not limited to common-law setoff and by its plain wording applies whenever a creditor seeks to exercise *any* purported setoff right—including one created by contract—in a case under the Bankruptcy Code."); *Sass v. Barclays Bank PLC* (*In re Am. Home Mortgage, Inc.*), 501 B.R. 44, 57 (Bank. D. Del., 2013) (concurring "entirely with Judge Shannon's decision [*SemCrude*]".) McKesson is confident that the Appellees will refer to similar decisions.

That said, McKesson asserts that the correct reading of section 553—under controlling Supreme Court precedent—does not lend itself to impose such requirements on what would otherwise be a perfectly enforceable contract right, especially if they are not related to setoff in the context of prepetition avoidance actions.  In short, state law governs "mutuality," which is not defined in the Bankruptcy Code, and McKesson's Application Rights give rise to "mutual" debts

between McKesson and the Debtor under applicable (and undisputed) California law.  Therefore, this Court should reverse the Bankruptcy Court's Order.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the appellants respectfully request that this Court reverse the Bankruptcy Court's Order, and hold that under applicable California law, McKesson is entitled to exercise McKesson's Application Rights under the Distribution Agreement.

Dated:  January 30, 2019

OF COUNSEL

**BUCHALTER**
A PROFESSIONAL CORPORATION
Jeffrey K. Garfinkle (*pro hac vice*)
Daniel H. Slate (*pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: (949) 760-1121
E-mail:  jgarfinkle@buchlater.com
E-mail:  dslate@buchalter.com

Respectfully submitted,

**REED SMITH LLP**

By:/*s/ Jason D. Angelo*
     Kurt F. Gwynne (No. 3951)
     Jason D. Angelo (No. 6009)
     1201 North Market Street, Suite 1500
     Wilmington, DE 19801
     Telephone:  (302) 778-750
     Facsimile:  (302) 778-7575
     E-mail:  kgwynne@reedsmith.com
     E-mail:  jangelo@reedsmith.com


     *Counsel to Appellants McKesson*
     *Corporation and McKesson Specialty*
     *Arizona, Inc.*

## CERTIFICATE OF COMPLIANCE WITH
## <u>TYPEFACE REQUIREMENT AND TYPE-VOLUME LIMITATION</u>

1.     This brief complies with the typeface requirement of Federal Rules of Bankruptcy Procedure 8015(a)(7)(B) because it has been prepared in Times New Roman 14-point typeface using Microsoft Office 2016 Word.

2.     This brief complies with the type-volume limitation of Rule 8015(a)(7)(B)(iii) because it contains 7,521 words, which were counted by Microsoft Office 2016 Word, excluding the parts of the brief exempted by the rule.

Dated:  January 30, 2019                               **REED SMITH LLP**

By: <u>*/s/ Jason D. Angelo*</u>
Jason D. Angelo (No. 6009)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
E-mail:  jangelo@reedsmith.com

*Counsel to Appellants McKesson Corporation and McKesson Specialty Arizona, Inc.*

## CERTIFICATE OF SERVICE

I, Jason D. Angelo, Esq., hereby certify that, on this 30th day of January, 2019, I caused a true and correct copy of (i) *Appellants' Opening Brief* and (ii) *Appendix in Support of Appellants' Opening Brief* to be served upon the following counsel of record via CM-ECF:

Richard S. Cobb, Esq.
Kerri K. Mumford, Esq.
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
E-mail: cobb@lrclaw.com
E-mail: mumford@lrclaw.com

Christopher M. Samis, Esq.
Aaron H. Stulman, Esq.
WHITEFORD, TAYLOR
  & PRESTON LLC
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, DE 19801
E-mail: csamis@wtplaw.com
E-mail: astulman@wtplaw.com

Bennett Murphy, Esq.
Razmig Izakelian, Esq.
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
E-mail:bennettmurphy@quinnemanuel.com
E-mail: razmigizakelian@quinnemanuel.com

Eric M. Sutty, Esq.
ELLIOTT GREENLEAF
1105 North Market Street, Suite 1700
Wilmington, DE 19801
E-mail: ems@elliottgreenleaf.com

Dated:  January 30, 2019

By: */s/ Jason D. Angelo*
    Jason D. Angelo (No. 6009)
    **REED SMITH LLP**
    1201 North Market Street, Suite 1500
    Wilmington, DE 19801
    Telephone:  (302) 778-7500
    E-mail:  jangelo@reedsmith.com

    *Counsel to Appellants McKesson
    Corporation and McKesson Specialty
    Arizona, Inc.*