**1:18-cv-1873-CFC**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

In re Orexigen Therapeutics, Inc., *et al.*,

*Debtors.*

McKesson Corporation, Inc. and McKesson Specialty Arizona, Inc.,

*Appellants.*

v.

Orexigen Therapeutics, Inc., The Baupost Group Securities, L.L.C., EcoR1 Capital Fund, L.P., EcoR1 Capital Fund Qualified, L.P., Biotechnology Value Trading Fund OS, LP, BiotechnologyValue Fund LP, Biotechnology Value Fund II, LP, Investment 10, LLC, MSI BVF SPV LLC, and Roadrunner Co.,

*Appellees.*

On Appeal from the United States Bankruptcy Court for the District of Delaware;
*In re Orexigen Therapeutics, Inc., et al.,* Bankruptcy Case No. 18-10518 (KG); BAP No. 18-58

### APPENDIX IN SUPPORT OF APPELLANTS' ANSWERING BRIEF

OF COUNSEL:

**BUCHALTER**
A PROFESSIONAL CORPORATION
Jeffrey K. Garfinkle (*pro hac vice*)
Daniel H. Slate (*pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: (949) 760-1121
E-mail: jgarfinkle@buchlater.com
E-mail: dslate@buchalter.com

Dated: January 30, 2019

**REED SMITH LLP**
Kurt F. Gwynne (No. 3951)
Jason D. Angelo (No. 6009)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
E-mail: kgwynne@reedsmith.com
E-mail: jangelo@reedsmith.com

*Counsel to Appellants McKesson Corporation and McKesson Specialty Arizona, Inc.*

## **Table of Contents**

1.  Declaration of Michael A. Narachi in Support of First Day
    Relief
        (Case No. 18-10518 (KG); D.I. 3)…………………………A001-A069

2.  Debtor's Motion Pursuant to 11 USC §§ 361, 363, 503 and
    105(a) for Authority to Enter into a Stipulation Granting
    Adequate Protection to McKesson Specialty Arizona, Inc. and
    its Affiliates
        (Case No. 18-10518 (KG); D.I. 109)……………………...A070-A083

3.  Order Granting Debtor's Motion Pursuant to 11 USC §§ 361,
    363, and 105(a) for Authority to Enter into a Stipulation
    Granting Adequate Protection to McKesson Specialty Arizona,
    Inc. and its Affiliates
        (Case No. 18-10518 (KG); D.I. 176)………………………A084-A099

4.  Debtor's Motion Pursuant to 11 USC §§ 361, 363 and 105(a)
    for Authority to Enter into a Stipulation with McKesson
    Corporation and McKesson Patient Relationship Solutions, a
    Business Unit of McKesson Specialty Arizona, Inc.
        (Case No. 18-10518 (KG); D.I. 281)...…………………..A100-A110

5.  Order Granting Debtor's Motion Pursuant to 11 USC §§ 361,
    363, and 105(a) for Authority to Enter into a Stipulation with
    McKesson Corporation and McKesson Patient Relationship
    Solutions, a Business Unit of McKesson Specialty Arizona, Inc.
        (Case No. 18-10518 (KG); D.I. 319)………………………A111-A121

6.  Omnibus Motion for Entry of an Order (I) Authorizing the
    Debtor to Reject Certain Contracts and (II) Granting Certain
    Related Relief
        (Case No. 18-10518 (KG); D.I. 459)………………………..A122-A129

7.  Omnibus Order (I) Authorizing the Debtor to Reject Certain
    Contracts Related to the McKesson Entities and (ii) Granting
    Certain Related Relief
        (Case No. 18-10518 (KG); D.I. 561)………………………A130-A134

8.    Order Approving Stipulation between Debtor, Certain Secured
      Creditors and McKesson Corporation Regarding Resolution of
      Certain Disputed Claims
            (Case No. 18-10518 (KG); D.I. 592)...........................A135-A144

9.    McKesson's Motion for an Order Determining that McKesson
      is Entitled to the Disputed Funds
            (Case No. 18-10518 (KG); D.I. 654)...........................A145-A183

10.   Declaration of Erin Beesley In Support of Motion for an Order
      Determining that McKesson is Entitled to the Disputed Funds
            (Case No. 18-10518 (KG); D.I. 655)...........................A184-A187

11.   Opposition to Motion for an Order Determining that McKesson
      Specialty Arizona is Entitled to the Disputed Funds
            (Case No. 18-10518 (KG); D.I. 697)...........................A188-A224

12.   Debtor's Objection to McKesson's Motion for an Order
      Determining that McKesson is Entitled to the Disputed Funds
            (Case No. 18-10518 (KG); D.I. 698)...........................A225-A249

13.   Declaration of Thomas P. Lynch in Support of Debtor's
      Objection to McKesson's Motion for an Order Determining that
      McKesson Is Entitled to the Disputed Funds
            (Case No. 18-10518 (KG); D.I. 699)...........................A250-A253

14.   McKesson's Reply in Support of Motion for an Order
      Determining that McKesson is Entitled to the Disputed Funds
            (Case No. 18-10518 (KG); D.I. 710)...........................A254-A279

15.   Transcript of Hearing, October 24, 2018, on McKesson's
      Motion for an Order Determining that McKesson is Entitled to
      the Disputed Funds
            (Case No. 18-10518 (KG); D.I.804)............................A280-A347

16.   Opinion
            (Case No. 18-10518 (KG); D.I. 817)...........................A348-A371

17.   Order
            (Case No. 18-10518 (KG); D.I. 818)...........................A372

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **Orexigen Therapeutics, Inc.**, | Case No. 18-10518 (__) |
| Debtor.[1] | |

## DECLARATION OF MICHAEL A. NARACHI
## IN SUPPORT OF FIRST DAY RELIEF

I, Michael A. Narachi, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I have served as the President and Chief Executive Officer of Orexigen Therapeutics, Inc. (the "Debtor" or "Orexigen") since March 31, 2009. In this capacity, I have become familiar with the Debtor's day-to-day operations, business, and financial affairs.

2. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") thereby commencing the above captioned case (the "Chapter 11 Case") and filed the motions described herein requesting certain relief (the "First Day Pleadings"). I submit this declaration (the "Declaration") on behalf of the Debtor in support of the Debtor's chapter 11 petition and the First Day Pleadings.

3. The Debtor is operating its business and managing its property as debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA, 92037.

4.     The First Day Pleadings seek, among other things, to ensure the continuation of the Debtor's cash management system and other business operations without interruption and establish certain other administrative procedures to promote a smooth transition into the Chapter 11 Case.

5.     Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or professionals, information learned from my review of the relevant documents, or my experience and knowledge of the Debtor's operations and financial condition and the biotech and pharmaceutical industry generally.  If called as a witness, I could and would testify to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

6.     This Declaration is divided into three parts. Part I provides background information about the Debtor, its business operations, its corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Case. Part II summarizes the DIP Facility (as defined below) and sets forth the relevant facts in support of the DIP Motion. Part III sets forth the relevant facts in support of each of the First Day Pleadings.

## I.     BACKGROUND

**A.     The Debtor's Formation**

7.     Orexigen was incorporated on September 12, 2002 under the laws of the State of Delaware and commenced operations in 2003. Orexigen wholly owns non-debtor Orexigen Therapeutics Ireland, Limited ("Orexigen Ireland"), which in turn wholly owns non-debtor Orexigen Therapeutics Ireland, LLC ("Orexigen LLC"). Orexigen Ireland was formed as a limited company on June 25, 2013 under the laws of the Republic of Ireland.  Orexigen LLC

2

Appendix A002

was formed as a limited liability company on October 13, 2015 under the laws of the State of Delaware.

**B.      The Debtor's Business**

8.      Orexigen is a biopharmaceutical company focused on the treatment of obesity. Its sole commercial product, Contrave® (naltrexone HCL/bupropion HCL), is approved in the United States by the U.S. Food and Drug Administration ("<u>FDA</u>"), as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adults with an initial body mass index of 30 kg/m 2 or greater (obese), or 27 kg/m 2 or greater (overweight) in the presence of at least one weight-related co-morbid condition. The American Medical Association designated obesity as a disease in 2013. In 2016 the CDC reported that 36.5% of adults (approx. 91 million) suffered from obesity. Obesity is a chronic, relapsing and complex condition requiring ongoing management in order to maintain weight-loss.  Contrave® is a unique and proprietary combination of two generic drug components, each of which has already received regulatory approval for other indications and has been commercialized in the United States and in a majority of the member countries of the European Union. The drug was approved by the FDA in 2014 and is the only approved medicine for chronic weight management that is believed to work on two areas of the brain—the hypothalamus to reduce hunger and the mesolimbic reward system to help control cravings. The drug is the number one prescribed weight-loss brand in the United States with over 2.3 million prescriptions written to date which equates to approximately 800,000 patients.  In Europe, the drug has been approved under the brand name Mysimba™ (naltrexone HCl/ bupropion HCl prolonged release). The drug is also approved in South Korea, Canada, Lebanon and the United Arab Emirates.

Appendix A003

9. Orexigen's primary activities since incorporation include recruiting personnel, conducting research and development, including four Phase 3 clinical studies prior to FDA approval and ongoing post-marketing required studies, raising capital, overseeing the manufacturing, marketing and commercialization of its drug product in the United States, and establishing and supporting partnerships to commercialize the drug outside of the United States. The drug was originally launched in the United States by Orexigen's former partner, Takeda Pharmaceutical Company Limited ("Takeda"), in 2014. In March 2016, Orexigen repurchased the commercial rights to the drug in the United States and in August 2016 became solely responsible for commercializing Contrave® within the United States. Outside of the United States, Orexigen has been commercializing the drug through a network of distribution partners since 2015 and the drug has been launched in 24 countries.

10. Orexigen has experienced losses since its inception, and as of September 30, 2017, had an accumulated deficit of $765.6 million, primarily due to the cost of product clinical development. Orexigen continues to incur losses, and its ability to successfully transition to profitably is dependent upon achieving a level of revenues adequate to support Orexigen's cost structure and/or reducing Orexigen's cost structure. Orexigen projects it could be profitable by 2019 under its existing operating model and based on its current revenue forecasts. A successful patent litigation involving a challenge by a generic manufacturer was recently held in U.S. District Court of Delaware and confirmed exclusivity for Contrave® in the United States until 2030. Orexigen is actively developing a revised operational plan with the objective of maintaining operations that enable continued prescription supply and support of patients while quickly achieving and maintaining profitability.

Appendix A004

### C. The Debtor's Corporate and Capital Structure

11.    Orexigen is a publicly traded company with its shares listed on The NASDAQ Global Select Market under the ticker symbol "OREX". Orexigen Ireland is a wholly owned foreign subsidiary of Orexigen and Orexigen LLC is a wholly owned subsidiary of Orexigen Ireland. The following is an organizational chart showing the organizational structure of the foregoing entities with nondebtor entities shaded in gray and the Debtor entity in white:



12.    As of the Petition Date, the Debtor's capital structure consisted of the following:

#### The 2016 Secured Notes

13.    In March 2016, Orexigen closed an offering of $165 million in aggregate principal amount of 0% Convertible Senior Secured Notes due 2020 (the "2016 Secured Notes"), related warrants to purchase up to 21,999,999 shares of the Orexigen common stock (the "Warrants"), and 219,994 shares of Series Z Non-Convertible Non-Voting Preferred Stock (the "Series Z Preferred Stock"), to qualified institutional buyers and accredited investors (the "2016 Secured Note Purchasers") pursuant to a securities purchase agreement (the "2016 SPA"), dated March 15, 2016, by and between the Debtor and the Secured Note Purchasers. The offering was

5

Appendix A005

led by funds managed by The Baupost Group, L.L.C. (collectively, "Baupost" and together with the other beneficial holders of the 2016 Secured Notes, the "Prepetition Secured Noteholders"), which, prior to the offering, was the holder of approximately 18.1% of outstanding Orexigen common stock.

14.    The 2016 Secured Notes were scheduled to mature on July 1, 2020, unless earlier repurchased, redeemed or converted in accordance with that certain Indenture, dated as of March 21, 2016, by and between the Debtor, as Issuer, and U.S. Bank National Association, as Trustee (in such capacity, the "Prepetition Indenture Trustee"), governing the issuance of the 2016 Secured Notes (the "2016 Indenture").

15.    In connection with the offering of the 2016 Secured Notes, the parties entered into a Security Agreement (the "Security Agreement" and together with the 2016 Secured Notes, 2016 Indenture and related documents, the "Secured Note Documents"), dated March 21, 2016, by and between Orexigen, the guarantors party thereto from time to time, and U.S. Bank National Association, as the collateral agent (in such capacity, the "Prepetition Collateral Agent"), pursuant to which Orexigen granted a first-priority security interest in substantially all of its current and future assets, including a pledge of 65% of its equity of Orexigen Ireland (the "Prepetition Collateral"), to secure its obligations under the 2016 Indenture. Orexigen Ireland and Orexigen LLC are not guarantors of the Notes.

16.    The 2016 Indenture provides that, upon the occurrence of certain fundamental changes or adverse events related to the regulatory approval for its drug product and commercialization, including net sales of Orexigen, as described in the 2016 Indenture, holders of the 2016 Secured Notes will, at their option, have the right to require Orexigen to repurchase for cash all or a portion of its 2016 Secured Notes at a repurchase price equal to 100% of the

Appendix A006

aggregate principal amount of the 2016 Secured Notes. In particular, under the 2016 Indenture a fundamental change is deemed to occur if consolidated net product sales (a non-GAAP measure defined in the 2016 Indenture as Orexigen's net sales plus aggregate net sales by Orexigen's distributors outside the United States) are less than $100 million for fiscal year 2017 (the "Net Sales Milestone"). As discussed below, Orexigen anticipates narrowly missing this Net Sales Milestone, further precipitating the need for Orexigen to file this Chapter 11 Case.

17.     Pursuant to sections 6.01 and 6.02 of the 2016 Indenture, an event of default occurred upon the Debtor's voluntary filing of this Chapter 11 Case and 100% of the principal of, and accrued and unpaid interest, if any, on all 2016 Secured Notes automatically became immediately due and payable. As of the Petition Date, the 2016 Secured Notes had an outstanding principal balance remaining of $165 million.

**The 2013 Notes**

18.     In December 2013, Orexigen issued $115 million in aggregate principal amount of 2.75% Convertible Senior Notes due 2020 (the "2013 Notes") in an offering to qualified institutional buyers conducted in accordance with Rule 144A under the Securities Act of 1933, as amended.

19.     Prior to the Petition Date, the 2013 Notes were scheduled to mature on December 1, 2020, unless earlier repurchased or converted in accordance with the terms of that certain Indenture, dated as of December 6, 2013, by and between Orexigen, as Issuer, and Wilmington Trust National Association, as Trustee (the "2013 Indenture"). The 2013 Notes are the Debtor's senior, unsecured obligations and rank senior in right of payment to any of the Debtor's indebtedness that is expressly subordinated in right of payment to the 2013 Notes; equal in right of payment to any of Debtor's unsecured indebtedness that is not so subordinated,

7

Appendix A007

including the 2017 Exchange Notes (defined below); and effectively junior in right of payment to any of the Debtor's secured indebtedness (including the 2016 Secured Notes) to the extent of the value of the assets securing such indebtedness; and are structurally junior to all indebtedness and other liabilities (including trade payables) of the Debtor's subsidiaries.

20.     In December 2016, Orexigen repurchased approximately $35 million in face value of outstanding 2013 Notes for approximately $10 million in open-market transactions. In February 2017, Orexigen exchanged approximately $49.6 million in aggregate principal amount of the 2013 Notes for an equal principal amount of 2017 Exchange Notes (as discussed below). In November 2017, Orexigen agreed to exchange approximately $5 million in principal amount of the 2013 Notes for 1.6 million shares of Orexigen common stock.

21.     Orexigen pays 2.75% interest per annum on the principal amount of the 2013 Notes semi-annually in arrears in cash on June 1 and December 1 of each year. Pursuant to sections 7.01 and 7.02 of the 2013 Indenture, an event of default occurred upon Orexigen's voluntary filing of the Chapter 11 Case and 100% of the principal of, and accrued and unpaid interest, if any, on all 2013 Notes automatically became immediately due and payable.  As of the Petition Date, the 2013 Notes had an outstanding principal balance of $25.343 million.

**The 2017 Exchange Notes**

22.     In February 2017, Orexigen entered into an indenture, dated as of February 23, 2017 (the "2017 Indenture"), with U.S. Bank National Association, as trustee, governing Orexigen's new 2.75% Convertible Exchange Senior Notes due 2020 (the "2017 Exchange Notes"). Approximately $49.6 million in aggregate principal amount of the 2013 Notes were exchanged for an equal principal amount of 2017 Exchange Notes. The 2017 Exchange Notes are the Debtor's senior, unsecured obligations and rank senior in right of

Appendix A008

payment to any of the Debtor's indebtedness that is expressly subordinated in right of payment to the 2017 Exchange Notes; are equal in right of payment to any of the Debtor's unsecured indebtedness that is not so subordinated, including the 2013 Notes; are effectively junior in right of payment to any of the Debtor's secured indebtedness (including the 2016 Secured Notes) to the extent of the value of the assets securing such indebtedness; and are structurally junior to all indebtedness and other liabilities (including trade payables) of the Debtor's subsidiaries.

23.     The 2017 Exchange Notes bear interest at a fixed rate of 2.75% per year, payable semi-annually in arrears on June 1 and December 1 of each year, beginning June 1, 2017. Interest on the 2017 Exchange Notes accrues from December 1, 2016.

24.     Prior to the Petition Date, approximately $9.2 million of principal value of the 2017 Exchange Notes had been voluntarily converted into approximately 800,000 shares of common stock and $1.4 million in cash. In addition, in November 2017, Orexigen agreed to exchange approximately $1.5 million of principal value of 2017 Exchange Notes for approximately 500,000 shares of Orexigen common stock.

25.     Pursuant to sections 7.01 and 7.02 of the 2017 Indenture, an event of default occurred upon the Debtor's voluntary filing of the Chapter 11 Case and 100% of the principal of, and accrued and unpaid interest, if any, on the 2017 Exchange Notes automatically became immediately due and payable.  As of the Petition Date, the 2017 Exchange Notes had an outstanding principal balance of $38.942 million.

**Other Unsecured Debt**

26.     In addition to the 2013 Notes and the 2017 Exchange Notes, the Debtor had unsecured obligations, as of the Petition Date, in the amount of approximately $38,000,000 consisting of accounts payable to various trade creditors.

Appendix A009

**Orexigen Common and Preferred Stock**

27.     Since its inception, Orexigen has raised capital investment through numerous equity offerings totaling approximately $798,693,376.

28.     On April 26, 2007, Orexigen completed its initial public offering ("IPO") and sold 7,000,000 shares of common stock at a price of $12 per share to the public. The aggregate net proceeds received by Orexigen from the IPO, net of underwriting discounts and commissions and offering expenses, was $84 million.  Orexigen remains a publicly traded company with its shares listed on The NASDAQ Global Select Market.

29.     In connection with the 2016 Secured Notes, Orexigen issued 219,994 shares of Series Z Preferred Stock. The Series Z Preferred Stock is not convertible and does not pay or accrete dividends. The Series Z Preferred Stock is entitled to a liquidation preference upon a fundamental change.

30.     As of December 31, 2017, there were 18,887,033 shares of Orexigen common stock issued and outstanding and 219,994 shares of Series Z Preferred Stock issued and outstanding. On March 9, 2018, the closing price of Orexigen common stock was $1.40 per share.

**Assets and Intercompany Receivables**

31.     The Debtor has total assets of approximately $271.1 million consisting of cash, inventory, receivables, intellectual property and general intangibles.

32.     The Debtor has various intercompany agreements with Orexigen Ireland, including a license agreement and a Platform Contribution Transaction Agreement ("PCTA"). Per the PCTA, Orexigen Ireland is obligated to make annual payments of $14,561,320 each year

Appendix A010

to Orexigen on August 31st from 2015 to 2019. As of December 31, 2017, Orexigen Ireland was obligated to the Debtor under the PCTA in an approximate amount of $29 million.

33. The Debtor also has provided various loans to Orexigen Ireland since 2015. As of December 31, 2017, the outstanding debt balance due from Orexigen Ireland to Orexigen is $58.5 million (the "Intercompany Loans"). The Intercompany Loans are due and payable at five years from the various loan dates with interest rates ranging from 1.22% to 1.95%. Interest only payments are due on December 31st of each year.

34. Additionally, in an effort to pool their resources to further develop and commercialize the drug product in countries outside of the U.S., Orexigen and Orexigen Ireland share certain development and clinical costs. Orexigen performs certain services for Orexigen Ireland including, but not limited to, general, administrative, marketing, accounting, regulatory approval support, and supply chain, manufacturing and quality support. The services performed by Orexigen are billed to Orexigen Ireland for reimbursement. As of December 31, 2017, Orexigen Ireland owed the Debtor approximately $5.5 million on account of these services.

35. In total, the outstanding intercompany balance as of December 31, 2017 is $93 million in favor of the Debtor.

**D.  U.S. Drug Commercialization**

36. Contrave® was launched in the United States in October 2014 by Orexigen's collaboration partner, Takeda. In September 2010, Orexigen had entered into a collaboration agreement with Takeda to develop and commercialize Contrave® in the United States (as well as Canada and Mexico). Effective September 2013, the Debtor and Takeda entered into an amendment to the collaboration agreement pursuant to which Takeda assumed the responsibility to package the drug for commercial sale in the United States, Canada and

Appendix A011

Mexico. Under the terms of the original collaboration agreement, Orexigen received a nonrefundable upfront cash payment of $50 million and additional payments totaling $100 million that were earned between the execution of the collaboration agreement and the first commercial sale of the drug in the United States.

37. In July 2015, Orexigen entered into a restated collaboration agreement (the "Restated Collaboration Agreement"), which amended and restated the original collaboration agreement that the parties first entered into in September 2010. In addition to the Restated Collaboration Agreement, the parties also simultaneously agreed to a mutual release to, among other things, any claims or potential claims among the parties. However, due to a change in its overall business focus and objectives, in late 2015, Takeda began to adjust its priorities away from the commercialization and marketing of Contrave®.

38. In March 2016, Orexigen entered into a separation agreement with Takeda that terminated the Restated Collaboration Agreement and related agreements (the "Separation Agreement"). The termination of the Restated Collaboration Agreement was effective on August 1, 2016 in connection with which certain rights and assets were transferred from Takeda to Orexigen. In connection with the Separation Agreement, Orexigen made a $60 million payment for the acquisition of the drug product and related business and paid an additional $15 million in January 2017. After the termination of the Restated Collaboration Agreement, Orexigen assumed full responsibility for the commercialization of Contrave® in the United States

39. During the transition period from Takeda to Orexigen from March to August 1, 2106, Orexigen devoted resources to build a U.S. commercial infrastructure. On August 1, 2016, Orexigen relaunched the drug with an effective and efficient U.S. commercial

Appendix A012

organization, including 160 contract sales representatives, focused on the highly concentrated 20,000 health care practitioners who write the majority of prescriptions for branded and generic anti-obesity medicines.

40.  Following the successful relaunch of its commercial organization, Orexigen launched a direct-to-consumer program with broadcast and digital marketing to patients in December 2016.  In addition, Orexigen launched partnerships with two telemedicine partners, offering an innovative solution for patients to consult with a physician and, if appropriate, receive a prescription on-line.   As a result of these commercial initiatives, Orexigen sales in the U.S. grew approximately 60% in 2017, as compared to 2016.

41.  In December 2017, Orexigen launched its commercial campaign for the weight-loss season,[2] with a greater focus on more cost-efficient and targeted direct-to-consumer networks such as digital and social media.  Through the first two months of 2018, prescriptions for Contrave® have increased by approximately 21% over the same period in 2017.

42.  As described in greater detail in the Customer Program Motion, today the Debtor's commercialization and distribution of Contrave® is currently effected through a complex distribution and customer program network that is absolutely essential to driving increased prescription volumes and revenue, which includes: (a) a complex distribution network that utilizes a third party logistics provider to manage finished goods inventory and perform distribution and order-to-cash services and wholesaler arrangements to facilitate the distribution of inventory through numerous channels, including retail pharmacies; (b) the payment of rebates to managed care organizations ("MCO") and pharmacy benefit managers ("PBM") to gain access to a significant base of employees covered by the employer's insurance programs, which requires

---

[2] In the weight loss industry, a significant amount of annual net sales typically derive from sales between January and June of each year.

Appendix A013

systems and controls for data processing and administration; (c) the provision of contracted and/or calculated discounted rates on the product for distributors, Governmental Entities (defined below) and 340B Covered Entities (defined below); (d) the pricing calculations, data processing and payment of Medicaid rebates; and (e) a return policy for expired or damaged product.

**E.     Drug Commercialization Outside the U.S.**

43.     Orexigen has numerous distribution agreements for its drug product in various countries and regions all over the world, including South Korea, Central and Eastern Europe, Western Europe, Australia and New Zealand, South Africa, Canada, the Middle East and Latin America.  Approximately 94% of the potential global obesity market is subject to a distribution agreement, with the drug already commercially available in 23 countries in Europe, the Middle East and South Korea.  Net revenue from sales to partners outside of the U.S. totaled approximately $13 million in 2017.

44.     Specifically, Orexigen Ireland has entered into distribution agreements, local regulatory approval has been obtained and the product has been launched in (a) South Korea with Kwang Dong Pharmaceutical Company, Ltd.; (b) 19 countries in Central and Eastern Europe with Valeant Pharmaceuticals Ireland; (c) Spain with Laboratorios Farmacéuticos Rovi, S.p.A; (d) in Italy with Bruno Farmaceutici S.p.A; (e) the UK and Ireland with Consilient Health Ltd; (f) Germany, France and Austria with Cheplapharm Arzneimittel GmbH, (launched in Germany); and (g) the Nordic countries, with Navamedic ASA.

45.     In addition, Orexigen has entered into distribution agreements with partners in other regions and is working with these partners to obtain the necessary regulatory approvals to permit drug commercialization and subsequent product launches: (a) in the Middle East (covering the countries of Saudi Arabia, the United Arab Emirates, Kuwait, Oman, Qatar,

14

Appendix A014

Bahrain, Lebanon, Jordan, Iraq, Iran and Egypt), Orexigen has entered into a distribution agreement with Biologix FZCO; (b) in Australia, New Zealand and South Africa, Orexigen has a distribution agreement with iNova Pharmaceuticals ("iNova"); (c) in Canada, Orexigen entered into a distribution agreement with Valeant Pharmaceuticals Ireland; and (d) in Latin America, Orexigen has entered into a distribution agreement with Merck KGaA, Darmstadt, Germany (covering the countries of Brazil, Mexico, Argentina, Chile, Bolivia, Paraguay, Uruguay, Colombia, Ecuador, Peru, Venezuela, Honduras, Guatemala, Dominican Republic, Nicaragua, Panama, Costa Rica, Belize and El Salvador).

46.     In parallel, Orexigen is continuing partnership discussions for its drug product in other markets in the EU and other territories outside the United States, but its ability to generate revenue for the foreseeable future will depend primarily on its commercial success in the United States.

## F.     Events Leading to the Chapter 11 Case

47.     In 2010, after completion of the extremely thorough and costly clinical development program, an Advisory Committee to the FDA recommended the marketing approval of Contrave®. However, the FDA added a new but ambiguous requirement to produce new safety data from a large clinical trial prior to approval. After reducing Orexigen's staff to 16 people to pursue a formal dispute resolution process with FDA, Orexigen gained clarity from the FDA a year later on the specific safety hurdle and study parameters required for approval. Following that clarity, Orexigen raised an additional $90 million in equity capital and $115 million in convertible debt from the 2013 Notes to help fund the safety assessment and continue the regulatory process. After meeting the required safety assessment, Orexigen ultimately gained regulatory approval for Contrave® from the FDA in 2014. The US commercialization launch by

Appendix A015

Orexigen's partner, Takeda, began later that year. Orexigen also gained regulatory approval for Contrave® from the European Medicines Agency (EMA) in early 2015.

48.     In late 2015 and early 2016, due in large part to a shift in the overall strategic business focus of Takeda, Orexigen recognized an opportunity to potentially acquire Contrave® and implement a different and innovative set of commercialization strategies to drive continued growth of prescription volumes (and ultimately net sales). Although Orexigen executed the acquisition agreement in March 2016, through the nearly 5-month transitional period from Takeda to Orexigen, which was completed in August 2016, sales declined precipitously. Weekly prescription volume in August 2016 was approximately 19% lower than when Orexigen's acquisition of Contrave® was announced in March 2016.

49.     Orexigen's innovative commercialization plan required significant capital investment to return the product to a growing prescription volume trajectory and deliver the greatest long-term value to its investors.  As a result of these significant investments made with the objective of driving growth, Orexigen incurred significant losses and required additional capital to provide a bridge to profitability, which was projected to occur in 2019. Recognizing the need to address its debt and to raise additional capital, management took steps throughout 2017 to attempt to strengthen Orexigen's balance sheet and pursue a variety of sources to meet its capital needs.

50.     In February 2017, Orexigen executed a transaction that exchanged approximately $50 million of the 2013 Notes to the 2017 Exchange Notes. The 2017 Exchange Notes included a significantly lower conversion price as well as a mandatory conversion feature, which were designed with the intent of achieving conversions of the 2017 Exchange Notes based on an assumed continuation of stock price growth that was observed at the start of 2017.

Appendix A016

Although approximately $9.2 million of those notes were converted and retired, further debt reduction through conversions was hindered by the ensuing stock price weakness.

51. In March 2017, Orexigen established a $20 million controlled equity offering, which ultimately yielded only approximately $2.4 million of net proceeds as a result of the low trading volume and stock price weakness. Orexigen also pursued a non-dilutive Asset Based Loan ("ABL"), signing a term sheet with a lender for a $25 million facility. However, because closing the ABL required majority consent from the Prepetition Secured Noteholders and because it was a potential hindrance to a necessary restructuring involving a waiver of the Net Sales Milestone, the ABL was never completed. In November 2017, in an effort to further reduce its level of debt, Orexigen exchanged $6.5 million of unsecured notes for approximately 2.1 million shares of common stock.

52. In large part due to Orexigen's innovative commercialization plan, Orexigen recorded total net sales of $87.9 million in 2017. Although net sales in 2017 by Orexigen's distributors outside of the United States are not yet available, Orexigen estimates that such partner-reported net sales were approximately $10.1 million, bringing the total consolidated net sales in 2017 to approximately $98 million—a significant increase from 2016 but falling short of projected net sales, and insufficient to satisfy the Net Sales Milestone in the 2016 Indenture. At the end of 2017, Orexigen had approximately $46 million in cash, cash equivalents, and marketable securities on its balance sheet and was facing a near-term liquidity crisis.

## G. The Prepetition Restructuring Efforts

53. In parallel with its efforts detailed above, Orexigen also began exploring potential strategic alternatives for maximizing the value of its business and began discussing

17

Appendix A017

those strategic alternatives with Baupost, its largest Secured Noteholder. The goal was to leverage the operating expenses necessary to support Orexigen's commercialization efforts through the purchase of additional complementary assets or, in the alternative, partner Contrave® with assets through the sale of Orexigen or its assets to a strategic partner.

54.     In April of 2017, Orexigen retained Torreya Partners ("Torreya") as its investment banker to assist it with a potential transaction. Following public announcement of the engagement, Orexigen and Torreya met with numerous potential parties between August and November 2017. A virtual data room was made available containing extensive information about Orexigen, including documents describing Orexigen's business and financial results in considerable detail, and potential purchasers had the opportunity to conduct due diligence via the virtual data room, as well as through meetings with Orexigen management.

55.     During this marketing process, however, it became apparent that there were various uncertainties that were inhibiting successful completion of the process. One of these uncertainties related to the status of a patent infringement litigation involving Orexigen. In June 2017, a trial was held in U.S. District Court of Delaware regarding a challenge by a generic manufacturer against Orexigen and certain patents relating to Contrave®. With a decision expected in a few months, many potential partners delayed significant diligence until a judgement was issued. On October 13, 2017, Orexigen received a favorable decision, which confirmed exclusivity for Contrave® in the United States until 2030.

56.     Also during this time, Orexigen was in discussions with the FDA regarding the study design for a cardiovascular outcomes trial, a post-market requirement that was part of the original approval for Contrave® in the U.S. Such studies are typically extremely large and costly, with traditional trial designs requiring $250 to $400 million to complete. In

Appendix A018

early 2017, Orexigen submitted to the FDA a protocol synopsis for an innovative study design involving a Bayesian statistical analysis approach, which essentially uses previously obtained data in combination with a significantly smaller and more efficient new study to complete the post marketing requirement. Such a design would be novel and potentially precedent-setting for this type of cardiovascular outcomes study and therefore the FDA required considerable time and further consultation with Orexigen prior to issuing an opinion. In February 2018, the FDA notified Orexigen of its approval of Orexigen's proposed study synopsis. With an estimated budget of $88 million to $108 million, the new study design represented significant cost savings of more than $100 million to Orexigen's operating model.

57.     The pending patent lawsuit and the pending FDA review likely served as deterrents to potential interested partners or purchasers and, as a result, Orexigen did not receive any feasible bids that could satisfy its current debt structure. Throughout this marketing process, Orexigen met with its Prepetition Secured Noteholders to update them on the progress of its marketing efforts.

58.     Although Orexigen remained positive about its longer-term prospects and its ability to ultimately maximize value, it continued to be concerned with its highly levered capital structure and inability to generate positive free cash flow in the near term. In addition, it became increasingly apparent that Orexigen may be unable to satisfy the Net Sales Milestone in the 2016 Indenture. In November 2017, Orexigen retained Perella Weinberg Partners ("PWP") to provide general financial advisory services and expand Orexigen's efforts to evaluate potential strategic alternatives, including assisting Orexigen in any potential restructuring, sale transaction or financing transaction. One of Orexigen's goals in hiring PWP was to gain assistance with addressing the 2016 Secured Notes, possibly through a refinancing, an extension of the maturity

Appendix A019

or a conversion of the 2016 Secured Notes to new debt or equity.  Orexigen and PWP continued to frequently communicate with the Prepetition Secured Noteholders regarding a potential restructuring or financing transaction.  Given that the Prepetition Secured Noteholders constitute Orexigen's only outstanding secured debt, Orexigen believed (and continues to believe) that the Prepetition Secured Noteholders' input and cooperation is invaluable to its restructuring efforts and this Chapter 11 Case.

59.    As discussed above,  Orexigen and its advisors actively pursued numerous strategic options including raising new capital investment, obtaining an ABL, or entering into a consensual restructuring with its Prepetition Secured Noteholders, including a waiver in the Net Sales Milestone in the 2016 Indenture.  Although Orexigen gained the support of a majority of its Prepetition Secured Noteholders, including Baupost, Orexigen was unable to obtain the unanimous consent of the Prepetition Secured Noteholders required to waive the Net Sales Milestone or otherwise engage in a meaningful out of court restructuring.

60.    While continuing to evaluate strategic alternatives with the assistance of its financial advisors, in December 2017, Orexigen engaged restructuring professionals at Ernst & Young LLP ("EY") to assist it in refining its business plan and examining the possibility of further cost reductions throughout late 2017 and early 2018, including through reductions in force both at Orexigen and its independent sales consultants. Orexigen remained hopeful that it could achieve a strategic transaction that would provide value for all stakeholders, including holders of its equity.  Additionally, Orexigen implemented a reduction in force of 10 regional sales managers and 110 independent sales contractors, effective February 2, 2018.

61.    Orexigen ultimately concluded that given that (a) it was highly levered, (b) it was unlikely to satisfy the $100 million Net Sales Milestone in the 2016 Indenture, (c) it faced

Appendix A020

significant challenges in achieving positive free cash flows in the near term, and (d) it was unable to obtain unanimous Secured Noteholder consent for a consensual restructuring of its debt, the business likely would not be viable on a stand-alone basis absent a strategic transaction or a restructuring of its debt. To that end, Orexigen formalized discussions with Baupost and certain other Prepetition Secured Noteholders (together constituting approximately 93% of the 2016 Secured Notes) pursuant to non-disclosure agreements ("NDA"), regarding, among other things, a restructuring of the debt or a potential auction sale process. Orexigen, subject to these NDAs, further informed Baupost and other Prepetition Secured Noteholders of the details of Orexigen's business circumstances and the strategic alternatives available based on its efforts over the prior six months. In January 2017, Orexigen, Baupost and certain other Prepetition Secured Noteholders mutually agreed that, among the strategic alternatives to be considered, Orexigen could pursue an auction sale process that could be implemented through the filing of a chapter 11 case.

62. Orexigen believed that on account of the significant investments it had made and intellectual "know-how" it had acquired in commercialization, patent protection, equipment, and development process, there might be significant value to a purchaser, particularly one with synergies to Orexigen's business. Therefore, Orexigen conducted a second marketing process, in parallel with discussions with PWP, EY and the Prepetition Secured Noteholders, as an additional option to maximize value. To that end, PWP developed a list of potentially interested parties and solicited such parties' interest in a sale transaction. PWP contacted 86 potential buyers, including financial buyers, privately-held specialty pharmaceutical companies, and a number of publicly-traded pharmaceutical companies. Approximately 23 of the parties contacted by PWP entered into NDAs with Orexigen to further explore the potential purchase of

Appendix A021

Orexigen's business. Among other things, the buyers were granted access to the virtual data room already established by Orexigen as part of the previous sale process. Orexigen established February 7, 2018 as the deadline for submitting non-binding preliminary proposals. The marketing process did not yield a credible preliminary proposal from a party willing to serve as stalking horse purchaser in an in-court auction sale process. Several parties, however, expressed interest in bidding at any potential 363 auction sale.

## II.  THE DIP FACILITY

63.    As part of the first day relief, the Debtor filed the *Motion For Entry of Interim and Final Orders, (I) Approving Debtor-in-Possession Financing Pursuant To 11 U.S.C. §§ 105(a), 362, and 364, Fed. R. Bankr. P. 2002, 4001 and 9014, and Local Bankruptcy Rule 4001-2 (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363 of the Bankruptcy Code (III) Granting Adequate Protection and Super-Priority Administrative Claims; (IV) Scheduling A Final Hearing; and (V) Granting Related Relief* (the "DIP Motion"). The DIP Motion seeks authority for the Debtor, on the terms set forth in that certain Debtor in Possession Credit and Security Agreement dated March 12, 2018 (the "DIP Loan Agreement") to obtain postpetition financing in an aggregate principal amount of up to $70,350,000, consisting of (i) up to $35,000,000 of New Money Loans,[3] (ii) $35,000,000 of Roll-Up Loans and (iii) a $350,000 Upfront Fee (collectively, the "DIP Facility"), from certain lenders party to the DIP Loan Agreement (the "DIP Lenders"), of which, upon entry of and pursuant to the Interim DIP Order (1) up to $7,500,000 of New Money Loans may be borrowed by the Debtor; (2) up to $7,500,000 of Roll-Up Loans may be incurred, which the Roll-Up Lenders will be deemed to have made to the Debtor at the same time and in the same amount as each New Money Loan is

---

[3] Capitalized terms not otherwise defined in this section have the meaning ascribed to them in the DIP Loan Agreement.

Appendix A022

borrowed during the interim period; and (3) the Debtor will incur the Upfront Fee to the DIP Lenders (which will be deemed capitalized and added to the principal of the DIP Loans). Automatically upon entry of the Final DIP Order, the balance of the $35,000,000 Roll-Up Facility will be deemed borrowed.

64.     The terms of the DIP Facility also require the Debtor to complete a sale of its assets in accordance with certain milestones.  To maximize the value of its estate, and in compliance with the milestones under the proposed DIP Facility, the Debtor will file a motion seeking authority to conduct an auction process (the "Sale Motion") by which the Debtor will solicit offers and ultimately seek approval to sell substantially all of its assets to the bidder with the highest or otherwise best offer.  The Debtor also reserves the right to appoint a stalking horse purchaser of its assets and to modify its auction and sale procedures accordingly.  The Debtor also will seek authority to retain PWP to serve as its investment banker to assist with conducting the marketing and sale of its assets.  In order to maximize the likelihood of success of the sales process, the parties have also agreed to include in the Carve-Out from the collateral of the DIP Administrative Agent (defined below) for the benefit of the DIP Lenders, the Debtor's Key Employee Incentive Plan ("KEIP") and Key Employee Retention Plan ("KERP") as well as the fees and expenses of the Debtor's professionals.[4]

65.     I believe the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on the extensive negotiations that took place, I believe that these are the only terms on which the DIP Lenders will provide the financing.  As the DIP Facility proceeds are necessary and the best financing available at this time, I believe that sufficient justification exists for agreeing to these provisions.  Moreover, it is my

---

[4] The Debtor intends to file a motion seeking Court approval of the KEIP and KERP in conjunction with the Sale Motion and proposed bidding procedures within 3 business days following the Petition Date.

Appendix A023

understanding that the DIP Lenders would not have been amenable to providing financing without the heavily bargained-for protections contained in the DIP Loan Agreement.

## A.  Marketing The DIP Facility

66.  Prior to the Petition Date, the Debtor, with the assistance of PWP and its other professionals, worked diligently to identify sources of working capital financing to determine if they could obtain postpetition financing on the most favorable terms or conditions available.  PWP reached out to more than 30 parties for postpetition financing proposals, with three parties ultimately submitting indicative proposals. All three indicative proposals sought to prime the Prepetition Secured Noteholders, who refused to consent to priming liens.

67.  Subsequently, certain holders of the Prepetition Secured Notes agreed to provide DIP financing on more attractive terms to the Debtor than the other indicative proposals. Certain of these holders made it clear, however, that they would not provide the required financing or consent to adequate protection provisions regarding their prepetition liens without (i) a roll up of a portion of the outstanding principal balance of the Prepetition Secured Notes, and (ii) milestones related to the Debtor's sale of its assets under section 363 of the Bankruptcy Code. After lengthy, arms'-length negotiations and trading numerous drafts of proposed term sheets, the parties settled on the arrangement described above and other terms described in the DIP Motion.

68.  One critical element of the negotiations was the inclusion of the payment of the Debtor's contemplated KEIP and KERP (both of which have been approved by the Debtor's Board of Directors) into the Carve-Out from the secured liens and obligations under the DIP Facility, which are necessary both to ensure that management is properly incentivized to support and drive an auction process that will yield the highest and best offer for the benefit of

Appendix A024

the Debtor's estate and to retain non-management employees to continue work on the Debtor's business plan and preserve its value as a going concern. The parties ultimately agreed that the way to ensure the payment of the KEIP and KERP was to include the program in the Carve-Out under the DIP Loan Agreement. Although the parties understand such a structure is atypical, it is necessary here because the Debtor faces a unique set of circumstances that justifies their inclusion into the Carve-Out. The Debtor, as a small biopharmaceutical company, depends on the successful commercialization of its product to become profitable. Following the reacquisition of its product from its former partner, the Debtor relaunched its product in August 2016. To fund the build of its commercial infrastructure and relaunch its product, the Debtor needed secured debt to be added to its capital structure, which is now dominated by secured debt. Moreover, given the Debtor's expected cash flows, a traditional debt-for-equity plan of reorganization seems unfeasible. Therefore, a section 363 sale is the primary, if not exclusive, vehicle available to the Debtor to maximize the value of its assets for its creditors and to continue the Debtor's business and preserve jobs. The Debtor has already run two sales processes prepetition but was unable to secure a stalking horse bid before running very tight on liquidity, and therefore the DIP Facility is necessary to bridge the Debtor to the completion of a sale. Finally, in light of the recent resignation of the Debtor's Chief Financial Officer immediately before the filing of the Chapter 11 Case, there is a credible concern that without iron-clad assurances that the KEIP and KERP (if approved) will be part of the Carve-Out, other senior executives and employees will do the same. Based on these peculiar facts, the DIP Lenders agreed to include the KEIP and KERP in the Carve-Out.

69.     Following extensive negotiations regarding these issues, and given the Debtor's working capital needs and the means by which the Debtor will seek to maximize the

Appendix A025

25

value of its assets, the DIP Lenders ultimately agreed to provide the DIP Financing on more attractive terms to the Debtor than the other indicative proposals. The Lenders have offered to provide the DIP Facility to address the Debtor's anticipated working capital needs during the pendency of this Chapter 11 Case. The DIP Lenders are Required Holders because they hold in the aggregate the requisite amount of Prepetition Secured Notes, and as such consent to the priming of the liens securing the Prepetition Secured Notes.

70.    In their capacity as Prepetition Secured Noteholders, the DIP Lenders already have a vested interest in seeing the value of the Debtor's business preserved and maximized.  One or more of the DIP Lenders made inquiries with other Prepetition Secured Noteholders regarding participation in the DIP Facility, but not all Prepetition Secured Noteholders were willing to commit the significant amounts of additional capital contemplated under the DIP Facility.

71.    The Debtor requires access to liquidity from the DIP Facility and use of cash collateral in order to facilitate a smooth transition into chapter 11, to avoid serious impairment of its business operations, to operate the Debtor's cash-intensive business in the ordinary course, and to implement an auction process to maximize the value of the Debtor's assets.  A contested priming or adequate protection fight could have proved devastating to the Debtor's business and to the contemplated auction process, subjecting the Debtor to a significant risk of being unfinanced or underfinanced for an extended period of time, especially in light of the Debtor's low liquidity position as of the Petition Date.

72.    As discussed above, the Debtor and its advisors considered a variety of potential transactions, including refinance and sale options.  Based on all of the factors described herein, the Debtor deemed that it was in the best interests of its business to commence the Chapter

Appendix A026

11 Case and effectuate a sale to maximize the value of its assets.  The Debtor also has determined that the DIP Facility presents the only viable mechanism for providing the liquidity that the Debtor requires to continue its operations during the Chapter 11 Case.  In addition, the Debtor has determined that a prompt and open sale of its assets in which all interested buyers are encouraged to participate is the best way to maximize value for its estate under the circumstances.

**B.      The Terms of the DIP Facility are Fair and Reasonable**

73.      The proceeds of the DIP Facility are sized to support the Debtor through the anticipated pendency of the Chapter 11 Case and preserve and promote the health and viability of the business.  Moreover, I believe that the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on the negotiations that took place, I believe that these are the only terms on which the DIP Lenders will provide the financing. In addition, I am generally aware that terms similar to those included in the DIP Loan Agreement have been approved in other recent and/or ongoing cases.

74.      It is my further understanding that any alternative financing arrangement, including arrangements provided by other potential DIP lenders, likely would have led to a lengthy and almost certain value-destroying priming fight. Moreover, I understand that the DIP Lenders would not have been amenable to providing financing without the bargained-for provisions.  In the course of negotiations with the DIP Lenders, the Debtor explored whether the DIP Lenders would provide the DIP Facility with lower or no associated fees and free from procedural milestones.  The DIP Lenders made clear that they would not be willing to provide the DIP Facility on more favorable terms.

75.      Accordingly, the Debtor and its advisors—recognizing the absence of better competing proposals and the benefits to be provided under the DIP Facility—determined

Appendix A027

in their sound business judgment that the terms of the DIP Loan Agreement were and remain superior to any other set of terms reasonably available to the Debtor at this time. I therefore believe that the DIP Facility provides the Debtor with the best, most feasible and most value-maximizing financing option available at this time.

### C.     The Terms of the Debtor's Cash Collateral Use are Fair and Reasonable

76.     In addition to the DIP Facility, the Debtor requires the continued use of cash collateral (as defined in section 363(a) of the Bankruptcy Code, the "<u>Cash Collateral</u>").  The Prepetition Collateral Agent has consented to the Debtor's continued use of Cash Collateral and the Adequate Protection Package (as defined below), subject to the terms of the form of order approving the DIP Facility on an interim basis (the "<u>Interim DIP Order</u>").

77.     I believe that continued access to Cash Collateral will (i) ensure that the Debtor has access to sufficient working capital to, among other things, pay its employees, vendors, and suppliers, (ii) enable the Debtor to continue honoring its prepetition obligations under and in accordance with the "first-day" orders entered by the Court, and (iii) satisfy administrative expenses incurred in connection with the commencement of the Chapter 11 Case.

### D.     The Adequate Protection Package is Justified under the Circumstances

78.     The Debtor and the Prepetition Collateral Agent have agreed that the Debtor will provide the following primary forms of adequate protection: (the "<u>Adequate Protection Package</u>"):

- The Prepetition Collateral Agent, for the benefit of the Prepetition Secured Noteholders, shall be granted, effective and perfected as of the Interim DIP Order Entry Date and without the necessity of the execution of mortgages, deeds of trust, security agreements, pledge agreements, control agreements, financing statements or other agreements, a valid and perfected security interest in and lien on all assets of the Debtor and in the same relative priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the respective Prepetition Secured Parties' Prepetition Liens in the Pledged Collateral, which

Appendix A028

liens and security interests are junior and subordinate only to (i) the Carve-Out, (ii) the DIP Liens, (iii) the DIP Obligations, (iv) the Super-priority Claims of the DIP Administrative Agent, and (v) the Permitted Exceptions.

- Pursuant to and upon the entry of the Final DIP Order, the Prepetition Collateral Agent, on behalf of the Holders, shall be granted, subject to the Carve-Out, an allowed Super-priority Claim junior only to the Super-priority Claim of the DIP Administrative Agent and any Permitted Exceptions; provided that the Trustee and the Prepetition Collateral Agent and Holders shall not receive or retain any payments, property or other amounts in respect of such Super-priority Claim unless and until the DIP Obligations have indefeasibly been paid in cash in full.

- The Debtor shall make current cash payments payable under the Prepetition Note Documents to the Trustee or the Prepetition Collateral Agent for all professional fees and expenses incurred by the Trustee or Prepetition Collateral Agent in connection with enforcement of the Prepetition Note Documents and the Chapter 11 Case, subject to the delivery of a Fee Notice, as defined in, and in the manner set forth in the Interim DIP Order.

- The Debtor shall (a) provide the Trustee and its advisors with unaudited quarterly financial statements within sixty (60) calendar days after the conclusion of each quarter, and (b) shall provide the Trustee with any other reporting as reasonably required by the Required DIP Lenders.

79. The Adequate Protection Package will adequately protect the Prepetition Secured Noteholders' interests in the Prepetition Collateral from diminution in value caused by the Debtor's use of the Cash Collateral, as well as for any decline in, or diminution of, the value of the Prepetition Secured Noteholders' liens or security interests under any of the Secured Note Documents.

**E.     The DIP Facility Was Negotiated in Good Faith**

80. The Debtor and its advisors have determined that the DIP Lenders offered the most viable option for obtaining the postpetition financing the Debtor requires. I believe that the DIP Loan Agreement is the result of the Debtor's reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to timely obtain needed postpetition

Appendix A029

financing, and reflective of arms'-length, good faith negotiations between the Debtor, the DIP Administrative Agent, and DIP Lenders.

**F.     The Debtor Requires Immediate Access to the DIP Facility and Cash Collateral**

81.     The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested in the DIP Motion is not granted, including authorizing the Debtor's use of Cash Collateral and borrowings (or deemed borrowings) of up to $15.35 million under the DIP Loan Agreement.  I further believe that the commencement of the Chapter 11 Case will materially increase demands on the Debtor's free cash as a result of, among other things, the costs of administering the Chapter 11 Case and addressing key customers' concerns regarding the Debtor's financial health and ability to continue operations.

82.     The Debtor has an immediate need for access to liquidity to, among other things, continue the operation of its business in an orderly manner, maintain business relationships with customers and vendors, pay employees and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtor's going-concern value and, ultimately, effectuate a successful restructuring.  Based on these circumstances, the Debtor requires the interim funding provided by the DIP Facility to avoid immediate and irreparable harm to its operations, business and estate.

### III.     FIRST DAY PLEADINGS

83.     Concurrently with the commencement of the Chapter 11 Case, the Debtor has filed, and requests this Court's approval for, a number of proposed orders (the "First Day Orders"), which the Debtor believes are necessary to enable it to operate with a minimum level of disruption and loss of productivity.  The Debtor requests that each of the First Day Orders be entered as critical elements in stabilizing and facilitating the Debtor's operations during the

Appendix A030

pendency of the Chapter 11 Case. A description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

**A.      Administrative and Procedural Matters**

84.      The Debtor has filed three "administrative" pleadings that seek to (1) to retain Kurtzman Carson Consultants ("KCC") as claims and noticing agent, (2) extend the time for the Debtor to file its schedules and statements, and (3) an equity and claims trading procedures motion. The Debtor's attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

<u>Application to Appoint KCC as Claims and Noticing Agent</u>

85.      It is my understanding that the Debtor is applying (the "Section 156(c) Application") for entry of an order appointing KCC as claims and noticing agent in this Chapter 11 Case. I understand that such appointment is required by the rules of this Court. Moreover, I believe that such relief is prudent in light of the thousands of creditors, potential creditors and parties in interest to whom certain notices will be sent.

86.      I believe that KCC's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Case and of other developments in this Chapter 11 Case. Moreover, I am informed that KCC has acted as the claims and noticing agent in numerous cases of comparable size, including several large bankruptcy cases pending in both this District and in other districts. Moreover, in compliance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of Delaware, the Debtor obtained and

Appendix A031

reviewed engagement proposals from three other Court-approved claims and noticing agents to ensure selection through a competitive process.

87.     As more fully detailed in the Section 156(c) Application, I understand that KCC will engage in certain Claims and Noticing Services, including, but not limited to, transmitting, receiving, docketing and maintaining proofs of claim filed in connection with this Chapter 11 Case. KCC will also work with the office of the Clerk of the United States Bankruptcy Court for the District of Delaware to ensure that its methodology conforms with all of the Court's procedures, the Local Bankruptcy Rules and the provisions of any order entered by this Court. Moreover, I am informed that the Section 156(c) Application pertains only to the work to be performed by KCC under the Clerk of the United States Bankruptcy Court for the District of Delaware delegation of duties permitted by 28 U.S.C. § 156(c) and Local Bankruptcy Rule 2002-1(f).[5]

88.     Accordingly, I believe that retention of KCC, an independent third party with significant experience in this role, to act as an agent of the Court, is in the best interests of the Debtor and its estates and creditors.

<u>Extension of Time to File Schedules and Statements</u>

89.     It is my understanding that the Debtor is requesting that the Court extend the time by which the Debtor must file its schedules of assets and liabilities and statements of financial affairs (the "<u>Schedules and Statements</u>") to thirty two (32) days after the current deadline. It is my understanding that the Local Bankruptcy Rules automatically extended the Debtor's deadline twenty-eight (28) days because the Debtor filed a creditor matrix containing

---

[5] The Debtor also intends to file an application to retain KCC to perform certain administrative services pursuant to Bankruptcy Code section 327.

Appendix A032

more than two hundred (200) creditors. Thus, the Debtor is requesting the Court to extend the deadline to file Schedules and Statements to May 11, 2018 (the "Filing Deadline").

90.    Given the substantial burdens already imposed on the Debtor's management by the commencement of this Chapter 11 Case, the limited number of employees available to collect the information, the competing demands upon such employees and the time and attention that the Debtor must devote to the Chapter 11 process, the Debtor may be unable to complete its Schedules and Statements by the current deadline imposed by the Bankruptcy Rules and the Local Bankruptcy Rules. I also believe that the relief requested is in the best interest of the Debtor, its estate, creditors and other parties in interest.

91.    Accordingly, I believe that "cause" exists to extend the current deadline imposed by Bankruptcy Rule 1007(c) for an additional thirty two (32) days, until the Filing Deadline. The requested extension will enhance the accuracy of the Debtor's Schedules and Statements and avoid the necessity of substantial subsequent amendments.

### Trading Procedures Motion

92.    The Debtor has generated, and is currently generating, a significant amount of Tax Attributes for U.S. federal income tax purposes. The Debtor has experienced losses from the operation of its business, having failed to post positive net earnings since its inception.  As a result, the Debtor estimates that its utilizable federal income tax net operating losses are approximately $350 million to $400 million ("NOLs"), consisting of approximately $200 million of NOLs through 2016 and $150 million to $200 million of NOLs generated during 2017, and it expects to have incurred additional NOLs since then through the Petition Date, which amounts could be even higher when the Debtor emerges from chapter 11.   The Debtor's Tax Attributes are a valuable asset because the Debtor generally can carry forward its Tax Attributes to reduce or eliminate its income tax liability, thereby potentially freeing up funds to

Appendix A033

meet working capital requirements and service debt. In particular, the Tax Attributes may be available to the Debtor to offset taxable income generated by ordinary course activity and other transactions completed during the course of the Chapter 11 Case. Additionally, the Debtor can carry forward the NOLs and credits to reduce its future tax liability, thereby potentially recovering cash for the benefit of its estate.

93.     It is my understanding that the Debtor's ability to use its Tax Attributes, however, could be severely limited under Section 382 of title 26 of the United States Code as a result of the trading and accumulation of its equity securities and claims against the Debtor prior to consummation of a chapter 11 plan. The Debtor thus seeks to establish procedures for continuously monitoring the trading of its equity securities and provide notice of the potential that it will seek certain sell-down procedures for claims so that the Debtor can preserve its ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of its NOLs under Section 382. Therefore, I submit that the relief requested in the Trading Procedures Motion is appropriate and in the best interests of the Debtor's estate, its creditors and other parties in interest.

## B.     Motion to Continue Cash Management System

94.     The Debtor seeks entry of an interim order, pending the entry of a final order or the interim order becoming a final order, authorizing, but not directing, the Debtor to continue to operate its existing cash management system in the day-to-day operation of its businesses, and to honor certain prepetition obligations in accordance with the operation of the cash management system. Specifically, the Debtor requests authority to: (a) continue to use, with the same account numbers, each of its existing bank accounts; (b) treat the bank accounts for all purposes as accounts of the Debtor as debtor in possession; and (c) conduct banking

Appendix A034

transactions by all usual means and debit the bank accounts on account of all usual items and payment instructions.

95.     Additionally, the Debtor seeks authority to: (a) use, in their present form, all business forms (including check stock, letterhead, purchase orders, and invoices) and other correspondence and documents related to its bank accounts, without reference to the Debtor's status as debtor in possession; and (b) continue intercompany transactions between and among the Debtor and is nondebtor affiliates in the ordinary course of business and in accordance with transfer pricing agreements and historical practices.  The Debtor further requests authority for its banks to: (i) continue to maintain, service, and administer its bank accounts; (ii) debit its bank accounts in the ordinary course of business on account of (a) all checks drawn on its bank accounts that are cashed at its banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (b) all checks or other items deposited in one of the bank accounts at the banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any bank as fees or service charges for the maintenance of any aspect of the applicable cash management system.

96.     Further, the Debtor requests that the Court grant interim and final waivers of the requirements of section 345(b) of the Bankruptcy Code.  The Debtor also requests that, upon entry of the interim order, the Court schedule a final hearing on the motion to consider the relief requested on a final basis.

<div align="center">The Cash Management System</div>

97.     The Debtor maintains an integrated cash management system (as described herein, the "Cash Management System"), comprising four accounts (the "Bank

<div align="right">Appendix A035</div>

Accounts") at two financial institutions.  Attached as <u>Exhibit C</u> to the Cash Management Motion is a table identifying the Bank Accounts, along with the financial institutions at which they are held (the "<u>Banks</u>"), and the last four digits of each Bank Account number.

98.    The Cash Management System is centrally managed for the Debtor out of the Debtor's U.S offices in San Diego, California, and all funds in the Bank Accounts are denominated and held in U.S. Dollars.  The Debtor uses the Cash Management System in the ordinary course of business to collect, transfer, and disburse funds generated from its operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtor's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, the Debtor regularly reconciles books and records to ensure that all transfers are accounted for properly.

<div align="center">The Bank Accounts</div>

99.    U.S. customer payments are made to an account receivable lockbox account at Silicon Valley Bank in the name of Orexigen Therapeutics, Inc. (the "<u>AR Account</u>").  The AR Account is swept daily into a general checking account at Silicon Valley Bank in the name of Orexigen Therapeutics, Inc. (the "<u>Checking Account</u>").  The Checking Account is also swept daily into a sweep account at Silicon Valley Bank in the name of Orexigen Therapeutics, Inc. (the "<u>Sweep Account</u>"), which holds excess cash and investments in U.S. Short-term Treasury and government securities.  Funds are transferred from the Sweep Account to the Checking Account as necessary for disbursements to fund payroll and operations.

100.    The Debtor also maintains a holding account at U.S. Bank (the "<u>Holding Account</u>") for excess cash and investments in short-term U.S. Government securities.  The Holding Account is managed by Wells Fargo.  The Debtor transfers funds, as necessary, from the

<div align="center">36</div>

<div align="right">Appendix A036</div>

Checking Account and also the Debtor's non-debtor affiliates transfer funds from foreign accounts to the Holding Account.

101.    A diagram illustrating the foregoing Cash Management System is attached as Exhibit D to the Cash Management Motion.

<div align="center">Bank and Investment Fees</div>

102.    The Debtor pays on average approximately $850 per month in bank and investment fees incurred in connection with the Bank Accounts (the "Bank Fees"). The Debtor pays the Bank Fees as they come due on a rolling basis over the course of each month, typically by direct debit. The Debtor estimates that there are no outstanding Bank Fees as of the Petition Date.

<div align="center">Business Forms</div>

103.    As part of the Cash Management System, the Debtor utilizes numerous preprinted business forms (the "Business Forms") in the ordinary course of its business. The Debtor also maintains books and records to document, among other things, receipts and expenses. To minimize expenses to its estate and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of this Chapter 11 Case, the Debtor requests that the Court authorize its continued use of all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date and thereafter, without reference to the Debtor's status as debtor in possession, rather than requiring the Debtor to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

<div align="right">Appendix A037</div>

## C.      Payment of Employee and Payroll Obligations and Certain Taxes

### Employee Salary and Expense Obligations

104.    The Debtor has approximately 111 employees in the U.S. (the "Employees") that conduct its normal business, including executive, management, financing and accounting, information technology, legal, and actuarial services.

**(i)      *Payroll***

105.    All Employees are paid twice monthly, on the 15th and last day of each month.  If either of these days falls on a weekend or holiday, employees are paid the day before the weekend or holiday.   All required tax deductions and voluntary deductions are withheld automatically from paychecks.    The Debtor's twice monthly Employee-related payroll obligations equal approximately $865,000. The Debtor pre-funded ADP (defined below) on March 9, 2018 with the amounts necessary to satisfy the Employee-related payroll obligations due on March 15, 2018 to ensure that payroll would be processed on time.  Although the Debtor does not anticipate owing any money on account of prepetition wages and salaries, out of an abundance of caution, the Debtor is seeking authority, but not direction, to pay prepetition Employee-related payroll obligations in an aggregate amount not to exceed $100,000 in the interim period.

**(ii)      *Payroll Servicers***

106.    Debtor utilizes ADP, LLC ("ADP") as payroll service provider for Employees.  ADP performs all services related to the Debtor's Employee payroll, including payroll deductions and tax withholdings.  Each payroll period, the Debtor pre-funds ADP with the amounts necessary to satisfy the Debtor's payroll obligations two (2) business days in advance of the pay date.  ADP then processes direct deposit transfers or checks.  The services that ADP provides are critical to the smooth functioning of the Debtor's payroll system.  ADP is

Appendix A038

responsible for ensuring that (i) Employees are paid on time, (ii) appropriate deductions are made, (iii) payroll reporting is accurate, and (iv) appropriate amounts are remitted to the applicable taxing authorities and other payees.   The Debtor pays ADP approximately $2,000 per month for the aforementioned services (the "Payroll Maintenance Fees").   As of the Petition Date, the Debtor estimates that it owes ADP approximately $4,000 on account of prepetition Payroll Maintenance Fees.  The Debtor seeks authority to pay all Payroll Maintenance Fees in the ordinary course, including all prepetition fees.

### (iii)   *Payroll Deductions and Tax Withholdings*

107.    ADP deducts certain amounts from Employees' paychecks, including, without limitation: (i) pre-tax, optional contributions to health and dependent care, as described in detail below; (ii) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below; (iii) certain amounts related to federal, state, and local income taxes, social security taxes, Medicare taxes, and taxes imposed by the law; (iv) matching payments on account of social security and Medicare taxes and, subject to certain limitations, additional amounts based upon a percentage of gross payroll for, among other things, state and federal unemployment insurance and (v) other miscellaneous deductions.  The Debtor estimates that ADP withholds, on average, approximately 54% of each payroll in payroll deductions and tax withholdings from Employees' paychecks, collectively. The Debtor pre-funds payroll deductions and tax withholdings to ADP two (2) business days in advance of the pay date. The Debtor's average liabilities twice-monthly for payroll deductions and tax withholdings total approximately $467,000.  The Debtor estimates that, as of the Petition Date, its liability for payroll deductions and tax withholdings is in the approximate amount of $30,000. The Debtor is seeking authority, but not direction, to remit prepetition payroll deductions and tax withholdings in an aggregate amount not to exceed $30,000 in the interim period.

Appendix A039

108. In the ordinary course of processing payroll for the Employees, the Debtor may also be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments. Each pay cycle, the Debtor withholds such amounts from applicable Employees' paychecks and remits them to the appropriate authorities or entities on a monthly basis. On average, the Debtor withholds approximately $2,000 in garnishments per month from Employees' wages and salaries and estimate that, as of the Petition Date, it holds approximately $3,000 in prepetition garnishments that have not yet been remitted. The Debtor seeks authority to continue garnishing Employee wages in accordance with applicable law.

(iv)    *Expense Reimbursement*

109. In the ordinary course of business, the Debtor reimburses Employees for certain expenses incurred while performing their duties. Reimbursable expenses include payments for travel, lodging, reimbursable meals, business meals and entertainment, and other business-related activities. Non-executive staff (below Vice President-level) are entitled to expense reasonable and necessary business-related expenses while traveling on authorized company business. Travel expenses higher than those outlined in the Employee Handbook must be pre-approved by the Chief Financial Officer ("CFO"). Executive Staff (Vice President-level and above) must also follow guidelines as outlined in the Employee Handbook; however, expenses higher than those outlined must be approved by either the CFO or respective Vice President. Employees submit expense reports via SAP Concur ("Concur") when needed. Reports are then automatically routed to the Employee's respective manager for review and electronic approval. Once approved by the manager, the expense report is routed to Accounts Payable for review. Accounts Payable reviews and processes the report for payment. Payment files are processed every day by Concur at 6:00 pm Pacific. Concur then transfers the funds to

Appendix A040

the Employee approximately two (2) business days after the payment file is processed (e.g., if a payment file is processed on Monday, a corresponding ACH payment is made to the Employee on Wednesday).

110. The Debtor estimates that, on average, it is charged $210,000 in Employee expense reimbursements per month. As of the Petition Date, the Debtor believes it is obligated to pay for approximately $150,000 in outstanding prepetition expense reimbursements.

**Employee Benefits**

111. The Debtor also provides Employees with access to health and other benefit plans. For Employees, benefit plans include the following (along with a notation as to whether the Debtor or the Employee pays the applicable premium or cost):

| Benefit Plan | Premiums Paid By |
|---|---|
| Medical | Orexigen Pays 85% |
| Dental | Orexigen Pays 85% |
| Vision | Orexigen Pays 85% |
| Basic Life Insurance | Orexigen Pays 100% |
| Basic Accidental Death & Dismemberment | Orexigen Pays 100% |
| Voluntary Insurance | Employee Pays 100% |
| Voluntary Accidental Death & Dismemberment | Employee Pays 100% |
| CIGNA Long-Term Disability | Orexigen Pays 100% |
| CIGNA Short-Term Disability | Orexigen Pays 100% |
| Orexigen 401(k) Plan | Orexigen and Employee |
| CONTRAVE Self-Funded Drug Plan | Orexigen Pays 100% |

112. The Debtor is the primary contract party with the applicable coverage provider on the foregoing U.S. benefit programs, and is also the sponsor of the Orexigen 401(k) Plan.

**(i)** *Medical, Dental and Vision Plans*

113. The Debtor offers coverage to eligible Employees, their spouses, and their dependents for medical, dental, vision, and other related benefits. All full-time Employees are

Appendix A041

eligible for these benefits (subject to the terms, conditions, and limitations of each program). Part-time employees may be eligible for the benefits package at the sole discretion of the Debtor (subject to the terms, conditions, and limitations of each program).

114. Debtor offers medical, dental, and vision insurance plans to eligible Employees through CIGNA Health and Life Insurance Co. ("CIGNA"). The Debtor offers both OAP and HMO medical plans. The Debtor initially pays 85% of the monthly premiums under the medical, dental and vision plans for each eligible U.S. Employee and his or her spouse and dependents.

115. In an average month, Debtor pays approximately $160,000 in premiums under the medical, dental and vision plans. As of the Petition Date, the Debtor does not owe any prepetition premiums under these plans.

**(ii)** ***Life and Accidental Death and Dismemberment & Long-Term and Short-Term Disability Insurance***

116. All of the Debtor's full-time Employees and their eligible dependents receive basic life insurance and accidental death and dismemberment coverage ("AD&D"), plus long-term ("LTD") and short-term disability ("STD") insurance. The Debtor initially funds 100% of the premiums under these plans for Employees. In an average month, Debtor pays approximately $15,000 in premiums under these plans, payable monthly in advance. As of the Petition Date, the Debtor does not owe any prepetition premiums under these plans. The AD&D benefit is equivalent to 100% of an Employee's salary up to a maximum of $200,000 (amounts greater than $200,000 will require a health statement). STD includes an elimination period of zero (0) days for an accident and seven (7) days for a sickness. The benefit pays 66.67% of an employee's weekly earnings, up to a weekly maximum of $2,500. LTD includes an elimination

Appendix A042

period of 90 days.  The benefit pays 66.67% of an employee's monthly earnings, not to exceed $10,000 per month.

117.    Eligible Employees may purchase supplemental personal insurance coverage.  Participating Employees pay premiums for supplemental insurance through payroll withholding, which is then remitted to the appropriate provider.  Employees may purchase additional life and AD&D insurance in $10,000 increments, not to exceed $300,000 (guarantee issue amount $100,000).  Spouses and children of employees may also purchase additional life and AD&D insurance.

**(iii)**    ***COBRA Medical, Dental and Vision Coverage***

118.    Former Employees are entitled to continue to participate in the Debtor's healthcare, dental and vision insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 (as amended, "COBRA") for up to 18 months following the end of their employment (such coverage, the "COBRA Coverage").  Former Employees who elect to participate in the COBRA Coverage must pay a set amount, dependent on which type of plan they elect (*i.e.*, family or individual) to the Debtor's healthcare insurance provider.  The Debtor currently has ten (10) former employees terminated prepetition that are currently entitled to participate in COBRA Coverage at the Debtor's cost for up to three (3) months past the Petition Date at a total cost of approximately $15,200 per month including fees to IGOE Administrative Services ("IGOE Fees").  Additionally, one former employee is entitled to participate in COBRA Coverage at the Debtor's cost for up to nine (9) months past the Petition Date at a cost of approximately $1,000 per month including IGOE fees. The COBRA Coverage amounts billed to and paid by the Debtor for the months of January, February and March 2018 averaged approximately $4,000 per month.

Appendix A043

### (iv) *Workers' Compensation Insurance*

119. Debtor maintains a workers' compensation insurance policy that covers all Employees. The Debtor requests authority to continue the workers' compensation insurance policy in the ordinary course of business in its motion to maintain insurance programs, filed contemporaneously with this Motion.

### (v) *Paid Time-Off Benefits*

120. Employees accrue paid vacation days based on position and years of service (see the chart below for details). Employees in the part-time category (less than 30 hours a week) may accrue vacation time on a pro-rata basis with written approval of the Debtor. Temporary employees do not accrue vacation. Employees begin to accrue vacation on their start date, and are eligible to utilize the benefit as work schedules permit. Once the maximum accrual cap is reached (in accordance with the chart below), vacation will no longer be accrued until the accrued vacation drops below the cap. No Employee is permitted to use vacation time prior to actual accrual without the written approval of his or her manager. The Debtor does not "cash out" Employees for unused accrued vacation time at the end of the calendar year or at any other time while Employees remain employed by the Debtor. Upon termination, Employees are paid for accrued and unused vacation time that has been earned through the last day of work. The Debtor, from time to time, may require Employees to use vacation on specified days, with advanced written notice. Vacation time does not accrue while an Employee is on unpaid leave. As of the Petition Date, the Debtor's liability for accrued vacation time is estimated at approximately $1,000,000. Under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, certain obligations related to wages, salaries, commissions, vacation, severance, sick leave, and employee benefit plans are accorded priority in payment in an amount not to exceed $12,850 for each employee to the extent such amounts accrued within 180 days of the petition date. As of the

44

Appendix A044

Petition Date, the Debtor estimates that approximately 64 Employees had accrued vacation time that exceeded the priority cap totaling approximately $460,000. The remaining balance of accrued vacation time estimated by the Debtors at approximately $540,000 however is not a current cash-payment obligation as the Debtor's policy states that it is only to be paid out upon the Employee's termination.

121.    The following is a chart that summarizes the Debtor's paid time-off benefits:

| Position | Years of Service | Hours Accrued per Pay Period | Annual Accrual Rate Number of Days | Maximum Accrual Cap in Days |
|---|---|---|---|---|
| Vice President and above | 1 to 3 years | 6.67 hours | 20 days | 30 days |
| | 4 to 10 years* | Depends on years of service | 20 days **PLUS** accrual of 1 additional day/ each year of service; cap at 30 days | An amount equivalent to 1.5 times your then applicable annual accrual rate** |
| Those employees below the title of Vice President | 1 to 3 years | 5 hours | 15 days | 22.5 days |
| | 4 to 10 years* | Depends on years of service | 15 days **PLUS** accrual of 1 additional day/ each year of service; cap at 22.5 days | An amount equivalent to 1.5 times your then applicable annual accrual rate** |

*Effective on your anniversary date.
**For example, if you have an annual accrual rate of 25 days,  your maximum accrual cap will be 37.5 days.

122.    Each calendar year, eligible Employees receive five (5) paid sick days, and eligible offshore employees receive ten (10) paid sick days.  Unused sick days do not roll over to the next calendar year.   The full amount of sick leave will be granted at the commencement of employment, and thereafter on January 1 of each year. Unused sick leave will

45

Appendix A045

expire on December 31 of each year. Accrued but unused paid sick leave does not carry over from year-to-year and will not be paid out at any time, including upon termination of employment.

123.    Eligible Employees are also afforded paid time off each year of up to ten (10) days for bereavement and up to ten (10) days for jury duty. Employees are not disciplined for taking time off to perform their duties as volunteer firefighters, peace officers, or emergency rescue personnel. Employees may use any accrued vacation for these community service activities; otherwise, this time is unpaid. Employees are paid for official holidays. Employees are also eligible for unpaid leaves of absence consistent with the Uniformed Services Employment and Reemployment Rights Act and other applicable federal and state laws. Other paid or unpaid leaves of absence may be granted upon prior approval of the Debtor's chief executive officer.

### (vi)    *Employee Wellness and Development Programs*

124.    Debtor provides employees with a Wellness Program to encourage Employees to strive for good health both as individuals and collectively as a team. This plan does not include direct payment from the Debtor. Instead, if an Employee opts-in, that Employee's medical, dental, and vision benefits are 85% covered (as opposed to 75% covered if the employee does not opt-in). As of the Petition Date, the percentage of Employees that opt-in to this program is nearly 100%.

### (vii)    *Contrave® Self-Funded Drug Plan*

125.    The Debtor provides Employees with a Contrave® Self-Funded Drug Program through Ridgeway. The payment to Ridgeway averages $2,000 per quarter encompassing a $7 per order processing fee plus the cost of the product.

46

Appendix A046

**(viii)** *Retirement Plans*

126. Debtor sponsors a 401(k) retirement savings plan for the benefit of eligible Employees and former Employees. All such Employees who have completed three months of service (and are over the age of 21) are eligible to participate in the 401(k) plan. Employees may enter the plan on the first of the month after eligibility. Employees may choose either a traditional 401(k) account or a Roth 401(k) account. Employees who elect to participate in the traditional plan may defer up to 100% of their compensation on a pre-tax basis. The limit (as of 2018) is $18,500 in one calendar year for participants under the age of 50. If the employee is 50 years or older, they may elect to defer an additional $6,000 for the calendar year, for a maximum of $24,500.

127. Employees who elect to participate in the Roth 401(k) program may elect to defer up to 100% of their compensation on a post-tax basis. The limit (as of 2018) is $18,000 in one calendar year for participants under the age of 50. If the employee is 50 years or older, they may elect to defer an additional $6,000 for the calendar year, for a maximum of $24,000. Adjusted gross income limits as set forth for Roth IRA accounts do not apply for the Roth 401(k). Regarding vesting for both plans, the Debtor can make a matching contribution of $0.50 on every $1.00 contributed by an employee up to 6.0% of an Employee's annual salary. This matching contribution is determined by the Debtor's Board of Directors which reserves the right to change it at any time. Employee contributions are vested immediately at 100%. Debtor contributions, however, are subject to the following vesting schedule (vesting starts from the date of hire, where one (1) year vesting is equal to 1,000 hours per year): 25% after one (1) year of service; 50% after two (2) years of service; 75% after three (3) years of service; and 100% after four (4) years of service. The plan is administered by Nationwide Insurance, and the Debtor pays a quarterly fee of $1,000. The Debtor remits payment for the plan to Nationwide Insurance

47

Appendix A047

on a twice- monthly basis in line with the Debtor's pay cycle. The Debtor's average twice-monthly payment for the plan is approximately $84,000. As of the Petition Date, the Debtor does not owe any amounts for the plan.

### Debtor's Independent Contractor Obligations

128.    In addition to its Employees, the Debtor relies on services from 21 independent contractors (the "Independent Contractors") and a contractor provided by an employment agency (the "Agency Contractor") (together, the "Contractors").[6]

129.    The Independent Contractors are individual service providers that, for the most part, receive a 1099 and have a SSN for their tax ID. They are also known as temporary employees or "temps" and provide usual and customary business service in support of the Debtor for a limited period of time (no longer than twelve (12) months).  The Independent Contractors perform work in absence of an Employee (such as covering a leave of absence), during a temporary period of vacancy, and/or during period of increased work volume or other similar business necessity. They may work onsite or offsite and may be converted to an Employee at the Debtor's discretion.

130.    The Debtor retains the Agency Contractor through an employment agency (the "Agency") to provide temporary support needed.  The Agency bills the Debtor for work provided by the Agency Contractor and charges fees as an addition to each worker's applicable hourly rate.  The Debtor remits compensation to the Agency on account of the Agency Contractor's services upon services rendered.

---

[6] The Debtor is contracted with Syneos Health (formerly inVentiv) for 50 salespeople. This contracted sales organization ("CSO") is paid monthly and also is paid incentive compensation five months in arrears.

Appendix A048

131.     As of the Petition Date, the Debtor estimates it may owe the Independent Contractors $330,000 in the aggregate for prepetition services provided. As of the Petition Date, the Debtor estimates it may owe the Agency approximately $15,000 in the aggregate for prepetition services provided by the Agency Contractor. The Debtor therefore seeks the authority, but not the direction, to pay $345,000 on account of prepetition Contract-related Obligations in the interim period. The Debtor believes it is necessary to pay the obligations owed to the Contractors so that they will continue to assist with the Debtor's staffing needs as needed.

**D.     Motions for Payment of Other Critical Business Expenditures**

<u>Insurance</u>

132.     In the ordinary course of its business, the Debtor maintains an insurance program (the "<u>Insurance Program</u>") that provides coverage for, among other things: commercial general liability; property and casualty; automobile liability; employers responsibility; accidental death and dismemberment; commercial property; international operations; crime and theft; directors, officers, and organizational liability; insurance company professional liability; workers compensation; and umbrella liability (collectively, the "<u>Policies</u>").

133.     The Policies are essential to the preservation of the value of the Debtor's business, property and assets. Not only are some of the Policies required by various regulations, laws, and contracts that govern the Debtor's commercial activities, but I have also been advised by counsel that section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.

134.     Moreover, I have been advised by counsel that the Operating Guidelines for Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the

Appendix A049

"U.S. Trustee Guidelines") require the Debtor to maintain insurance coverage throughout the pendency of the Chapter 11 Case. For the policy period of 2017 to 2018, as of the Petition Date, the Debtor believes that it was substantially current on amounts owed under the Policies and the AFCO financing arrangement. Out of an abundance of caution, however, the Debtor seeks authorization to make payments attributable to the prepetition period (plus any unforeseen deductible payment amounts for prepetition claims). The Debtor seeks authorization to make monthly payments in accordance with the AFCO financing arrangement as each payment comes due. The payment is $76,000 per month.

135. I believe that the coverage types, levels and premiums for these Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtor, and they are similar to businesses of comparable size and type to those of the Debtor.

136. If the Debtor is unable to make any outstanding payments that may be owed on account of the Policies or AFCO financing arrangement, I have been advised by counsel that the Debtor's insurance providers (the "Insurance Providers") may seek relief from the automatic stay to terminate such Insurance Policies. If that were to happen, the Debtor would be required to obtain replacement insurance on an expedited basis and at a significant cost to the estates. If the Debtor is required to obtain replacement insurance, this payment would be likely greater than what the Debtor currently pays. Even if the Debtor's Insurance Providers were not permitted to terminate the agreements, it is my opinion that any interruption of payment would have a severe, adverse effect on the Debtor's ability to obtain future policies at reasonable rates.

137. In light of the importance of maintaining insurance coverage with respect to its business activities and preserving liquidity by financing its insurance premiums, I believe it

Appendix A050

is in the best interest of the Debtor's estates to receive Court approval to honor the Debtor's obligations under the Policies and AFCO financing and, as necessary, renew or enter into new such agreements.

138.    In sum, through the Insurance Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor (i) to continue to pay monthly financing payments to AFCO and (ii) renewing or replacing insurance arrangements in the ordinary course of business without further order of the Court and (iii) related relief.  Though the Debtor believes that it does not owe any prepetition Policy premiums or other obligations on the Policies, the Debtor also requests, out of an abundance of caution, permission to make all payments required to continue its Insurance Program, including payment of any prepetition premiums, deductibles, or other obligations under the Policies and, to the extent applicable, engage and pay insurance brokers in the ordinary course of business. The Debtor wishes to pay the appropriate parties up to $250,000, and $100,000 on an interim basis, to be allocated at the Debtor's discretion without prejudice to seek additional relief on an emergency basis.  Further, if the Court grants the relief sought in the Insurance Motion, the Debtor requests that all applicable banks and other financial institutions be authorized, when requested by the Debtor in its discretion, without any duty of inquiry or liability to any party for following the Debtor's instructions, to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts to pay amounts owed under the Insurance Program, whether those checks are presented prior to or after the Petition Date, and to make other transfers, provided that sufficient funds are available in the applicable accounts to make the payments.

139.    I believe that all of the relief requested in the Insurance Motion is in the best interest of the Debtor, its estates, creditors and other parties in interest. I also believe that all

Appendix A051

of the relief requested in the Insurance Motion is necessary to preserve and enhance the value of the Debtor's estate for the benefit of all creditors, and that absent the relief sought in the Insurance Motion, a failure to pay any Insurance Obligations or to permit the Debtor to renew, revise, extend, supplement, change or enter into new insurance policies, as needed in its business judgment, will immediately threaten the continued operation of the Debtor and, consequently, the Debtor's estates. Therefore, it is my opinion that the potential harm and economic disadvantage that would stem from the cancellation of the Insurance Policies, and failure to renew the Insurance Policies or revise, extend, supplement, change or enter into new insurance arrangements as needed in its business judgment, are grossly disproportionate to the amount of the Insurance Obligations, and the costs to renew, revise, extend, supplement, change or enter into new insurance coverage.

Taxes

140.    The Debtor incurs taxes in the ordinary course of business, primarily comprising of income (federal and state), state franchise taxes, and property taxes on owned and leased property (the "Taxes"). Additionally, the Debtor is currently the subject of an audit of its 2015 income tax returns by the Internal Revenue Service (the "IRS Audit").

141.    In the most recently concluded calendar year, the Debtor incurred approximately $337,000 in tax liabilities payable to various authorities. As of the Petition Date, the Debtor estimates that it is required to remit approximately $42,000 in prepetition taxes, of which approximately $2,000 is estimated to fall due within 30 days of the Petition Date.

142.    In addition to Taxes, the Debtor incurs business license, compliance and regulatory fees and other similar assessments (the "Assessments"). Laws and regulations in jurisdictions in which the Debtor operates require the Debtor to pay fees to obtain a range of business licenses and permits from a number of different authorities. The methods for

52

Appendix A052

calculating amounts due for such licenses and permits, and the deadlines for paying such amounts, vary by jurisdiction.

143. In the most recently concluded fiscal year, the Debtor incurred approximately $340,000 in fee liabilities payable to various authorities. As of the Petition Date, the Debtor estimates that they are required to remit approximately $5,000 in prepetition Assessments, of which approximately $2,000 are estimated to fall due within 30 days of the Petition Date.

144. It is my belief that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtor's estate, thereby promoting its prospects for maximizing the value of its estate. If such obligations are not timely paid, it is my understanding that the Debtor will be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws. The Debtor desires to avoid unnecessary disputes with the Taxing Authorities and expenditures of time and money resulting from such disputes over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect taxes. Accordingly, I believe that the Debtor could suffer irreparable harm if the prepetition Taxes are not paid when they become due and payable.

145. Additionally, the Taxing Authorities may cause the Debtor to be audited if Taxes are not paid immediately. Such audits will unnecessarily divert the Debtor's attention away from its efforts to maximize value, including the conduct of its business and the sale process. If the Debtor does not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtor's licenses, suspend the Debtor's operations and pursue other

Appendix A053

remedies that will harm the estates. In all cases, the Debtor's failure to pay Taxes could have a material adverse impact on its ability to operate in the ordinary course of business.

146. I have also been advised that the federal government and many states in which the Debtor operates have laws providing that the Debtor's officers, directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes. In such event, collection efforts by the Taxing Authorities would be extremely distracting for the Debtor and its directors and officers in its efforts to bring the Chapter 11 Case to an expeditious conclusion.

<div align="center">Customer Programs</div>

147. The Debtor's customers are mainly wholesalers (the "Wholesalers"), who sell the Debtor's products primarily to retail drug stores in the U.S. In addition, the Wholesalers sell the Debtor's product to hospitals and clinic patients of the U.S. Department of Veterans Affairs (the "DVA"), the U.S. Department of Defense (the "DOD"), Indian Health Services ("IHS"), 340B Covered Entities (defined below), and recipients of Medicaid benefits, including State Pharmaceutical Assistance Programs ("SPAPs"), that each receive Contrave® at a reduced price. The Debtor also sells product at a discount directly to certain Customers including specialty distributors, direct retail accounts and pharmacies (the "Specialty Distributors"). The Debtor's financial support programs are each designed to help offset the costs of Contrave®. In addition, the cost to the patient of the Debtor's products is subsidized by private insurance plans via managed care organizations ("MCOs") and prescription benefit managers ("PBMs") with which the Debtor has special pricing arrangements. Further, the Debtor's products are currently covered under Medicaid and are available to authorized users of the General Services Administration's Federal Supply Schedule ("Federal Supply Schedule"), including SPAPs, the DVA, the DOD, IHS, the Coast Guard and the Public Health Service (collectively, the

<div align="center">54</div>

Appendix A054

"Governmental Entities" and together with Wholesalers and MCOs, and PBMs, the "Customers").

148. Through the Customer Programs, the Debtor provides, among other things, (a) discounted rates on the Debtor's product for purchases made by patients covered by health insurance; and, (b) discounted rates on the Debtor's product related to patients eligible for certain federal and State government programs. The Debtor's Customer Programs are common and typical of those in the pharmaceutical industry, critical to the Debtor's ability to serve its Customers and essential to the Debtor's business and growth. During fiscal year 2017, approximately ninety-six percent (96%) of the Debtor's unit sales ultimately went to patients who received the Debtor's product pursuant to a Customer Program. Approximately four percent (4%) of the patients who received one of the Debtor's products received it from Specialty Distributor sales channels that are not part of these Customer Programs and, consequently, are not subject to the relief sought in this Motion.

149. Therefore, the success and viability of the Debtor's business, and ultimately the Debtor's ability to preserve and maximize value for creditors through this Chapter 11 Case, including the sale process, are fundamentally dependent upon the continuation of the Customer Programs and honoring the Debtor's obligations thereunder. Maintaining ordinary course relationships with Customers is integral to preserving the value of the business. The Debtor submits that any value-maximizing outcome to this Chapter 11 Case will, of necessity, involve the Debtor being able to continue its ordinary course operations and, thus, the Customer Programs.

150. Through the Customer Programs, the Debtor provides, among other things, (a) discounts on the products for the DVA, the DOD, IHS, 340B Covered Entities

Appendix A055

(defined below) and Specialty Distributors; (b) Medicaid (including SPAPs) Rebates; (c) rebates to supplement employer and patient costs via MCOs and PBMs; and (d) a return policy on purchases of the product.  The Debtor's Customer Programs are common and typical of those in the pharmaceutical industry.  Therefore, if the Debtor is to stay competitive, it is critical that the Debtor be authorized to continue the Customer Programs and honor prepetition obligations associated with the Customer Programs.  The following are general descriptions of the Debtor's principal Customer Programs.

### A. Customer Discounts via Wholesalers and MCOs/PBMs

151.    The Debtor has contracts with Wholesalers to sell its product at wholesale acquisition cost ("WAC"), which is the base price determined by the Debtor in its sole discretion and adjusted from time to time.  The contracts with Wholesalers provide for industry-standard discounts, such as the "prompt pay" discount, which affords a two percent (2%) discount to Wholesalers for paying their invoice within the payment terms of the contract.  Further, the Wholesalers charge the Debtor fees for handling its products and processing retail channel orders as well as for product returns ("Wholesaler Fees").  These fees and returns are normally taken as credits against future payments by the Wholesalers to the Debtor; however, a limited portion of Wholesalers prefer their Wholesaler Fees to be paid by check instead of taken as credits against future payments.  Those Wholesalers who prefer to be paid by check represent less than 1% of the total Wholesaler Fees paid by the Debtor annually.  Similar to the Wholesaler payment timing noted above, any prepetition balance owing to these Wholesalers paid by check could be setoff against prepetition balances owing from these Wholesalers to the Debtor.

152.    With respect to MCOs/PBMs, the Debtor enters into agreements with MCOs and PBMs to gain access to patients covered by insurance and establish a formulary position for its product within the MCOs/PBMs network of coverage.  MCOs and PBMs submit

Appendix A056

Rebate claims to the Debtor based on agreed upon Rebate percentages between the MCO/PBM and the Debtor and volume of claims. MCOs/PBMs remit invoices and claim level detail to the Debtor for their Rebate claims either monthly or quarterly, depending on their arrangement with the Debtor. Absent approval to continue making the Rebates to MCOs and PBMs there is a potential risk that they will attempt to reduce Contrave®'s tier of coverage or remove it from the formulary entirely, which would result in an inability to access a substantial market of covered patients and offer those covered patients the ability to participate in the discount programs likely resulting in significantly reduced prescriptions and ultimately revenue. For the avoidance of doubt, the Debtor does not intend to pay any prepetition amounts owed to any MCOs or PBMs who reduce the Debtor's tier of coverage.

153. Thus, (as described in more detail below), if the Debtor has contracted with certain Customers that acquire the product, or subsidize the price to the patient, for a lower agreed upon contract price than the WAC, then either (i) the Wholesaler will receive payment for the product from particular Government Entities at the lower contracted price, and the Wholesaler will chargeback the Debtor for the price difference to the WAC price originally paid ("Chargebacks") or, (ii) in the case of patients that utilize insurance, the MCOs, or PBMs, will receive a rebate from the Debtor for formulary placement ("Rebates").[7] These price differences are resolved through (i) credits for Chargebacks attributed to such Wholesaler in the Debtor's accounts receivable system and are applied against subsequent payments for product made by the Wholesaler, or (ii) Rebates paid to such MCOs/PBMs based on claims generated by patients using insurance (collectively, the "Discount Programs").

---

[7] Formulary placement allows the Debtor better positioning of the product within the organizations covered by the MCOs/PBMs, effectively increasing access to the Debtor's product.

Appendix A057

154.     Given that Wholesalers continue to owe the Debtor for subsequent product purchases, they will simply reduce their next payment to the Debtor for the Chargebacks they've incurred. Further, because purchases and Chargebacks happen through the accounts receivable system on a daily basis, it is difficult for the Debtor to determine with precision the actual amount of outstanding Chargebacks at any particular time.  These Chargebacks generally do not result in an actual payment of cash to the Wholesaler except for the less than 1% noted previously who prefer to be paid by check, or in other rare circumstances, such as where the Debtor is ending its relationship with a particular Wholesaler and the amount of the Chargeback has not yet been fully applied against subsequent orders.  This same mechanism of setoff applies for Wholesaler Fees and Returns (discussed below).

155.     By offering customary prompt pay discounts and Wholesaler Fees to Wholesalers, the Debtor is able to incentivize the Wholesalers to enter into contracts with the Debtor.  In addition, allowing Wholesalers to set off prompt pay discounts, Wholesaler Fees, Chargebacks and Returns against amounts owing to the Debtor is a customary practice in the pharmaceutical industry.   The Debtor believes that the failure to continue to allow the Wholesalers to purchase the product with the customary prompt pay discounts and Wholesaler Fees, or to allow for continued set off of prompt pay discounts, Wholesaler Fees, Chargebacks, and Returns against amounts owing to the Debtor, will result in such Customers ceasing to (a) enter into purchase agreements with the Debtor or (b) purchase the Debtor's product. Any interruption in purchases by Wholesalers will likely have a devastating impact on the Debtor's ability to continue to sell its product and be detrimental to its revenue stream.

156.     In sum, the Debtor seeks authority to continue the Discount Programs in the ordinary course of business.   The Debtor's average monthly liabilities for the Discount

Appendix A058

58

Programs are as follows: (i) Wholesaler Fees of approximately $1.0 million, (ii) Chargebacks to Wholesalers of approximately $400,000 and (iii) Rebate claims to MCOs/PBMs of approximately $900,000. The Debtor estimates that as of the Petition Date, (i) approximately $2.2 million is outstanding for prepetition Wholesaler Fees with approximately $1.3 million due in the interim period, (ii) 400,000 is outstanding for prepetition Chargeback claims with the entirety due in the interim period, and (iii) with respect to Rebate claims from MCOs/PBMs, approximately $2.6 million in outstanding prepetition Rebates with approximately $850,000 due in the interim period. The Debtor seeks the authority, but not the direction, to allow Wholesalers to continue to setoff Wholesaler Fees and Chargebacks against the Debtor's accounts receivable in the ordinary course and pursuant to prepetition customary terms between the Debtor and Wholesalers, and to pay Rebate claims to MCOs and PBMs when they become due in the ordinary course of business.

### B. Government Programs

157. The Medicaid Drug Rebate Program ("MDRP") is a health program that includes the Centers for Medicare & Medicaid Services ("CMS"), State Medicaid Agencies, and participating drug manufacturers to help offset the Federal and State costs of most outpatient prescription drugs dispensed to Medicaid patients. In order to participate in MDRP, the Debtor is required to enter into agreements with two other Federal programs in order to have their drugs covered under Medicaid: A pricing agreement for the 340B Drug Pricing Program (the "340B Program") and a master agreement with the Secretary of Veterans Affairs for the Federal Supply Schedule. Each of these programs requires the Debtor to sell Contrave® at a substantial discount to WAC to the applicable Customers. In addition to MDRP, the Debtor also participates in SPAPs, which are intended to aid low-income elderly or persons with disabilities who do not qualify for MDRP.

Appendix A059

158.  **Federal Supply Schedule.**  The Federal Supply Schedule collectively includes the Governmental Entities, and provides the maximum amount that can be charged to these Governmental Entities for pharmaceuticals based on a specific mandated formula set annually.  The Debtor was awarded a Federal Supply Schedule contract (the "FSS Contract") in exchange for the Debtor providing federally mandated pricing to the Governmental Entities. Participants under the Federal Supply Schedule place orders for the product through Wholesalers who purchase the product from the Debtor and then ship the product directly to the hospitals and clinics.  In accordance with the Federal Supply Schedule, in 2018, the Debtor charged member patients $154.39 per 120ct bottle of Contrave®, a discount of approximately thirty-six percent (36%) to the Debtor's current WAC price of $241.73 per 120ct bottle.[8]  If the price of the product offered through the FSS Contract is lower than the WAC price, the Wholesaler will Chargeback the Debtor for the difference.  The Debtor expects that the Contrave® discount will remain the same or increase in the future, contingent on price changes.

159.  The Debtor seeks authority to continue operating pursuant to the FSS Contract in the ordinary course of business.  The Debtor's average monthly liability for Chargebacks related to the FSS Contract is approximately $10,000, though Chargebacks and purchases are reconciled through the Debtor's accounts receivable and do not generally result in cash payment.  The Debtor seeks authority to allow Wholesalers to continue to setoff Chargebacks related to the FSS Contract against the Debtor's accounts receivable in the ordinary course of business.

---

[8] The 2018 Federal Supply Schedule price includes The Industrial Funding Fee ("IFF"), a fee that is required to be added to a Federal Supply Schedule price to reimburse the VA National Acquisition Center for the costs incurred in operating the Federal Supply Schedule program.  The IFF applicable to the VA FSS contract is 0.5 percent (0.5%) of total sales related to the Federal Supply Schedule program.  The IFF payment is due 60 days following the end of each reporting quarter.

Appendix A060

160.     **340B Covered Entities.** Certain hospitals and health care facilities (the "340B Covered Entities") provide the majority of their services to low income patients and receive payments from CMS to cover the costs of providing care to uninsured patients.  Pursuant to the 340B Program, the Debtor provides its product to 340B Covered Entities at a discounted price set by statute, which is calculated on a quarterly basis.  340B Covered Entities submit a request for the product to one of the Debtor's Wholesalers and the Wholesaler fulfills that request and then submits a Chargeback to the Debtor for the difference between the price that the Wholesaler paid and the discounted price that the 340B Covered Entities paid for the product.

161.     The Debtor's average monthly liability for Chargebacks related to the 340B Program is approximately $390,000, but Chargebacks and purchases are reconciled through the Debtor's accounts receivable and do not generally result in a cash payment.  By this Motion, the Debtor seeks authority to continue the 340B Program in the ordinary course of business and to apply any prepetition Chargebacks that may be outstanding against prepetition accounts receivable and, if necessary, against subsequent orders of the Debtor's products in the ordinary course of business.

162.     **Medicaid Rebates.** MDRP covers certain outpatient drugs, including the Debtor's product, and requires the Debtor to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services in exchange for Medicaid coverage of its product.  The Debtor's Wholesalers provide the product to a retail pharmacy to be utilized by a Medicaid patient.  Individual states collect product utilization data on the use of the product and send the Debtor a report and invoice.  The Debtor is then responsible for paying a rebate ("Medicaid Rebate") on the product for each time that the product was dispensed to Medicaid patients.  The amount of the Medicaid Rebate due for each unit of the individual

Appendix A061

product is based on a statutory formula. The Debtor pays the Medicaid Rebates to each State MDRP or SPAP on a quarterly basis, and the amount is shared between the states and the federal government to offset the overall cost of the prescription drugs under the Medicaid program. As of the Petition Date, the Debtor estimates that approximately $250,000 has been accrued but has not been invoiced for Medicaid Rebates with approximately $150,000 due in the interim period. While this amount is not yet due and payable, it may become due and payable over the course of this Chapter 11 Case.

163. The Debtor's participation in the FSS Contract and the 340B Program requires the Debtor to participate in the MDRP and pay Medicaid Rebates. As a result, if the Debtor fails to fulfill its obligations under the MDRP, including payment of the Medicaid Rebates as they become due, it risks becoming excluded from all federal programs. As such, honoring Medicaid Rebates is integral to the Debtor's business, and the Debtor cannot risk the substantial harm that could arise from the failure to pay the Medicaid Rebates, including denial of coverage and damage to the Debtor's relationship with its Customers. Such a result would irreparably impair the Debtor's efforts to conduct its business during this Chapter 11 Case and maximize value. Consequently, the Debtor requests authorization to continue to make Medicaid Rebates pursuant to the MDRP and SPAPs during this Chapter 11 Case as related to both prepetition and postpetition sales of its products.

164. In addition, as noted above, the Debtor offers mandated price discounts as part of the FSS Contract and the 340B Program. These price discounts are honored by Wholesalers who, in turn, Chargeback the price difference between the discounted price and the WAC back to the Debtor. These Chargebacks are normally taken as credits against future payments by the Wholesalers to the Debtor. Thus, there will be prepetition amounts for these

Appendix A062

Chargebacks, which are going to be setoff against payments of prepetition receivables.  The Debtor estimates the total prepetition Chargebacks at approximately \$400,000, which would be entirely setoff against the Debtor's prepetition accounts receivables and all in the interim period.

### C.  Sales Return Program

165.    In the ordinary course of business, the Debtor's Customers may be unable to sell products it purchased from the Debtor because the product expires, the product is damaged and unsellable, there is a drop in demand, or for some other reason.  Accordingly, the Debtor allows its Customers to return the expired and damaged products (a "Return") to the Wholesalers in exchange for credit within a limited time before and after the date of expiration (the "Sales Return Program").  Purchasers of Contrave® may return the expired product within six (6) months prior to and twelve (12) months after the expiration date, and may return damaged goods if the Debtor is notified of the damaged goods within five days of receipt of the damaged goods.  Credits are then issued by the Debtor to the Wholesaler based on its purchase history and can be used to offset any amounts the Wholesaler owes the Debtor.

166.    As of the Petition Date, the Debtor estimates that there is approximately \$70,000 in potential Returns of the Debtor's product, which would be setoff against the Debtor's prepetition accounts receivable entirely in the interim period.  To maintain its Customers' goodwill and continued business, the Debtor seeks authorization to honor any prepetition Return requests and obligations under the Sales Return Program that occur postpetition in the ordinary course of business.

167.    The ability of the Debtor to maximize the value of its business and its inventory is dependent on continuing the Customer Programs.  Any delay in honoring the Debtor's obligations thereunder could severely disrupt the Debtor's efforts to maximize its value.

Appendix A063

Any failure to honor prepetition Customer obligations, even for a brief period of time, may drive away valuable Customers, thereby harming the Debtor's efforts to maximize the value of its inventory. Accordingly, the Debtor seeks authorization to continue the Customer Programs.

### D.  Managed Services Operations

168.    The Debtor utilizes CIS by Deloitte ("CIS") to provide managed services operations that include government price calculations, Medicaid and SPAPs claim validation and processing, MCO and PBM claim validation and processing, contract administration, and dispute resolution. Once Rebates or Medicaid Rebates have been validated and processed, CIS makes a funding request to the Debtor sufficient to fund payments to Medicaid, SPAPs, MCOs and PBMs, as applicable, in accordance with their terms of payment. As of the Petition Date, there is approximately $650,000 of outstanding funding requests from CIS pertaining to Rebates due (these amounts are already reflected in the prepetition balances for Rebates noted above). CIS provides these ongoing services daily and such services are an integral part of the Debtor's management of access to a significant segment of its target market. As of the Petition Date, there is approximately $100,000 accrued and outstanding from CIS pertaining to its services with $50,000 due in the interim period. Any interruption in CIS's services will likely have a devastating impact on the Debtor's ability to continue to sell its product and be detrimental to its revenue stream. Therefore, the Debtor seeks permission to continue paying CIS its service fees in the ordinary course, including any service fees that may have arose prepetition.

<u>Utilities</u>

169.    In connection with its business operations, the Debtor obtains electricity, natural gas, and telephone and telecommunication services (collectively, the "Utility Services") through approximately seven accounts that it has with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers"). The Debtor has

64

Appendix A064

filed a motion requesting that the Court approve the Debtor's proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies, as that term is used in Bankruptcy Code section 366, approving procedures for resolving any objections by the Utility Providers relating to the Proposed Adequate Assurance and prohibiting the Utility Providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtor.

170.    I believe that any interruption in Utility Services, even for a brief period of time, would cause the Debtor to no longer be able to operate its business and the Debtor could suffer irreparable harm. Such an interruption would undoubtedly impede the Debtor's efforts to maximize the value of its business. In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Case. I believe that the procedures the Debtor has proposed for the Utility Providers adequately protect the rights that I have been advised are provided to the Utility Providers under the Bankruptcy Code, while also protecting the Debtor's need to continue to receive, for the benefit of its estate, the Utility Services upon which its business depends on.

### Critical Vendors

171.    The Debtor continues to do business with vendors whose goods and services are essential to the Debtor's operations (the "Critical Vendors"). By this Motion, the Debtor seeks entry of an order granting it authority to make payments on account of the prepetition claims of the Critical Vendors (the "Critical Vendor Claims"), not to exceed an aggregate amount of $1,000,000 on an interim basis and $1,500,000 on a final basis (for both interim and final periods, the "Critical Vendor Claims Cap").

172.    The Debtor has categorized its Critical Vendors into three subsets for purposes of this Motion and seeks different interim and final caps on payments to such categories of Critical Vendors on account of their prepetition claims. First, the Debtor has

Appendix A065

Critical Vendors on account of manufacturing, supply and service provider arrangements with the Debtor (the "Critical Supply and Service Vendors"). The Debtor is seeking authority to pay such Critical Supply and Service Vendors up to $600,000, and $300,000 on an interim basis. Second, the Debtor has Critical Vendors that are owed approximately $600,000 on account of certain warehousing and freight arrangements with the Debtor (the "Critical Warehouse and Freight Vendors"). The Debtor wishes to pay such Critical Warehouse and Freight Vendors up to $600,000, and $500,000 on an interim basis. Third, the Debtor has Critical Vendors that are foreign suppliers of goods and services that are owed approximately $300,000 on account of goods and services provided to the Debtor (the "Critical Foreign Vendors"). The Debtor wishes to pay such Critical Foreign Vendors up to $300,000 and $200,000 on an interim basis.

173. The Debtor seeks the authority to pay, in its sole discretion and business judgment, all or a portion of the Critical Vendor Claims. The Debtor estimates the maximum amount needed to pay the Critical Vendor Claims is the amount of the Critical Vendor Claims Cap. Of this amount, the Debtor estimates the maximum amount needed to pay Critical Vendor Claims before the final hearing is $1,000,000. The Critical Vendor Claims Cap represents the Debtor's best estimate as to how much must be paid to such creditors to continue an uninterrupted supply of critical goods and services. The Debtor may pay less than the requested amount. The Debtor further requests that the Court grant the Debtor the authority to allocate the forgoing amounts at the Debtor's discretion without prejudice to seek additional relief on an emergency basis, and subject to an agreement to receive terms consistent with Customary Trade Terms (as defined herein) from the Critical Vendors.

174. In an exercise of business judgment, the Debtor has determined that continuing to receive specialized goods and services from the Critical Vendor Claimants is

Appendix A066

necessary to operate and restructure its business as a going concern and to maximize value. If granted discretion to satisfy Critical Vendor Claims, as requested in the Critical Vendor Motion, the Debtor will assess, case by case and in real time the benefits to the estate of paying Critical Vendor Claims and pay such claim only to the extent the estate will benefit. Without this relief, the Debtor believes that the Critical Vendor Claimants would cease providing goods and services to the Debtor or otherwise take action to impede the Debtor's restructuring – a dire result for the Debtor and its stakeholders.

175.     The Debtor believes that most of its vendors will continue to do business with the Debtor after commencement of this Chapter 11 Case because doing so simply makes good business sense.  I, however, anticipate that certain vendors that supply goods or services that are necessary to the Debtor's business will: (a) refuse to deliver goods and services without payment of its prepetition claims; (b) refuse to deliver goods and services on reasonable credit terms absent payment of prepetition claims, thereby requiring the Debtor to use even greater liquidity and increase its operating costs; or (c) suffer significant financial hardship, such that the Debtor's non-payment of its prepetition claims could have a significant negative impact on a Critical Vendor's business and therefore its ability to supply the Debtor with needed goods and services.

176.     Accordingly, the Debtor requests the Court's authority to pay the prepetition Critical Vendor Claims because payment of such claims is necessary to an effective businesses, the Debtor used the following criteria: (a) whether the vendor in question is a "sole source" provider; (b) whether quality requirements or other specifications prevent the Debtor from obtaining a vendor's products or services from alternative sources within a reasonable timeframe; (c) whether a vendor meeting the standards of (a) or (b) is likely to refuse to ship

Appendix A067

product to the Debtor postpetition if its prepetition balances are not paid; (d) whether a vendor would suffer significant financial hardship absent the Debtor's payment of prepetition claims; (e) the degree to which replacement costs (including, pricing, transition expenses, professional fees and lost sales of future revenue) exceed the amount of a vendor's prepetition claim; (f) whether an agreement exists by which the Debtor could compel a vendor to continue performing on prepetition terms; and (g) for foreign vendors specifically, whether the vendor lacks minimum contacts with the United States such that the vendor may not be subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtor's assets and business operations, or may simply be confused by the chapter 11 process.

177.   I am confident that this process has appropriately identified only those vendors that meet some or all of the foregoing stringent guidelines and that, if the Debtor failed to pay for the vital goods and services it provided prepetition, would likely cease to provide them in the future. It is my opinion that the cessation of such goods or services would adversely impact the Debtor's ability to reorganize, and any efforts to replace such good or services would distract the Debtor from the chapter 11 process more generally, at the expense of the Debtor's creditors and other parties in interest.

[*remainder of page intentionally left blank; signature page to follow*]

Appendix A068

I declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code that the foregoing is true and correct to the best of my knowledge.

Dated: _____March 12_____, 2018

Michael A. Narachi
President and CEO

*[Signature Page to First Day Declaration]*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | **Requested Hearing Date:** |
| | **April 11, 2018 at 10:00 a.m. (ET)** |
| | **Requested Objection Deadline:** |
| | **April 9, 2018 at 4:00 p.m. (ET)** |

## DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 361, 363, 503 AND 105(A) FOR AUTHORITY TO ENTER INTO A STIPULATION GRANTING ADEQUATE PROTECTION TO McKESSON SPECIALTY ARIZONA, INC. AND ITS AFFILIATES

Orexigen Therapeutics, Inc., the debtor and debtor-in-possession in the above-captioned case (the "Debtor"), hereby moves (the "Motion"), pursuant to sections 105, 361, 363 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit 1** authorizing the Debtor to enter into a stipulation (the "Stipulation", and together with the Order, the "Stipulation and Order"), granting adequate protection to the McKesson Specialty Arizona, Inc. and its affiliates ("McKesson", and together with the Debtor, the "Parties") with respect to the replenishment of the Reimbursement Funds and the continuation of the LoyaltyScript® Program (both as defined below).  In support of this Motion, the Debtor respectfully represents as follows:

---

[1]     The last four digits of the Debtor's federal tax identification number are 8822.  The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief requested herein are sections 105, 361, 363, and 503 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 4001 and 9014.  The Debtor consents pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

3.      On March 12, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (this "Chapter 11 Case"). The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner. On March 27, 2018, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors in this Chapter 11 Case (the "Committee").

4.      The Debtor is a biopharmaceutical company focused on the treatment of obesity and the commercialization of a single pharmaceutical drug for chronic weight management. The Debtor's assets include certain rights related to the development and sale of Contrave® (the "Covered Drug"), a drug approved by the Food and Drug Administration for chronic weight management in certain adults.  Additional details regarding the Debtor's business

Appendix A071

and the facts and circumstances supporting the relief requested herein are set forth in *the Declaration of Michael A. Narachi in Support of First Day Relief* [D.I. 3] (the "First Day Declaration") and incorporated herein by reference.

5.      As of the Petition Date, the Debtor was and remains a party to agreements with McKesson (collectively, the "Program Service Agreement")[2] related to the purchase and distribution of the Covered Drug and the distribution and processing of the Debtor's LoyaltyScript® that provide the Debtor's customers with an array of discounts off of the purchase price of the Covered Drug through retail pharmacies (the "LoyaltyScript® Program").

6.      The Debtor believes that the LoyaltyScript® Program is critically necessary for the success and viability of the Debtor's business and its ability to preserve and maximize value for creditors.  In general, the LoyaltyScript® Program provides discounts to patients for the purchase of the Covered Drug that the patients receive at the pharmacy, right at the point of sale.  The Debtor designed the LoyaltyScript® Program to provide patients with an immediate discount on the Covered Drug with a minimum amount of paperwork and delay and without requiring mail-in forms or the like.  To implement the LoyaltyScript® Program, the Debtor engaged McKesson to provide technical support and to manage the LoyaltyScript® Program.

7.      In general, and as set forth with greater specificity in the Program Service Agreement, the Debtor has the sole responsibility to select the criteria for, and the other terms and conditions of, the LoyaltyScript® Program.  McKesson implements the LoyaltyScript® Program as designed by the Debtor and coordinates with the retail pharmacies to insure that the

---

[2]      The terms and conditions of the Program Service Agreement and the LoyaltyScript® Program are confidential and proprietary.  To the extent necessary, the Parties will file the Program Service Agreement under seal.

LoyaltyScript® Program works as intended and the Debtor's customers receive their immediate discounts on the Covered Drug. In performing its obligations under the Program Service Agreement, McKesson is solely administering the LoyaltyScript® Program as directed by the Debtor. Among its tasks, McKesson uses funds provided by the Debtor in the ordinary course of business to reimburse the pharmacies for discounts extended to patients (the "Reimbursement Funds").

8.     McKesson asserts that it holds a prepetition claim against the Debtor in the amount of approximately $9.1 million (the "McKesson Prepetition Claim") for continuing to pay third parties on account of obligations paid by McKesson under the LoyaltyScript® Program before the Petition Date without reimbursement from the Debtor.

9.     Given the importance of the LoyaltyScript® Program, the Debtor negotiated for and obtained funding from the DIP Lenders to continue the LoyaltyScript® Program and the replenishment of the Reimbursement Fund. *See* Exhibit A to the *Interim Order (I) Approving Debtor-In-Possession Financing Pursuant to 11 USC §§ 105(a), 362, and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2;* etc. [Dkt. No. 48] (the "Interim DIP Financing Order").

10.     In addition to the obligations associated with the Reimbursement Funds, in the ordinary course of business McKesson sends the Debtor a monthly invoice for the various fees and other costs associated with the LoyaltyScript® Program. These monthly invoices (each an "Administrative Fee Invoice") are for payment of what the Program Service Agreement refers to as the "Administrative Fees." For the most part, and as set forth with specificity in the Schedule of Fees, the Administrative Fees are calculated based on incremental services; *e.g.*, so much for each completed enrollment, so much for each rebate check, etc. The Administrative

Appendix A073

4

Fees are to be paid by wire transfer within 30 days of the date of the Administrative Fee Invoice. The Administrative Fees average approximately $100,000 per month. The Administrative Fees set forth in the February 2018 Administrative Fee Invoice totaled $91,801.89 and, as a result of the intervening bankruptcy filing, have not been paid.

11.     The Debtor believes that maintenance of the LoyaltyScript® Program is in the best interest of creditors and the estate.

## RELIEF REQUESTED AND BASIS FOR RELIEF

12.     By this Motion, the Debtor seeks entry of an order under Bankruptcy Code sections 105, 361, 363, and 503 authorizing the Debtor to enter into the Stipulation with McKesson.

### A.     Summary of the Stipulation's Key Terms

13.     By the Stipulation and Order, the Debtor seeks to grant McKesson adequate protection by the Debtor agreeing to make periodic cash payments to McKesson to pre-fund estimated amounts to be paid by McKesson to pharmacies under the LoyaltyScript® Program.[3]

14.     Pursuant to the Stipulation, no less than 2 business days after entry of an Order approving the Stipulation, which Order shall be in form and content acceptable to each of the Parties, but in no event later than April 13, 2018, the Debtor shall make an initial payment to McKesson of Six Million, Twenty-Seven Thousand, One Hundred and Fifty-Five Dollars ($6,027,155) to pay McKesson for the actual and projected amounts remitted or to be remitted by McKesson under the LoyaltyScript® Program from the Petition Date through and including

---

[3]     This summary is qualified in its entirety by reference to the provisions of the Stipulation. In the event of a conflict between this summary and the Stipulation, the terms of the Stipulation control.

Appendix A074

April 8, 2018. For the avoidance of doubt, no payments under the Stipulation shall be on account of or applied to the McKesson Prepetition Claim and the Parties reserve all rights, whether arising in law or equity, with respect to the McKesson Prepetition Claim.

15. <u>Weekly Payments to McKesson</u>. Commencing on the first Monday after entry of an order approving the Stipulation, and continuing on each Monday thereafter until the occurrence of a Termination Event (defined below) the Debtor shall remit by ACH wire transfer the "<u>Weekly Payment</u>" of One Million Six Hundred and Seventy-Five Thousand Dollars ($1,675,000), comprised of the sum of (i) One Million Six Hundred and Fifty Thousand Dollars ($1,650,000) to replenish the Reimbursement Funds, and (ii) Twenty-Five Thousand ($25,000) to be applied to the Administrative Fee. If, for example, the Stipulation is approved by an order of the Court entered on April 11, 2018, the first Weekly Payment shall be made on April 16, 2018. Every two weeks, the Parties shall meet and confer to consider whether to adjust the amount of the Weekly Payment. If both of the Parties agree, then the amount of the Weekly Payment shall change to the agreed amount, whether an increase or a decrease. The amount of the Weekly Payment shall not change unless both of the Parties agree.

16. <u>Settlement of Actual Amounts</u>. The Parties acknowledge and agree that the advance payment amounts provided in paragraph 15 of this Motion are the Parties' good faith estimates based on past performance and the Parties will reconcile such amounts with actual amounts incurred by McKesson under the LoyaltyScript® Program on a monthly basis within a week of the end of the preceding calendar month, which will result in a return by McKesson to the Debtor of the unused portion of the estimate, or a true up payment from the Debtor to McKesson, as applicable, unless otherwise agreed to by the Parties.

Appendix A075

17.   <u>Administrative Priority</u>.   McKesson (a) will only seek administrative priority under section 503 of the Bankruptcy Code for actual post-petition amounts incurred under the LoyaltyScript® Program (b) shall return to the Debtor any unused post-petition funds received under the Stipulation in excess of the post-petition obligations incurred by McKesson under the LoyaltyScript® Program and (c) shall not seek administrative priority for such unused funds.   McKesson further agrees that any administrative priority claim it may have is junior in all respects to the super-priority administrative claim of the DIP Lenders under that certain Debtor in Possession Credit and Security Agreement dated as of March 12, 2018 (the "<u>DIP Loan Agreement</u>") and approved by the Bankruptcy Court in the Interim DIP Financing Order (D.I. 48) and any order approving the DIP Loan Agreement on a final basis.

18.   <u>Waiver of Set-off Right</u>.   McKesson will not assert against the Debtor any post-petition right of setoff that it has or may have, whether any such right arises by virtue of contract or law, with respect to claims arising under the Stipulation.   For clarity, McKesson's waiver of post-petition setoff rights related to the Stipulation is limited to the situation in which McKesson receives Weekly Payments in excess of the Debtor's post-petition and pre-termination obligations under the LoyaltyScript® Program (the "<u>Excess Payments</u>").   In the event any Excess Payments exist, McKesson may not setoff such amounts against the McKesson Pre-Petition Claim.

19.   <u>Termination</u>.   The Stipulation and the Program Service Agreement shall continue in full force and effect until the first to occur of the following (each a "<u>Termination Event</u>"):  (a) the Debtor advises in writing that the LoyaltyScript® Program is no longer active; (b) entry of an order of the Bankruptcy Court which provides for the rejection of the Program Service Agreement under the Bankruptcy Code; (c) the Debtor fails to make one or more of the

Appendix A076

payments to McKesson as set forth in the Stipulation; (d) the closing date of a sale of all or substantially all of the Debtor's assets; and (e) entry of an order (i) dismissing the Bankruptcy Case or (ii) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code. Immediately upon the occurrence of a Termination Event, (x) the Program Service Agreement shall terminate, (y) McKesson shall be relieved of any obligation to perform under the Program Service Agreement, and (z) McKesson shall no longer provide any support function for the LoyaltyScript® Program. As soon as practicable after the Termination Event, McKesson will return to the Debtor any Excess Payments received by McKesson under the LoyaltyScript® Program before the Termination Date.

20. <u>Strict Compliance with the Program Service Agreement</u>. Until the occurrence of a Termination Event, the Debtor and McKesson shall fully and completely comply in every material respect with each and all of the terms and conditions set forth in the Program Service Agreement, except only to the extent the terms and conditions set forth in the Stipulation are at material variance from those set forth in the Program Service Agreement and then only if the Stipulation expressly advises that the terms are at material variance and shall amend the Program Service Agreement. In that event, the Debtor and McKesson shall fully and completely comply in every material respect with the terms and conditions of the Program Service Agreement as expressly modified by the terms and conditions of the Stipulation.

21. <u>No Prejudice to any claims held by McKesson</u>. Performance under the Stipulation and Order shall be without prejudice to any prepetition claim held by McKesson. Specifically, and without modifying the foregoing general statement, McKesson expressly reserves any and all claims of priority, collateral security, offset or otherwise. Without limiting the foregoing, McKesson specifically reserves the right to assert that McKesson's claim

Appendix A077

associated with the LoyaltyScript® Program is entitled to administrative priority to the extent McKesson, after the Petition Date, makes payment to or otherwise reimburses pharmacies for providing discounts to patients, whether the patient was given the discount by the pharmacy before or after the Petition Date. The Debtor does not agree, and instead asserts that McKesson's claim associated with the LoyaltyScript® Program is entitled to administrative priority only to the extent McKesson, after the Petition Date, makes payment to or otherwise reimburses pharmacies for providing discounts to patients after the Petition Date. The Parties agree to work to resolve this issue, but until such resolution, either by consent or court order, the Parties shall faithfully comply with all provisions of the Stipulation and Order.

22.    <u>Payments under the Stipulation are Absolute and Final.</u>    The Debtor acknowledges that it received good and fair consideration in exchange for each payment made after the Petition Date and under the terms of the Stipulation. Each payment made by the Debtor under the authority of the Stipulation shall be absolute and final and not subject to any claim based in whole or in part on any provision of the Bankruptcy Code including any claim of disgorgement based on the claims provided under the DIP Loan Agreement and the associated court orders approving that agreement. Further, and without limiting the foregoing, no payment from the Debtor after the Petition Date shall be subject to any claim of avoidance under chapter 5 of the Bankruptcy Code or otherwise. The Debtor, any reorganized debtor, its estate, its affiliate and any and all successors (collectively, the "<u>Releasing Entities</u>") unconditionally, irrevocably, absolutely and forever waives, releases and discharges McKesson, its officers, agents, and principals of any liability that arises in whole or in part under chapter 5 of the Bankruptcy Code (such claims are referred to collectively as "<u>Avoidance Actions</u>"), whether known or unknown, fixed or contingent, existing or hereafter arising, in law, equity or otherwise, and including any

Appendix A078

9

Avoidance Actions that may be asserted as derivative claims on behalf of any of the Releasing Entities.

23.     <u>Termination of Stipulation upon Assumption and Assignment</u>.   If the Debtor, under section 365 of the Bankruptcy Code, both assumes the Program Service Agreement and assigns that agreement to a third party, then upon such assignment, the Stipulation shall terminate.

**B.      The Debtor is Exercising Sound Business Judgment in Entering into the Stipulation.**

24.     The Debtor seeks approval, pursuant to sections 105(a) and 361, 363(b) and 503 of the Bankruptcy Code to enter into the Stipulation.   The Stipulation constitutes a sound exercise of business judgment and is in the best interest of the Debtor.

25.     Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).   Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* § 105(a).

26.     Under applicable case law in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents the exercise of the debtor's reasonable business judgment, such use should be approved.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that, under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Del. & Hudson R.R.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Comm. of Equity Sec.*

Appendix A079

*Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification").

27.     If a valid business justification exists for the use or sale of property of the estate, a debtor's decision enjoys a strong presumption that "in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  *See Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.  Delaware courts have said that it may be accomplished by showing either irrationality or inattention."); *In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) (applying the business judgment standard to transactions under section 363 of the Bankruptcy Code).

28.     Section 105(a) of the Bankruptcy Code further provides that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105(a) allows the bankruptcy court to "craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the [Bankruptcy] Code was designed to obtain."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190,

Appendix A080

235-36 (3d Cir. 2004) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003)).

29.     Here, the Debtor's decision to enter into the Stipulation satisfies the business judgment test.  The Stipulation allows the Debtor to continue the LoyaltyScript® Program without interruption.  As stated above, the Debtor believes the LoyaltyScript® Program is a critical component of its comprehensive marketing and sales strategy for the Covered Drug. Accordingly, the Debtor's decision to enter into the Stipulation is a sound exercise of its business judgment and is in the best interest of the Debtor, its estate, creditors, and all parties in interest.

30.     Moreover, to the extent that the Debtor's entry into the Stipulation implicates sections 361 or 503 of the Bankruptcy Code, the Debtor believes such relief is appropriate given the importance of the LoyaltyScript® Program to the Debtor's ongoing business and customer relations.

## REQUEST FOR WAIVER OF STAY

31.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtor requests that any order approving the Motion be effective immediately upon entry by providing that the 14-day stay shall not apply.  Immediate entry into the Stipulation is in the best interests of the Debtor and its stakeholders.

## NOTICE

32.     Notice of this Motion shall be given to: (i) the U.S. Trustee, (ii) counsel to the Unsecured Creditors' Committee; (iii) the parties included on the Debtor's list of thirty (30) largest unsecured creditors (iv) counsel to the DIP Administrative Agent, DIP Lenders,

Appendix A081

Prepetition Indenture Trustee and Secured Noteholders (each as defined in the First Day Declaration) (v) the Delaware Secretary of State; (vi) the Delaware State Treasury; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; (ix) counsel to McKesson; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested in this Motion, the Debtor respectfully submits that no further notice is necessary.

33.     Additionally, this Motion is filed on shortened notice, given the exigent nature of the relief request.

<div align="center"><u>**CONCLUSION**</u></div>

WHEREFORE, the Debtor respectfully requests that the Court enter the Stipulation and Order, substantially in the form attached hereto as **<u>Exhibit 1</u>**, and grant the relief requested and such other relief as is just and proper.

April 3, 2018
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT &
TUNNELL LLP**

*/s/      Jose F. Bibiloni*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Jose F. Bibiloni (No. 6261)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
aremming@mnat.com
jbibiloni@mnat.com

- and -

Appendix A082

13

Christopher R. Donoho, III
Christopher R. Bryant
John D. Beck
**HOGAN LOVELLS US LLP**
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
chris.donoho@hoganlovells.com
christopher.bryant@hoganlovells.com
john.beck@hoganlovells.com

*Proposed Counsel for Debtor and Debtor in
Possession*

Appendix A083

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | **Re: D.I. 109** |

## ORDER GRANTING DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 361, 363, 503 AND 105(A) FOR AUTHORITY TO ENTER INTO A STIPULATION GRANTING ADEQUATE PROTECTION TO McKESSON SPECIALTY ARIZONA, INC. AND ITS AFFILIATES

Upon the motion (the "Motion")[2] of the Debtor pursuant to sections 105, 361, 363, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), requesting entry of an order approving the stipulation (the "Stipulation") granting adequate protection to McKesson Specialty Arizona, Inc. and its affiliates ("McKesson", and together with the Debtor, the "Parties") with respect to the replenishment of the Reimbursement Funds and the continuation of the LoyaltyScript® Program (both as defined below); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in this district pursuant to 28 U.S.C. § 1410; and due and proper notice of the Motion having been provided to the parties

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

Appendix A084

listed therein and no adverse interest being affected; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Stipulation, attached hereto as **Exhibit A,** is hereby approved in its entirety.

3.      The Stipulation and this Order and the transactions contemplated thereby and hereby shall be without prejudice to the rights of McKesson to seek additional or different adequate protection, to move to vacate the automatic stay, to move for the appointment of a trustee or examiner, to move to dismiss or convert the Chapter 11 Case, or to take any other action in the Chapter 11 Case and to appear and be heard in any matter raised in this Chapter 11 Case.  The Debtor and the Committee shall have the right to object to any such motion.

4.      Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

5.      The Debtor is authorized to take all steps necessary or appropriate to carry out this Order.

6.      This Court retains jurisdiction to construe and enforce the terms of this Order.

Dated:  APRIL 11, 2018
Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

Appendix A085

2

**EXHIBIT A**

**STIPULATION**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | |

## STIPULATION FOR ENTRY OF ORDER PROVIDING McKESSON WITH ADEQUATE PROTECTION WITH RESPECT TO THE DEBTOR'S LOYALTYSCRIPT® PROGRAM

This *Stipulation for Entry of Order Providing McKesson with Adequate Protection with respect to the Debtor's LoyaltyScript® Program* (the "**Stipulation**") is entered into this 3rd day of April, 2018 by and between (i) Orexigen Therapeutics, Inc., debtor and debtor in possession (the "**Debtor**"); and (ii) McKesson Specialty Arizona, Inc. and its affiliates ("**McKesson**"). The Debtor and McKesson are referred to separately as a "**Party**," and collectively as the "**Parties**." The Stipulation is based on the following facts, as to which each of the Parties acknowledges as true and accurate in every material respect:

A.     The Debtor commenced a chapter 11 bankruptcy case (the "**Bankruptcy Case**") on March 12, 2018 (the "**Petition Date**") and continues as "debtor in possession," with all the rights, powers and duties set forth in section 1107 of title 11 of the United States Code, U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**"). The Debtor's assets include certain rights related to the development and sale of Contrave® (the "**Covered Drug**"), a drug approved by the Food and Drug Administration for chronic weight management in certain adults.

B.     As of the Petition Date, the Debtor was and remains a party to agreements with McKesson (collectively, the "**Program Service Agreement**")[2] related to the purchase and

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

Appendix A087

distribution of the Covered Drug and the distribution and processing of the Debtor's LoyaltyScript® for patients to have the benefit of an array of discounts off of the purchase price of the Covered Drug through retail pharmacies (the "**LoyaltyScript® Program**"). The Debtor believes and represents that the LoyaltyScript® Program is critically necessary for the success and viability of the Debtor's business and its ability to preserve and maximize value for creditors. In general, the LoyaltyScript® Program provides discounts to patients for the purchase of the Covered Drug which is received by the patients at the pharmacy, right at the point of sale. The Debtor designed the LoyaltyScript® Program to provide patients with an immediate discount on the Covered Drug with a minimum amount of paperwork and delay and without requiring mail-in forms or the like. In order to implement the LoyaltyScript® Program, the Debtor engaged the services of McKesson to provide technical support and to manage the LoyaltyScript® Program.

C.     In general, and as set forth with greater specificity in the Agreement, the Debtor has the sole responsibility to select the criteria for, and the other terms and conditions of, the LoyaltyScript® Program. McKesson implements the LoyaltyScript® Program as designed by the Debtor and coordinates with the retail pharmacies to insure that the LoyaltyScript® Program works as intended. The Debtor initiated the LoyaltyScript® Program in order to provide patients with substantial discounts on the price of the Covered Drug at the time of purchase. In performing its obligations under the Program Service Agreement, McKesson is solely administering the LoyaltyScript® Program as directed by the Debtor. Among its tasks, McKesson is to use funds provided by the Debtor to reimburse the pharmacies for discounts extended to patients (the "**Reimbursement Funds**").

---

[2] The terms and conditions of the Program Service Agreement and the LoyaltyScript® Program are confidential and proprietary. To extent necessary, the Parties will file the Program Service Agreement under seal.

Appendix A088

D.      The LoyaltyScript® Program gives patients a discount on the cost of the Covered Drug, and McKesson works with retail pharmacies to insure that the discount expectations of patients are met at the counter in the pharmacy. The dispensing pharmacy uses electronic means to advise of the proposed transaction and, upon meeting the requirements of the LoyaltyScript® Program, the pharmacy extends the discount to the patient. McKesson in turn reimburses the pharmacy for the discount (and so-called "pass through fees" for the pharmacy), primarily from the Reimbursement Funds provided to McKesson from the Debtor.

E.      Each month, using historical marketing data, McKesson estimates the amount required in order to fund projected discounts under the LoyaltyScript® Program, and advises the Debtor of the estimate in a monthly "**Reimbursement Invoice**." In turn, the Debtor is to "immediately pay such amount to prefund" the Reimbursement Funds. Each Reimbursement Invoice directs that payment is to be made no more than ten (10) days after the invoice date. If the Debtor fails to pay any net undisputed amount due on a timely basis, the Program Service Agreement provides for the application of a "Finance Charge" at the lesser of the maximum legal rate of interest and the "Carrying Fee" of one percent per month.

F.      Since implementation of the LoyaltyScript® Program in 2016, the amounts set forth in the Reimbursement Invoices have ranged monthly from approximately $3 million to approximately $8.7 million. The most recent Reimbursement Invoice (dated March 12, 2018) was for $6.3 million and, due to the intervening bankruptcy, has not been paid.

G.      McKesson asserts that it holds a prepetition claim against the Debtor in the amount of approximately $9.1 million (the "**McKesson Prepetition Claim**") for continuing to pay third parties on account of obligations paid by McKesson under the LoyaltyScript® Program before the Petition Date without reimbursement from the Debtor.

Appendix A089

H.     The Debtor represents that the Debtor's obligation to replenish the
Reimbursement Funds is incorporated into the Debtor's DIP Cash Flow Forecast attached as
Exhibit A to the *Interim Order (I) Approving Debtor-In-Possession Financing Pursuant to 11
USC §§ 105(a), 362, and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy
Rule 4001-2; etc.* [Dkt. No. 48] (the "**Interim DIP Financing Order**").

I.     In addition to the obligations associated with the Reimbursement Funds,
McKesson sends to the Debtor a monthly invoice for payment of the various fees and other costs
associated with the LoyaltyScript® Program.  These monthly invoices (each an "**Administrative
Fee Invoice**") are for payment of what the Program Service Agreement refers to as the
"**Administrative Fees**."  For the most part, and as set forth with specificity in the Schedule of
Fees, the Administrative Fees are calculated based on incremental services; *e.g.*, so much for
each completed enrollment, so much for each rebate check, etc.  The Administrative Fees are to
be paid by wire transfer within 30 days of the date of the Administrative Fee Invoice.  The
Administrative Fees average approximately $100,000 per month.  The Administrative Fees set
forth in the February 2018 Administrative Fee Invoice totaled $91,801.89 and, as a result of the
intervening bankruptcy filing, have not been paid.

J.     The Debtor believes that maintenance of the LoyaltyScript® Program is in the best
interest of creditors and the estate.

Based upon the foregoing, IT IS HEREBY AGREED AS FOLLOWS:

1.     Adequate Protection and Catch-up Payment.  No less than 2 business days after
entry of an Order approving this Stipulation, which Order shall be in form and content acceptable
to each of the Parties, but in no event later than April 13, 2018, the Debtor shall make an initial
payment to McKesson of Six Million, Twenty-Seven Thousand, One Hundred and Fifty-Five

Appendix A090

Dollars ($6,027,155) to pay McKesson for the actual and projected amounts remitted or to be remitted by McKesson under the LoyaltyScript® Program from the Petition Date through and including April 8, 2018. For the avoidance of doubt, no payments under this Stipulation shall be on account of or applied to the McKesson Prepetition Claim, and the Parties reserve all rights, whether existing in law or equity, with respect to the McKesson Prepetition Claim.

        2.      <u>Weekly Payments to McKesson</u>. Commencing on the first Monday after entry of an order approving this Stipulation, and continuing on each Monday thereafter until the occurrence of a Termination Event (defined below) the Debtor shall remit by ACH wire transfer the "**Weekly Payment**" of One Million Six Hundred and Seventy-Five Thousand Dollars ($1,675,000), comprised of the sum of (i) One Million Six Hundred and Fifty Thousand Dollars ($1,650,000) to replenish the Reimbursement Funds, and (ii) Twenty-Five Thousand ($25,000) to be applied to the Administrative Fee. If, for example, the Stipulation is approved by a court order entered on April 11, 2018, the first Weekly Payment shall be made on April 16, 2018. Every two weeks, the Parties shall meet and confer to consider whether to adjust the amount of the Weekly Payment. If both of the Parties agree, then the amount of the Weekly Payment shall change to the agreed amount, whether an increase or a decrease. The amount of the Weekly Payment shall not change unless both of the Parties agree.

        3.      <u>Settlement of Actual Amounts</u>. The Parties acknowledge and agree that the advance payment amounts provided in paragraph 2 are the Parties' good faith estimates based on past performance and the Parties will reconcile such amounts with actual amounts incurred by McKesson under the LoyaltyScript® Program on a monthly basis within a week of the end of the preceding calendar month, which will result in a return by McKesson to the Debtor of the unused

Appendix A091

portion of the estimate, or a true up payment from the Debtor to McKesson, as applicable, unless otherwise agreed to by the Parties.

4. <u>Administrative Priority</u>. McKesson agrees that it (a) will only seek administrative priority under section 503 of the Bankruptcy Code for actual post-petition amounts incurred under the LoyaltyScript® Program (b) shall return to the Debtor any unused post-petition funds received under this Stipulation in excess of the post-petition obligations incurred by McKesson under the LoyaltyScript® Program and (c) shall not seek administrative priority for such unused funds. McKesson further agrees that any administrative priority claim it may have is junior in all respects to the super-priority administrative claim of the DIP Lenders under that certain Debtor in Possession Credit and Security Agreement dated as of March 12, 2018 (the "**DIP Loan Agreement**") and approved by the Bankruptcy Court in the Interim DIP Financing Order and any order approving the DIP Loan Agreement on a final basis.

5. <u>Waiver of Set-off Right</u>. McKesson acknowledges and agrees that it will not assert against the Debtor any post-petition right of setoff that it has or may have, whether any such right arises by virtue of contract or law, with respect to claims arising under this Stipulation. For clarity, McKesson's waiver of post-petition setoff rights related to this Stipulation is limited to the situation in which McKesson receives Weekly Payments in excess of the Debtor's post-petition and pre-termination obligations under the LoyaltyScript® Program (the "**Excess Payments**"). In the event any Excess Payments exist, McKesson may not setoff such amounts against the McKesson Pre-Petition Claim.

6. <u>Termination</u>. The Stipulation and the Program Service Agreement shall continue in full force and effect until the first to occur of the following (each a "**Termination Event**"): (a) the Debtor advises in writing that the LoyaltyScript® Program is no longer active; (b) entry of

Appendix A092

an order of the Bankruptcy Court which provides for the rejection of the Program Service Agreement under the Bankruptcy Code; (c) the Debtor fails to make one or more of the payments to McKesson as set forth in this Stipulation; (d) the closing date of a sale of all or substantially all of the Debtor's assets; and (e) entry of an order (i) dismissing the Bankruptcy Case or (ii) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code. Immediately upon the occurrence of a Termination Event, (x) the Program Service Agreement shall terminate, (y) McKesson shall be relieved of any obligation to perform under the Program Service Agreement, and (z) McKesson shall no longer provide any support function for the LoyaltyScript® Program. As soon as practicable after the Termination Event, McKesson will return to the Debtor any Excess Payments received by McKesson under the LoyaltyScript® Program before the Termination Date.

      7.    <u>Strict Compliance with the Program Service Agreement</u>. Until the occurrence of a Termination Event, the Debtor and McKesson shall fully and completely comply in every material respect with each and all of the terms and conditions set forth in the Program Service Agreement, except only to the extent the terms and conditions set forth in this Stipulation are at material variance from those set forth in the Program Service Agreement and then only if the Stipulation expressly advises that the terms are at material variance and shall amend the Program Service Agreement. In that event, the Debtor and McKesson shall fully and completely comply in every material respect with the terms and conditions of the Program Service Agreement as expressly modified by the terms and conditions of this Stipulation.

      8.    <u>No Prejudice to any claims held by McKesson</u>. Performance under the Stipulation shall be without prejudice to any prepetition claim held by McKesson. Specifically, and without modifying the foregoing general statement, McKesson expressly reserves any and

Appendix A093

all claims of priority, collateral security, offset or otherwise. Without limiting the foregoing, McKesson specifically reserves the right to assert that McKesson's claim associated with the LoyaltyScript® Program is entitled to administrative priority to the extent McKesson, after the Petition Date, makes payment to or otherwise reimburses pharmacies for providing discounts to patients, whether the patient was given the discount by the pharmacy before or after the Petition Date. The Debtor does not agree, and instead asserts that McKesson's claim associated with the LoyaltyScript® Program is entitled to administrative priority only to the extent McKesson, after the Petition Date, makes payment to or otherwise reimburses pharmacies for providing discounts to patients after the Petition Date. The Parties agree to work to resolve this issue, but until such resolution, either by consent or court order, the Parties shall faithfully comply with all provisions of this Stipulation.

9. <u>Payments by Wire Transfer.</u> All payments made under the Program Service Agreement shall be by ACH wire transfer of immediately available Federal funds.

10. <u>Payments under the Stipulation Absolute and Final.</u> The Debtor acknowledges that it received good and fair consideration in exchange for each payment made after the Petition Date and under the terms of the Stipulation. Each payment made by the Debtor under the authority of the Stipulation shall be absolute and final and not subject to any claim based in whole or in part on any provision of the Bankruptcy Code including any claim of disgorgement based on the claims provided under the DIP Loan Agreement and the associated court orders approving that agreement. Further, and without limiting the foregoing, no payment from the Debtor after the Petition Date shall be subject to any claim of avoidance under chapter 5 of the Bankruptcy Code or otherwise. The Debtor, any reorganized debtor, its estate, its affiliate and any and all successors (collectively, the "**Releasing Entities**") unconditionally, irrevocably,

Appendix A094

absolutely and forever waives, releases and discharges McKesson, its officers, agents, and principals of any liability that arises in whole or in part under chapter 5 of the Bankruptcy Code (such claims are referred to collectively as "**Avoidance Actions**"), whether known or unknown, fixed or contingent, existing or hereafter arising, in law, equity or otherwise, and including any Avoidance Actions that may be asserted as derivative claims on behalf of any of the Releasing Entities.

11. <u>Termination of Stipulation upon Assumption and Assignment</u>. If the Debtor, under section 365 of the Bankruptcy Code, both assumes the Program Service Agreement and assigns that agreement to a third party, then upon such assignment, the Stipulation shall terminate.

12. <u>Successors and Assigns</u>. The terms and conditions set forth in the Stipulation may not be assigned by one Party without the prior written consent of the other Party, any such attempted assignment shall be without effect, except that McKesson may, without the consent of the Debtor, assign the Stipulation to a corporate affiliate. Upon the occurrence of an authorized assignment, the terms and conditions of the Stipulation shall be binding upon and inure to the benefit of the Parties, and their respective successors and assigns.

13. <u>Attorneys' Fees and Costs</u>. If any litigation arises under the Stipulation, the prevailing party shall be entitled to reimbursement of reasonable attorneys' fees and costs of suit in addition to any other relief to which it may be entitled.

14. <u>Entire Agreement; Integration</u>. Any invalidity, in whole or in part, of any provision of the Stipulation shall not affect the validity of any other provision. Except as set forth herein, the Stipulation, read together with the Program Service Agreement represents the entire agreement of the Parties and any previous communications, correspondence or

Appendix A095

memorializations of agreement are excluded from the Stipulation and are not to be employed to construe the Stipulation. The Parties further agree that the Stipulation shall not be subject to any claim of fraud, duress, deceit, mistake of law or mistake of fact and that it expresses the full, final and complete agreement of the Parties. No claim of waiver, modification, consent or acquiescence with respect to any provision of the Stipulation shall be made against any Party, except only on the basis of a written instrument executed by or on behalf of such Party.

15.    <u>Execution in Counterparts</u>. The Stipulation may be executed in one or more counterparts, and all such counterparts shall constitute one agreement. Delivery by fax of a copy of the Stipulation, or delivery by email in the form of an electronic image, executed by the Party to be bound shall evidence consent to the terms hereof, and the other Party may rely thereon as if it possessed a manually signed copy.

16.    <u>Interpretation</u>. No provision of the Stipulation is to be interpreted for or against any Party because that Party or that Party's representative or counsel drafted such provision.

17.    <u>Rules of Construction</u>. In the Stipulation, the following rules of construction shall apply:

> (i)    "includes" and "including" are not limiting and shall be construed to mean "including, without limitation;"

> (ii)    "or" is not exclusive; and

> (iii)    the singular includes the plural, and *vice versa.*

18.    <u>Time is of the Essence</u>. Time is of the essence with respect to the performance of all obligations required under the Stipulation.

19.    <u>No Third Party Beneficiaries</u>. The Stipulation is not for the benefit of any third party and shall not be deemed to grant any right or remedy to any third party, including a patient or a McKesson subcontractor, whether or not referred to herein.

Appendix A096

20.     <u>Debtor's Authority</u>.  The signature of the Debtor shall conclusively evidence that entry into the Stipulation is authorized by an order of the Bankruptcy Court in form and content acceptable to each of the Parties, entered after due and appropriate notice to all parties in interest. Further the Debtor represents that (i) it is authorized to execute, deliver and perform under the terms of the Stipulation; (ii) the Required DIP Lenders under the DIP Loan Agreement have consented to the terms of this Stipulation; (iii) compliance with the terms of the Stipulation, and with the Program Service Agreement will not violate any term or condition of the DIP Loan Agreement, the Interim DIP Financing Order and the order approving the DIP Loan Agreement on a final basis; and (iv) any and all conditions precedent to the Debtor's performance under the Stipulation have been satisfied in full.

21.     <u>Notices to the Parties</u>.  In addition to the notice provision in the Master Service Agreement, any notices required under the Stipulation shall be (i) in writing, (ii) sent by overnight mail by a nationally recognized courier for next business day delivery or electronic mail, and (iii) sent to the addresses as set forth below (or at such other addresses as the Party may specify in writing, and sent to the other Party):

Appendix A097

**McKesson:**

McKesson Specialty Arizona Inc.
Attn: Evan Coppola, Esq., Senior Counsel
5701 North Pima Road
Scottsdale, AZ 85250
E-Mail: Evan.Coppola@McKesson.com

With a copy to the following

Jeffrey K. Garfinkle
Buchalter, a Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
E-Mail: JGarfinkle@Buchalter.com

**Debtor:**

Orexigen Therapeutics, Inc.
Attn: Tom Lynch
3344 N. Torrey Pines Court,
Suite 200
La Jolla, CA 92037

With a copy to the following

Hogan Lovells US LLP
Attn: Christopher R. Donoho, III
and John D. Beck
875 Third Avenue
New York, NY 10022
Email:
chris.donoho@hoganlovells.com
John.beck@hoganlovells.com

IN WITNESS WHEREOF, the parties to the Stipulation have caused the Stipulation to be duly executed as of April __, 2018.

| McKesson Specialty Arizona Inc. a Delaware corporation | Orexigen Therapeutics, Inc. a Delaware corporation |
|---|---|
| By:_____ William Nolan Its:Vice President and General Manager | By:_____ Its:_____ |

12

Appendix A098

**McKesson:**

McKesson Specialty Arizona Inc.
Attn: Evan Coppola, Esq., Senior Counsel
5701 North Pima Road
Scottsdale, AZ 85250
E-Mail: Evan.Coppola@McKesson.com

With a copy to the following

Jeffrey K. Garfinkle
Buchalter, a Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
E-Mail: JGarfinkle@Buchalter.com

**Debtor:**

Orexigen Therapeutics, Inc.
Attn: Tom Lynch
3344 N. Torrey Pines Court,
Suite 200
La Jolla, CA 92037

With a copy to the following

Hogan Lovells US LLP
Attn: Christopher R. Donoho, III
and John D. Beck
875 Third Avenue
New York, NY 10022
Email:
chris.donoho@hoganlovells.com
John.beck@hoganlovells.com

IN WITNESS WHEREOF, the parties to the Stipulation have caused the Stipulation to be duly executed as of April ___, 2018.

| McKesson Specialty Arizona Inc.<br>a Delaware corporation | Orexigen Therapeutics, Inc.<br>a Delaware corporation |
|---|---|
| By:_____<br>_____<br>Its:_____ | By: _Thomas P. Lynch_<br>Thomas P. Lynch<br>Its: EVP, CAO, General<br>Counsel + Secretary |

12

Appendix A099

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | |

## DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 105(A) FOR AUTHORITY TO ENTER INTO A STIPULATION WITH McKESSON CORPORATION AND McKESSON PATIENT RELATIONSHIP SOLUTIONS, A BUSINESS UNIT OF McKESSON SPECIALTY ARIZONA, INC.

Orexigen Therapeutics, Inc., the debtor and debtor-in-possession in the above-captioned case (the "Debtor"), hereby moves (the "Motion"), pursuant to sections 361, 363 and 105 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit 1** authorizing the Debtor to enter into a stipulation (the "Stipulation") with McKesson Corporation ("McKesson") and McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona, Inc. ("MPRS", and together with McKesson and the Debtor, the "Parties" to the Stipulation) with respect to the McKesson Prepetition Distribution Agreement Receivable and the MPRS Prepetition Claim (both as defined below). In support of this Motion, the Debtor respectfully represents as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

Appendix A100

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief requested herein are sections 105(a), 361 and 363 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 4001 and 9014. The Debtor consents pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

3.      On March 12, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (this "Chapter 11 Case").  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner. On March 27, 2018, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors in this Chapter 11 Case (the "Committee").

4.      The Debtor is a biopharmaceutical company focused on the treatment of obesity and the commercialization of a single pharmaceutical drug for chronic weight management. The Debtor's assets include certain rights related to the development and sale of Contrave®, a drug approved by the Food and Drug Administration for chronic weight management in certain adults.  Additional details regarding the Debtor's business and the facts

Appendix A101

and circumstances supporting the relief requested herein are set forth in *the Declaration of Michael A. Narachi in Support of First Day Relief* (D.I. 3) (the "First Day Declaration") and incorporated herein by reference.

5. As of the Petition Date, the Debtor was and remains a party to that certain Core Distribution Agreement dated as of June 9, 2016 (as amended, the "Distribution Agreement"), pursuant to which the Debtor and McKesson agreed that McKesson would operate as an authorized distributor of healthcare products (as defined in the Distribution Agreement, the the "Product(s)") for the Debtor and provide certain core services related thereto. Additionally, the Debtor and MPRS remain parties to that certain Master Services Agreement dated as of July 15, 2016 (as amended, the "LoyaltyScript® Agreement") related to the processing of the Debtor's LoyaltyScript® for patients to have the benefit of an array of discounts off of the purchase price of the Product through retail pharmacies (the "LoyaltyScript® Program").

6. As of the Petition Date, the outstanding payable to the Debtor totaled six million, nine hundred thirty two thousand, eight hundred sixteen dollars and forty cents ($6,932,816.40) in prepetition amounts arising under the Distribution Agreement (the "McKesson Prepetition Distribution Agreement Receivable"). McKesson made payments to the Debtor after the Petition Date in the amount of $3,266,255.76 on account of the McKesson Prepetition Distribution Agreement Receivable but McKesson contends that the entirety of the McKesson Prepetition Distribution Agreement Receivable is subject to its contractual setoff, recoupment and withholding rights. In order to preserve its rights under the Distribution Agreement, among other things, on March 30, 2018, McKesson imposed an "administrative hold" on $3,666,560.64 of prepetition amounts otherwise owing to the Debtor under the Distribution Agreement. McKesson also acknowledges that it owes and will continue to owe the

Appendix A102

Debtor for post-petition purchases of additional Product under the Distribution Agreement (the "Post-Petition Distribution Agreement Receivables").

7.     The Debtor and MPRS previously entered into a stipulation (the "4.11.18 Stipulation") approved by the Court on April 11, 2018 (D.I. 176) (the "4.11.18 Order") with respect to certain performance obligations under the LoyaltyScript® Agreement and the provision of adequate protection payments.

8.     MPRS asserts that it holds a prepetition claim against the Debtor in the amount of approximately $8.5 million (the "MPRS Prepetition Claim") under the LoyaltyScript® Agreement, and the Debtor reserves all rights and defenses whether arising in law or equity with respect to the MPRS Prepetition Claim.  McKesson and MPRS each assert that as of the Petition Date and thereafter, they have a contractual right to set off the MPRS Prepetition Claim against the McKesson Prepetition Distribution Agreement Receivable.  The Debtor disputes that McKesson or MPRS has the right to set off the MPRS Prepetition Claim against the McKesson Prepetition Distribution Agreement Receivable.  The Debtor, and each of McKesson and MPRS, have ongoing post-petition obligations to one another under the Distribution Agreement and LoyaltyScript® Agreement.

9.     The Debtor believes that entering the Stipulation is in the best interest of creditors and the estate, as it embodies the Parties' efforts to resolve the outstanding balances owed under the Distribution Agreement and LoyaltyScript® Agreement and any disputes regarding those balances and their legal and equitable rights with respect to the same.

## RELIEF REQUESTED AND BASIS FOR RELIEF

10.     By this Motion, the Debtor seeks entry of an order under Bankruptcy Code sections 105, 361 and 363 authorizing the Debtor to enter into the Stipulation with McKesson.

Appendix A103

A.     **Summary of the Stipulation's Key Terms**

11.     Within three (3) business days of the entry of an Order approving the Stipulation, McKesson shall make a payment (by wire or other electronic means), to the Debtor on account of any prepetition amounts withheld under the McKesson Prepetition Distribution Agreement Receivable, which is currently estimated to be in the amount of three million, six hundred sixty-six thousand, five hundred sixty dollars and sixty four cents ($3,666,560.64), which McKesson and the Debtor agree will be applied to the McKesson Prepetition Distribution Agreement Receivable subject to any reconciliation by the Parties for facts not known at the time of the Stipulation.  With that payment, and the other payments made by McKesson after the Petition Date with respect to the McKesson Prepetition Distribution Agreement Receivable, and subject to any reconciliation contemplated above, McKesson shall have paid in full the entire McKesson Prepetition Distribution Agreement Receivable.  Subject to the reservation of rights and other terms of this Stipulation, any and all offset rights, if any, held by McKesson and MPRS are preserved, notwithstanding such payments.

12.     Each of the parties to the 4.11.18 Stipulation reserves all rights under the 4.11.18 Stipulation and the 4.11.18 Order.  Until such time as a Termination Event has occurred, as defined in the 4.11.18 Stipulation, McKesson and MPRS shall continue to perform under the terms of the LoyaltyScript® Agreement and Distribution Agreement, including by continuing to pay the Debtor monies owed under the Distribution Agreement in the ordinary course whether arising pre or post-petition. McKesson may continue to assert its right of setoff on a rolling basis over any monies owed to the Debtor and held by McKesson, including Post-Petition Distribution Agreement Receivables; provided that, all parties reserve all rights, claims, counter-claims, objections, defenses, and remedies with respect to the same.

Appendix A104

13. Upon the occurrence of a Termination Event, or if the MPRS Prepetition Claim is not otherwise satisfied in full, McKesson, MPRS or both of them shall file a motion in the Bankruptcy Court seeking an order authorizing them to set off the MPRS Prepetition Claim against the Debtor's Post-Petition Distribution Agreement Receivables ("McKesson's Setoff Motion").  The Debtor reserves all rights, counter-claims, objections, and defenses in connection with McKesson's Setoff Motion.

14. If McKesson's Setoff Motion is granted and an order is entered authorizing McKesson to set off the MPRS Prepetition Claim or requiring the Debtor to pay to MPRS all or any portion of the MPRS Prepetition Claim, within four (4) business days after entry of that order (unless the effect of the Order is stayed pending appeal) then, as applicable: (a) McKesson may set off the MPRS Prepetition Claim to the extent authorized by the Court against any Post-Petition Distribution Agreement Receivables; (b) to the extent that Post-Petition Distribution Agreement Receivables at the time of the order granting McKesson's Setoff Motion under the Distribution Agreement are insufficient to allow for the required set off, the Debtor shall pay to MPRS the difference between the amount of setoff approved by the Court and Post-Petition Distribution Agreement Receivables then available for setoff; and (c) if such differential is not paid timely, MPRS shall, to the extent of any unpaid or insufficient amount, be granted a priority administrative claim under Section 503 of the Bankruptcy Code, which claim shall survive the Bankruptcy Case, including any terms of a confirmed plan in this case, and shall be due and payable by the Debtor or any reorganized debtor.

15. Unless specifically ordered by the Court, the Debtor, McKesson, and MPRS agree to honor all of their respective post-petition obligations due to the other party pursuant to the Distribution Agreement, LoyaltyScript® Agreement, the 4.11.18 Stipulation and

Appendix A105

otherwise, in the ordinary course of business, including, but not limited to, all obligations under invoices issued to and from McKesson and MPRS on or after the Petition Date.

16.    Nothing contained in the Stipulation, the Motion, or the Order shall be deemed a waiver or release by McKesson, MPRS, or the Debtor, of any claims asserted by McKesson or MPRS against the Debtor or by the Debtor against McKesson or MPRS. McKesson, MPRS, and the Debtor hereby expressly reserve all rights, claims, counter-claims, objections, defenses, and remedies with respect to the same. Nothing in the Stipulation, the Motion, or the Order shall be deemed to constitute the Debtor's assumption of any agreement referenced herein. Nothing in the Stipulation, the Motion, or the Order constitutes a factual finding by the Court or an admission by any party. Nothing in the Stipulation, the Motion, or the Order shall be deemed to modify any of the rights and obligations of the parties under the 4.11.18 Stipulation.

17.    Nothing in the Stipulation, the Motion, or the Order shall be deemed to excuse McKesson, MPRS or any related entity from filing a proof of claim by any applicable bar date set pursuant to the *Order (A) Establishing Bar Date For Filing Proofs Of Claim, (B) Approving The Form And Manner For Filing Proofs Of Claim, (C) Approving Notice Thereof, (D) Implementing Uniform Procedures Regarding 503(B)(9) Claims, And (E) Granting Related Relief* (D.I. 170).

**B.    The Debtor is Exercising Sound Business Judgment in Entering into the Stipulation.**

18.    The Debtor seeks approval, pursuant to sections 105(a), 361, and 363(b) of the Bankruptcy Code to enter into the Stipulation. The Stipulation constitutes a sound exercise of business judgment and is in the best interest of the Debtor.

Appendix A106

7

19.     Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* § 105(a).

20.     Under applicable case law in this and other Circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents the exercise of the debtor's reasonable business judgment, such use should be approved.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that, under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Del. & Hudson R.R.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification").

21.     If a valid business justification exists for the use or sale of property of the estate, a debtor's decision enjoys a strong presumption that "in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets). Indeed, when applying the "business judgment" standard, courts show great deference to a

Appendix A107

debtor's business decisions. *See Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task. Delaware courts have said that it may be accomplished by showing either irrationality or inattention."); *In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) (applying the business judgment standard to transactions under section 363 of the Bankruptcy Code).

22.     Section 105(a) of the Bankruptcy Code further provides that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) allows the bankruptcy court to "craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the [Bankruptcy] Code was designed to obtain." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235-36 (3d Cir. 2004) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003)).

23.     Here, the Debtor's decision to enter into the Stipulation satisfies the business judgment test. As stated above, the Parties have ongoing post-petition obligations to one another under the Distribution Agreement and LoyaltyScript® Agreement, which agreements implement programs that are critical components of the Debtor's comprehensive marketing and sales strategy for the Product. The Stipulation embodies the Debtor's efforts to increase liquidity while preserving the McKesson and MPRS's ability to asset it has a valid right of set off and any disputes regarding their legal and equitable rights with respect to the same. Accordingly, the Debtor's decision to enter into the Stipulation is a sound exercise of its business judgment and is in the best interest of the Debtor, its estate, creditors, and all parties in interest.

Appendix A108

24.     Moreover, to the extent that the Debtor's entry into the Stipulation implicates sections 361 or 503 of the Bankruptcy Code, the Debtor believes such relief is appropriate given the importance of the Distribution Agreement and the LoyaltyScript[®] Agreement to the Debtor's ongoing business and customer relations.

## <u>REQUEST FOR WAIVER OF STAY</u>

25.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtor requests that any order approving the Motion be effective immediately upon entry by providing that the 14-day stay shall not apply. Immediate entry into the Stipulation is in the best interests of the Debtor and its stakeholders.

## <u>NOTICE</u>

26.     Notice of this Motion shall be given to: (i) the U.S. Trustee, (ii) counsel to the Unsecured Creditors' Committee; (iii) the parties included on the Debtor's list of thirty (30) largest unsecured creditors (iv) counsel to the DIP Administrative Agent, DIP Lenders, Prepetition Indenture Trustee and Secured Noteholders (each as defined in the First Day Declaration) (v) the Delaware Secretary of State; (vi) the Delaware State Treasury; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested in this Motion, the Debtor respectfully submits that no further notice is necessary.

27.     Additionally, this Motion is filed on shortened notice, given the exigent nature of the relief request.

Appendix A109

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter the Stipulation and Order, substantially in the form attached hereto as **Exhibit 1**, and grant the relief requested and such other relief as is just and proper.

May 10, 2018
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

/s/      *Jose F. Bibiloni*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Jose F. Bibiloni (No. 6261)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
aremming@mnat.com
jbibiloni@mnat.com

- and -

Christopher R. Donoho, III (admitted *pro hac vice*)
Christopher R. Bryant (admitted *pro hac vice*)
John D. Beck (admitted *pro hac vice*)
**HOGAN LOVELLS US LLP**
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
chris.donoho@hoganlovells.com
christopher.bryant@hoganlovells.com
john.beck@hoganlovells.com

*Counsel for Debtor and Debtor in Possession*

Appendix A110

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | **Re: D.I. 281** |

### ORDER GRANTING DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 105(A) FOR AUTHORITY TO ENTER INTO A STIPULATION WITH McKESSON CORPORATION AND McKESSON PATIENT RELATIONSHIP SOLUTIONS, <u>A BUSINESS UNIT OF McKESSON SPECIALTY ARIZONA, INC.</u>

Upon the motion (the "<u>Motion</u>")[2] of the Debtor pursuant to sections 105, 361 and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), as supplemented by Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), requesting entry of an order approving the Stipulation with McKesson Corporation ("<u>McKesson</u>") and McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona, Inc. ("<u>MPRS</u>", and together with McKesson and the Debtor, the "<u>Parties</u>" to the Stipulation) with respect to the McKesson Prepetition Distribution Agreement Receivable and the MPRS Prepetition Claim; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in this district pursuant to 28 U.S.C. § 1410; and due and proper notice of the Motion having been provided to the parties listed therein and no adverse interest being

---

[1] The last four digits of the Debtor's federal tax identification number are 8822.  The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

affected; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Stipulation, attached hereto as **Exhibit A,** is hereby approved in its entirety.

3.      The Stipulation and this Order and the transactions contemplated thereby and hereby shall be without prejudice to (i) any and all rights McKesson and MPRS may have to assert an offset as of the Petition Date of the MPRS Prepetition Claim against the McKesson Prepetition Distribution Agreement Receivable; and (ii) any and all rights the Debtor may have to dispute, object, and assert claims, counter-claims, defenses, and remedies with respect to any offset assertion raised by McKesson and MPRS.

4.      Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

5.      The Debtor is authorized to take all steps necessary or appropriate to carry out this Order.

6.      This Court retains jurisdiction to construe and enforce the terms of this Order.

Dated: May 18, 2018
      Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

Appendix A112

2

## EXHIBIT A

### STIPULATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | |

### STIPULATION BETWEEN DEBTOR, McKESSON CORPORATION AND McKESSON PATIENT RELATIONSHIP SOLUTIONS, A BUSINESS UNIT OF McKESSON SPECIALTY ARIZONA, INC.

Orexigen Therapeutics, Inc. ("**Orexigen**" or the "**Debtor**"), McKesson Corporation ("**McKesson**"), and McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona Inc. ("**MPRS**") having so stipulated (the "**Stipulation**"), and the Court being otherwise fully advised,

WHEREAS, Orexigen and McKesson entered into that certain Core Distribution Agreement dated as of June 9, 2016 (as amended, the "**Distribution Agreement**"), pursuant to which McKesson and Orexigen agreed, *inter alia*, that McKesson would operate as an authorized distributor of healthcare products (defined in the Distribution Agreement as the "**Product(s)**") for Orexigen as "Manufacturer," and provide certain core services related thereto;

WHEREAS, Orexigen and MPRS entered into that certain Master Services Agreement dated as of July 15, 2016 (as amended, the "**LoyaltyScript® Agreement**") related to the processing of the Debtor's LoyaltyScript® for patients to have the benefit of an array of discounts off of the purchase price of the Product through retail pharmacies (the "**LoyaltyScript® Program**");

WHEREAS, the Debtor commenced a chapter 11 bankruptcy case (the "**Bankruptcy Case**") on March 12, 2018 (the "**Petition Date**") and continues as "debtor in possession," with

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

all the rights, powers and duties set forth in section 1107 of title 11 of the United States Code, U.S.C. § 101, et seq. (the "**Bankruptcy Code**") and the Debtor's assets include certain rights related to the development and sale of the Product (known as Contrave®), a drug approved by the Food and Drug Administration for chronic weight management in certain adults;

WHEREAS, McKesson acknowledges that as of the Petition Date the outstanding payable to the Debtor totaled six million, nine hundred thirty two thousand, eight hundred sixteen dollars and forty cents ($6,932,816.40) in prepetition amounts arising under the Distribution Agreement (the "**McKesson Prepetition Distribution Agreement Receivable**");

WHEREAS, McKesson made payments to the Debtor postpetition in the amount of $3,266,255.76 to the Debtor on account of the McKesson Prepetition Distribution Agreement Receivable but McKesson contends that the entirety of the McKesson Prepetition Distribution Agreement Receivable is subject to its contractual setoff, recoupment and withhold rights. In order to preserve its rights under the Distribution Agreement, among other things, on March 30, 2018, McKesson imposed an "administrative hold" on $3,666,560.64 of prepetition amounts otherwise owing to the Debtor under the Distribution Agreement on account of the McKesson Prepetition Distribution Agreement Receivable. McKesson also acknowledges that it owes and will continue to owe the Debtor for post-petition purchases of additional Product under the Distribution Agreement (the "**Post-Petition Distribution Agreement Receivables**");

WHEREAS, MPRS and Orexigen entered into that stipulation (the "**4.11.18 Stipulation**") which was approved by a court order entered on April 11, 2018 as D.I. 176 (the "**4.11.18 Order**") with respect to certain performance obligations under the LoyaltyScript® Agreement;

Appendix A115

WHEREAS, MPRS asserts that it holds a prepetition claim against the Debtor in the amount of approximately $8.5 million (the "**MPRS Prepetition Claim**") under the LoyaltyScript® Agreement, and the Debtor reserves all rights and defenses whether arising in law or equity with respect to the MPRS Prepetition Claim;

WHEREAS, McKesson and MPRS each assert that as of the Petition Date and thereafter, they have a contractual right to set off the MPRS Prepetition Claim against the McKesson Prepetition Distribution Agreement Receivable;

WHEREAS, the Debtor disputes that McKesson or MPRS has the right to set off the MPRS Prepetition Claim against the McKesson Prepetition Distribution Agreement Receivable;

WHEREAS, the Debtor, and each of McKesson and MPRS have ongoing post-petition obligations to one another under the Distribution Agreement and LoyaltyScript® Agreement; and

WHEREAS, the Debtor, McKesson, and MPRS desire to work cooperatively to resolve the outstanding balances owed and any disputes regarding those balances and their legal and equitable rights with respect to same while, in the interim, preserving both: (i) any and all rights McKesson and MPRS may have to assert an offset as of the Petition Date of the MPRS Prepetition Claim against the McKesson Prepetition Distribution Agreement Receivable; and (ii) any and all rights the Debtor may have to dispute, object, and assert claims, counter-claims, defenses, and remedies with respect to any offset assertion raised by McKesson and MPRS.

NOW, THEREFORE, IT IS HEREBY STIPULATED, AGREED AND SO-ORDERED:

1. The foregoing recitals are incorporated herein by reference as if set forth at length herein.

Appendix A116

2.      Within three (3) business days of the entry of an Order approving this Stipulation, McKesson shall make a payment (by wire or other electronic means), to the Debtor on account of any prepetition amounts withheld under the McKesson Prepetition Distribution Agreement Receivable, which is currently estimated to be in the amount of three million, six hundred sixty-six thousand, five hundred sixty dollars and sixty four cents ($3,666,560.64), which McKesson and the Debtor agree will be applied to the McKesson Prepetition Distribution Agreement Receivable subject to any reconciliation by the Parties for facts not known at the time of this Stipulation.  With that payment, and the other payments made by McKesson after the Petition Date with respect to the McKesson Prepetition Distribution Agreement Receivable, and subject to any reconciliation contemplated above, McKesson shall have paid in full the entire McKesson Prepetition Distribution Agreement Receivable.  Subject to the reservation of rights and other terms of this Stipulation, any and all offset rights, if any, held by McKesson and MPRS are preserved, notwithstanding such payments.

3.      Each of the parties to the 4.11.18 Stipulation reserves all rights under the 4.11.18 Stipulation and the 4.11.18 Order.  Until such time as a Termination Event has occurred, as defined in the 4.11.18 Stipulation, McKesson and MPRS shall continue to perform under the terms of the LoyaltScript® Agreement and Distribution Agreement, including by continuing to pay the Debtor monies owed under the Distribution Agreement in the ordinary course whether arising pre or post-petition.  McKesson may continue to assert its right of setoff on a rolling basis over any monies owed to the Debtor and held by McKesson, including Post-Petition Distribution Agreement Receivables; provided that, all parties reserve all rights, claims, counter-claims, objections, defenses, and remedies with respect to the same.

Appendix A117

4.      Upon the occurrence of a Termination Event, or if the MPRS Prepetition Claim is not otherwise satisfied in full, McKesson, MPRS or both of them shall file a motion in the Bankruptcy Court seeking an order authorizing them to set off the MPRS Prepetition Claim against the Debtor's Post-Petition Distribution Agreement Receivables ("**McKesson's Setoff Motion**"). The Debtor reserves all rights, counter-claims, objections, and defenses in connection with McKesson's Setoff Motion.

5.      If McKesson's Setoff Motion is granted and an Order is entered authorizing McKesson to set off the MPRS Prepetition Claim or requiring the Debtor to pay to MPRS all or any portion of the MPRS Prepetition Claim, within four (4) business days after entry of that Order (unless the effect of the Order is stayed pending appeal) then, as applicable:   (a) McKesson may set off the MPRS Prepetition Claim to the extent authorized by the Court against any Post-Petition Distribution Agreement Receivables; (b) to the extent that Post-Petition Distribution Agreement Receivables at the time of the Order granting McKesson's Setoff Motion under the Distribution Agreement are insufficient to allow for the required set off, the Debtor shall pay to MPRS the difference between the amount of setoff approved by the Court and Post-Petition Distribution Agreement Receivables then available for setoff; and (c) if such differential is not paid timely, MPRS shall, to the extent of any unpaid or insufficient amount, be granted a priority administrative claim under Section 503 of the Bankruptcy Code, which claim shall survive the Bankruptcy Case, including any terms of a confirmed plan in this case, and shall be due and payable by the Debtor or any reorganized debtor.

6.      Unless specifically ordered by the Court, the Debtor, McKesson, and MPRS agree to honor all of their respective post-petition obligations due to the other party pursuant to the Distribution Agreement, LoyaltyScript® Agreement, the 4.11.18 Stipulation and otherwise, in

5

Appendix A118

the ordinary course of business, including, but not limited to, all obligations under invoices issued to and from McKesson and MPRS on or after the Petition Date.

7.      Nothing contained herein shall be deemed a waiver or release by McKesson, MPRS, or the Debtor, of any claims asserted by McKesson or MPRS against the Debtor or by the Debtor against McKesson or MPRS.  McKesson, MPRS, and the Debtor hereby expressly reserve all rights, claims, counter-claims, objections, defenses, and remedies with respect to the same.  Nothing in this Stipulation shall be deemed to constitute the Debtor's assumption of any agreement referenced herein.  Nothing in this Stipulation constitutes a factual finding by the Court or an admission by any party.  Nothing in this Stipulation shall be deemed to modify any of the rights and obligations of the parties under the 4.11.18 Stipulation.

8.      Nothing in this Stipulation shall be deemed to excuse McKesson, MPRS or any related entity from filing a proof of claim by any applicable bar date set pursuant to the *Order (A) Establishing Bar Date For Filing Proofs Of Claim, (B) Approving The Form And Manner For Filing Proofs Of Claim, (C) Approving Notice Thereof, (D) Implementing Uniform Procedures Regarding 503(B)(9) Claims, And (E) Granting Related Relief* (D.I. 170).


[remainder of page intentionally left blank; signature page to follow]

6

Appendix A119

IN WITNESS WHEREOF, the parties to the Stipulation have caused the Stipulation to be duly executed as of May 8, 2018.

**McKesson Corporation,**
**a Delaware corporation**


By:_____
_____
Its:_____


**Orexigen Therapeutics, Inc.,**
**a Delaware corporation**


By: _Thomas P. Lynch_
_Thomas P. Lynch_
Its: _EVP, Chief Administrative_
_Officer, General Counsel +_
_Secretary_


**McKesson Specialty Arizona Inc., a**
**Delaware corporation**

By: _____
_WILLIAM P NOLAN_
Its: _VICE PRESIDENT +_
_GENERAL MANAGER_

7

Appendix A120

IN WITNESS WHEREOF, the parties to the Stipulation have caused the Stipulation to be duly executed as of May 8, 2018.

**McKesson Corporation,**
**a Delaware corporation**


By: _~~Sean Murphy~~_
____Sean Murphy____
Its: _Director, Credit_


**McKesson Specialty Arizona Inc., a**
**Delaware corporation**


By:_____
_____
Its:_____

**Orexigen Therapeutics, Inc.,**
**a Delaware corporation**


By: _Thomas P. Lynch_
____Thomas P. Lynch____
Its: _EVP, Chief Administrative_
_Officer, General Counsel &_
_Secretary_

7

Appendix A121

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | **Hearing Date: July 17, 2018 at 10 a.m. [Requested]**<br>**Objection Deadline: July 13, 2018 at 4 p.m. [Requested]** |

## OMNIBUS MOTION FOR ENTRY OF AN ORDER
## (I) AUTHORIZING THE DEBTOR TO REJECT CERTAIN CONTRACTS AND (II) <u>GRANTING CERTAIN RELATED RELIEF</u>

---

> **PARTIES RECEIVING THIS MOTION SHOULD LOCATE THEIR NAMES AND THEIR CONTRACTS LISTED ON <u>EXHIBIT A</u>, ATTACHED HERETO.**

---

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") moves this Court for the entry of an order pursuant to sections 105(a) and 365 of the Bankruptcy Code: (i) authorizing the Debtor to reject certain contracts and (ii) granting certain related relief. In support of this motion (the "<u>Motion</u>"), the Debtor respectfully represents as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

1810518180703000000000004

## **BACKGROUND**

1. On March 12, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. The Debtor continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtor's cases.

3. An overview of the Debtor's history and business, a summary of the events leading to the commencement of this chapter 11 case, and the facts supporting this Motion are set forth in the *Declaration of Michael A. Narachi in Support of First Day Relief* (the "First Day Declaration") [Docket No. 3], filed on the Petition Date and incorporated by reference herein.

4. The Debtor is party to a significant number of prepetition executory contracts and unexpired leases (collectively, the "Contracts"). On June 28, 2018, the Court entered *Order (I) Approving the Sale of Substantially All Assets of the Debtor Free and Clear of Liens, Encumbrances, Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Sale Order") (Docket No. 438). Pursuant to the Sale Order, the Sale (as defined in the Sale Order) is scheduled to close on July 13, 2018. Accordingly, the Debtor's day-to-day operations have changed significantly and the Debtor has identified certain Contracts that no longer provide meaningful value to the Debtor or its estate.

Appendix A123

5.      By this Motion the Debtors seek to reject the Contracts listed in **Exhibit A**.[2]

I.      REJECTION OF THE CONTRACTS IS A SOUND EXERCISE
        OF THE DEBTOR'S BUSINESS JUDGMENT

6.      Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a). Courts routinely approve motions to reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts to authorize the rejection of an executory contract is that of "business judgment"); *see also In re Taylor*, 913 F.2d 102 (3d. Cir. 1990); *In re Buckhead America Corp.*, 180 B.R. 83 (Bankr. D. Del. 1995).

7.      Courts generally will not second-guess a debtor's business judgment concerning the rejection of an executory contract or unexpired lease.  *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice." (internal quotations omitted)). The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *N.L.R.B. v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3rd Cir. 1982) (noting that the "usual test for rejection of an executory contract is simply whether rejection would benefit the estate") *aff'd*, 465 U.S. 513.  Further, "[s]ection 365 enables the trustee to maximize the value of the debtor's estate by assuming executory contracts and

---

[2]      The Debtor reserves the right to remove any Contract from **Exhibit A** any time prior to the hearing on this Motion.

unexpired leases that benefit the estate and rejecting those that do not." *L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000); *see also Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (section 365 of the Bankruptcy Code "allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed").

8.     The rejection of the Contracts is an appropriate exercise of the Debtor's business judgment and will reduce the administrative burdens on its estate. The Contracts are financially burdensome and no longer necessary.  Further, the Contracts have no marketable value that could be generated through assumption and assignment. Accordingly, the Debtor's' continued performance under the Contracts would constitute an unnecessary depletion of value of the Debtor's estates.

9.     Further, the Debtor submits that it is appropriate for the Court to authorize rejection retroactive to July 13, 2018, i.e., the expected closing date of the Sale. Although section 365 of the Bankruptcy Code does not address whether a court may order retroactive rejection, many courts have held that they are so empowered.  See, e.g., SCS Co. v. Peter J. Schmitt Co., No. 94-125-RRM, 1995 U.S. Dist. LEXIS 22163, at *5 (D. Del. May 15, 1995) (noting that a bankruptcy court has authority to select a retroactive date for the effective date of a lease's rejection); *In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) (stating "the court's power to grant retroactive relief is derived from the bankruptcy court's equitable powers so long as it promotes the purposes of § 365(a)"); In re Mid Region Petroleum, Inc., 111 B.R. 968, 970 (Bankr. N.D. Okla. 1990) (finding that the effective date for the rejection of leases was the date the trustee gave notice of intent to reject); In re Carlisle Homes, Inc., 103 B.R. 524, 535 (Bankr.

Appendix A125

D.N.J. 1988) (finding that debtor may reject an executory contract by clearly communicating the intention to reject).]

10.     Courts in this jurisdiction have approved relief similar to that requested herein. *See In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Apr. 15, 2015) (authorizing rejection of executory contracts effective as of specified dates); *In re QCE Fin. LLC*, No. 14-10543 (PJW) (Bankr. D. Del. Apr. 9, 2014) (authorizing rejection of unexpired leases *nunc pro tunc* to the petition date); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Feb. 26, 2014) (authorizing rejection of unexpired leases *nunc pro tunc* to prior notice date); *In re Prommis Holdings, LLC*, No. 13-10551 (BLS) (Bankr. D. Del. June 14, 2013) (same).

11.     The balance of equities favors the relief requested herein. Without a retroactive date of rejection, contractual counterparties may attempt to assert additional administrative expenses under the Contracts.  Given that the Debtor will have transferred substantially all of its assets to the Purchaser at the closing on July 13, 2018, the Debtor has no use for the Contracts after July 13, 2018.  Therefore, the Debtors respectfully submit that it is fair and equitable for the Court to order that the Contracts be rejected retroactively as of July 13, 2018.

II.     <u>COMPLIANCE WITH BANKRUPTCY RULE 6006(F)</u>

12.     Bankruptcy Rule 6006(f) establishes requirements for a motion to reject multiple executory contracts or unexpired leases that are not each between the same parties. Rule 6006(f) states, in part, that such a motion shall:

      a.  state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;

Appendix A126

5

    b.   list parties alphabetically and identify the corresponding contract or lease;

    c.   specify the terms, including the curing of defaults, for each requested assumption or assignment;

    d.   specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;

    e.   be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and

    f.   be limited to no more than 100 executory contracts or unexpired leases.

13.    Bankr. R. 6006(f). The Debtor respectfully submits that the relief requested in this motion complies with the requirements of Rule 6006(f).

### III.   REQUEST FOR IMMEDIATE RELIEF & WAIVER OF STAY

14.    Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtor seeks a waiver of any stay of the effectiveness of an order granting this motion, to the extent that it applies to the relief requested in this motion. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The relief requested herein is essential to avoid the potential accrual of unnecessary administrative expenses. Accordingly, the Debtor submits that, to the extent that Bankruptcy Rule 6004(h) applies, ample cause exists to justify a waiver of the fourteen-day stay.

### RESERVATION OF RIGHTS

15.    Nothing in the Motion shall: (i) constitute an admission as to the validity or priority of any claim against the Debtor; (ii) constitute a waiver of the Debtor's rights to

Appendix A127

dispute any claim; or (iii) prejudice the Debtor's rights to assert that any of the Contracts are not executory or unexpired within the meaning of section 365 of the Bankruptcy Code;

<div align="center">**NOTICE**</div>

16.     Notice of this Motion shall be given to: (i) the U.S. Trustee, (ii) counsel to the Committee; (iii) the parties included on the Debtor's list of thirty (30) largest unsecured creditors (iv) counsel to the DIP Administrative Agent, DIP Lenders, Prepetition Indenture Trustee and Secured Noteholders (each as defined in the First Day Declaration) (v) the Delaware Secretary of State; (vi) the Delaware State Treasury; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; (ix) contractual counterparties to the Contracts listed on **Exhibit A**; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Due to the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this motion is necessary.

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as **Exhibit B**, granting:  (i) the relief requested herein; and (ii) such other and further relief to the Debtor as the Court may deem proper.

Dated: July 3, 2018          **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Wilmington, Delaware

*/s/ Andrew R. Remming*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
aremming@mnat.com

Appendix A128

- and -

Christopher R. Donoho, III (admitted *pro hac vice*)
Christopher R. Bryant (admitted *pro hac vice*)
John D. Beck (admitted *pro hac vice*)
**HOGAN LOVELLS US LLP**
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
chris.donoho@hoganlovells.com
chris.bryant@hoganlovells.com
john.beck@hoganlovells.com

*Counsel for Debtor and Debtor in Possession*

12024005

Appendix A129

# IN THE UNITED STATES BANKRUPTCY
# COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | **Ref. Nos.: 459, 511** |

## OMNIBUS ORDER (I) AUTHORIZING THE DEBTOR TO REJECT CERTAIN CONTRACTS RELATED TO THE MCKESSON ENTITIES AND (II) GRANTING CERTAIN RELATED RELIEF

This matter coming before the Court on the *Omnibus Motion for Entry of an Order (I) Authorizing the Debtor to Reject Certain Contracts and (II) Granting Certain Related Relief* [D.I. 459] (the "Motion")[2] filed by the above-captioned debtor and debtor in possession (the "Debtor"); the Court having reviewed the Motion; the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) that this Court may enter a final order consistent with Article III of the United States Constitution; and (v) notice of the Motion and the Hearing was sufficient under the circumstances; after due deliberation the Court having determined that the relief requested in the Motion is necessary and essential for the administration of the Debtor's estate and such relief is in the best interests of the Debtor, its estate and its creditors; and good and sufficient cause having been shown;

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

[2] Capitalized terms not defined herein are defined in the Motion.

Appendix A130

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED as to the McKesson Entities;[3]

2. Pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, the Contracts listed on **Exhibit A** hereto are rejected by the Debtor, effective immediately following the closing of the sale to Nalpropion Pharmaceuticals, Inc. (the "Closing Date"). Immediately following the closing the Debtor shall provide counsel to the McKesson Entities with telephonic notice followed by written, email notice that the Sale has closed. If the Closing Date occurs after July 17, 2018, the Debtor shall file a notice of Sale closing (the "Closing Notice") and serve a copy of the Closing Notice on contract counterparties to the Contracts listed on **Exhibit A**;

3. Notwithstanding the relief granted herein and any actions taken hereunder, nothing in the Motion or this Order shall: (i) constitute an admission as to the validity or priority of any claim against the Debtor; (ii) constitute a waiver of the Debtor's rights to dispute any claim; or (iii) prejudice the Debtor's rights to assert that any of the Contracts are not executory or unexpired within the meaning of section 365 of the Bankruptcy Code;

4. The terms and conditions of this order shall be immediately effective and enforceable upon its entry;

5. The rejection of the Contracts complies with the requirements of Bankruptcy Rule 6006(f); and

---

[3] For purposes of this Motion, the applicable McKesson entities include the counterparties identified on **Exhibit A** hereto: McKesson BioServices Corporation; McKesson Corporation; McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona Inc.; and McKesson Specialty Arizona, Inc. (collectively, the "McKesson Entities").

Appendix A131

6.    This Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation of this order.

Dated: July **17**, 2018
        Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

Appendix A132

Case 18-10518-KG Doc 561-1 Filed 07/17/18 Page 1 of 2

# EXHIBIT A

## Schedule of Orexigen Therapeutics, Inc. Contracts and Leases

| Lease (Lessor) / Contract Counterparty | Lease (Lessor) / Contract Counterparty Address | Lease (Lessor) / Contract Counterparty City, State, Zip | Lease / Contract Title | Lease / Contract Effective Date | Contract / Lease Type |
|---|---|---|---|---|---|
| McKesson BioServices Corporation | 14655 Rothgeb Drive | Rockville, MD 208050 | Service Agreement | 1/20/2005 | Executory |
| McKesson BioServices Corporation | 14655 Rothgeb Drive | Rockville, MD 208050 | Services Agreement | 6/16/2004 | Executory |
| McKesson BioServices Corporation | 14655 Rothgeb Drive | Rockville, MD 208050 | Addendum A-1 Statement of Work | 1/14/2017 | Executory |
| McKesson BioServices Corporation | 14655 Rothgeb Drive | Rockville, MD 208050 | Statement of Work | 7/14/2004 | Executory |
| McKesson Corporation | 4343 North Scottsdale Road | Scottsdale, AZ 85251-3329 | Core Distribution Agreement | 7/1/2016 | Executory |
| McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona Inc. | 4343 North Scottsdale Road Suite 370 | Scottsdale, AZ 85251-3329 | First Amendment to Schedule of Services for Loyalyscript® Program for Contrave® | 1/8/2017 | Executory |
| McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona Inc. | 4343 North Scottsdale Road Suite 370 | Scottsdale, AZ 85251-3329 | Master Service Agreement | 7/15/2016 | Executory |
| McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona Inc. | 4343 North Scottsdale Road | Scottsdale, AZ 85251-3329 | First Amendment Master Services Agreement | 9/23/2016 | Executory |
| McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona Inc. | 4343 North Scottsdale Road | Scottsdale, AZ 85251-3329 | Second Amendment Master Services Agreement | 1/20/2017 | Executory |

Page 1 of 1

Appendix A134

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | Ref. No. __ |

### ORDER APPROVING STIPULATION BETWEEN DEBTOR, CERTAIN SECURED CREDITORS AND McKESSON CORPORATION REGARDING RESOLUTION OF CERTAIN DISPUTED CLAIMS

Upon the Certification of Counsel and the *Stipulation Between Debtor, Certain Secured Creditors and McKesson Corporation Regarding Resolution of Certain Disputed Claims* (the "Stipulation")[2] entered into between the Debtor, McKesson, and the Lenders, a copy of which is attached hereto as **Exhibit A**; and the Court having jurisdiction to consider approval of the Stipulation; and it appearing that sufficient notice of the Stipulation has been given; and after due deliberation; and good and sufficient cause appearing therefore; it is hereby

ORDERED that the Stipulation is hereby APPROVED; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated: July **20**, 2018
Wilmington, Delaware

_____
The Honorable Kevin Gross
United States Bankruptcy Judge

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

[2] Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

{1210.001-W0051839.}

Appendix A135



1810518180720000000000000004

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | |

### STIPULATION BETWEEN DEBTOR, CERTAIN SECURED CREDITORS
### AND McKESSON CORPORATION REGARDING
### RESOLUTION OF CERTAIN DISPUTED CLAIMS

This Stipulation (this "**Stipulation**") is entered into this 19th day of July, 2018 (the "**Effective Date**") by and among (i) Orexigen Therapeutics, Inc., debtor and debtor in possession ("**Orexigen**," and after commencement of the Bankruptcy Case, the "**Debtor**"); (ii) McKesson Corporation ("**McKesson**"); and (iii) each of the following (collectively, the "**Lenders**"): (a) Baupost Group Securities, L.L.C.; (b) EcoR1 Capital Fund, L.P.; and (c) EcoR1 Capital Fund Qualified, L.P. The Debtor, the Lenders and McKesson are each referred to separately as a "**Party**," and collectively as the "**Parties**."

### RECITALS

This Stipulation is based upon the following facts, as to which each of the Parties acknowledges as true and correct in every material respect:

A.     Orexigen and McKesson entered into that certain Core Distribution Agreement dated as of June 9, 2016 (as amended, the "**Distribution Agreement**"), pursuant to which McKesson and Orexigen agreed, *inter alia*, that McKesson would operate as an authorized distributor of healthcare products (defined in the Distribution Agreement as the "**Product(s)**") for Orexigen as "Manufacturer," and provide certain core services related thereto;

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

Appendix A137

B.     Section VII.i. of the Distribution Agreement provides as follows: "Notwithstanding anything to the contrary in this Agreement, each of McKesson Corporation and its affiliates is hereby authorized to set-off, recoup and apply any amounts owed by it to Manufacturer's affiliates against any all [*sic*] amounts owed by Manufacturer or its affiliates to any of McKesson Corporation or its affiliates, without prior written notice;"

C.     Orexigen and McKesson Patient Relationship Solutions ("**MPRS**"), a business unit of McKesson Specialty Arizona, Inc., a subsidiary of McKesson, entered into that certain Master Services Agreement dated as of July 15, 2016 (as amended, the "**LoyaltyScript®  Agreement**") related to the processing of the Debtor's LoyaltyScript®(the "**LoyaltyScript® Program**");

D.     Orexigen commenced a chapter 11 bankruptcy case (the "**Bankruptcy Case**") on March 12, 2018 (the "**Petition Date**") and continues as a "debtor in possession," with all the rights, powers and duties set forth in section 1107 of title 11 of the United States Code, U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**") and the Debtor's assets include certain rights related to the development and sale of the Product (known as Contrave®);

E.     McKesson asserts rights under the Distribution Agreement, among other things, with respect to Six Million, Nine Hundred Thirty-Two Thousand, Eight Hundred Sixteen Dollars and Forty Cents ($6,932,816.40) of prepetition amounts the Debtor claims is owing under the Distribution Agreement (the "**Disputed Funds**"). McKesson's rights with respect to the Disputed Funds are referred to collectively as "**McKesson's Disputed Rights**."

F.     In the Bankruptcy Case, the following events occurred:

i.     On March 13, 2018, the Debtor filed a motion seeking authority, among other things, to sell substantially all of its assets [Docket No. 70] (the "**Sale Motion**");

Appendix A138

ii.      Thereafter, Nalpropion Pharmaceuticals ("**Nalpropion**") was identified as the "stalking horse" for the sale contemplated by the Sale Motion;

iii.      On April 11, 2018, the Court entered an order [Docket No. 176] (the "**4.11.18 Order**") approving a stipulation entered into by and between MPRS and the Debtor (the "**4.11.18 Stipulation**") with respect to certain performance obligations under the LoyaltyScript® Agreement;

iv.      On April 13, 2018, the Court entered an order approving the Lenders' financing of the Debtor's operations, granting adequate protection and other related relief [Docket No. 189] (the "**Final DIP Order**");

v.      On May 18, 2018, the Court entered an order [Docket No. 319] (the "**5.18.18 Order**") approving a stipulation (the "**5.8.18 Stipulation**") entered into by and between McKesson and the Debtor with respect to preservation of McKesson's Disputed Rights, among other things;

vi.      On June 11, 2018, McKesson filed a limited objection to the Sale Motion [Docket No. 365] (the "**McKesson Sale Objection**");

vii.      On June 28, 2018, at a hearing on the Sale Motion, McKesson withdrew the McKesson Sale Objection on the terms set forth on the record in open court and as provided in this Stipulation; and

viii.      At the end of the hearing on June 28, 2018, the Bankruptcy Court entered an order approving the Sale Motion, and granting related relief [Docket No. 438] (the "**Sale Order**").

G.     In order to facilitate the sale contemplated in the Sale Order, the Parties agreed to (i) defer resolution of McKesson's Disputed Rights, and (ii) the other accommodations set forth in this Stipulation.

## AGREEMENT

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED AS FOLLOWS:

1.     The foregoing Recitals are incorporated by reference as if set forth at length herein.

2.     On or before July 30, 2018, McKesson may file a motion, together with any supporting declarations, seeking an order authorizing it to assert McKesson's Disputed Rights (the "**Disputed Rights Motion**"). If McKesson does not file the Disputed Rights Motion on or before July 30, 2018, then McKesson shall be deemed to have no interest in the Disputed Funds. On or before August 21, 2018, each of the Debtor and the Lenders may file a response to the Disputed Rights Motion, together with any supporting declarations. On or before August 31, 2018, McKesson may file a reply in support of the Disputed Rights Motion, together with any supporting declarations. The Disputed Rights Motion shall be set for hearing at a date agreed upon by the Parties promptly after the completion of briefing, or as otherwise ordered by the Court. If, before July 30, 2018, McKesson, the Debtor and Nalpropion reach an agreement that resolves McKesson Disputed Rights, the Debtor shall be excused from its obligation to segregate the Disputed Funds, and McKesson shall be excused from filing the Disputed Rights Motion.

Appendix A140

3.      On or promptly after the Closing,[2] the Debtor shall segregate the amount of the Disputed Funds to be held pending resolution of McKesson's Disputed Rights as set forth in this Stipulation.

4.      To the extent an order is entered that grants, in whole or in part, the Disputed Rights Motion, upon that order becoming a Final Order, McKesson shall be paid from the Disputed Funds, but only to the extent such order grants the Disputed Rights Motion.  Any such payment to McKesson from the Disputed Funds shall be free and clear of any Lien, charge, claim or interest that may be asserted by the Lenders or any other party in interest.  To the extent an order is entered that denies, in whole or in part, the Disputed Rights Motion, upon that order becoming a Final Order, to the extent such order denies the Disputed Rights Motion, the Disputed Funds, as cash collateral of the Lenders, shall be paid to the Debtor, or, if the effective date of a chapter 11 plan shall have occurred, as provided in the plan.

5.      Each of the parties to the 4.11.18 Stipulation reserves all rights under the 4.11.18 Stipulation and the 4.11.18 Order.  Specifically, and without limiting the generality of the foregoing, as expressly provided in the 4.11.18 Stipulation, immediately upon the occurrence of a "**Termination Event**," as defined in the 4.11.18 Stipulation, (a) the LoyaltyScript® Agreement terminates, (b) MPRS is relieved of any obligation to perform under the LoyaltyScript® Agreement, and (c) MPRS shall no longer provide any support function under the LoyaltyScript® Agreement.  Upon the occurrence of a Termination Event, each of the parties to the 4.11.18 Stipulation is permitted to notify all patients, pharmacies and other parties in interest of the termination of (i) the LoyaltyScript® Program, and (ii) McKesson's distribution of the Debtor's products.

---

[2] This Stipulation uses certain definitions set forth in the Asset Purchase Agreement dated as of April 23, 2018 attached as Exhibit 4 to the Order approving bid procedures.  [Docket No. 231].

Appendix A141

6. Each of the parties to the 5.8.18 Stipulation reserves all rights under the 5.8.18 Stipulation and the 5.18.18 Order.

7. Nothing contained in this Stipulation shall be deemed a waiver or release by any of the Parties of any claims asserted by McKesson against the Debtor. McKesson and the Debtor hereby expressly reserve all rights, claims, counter-claims, objections, defenses, and remedies with respect to the Disputed Rights Motion. Without limiting the generality of the foregoing, McKesson specifically reserves the rights provided in section 9404 of the California Uniform Commercial Code.

8. Nothing in this Stipulation shall: (a) be deemed to constitute the Debtor's assumption of any agreement referenced herein; or (b) be deemed to modify any of the rights and obligations of the parties under (i) the 4.11.18 Stipulation; or (ii) the 5.8.18 Stipulation; or (iii) any agreement referenced in this Stipulation.

9. Each payment made from the Disputed Funds Escrow under the authority of this Stipulation shall be absolute and final and not subject to any claim based in whole or in part on any provision of the Bankruptcy Code. Without limiting the foregoing, no payment from the Disputed Funds Escrow shall be subject to any claim of avoidance under chapter 5 of the Bankruptcy Code or otherwise.

10. <u>Execution in Counterparts</u>. The Stipulation may be executed in one or more counterparts, and all such counterparts shall constitute one agreement. Delivery by fax of a copy of the Stipulation, or delivery by email in the form of an electronic image, executed by the Party to be bound shall evidence consent to the terms hereof, and the other Party may rely thereon as if it possessed a manually signed copy.

Appendix A142

11.     Interpretation.  No provision of the Stipulation is to be interpreted for or against any Party because that Party or that Party's representative or counsel drafted such provision.

12.     Rules of Construction.  In the Stipulation, the following rules of construction shall apply:

   i. "includes" and "including" are not limiting and shall be construed to mean "including, without limitation;"

   ii. "or" is not exclusive; and

   iii. the singular includes the plural, and *vice versa*.

13.     No Third Party Beneficiaries.  The Stipulation is not for the benefit of any third party and shall not be deemed to grant any right or remedy to any third party, including a patient or a McKesson subcontractor, whether or not referred to herein.

14.     Authority.  The signatures on behalf of the Parties shall conclusively evidence that entry into the Stipulation is authorized by the Bankruptcy Court in form and content acceptable to each of the Parties, entered after due and appropriate notice to all parties in interest. Further, each Party, as applicable, represents that (i) it is authorized to execute, deliver and perform under the terms of the Stipulation; (ii) compliance with the terms of the Stipulation will not violate any term or condition of the DIP Financing Order; and (iii) any and all conditions precedent to each Party's performance under the Stipulation have been satisfied in full.  The signature of all individuals shall constitute a representation and warranty that such individual is duly authorized to execute this Stipulation on behalf of the Party on whose behalf such individual executes this Stipulation.

**[SIGNATURE PAGE TO FOLLOW]**

**WHITEFORD, TAYLOR & PRESTON LLP**

/s/ Christopher M. Samis
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Telephone: (302) 353-4144
Facsimile: (302) 661-7950
csamis@wtplaw.com
kgood@wtplaw.com
astulman@wtplaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Eric Winston
Bennett Murphy
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
ericwinston@quinnemanuel.com
bennettmurphy@quinnemanuel.com

*Counsel for Baupost Group Securities, L.L.C.,*
*EcoR1 Capital Fund, L.P. and*
*EcoR1 Capital Fund Qualified, L.P.*

**REED SMITH LLP**

/s/ Kurt F. Gwynne
Kurt F. Gwynne (No. 3951)
1201 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 778-7550
Facsimile: (302) 778-7575
kgwynne@reedsmith.com

-and-

**BUCHALTER, A PROFESSIONAL CORPORATION**
Jeffrey K. Garfinkle
18400 Von Karman Avenue, Suite 800
Irvine, California 92612-0514
Telephone: (949) 760-1121
Facsimile: (949) 720-0182
JGarfinkle@Buchalter.com

*Counsel for McKesson*

**LANDIS RATH & COBB LLP**

/s/ Richard S. Cobb
Richard S. Cobb (No. 3157)
Kerri K. Mumford (No. 4186)
Jennifer L. Cree (No. 5919)
919 N. Market St. Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
cobb@lrclaw.com
mumford@lrclaw.com
cree@lrclaw.com

*Conflict Counsel for the Debtor and*
*Debtor-In-Possession*

Appendix A144

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | **Objections Due: August 21, 2018**<br>**Hearing Date: TBD** |

## McKESSON'S MOTION FOR AN ORDER DETERMINING THAT
## McKESSON IS ENTITLED TO THE DISPUTED FUNDS

McKesson Corporation ("**McKesson Corp.**" and together with McKesson Patient

Relationship Solutions ("**MPRS**"), a business unit of McKesson Specialty Arizona, Inc., a

wholly owned subsidiary of McKesson Corp., "**McKesson**"), by and through the undersigned

counsel, hereby moves (the "**Motion**") the Bankruptcy Court for entry of an order determining

that McKesson has contract rights enforceable under applicable law which expressly provide

McKesson Corp. the ability to apply amounts owed by the Debtor to MPRS under one agreement

as a credit against obligations owed by McKesson Corp. to the Debtor under another agreement.

The Motion is based on California law, as applicable under and preserved by section 553

of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), the

facts and arguments set forth in the Motion, the Declaration of Erin Beesley (the "**Beesley**

**Decl.**") filed in support, any additional declarations, papers and pleadings filed in support of the

Motion, and on such other and further information as the Bankruptcy Court may deem proper.

## INTRODUCTION

1.      Orexigen Therapeutics, Inc. (the "**Debtor**") was a pharmaceutical drug

manufacturer with a single product, Contrave® (the "**Product**").  Ninety percent or more of the

Product was sold to three wholesalers and product distributors:  AmerisourceBergen, Cardinal

---

[1] The last four digits of the Debtor's federal tax identification number are 8822.  The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

Appendix A145

Healthcare, and McKesson.  In fact, McKesson alone was responsible for the distribution of

approximately 40% of the Product to pharmacies in the United States and elsewhere.  As a result

of the Debtor's concentrated distribution strategy (which is standard in the pharmaceutical

industry), at any particular time, the three wholesalers/distributors were also obligated to the

Debtor for approximately 95% of the Debtor's US accounts receivable.

2.      As of March 12, 2018 (the "**Petition Date**"), the Debtor was a party to two

separate agreements with McKesson:  the "**Distribution Agreement**"[2] and the "**Master Services**

**Agreement**."[3]  The Distribution Agreement and the Master Services Agreement are referred to

collectively as the "**McKesson Agreements**."

3.      Under the Distribution Agreement, McKesson Corp. purchased the Product from

the Debtor and McKesson distributed the Product to various pharmacies throughout the United

States and McKesson, through its corporate family of companies, provided other services.  Under

the Master Services Agreement, MPRS managed the Debtor's LoyaltyScript® program for

patients to have access, through retail pharmacies at the point-of-sale, to an array of price

discounts for the Product.

---

[2]  The "Core Distribution Agreement" by and between McKesson Corp. and the Debtor was effective as of July 1,
2016, and amended several times.  The Distribution Agreement defined the terms and conditions pursuant to which
McKesson Corp. and others within the McKesson corporate family would distribute the Debtor's product and
provide certain "core" services.  Beesley Decl. ¶ 3.

[3]  The "Master Services Agreement" by and between MPRS and the Debtor dated as of July 15, 2016, as amended
from time to time.  The Master Services Agreement defined the terms and conditions pursuant to which MPRS
assisted the Debtor in managing the Debtor's LoyaltyScript® program.  Beesley Decl. ¶ 5.

Appendix A146

4.      In the Distribution Agreement, the parties agreed that McKesson Corp. had

certain rights to "set-off, recoup and apply amounts" owed between the Debtor and its affiliates

on the one hand, and McKesson and its affiliates on the other.  Specifically, the parties agreed:

> "VII.   General
>
>             . . .
>
> i.Notwithstanding anything to the contrary in this Agreement, each
> of McKesson Corporation and its affiliates is hereby authorized to
> set-off, recoup and apply any amounts owed by it to
> Manufacturer's [the Debtor's] affiliates against any all [*sic*]
> amounts owed by Manufacturer or its affiliates to any of
> McKesson Corporation or its affiliates, without prior written
> notice[.]"
>
> Beesley Decl. ¶ 4.

The rights accorded McKesson under that provision are referred to as "**McKesson's Application**

**Rights**."  These rights are fully enforceable under controlling California law.

5.      The Motion's relevant issue arises in the intersection of the business operations

under the two McKesson Agreements.  As a result of the integrated distribution-related activities,

McKesson Corp. owed the Debtor for Product purchased as of the Petition Date (less certain

amounts owed by the Debtor for services provided under the Distribution Agreement) and

McKesson and all of its affiliates had the contractual right to apply any payables for product

purchases against amounts owed to McKesson and all of its affiliates.  As a result of the

management of the Debtor's LoyaltyScript® program, the Debtor in turn owed MPRS for

program-related costs that were advanced by MPRS and not reimbursed by the Debtor.  This was

the exact circumstance anticipated by both McKesson and the Debtor at the time the Distribution

Agreement was entered into and, as a result, express provisions were included in the Distribution

Agreement to govern this exact situation.

Appendix A147

6.      As of the Petition Date, the Debtor owed MPRS approximately $9.1 million under the Master Services Agreement, and McKesson owed the Debtor approximately $6.9 million under the Distribution Agreement.  In this Motion, McKesson seeks an order authorizing it to exercise McKesson's Application Rights to these obligations.

7.      The resolution of the issues raised in this Motion has nothing to do with the Debtor, the Bankruptcy Code, the terms and conditions under the DIP Loan Facility provided to the Lenders, or the terms of the sale of the Debtor's assets.  Instead, the determining factors relate to the enforceability under applicable California law of certain provisions in the McKesson Agreements (now rejected) which expressly provide McKesson with certain contractual rights—McKesson's Application Rights.  Based on controlling California law, there is no legal or factual basis to limit the application of the express terms of the agreement that grants to McKesson the right to apply the amounts owed.  McKesson anticipates that the Lenders will assert that under section 553 of the Bankruptcy Code, McKesson's Application Rights cannot be asserted, and McKesson acknowledges there is considerable authority supporting the Lenders' assertion.  McKesson responds, however, and posits that the Lenders' argument flies in the face of several fundamental premises of bankruptcy law:  (i) property interests are created and defined by State law; and (ii) to analyze such interests in any other way requires a determination that there exists a substantial federal interest that requires a different result.  Moreover, as explained in more detail below, it would be grossly inequitable to bestow on the Lenders greater rights vis-à-vis McKesson then these Lenders held outside of bankruptcy.

///

///

Appendix A148

## STATEMENT OF FACTS

8.     The Debtor and McKesson have already addressed a number of the issues associated with the McKesson Agreements.[4]  As set forth more particularly in the two stipulations entered into between McKesson and the Debtor (collectively, the "**McKesson Stipulations**") [D.I. 176-1; D.I. 319-1], under the terms of the McKesson Agreements, McKesson provided product distribution, logistical support and other services for the Debtor.  Beesley Decl. ¶ 8.  As of the Petition Date, the Debtor was in default in its performance obligations under the McKesson Agreements.  Beesley Decl. ¶ 8.  McKesson incorporates, and will not repeat, the factual underpinnings of the Court-approved McKesson Stipulations.

<u>The Stipulation Related to the Master Services Agreement</u>.

9.     On April 11, 2018, an order was entered [D.I. 176] that approved the McKesson Stipulation attached as Exhibit A thereto (the "**April Stipulation**") that addressed, among other things, the Debtor's obligations under the Master Services Agreement[5] related to the processing

---

[4]  See, *e.g.*, the "Order Granting Debtor's Motion Pursuant to 11 U.S.C. §§ 361, 363, 503 and 105(a) for Authority to Enter into Stipulation Granting Adequate Protection to McKesson Specialty Arizona, Inc. and its Affiliates" [D.I. 176] and the "Order Granting Debtor's Motion Pursuant to 11 U.S.C. §§ 361, 363 and 105(a) for Authority to Enter into a Stipulation with McKesson Corporation and McKesson Patient Relationship Solutions, a Business Unit of McKesson Specialty Arizona, Inc."  [D.I. 319].

[5]  The Master Services Agreement was amended several times:  (i) the "First Amendment Master Service Agreement" dated as of October 10, 2016; (ii) the Second Amendment Master Service Agreement" dated as of January 20, 2017; and (iii) the "Third Amendment Master Services Agreement" dated as of October 2, 2017.  Beesley Decl. ¶ 5.

The LoyaltyScript® Program is further described in "Schedule A1—Schedule of Services for LoyaltyScript® Program for Contrave®" signed by the Debtor and MPRS and dated on or about July 25, 2016 ("**Schedule A1**").  In turn, Schedule A1 attaches a "Schedule of Fees" (the "**Fee Schedule**").  Beesley Decl. ¶ 7.  The prefatory paragraph of Schedule A1 provides:

> "This Schedule of Services A1 described the Services to be performed by McKesson . . . and [the Debtor] for the LoyaltyScript® Program for Contrave (the "Program").  This Schedule of Services and the attached Schedule of Fees (the "Schedule") are pursuant to the Master Services Agreement . . ."
> Beesley Decl. ¶ 7.

As a result, both Schedule A1 and the Fee Schedule were entered into pursuant to the Master Services Agreement.

Appendix A149

5

of the Debtor's LoyaltyScript® program for patients to have the benefit of an array of discounts off of the purchase price of the Product through retail pharmacies (the "**LoyaltyScript®**

**Program**").  Beesley Decl. ¶ 5.

10.     As set forth in the April Stipulation, McKesson asserted that it held a prepetition claim against the Debtor in the amount of approximately $9.1 million (the "**McKesson**

**Prepetition Claim**") for MPRS continued payments to patients and pharmacies on account of the Debtor's obligations under the LoyaltyScript® Program before the Petition Date without reimbursement from the Debtor.

11.     In the April Stipulation, the Debtor agreed to make substantial payments to MPRS to fund the "Reimbursement Funds" under the LoyaltyScript® Program, but expressly provided that the payments made shall not be applied to the McKesson Prepetition Claim.  The April Stipulation unambiguously sets forth that "no payments under this Stipulation shall be on account of or applied to the McKesson Prepetition Claim . . ."  [D.I. 176-1, page 6 of 14].

12.     In the April Stipulation, the Debtor agreed to make a "Catch-up Payment" in the form of an "initial payment" of approximately $6.027 million to MPRS for the actual and projected amounts remitted or to be remitted by MPRS under the LoyaltyScript® Program.  The Debtor also agreed to make weekly payments of $1.675 million ($25,000 to be applied to an "Administrative Fee" due under the Master Services Agreement, with the balance to replenish the "Reimbursement Funds" due under that agreement).  McKesson agreed that it would not assert against the Debtor offset rights with respect to weekly payments in excess of the Debtor's post-petition and pre-termination obligations under the LoyaltyScript® Program, but McKesson's

---

Schedule A1 was amended several times:  (i) the "First Amendment to Schedule of Services for LoyaltyScript® Program for Contrave®" dated on or about January 8, 2017; and (ii) the "Second Amendment to Schedule of Services for LoyaltyScript® Program for Contrave®" dated on or about November 16, 2017.  Beesley Decl. ¶ 7.

Appendix A150

waiver of post-petition setoff rights related to the April Stipulation is limited to the situation where the Debtor has made "Excess Payments" to McKesson.  [D.I. 176-1, page 7 of 14].

13.     The April Stipulation also provides [D.I. 176-1, page 8 of 14] that upon (a) "entry of an order of the Bankruptcy Court which provides for the rejection of the Program Service Agreement"[6] or (b) "the closing date of a sale of all or substantially all of the Debtor's assets" (each of which, under the April Stipulation, is a "**Termination Event**"), each of the following shall occur "immediately:"  (i) the Master Services Agreement shall terminate; (ii) McKesson shall be relieved of any obligation to perform under the Master Services Agreement; and (iii) McKesson shall no long provide any support function for the LoyaltyScript® Program.

14.     The McKesson Prepetition Claim was based upon MPRS continuing to pay third parties (pharmacies and patients) for discounts and other services that, under the LoyaltyScript® Program were entirely obligations of the Debtor.  MPRS continued the process, knowing that if the reimbursements under the LoyaltyScript® Program were to cease, that would cause confusion and damage to the Product and its patient base.  Indeed, in the April Stipulation, the Debtor acknowledged that it believed and represented that the LoyaltyScript® Program was "critically necessary for the success and viability of the Debtor's business and its ability to preserve and maximize value for creditors."  [D.I. 176-1, page 3 of 14].

The Stipulation Related to the Distribution Agreement.

15.     On May 18, 2018, an order was entered [D.I. 319] that approved the McKesson Stipulation attached as Exhibit A thereto (the "**May Stipulation**") [D.I. 319-1] that specifically addressed, among other things, the obligations arising under the Distribution Agreement. Beesley Decl. ¶ 9.  Under the Distribution Agreement, McKesson was authorized to operate as a

---

[6]  The "Program Service Agreement" is another name for the Master Services Agreement.  Beesley Decl. ¶ 6.

distributor of healthcare products (defined in the Distribution Agreement as "the Product(s)") for the Debtor and provide certain core services related thereto.  Beesley Decl. ¶ 3.

16.     Under the May Stipulation, McKesson acknowledged that as of the Petition Date, its outstanding payable owed to the Debtor was approximately $6.9 million.  [D.I. 319-1, page 3 of 9].  The Debtor acknowledged that after the Petition Date, McKesson paid approximately $3.266 million on account of that payable.  McKesson contended that the entire amount of approximately $6.9 million is subject to McKesson's claim of contractual setoff, recoupment, application, and withhold rights.  [D.I. 319-1, page 3 of 9].  Further, in accordance with McKesson's Application Rights, McKesson asserted that it has a contractual right, enforceable under applicable California law, to apply the amounts owed to MPRS under the LoyaltyScript® Program.  [D.I. 319-1, page 4 of 9].

17.     Under the May Stipulation, subject to a reservation of offset and other rights, McKesson paid the Debtor on account of any prepetition amounts owed under the Distribution Agreement, approximately $3.666 million.  Beesley Decl. ¶ 9.  As a result of that payment, the Debtor agreed that McKesson has paid in full the entire prepetition amount due under the Distribution Agreement.  [D.I. 319-1, page 5 of 9].

18.     The parties agreed in the May Stipulation that:  "McKesson may continue to assert its right of setoff on a rolling basis over any monies owed to the Debtor and held by McKesson, including Post-Petition Distribution Agreement Receivables; provided that all parties reserve all rights, claims, counter-claims, objections, defenses, and remedies with respect to the same."  [D.I. 319-1, page 5 of 9].  The provision was intended to preserve McKesson's Application Rights.  The May Stipulation goes on to provide as follows:

Appendix A152

"4.      Upon the occurrence of a Termination Event, or if the MPRS Prepetition Claim is not otherwise satisfied in full, McKesson, MPRS or both of them shall file a motion in the Bankruptcy Court seeking an order authorizing them to set off the MPRS Prepetition Claim against the Debtor's Post-Petition Distribution Agreement Receivables ("**McKesson's Setoff Motion**").  The Debtor reserves all rights, counter-claims, objections, and defenses in connection with McKesson's Setoff Motion.

5.      If McKesson's Setoff Motion is granted and an Order is entered authorizing McKesson to set off the MPRS Prepetition Claim or requiring the Debtor to pay to MPRS all or any portion of the MPRS Prepetition Claim, within four (4) business days after entry of that Order (unless the effect of the Order is stayed pending appeal) then, as applicable:  (a) McKesson may set off the MPRS Prepetition Claim to the extent authorized by the Court against any Post-Petition Distribution Agreement Receivables; (b) to the extent that Post-Petition Distribution Agreement Receivables at the time of the Order granting McKesson's Setoff Motion under the Distribution Agreement are insufficient to allow for the required set off, the Debtor shall pay to MPRS the difference between the amount of setoff approved by the Court and Post-Petition Distribution Agreement Receivables then available for setoff; and (c) if such differential is not paid timely, MPRS shall, to the extent of any unpaid or insufficient amount, be granted a priority administrative claim under Section 503 of the Bankruptcy Code, which claim shall survive the Bankruptcy Case, including the terms of a confirmed plan in this case, and shall be due and payable by the Debtor or reorganized debtor."

[D.I. 319-1, page 6 of 9].  (Emphasis in the original).

19.     The Order approving the May Stipulation provides that "[t]he Stipulation and this Order and the transactions contemplated thereby and hereby shall be without prejudice to (i) any and all rights McKesson and MPRS may have to assert an offset as of the Petition Date of the MPRS Prepetition Claim against the McKesson Prepetition Distribution Agreement Receivable; and (ii) any and all rights the Debtor may have to dispute, object, and assert claims, counter-claims, defenses, and remedies with respect to any offset assertion raised by McKesson and

Appendix A153

MPRS." D.I. 319, page 2 of 2. This Motion is "McKesson's Setoff Motion" referenced in the

Order approving the May Stipulation, and seeks to enforce McKesson's Application Rights.

20. The Debtor recently obtained approval of a motion to sell substantially all of its

assets, including substantially all rights associated with the Product, to a newly-formed entity

(the "**Buyer**"). The sale transaction closed on July 27, 2018. [D.I. 640]. Under the asset

purchase agreement, the Buyer purchased all accounts receivable, including any amounts owed

by McKesson. [D.I. 231-4, page 64 of 433]. Under the terms of an amendment to the asset

purchase agreement, the cash amount of the consideration for substantially all of the Debtor's

assets is $73.5 million. [D.I. 633-1]. The entirety of the proceeds of sale of the Debtor's assets

are subject to the security interest of and allocated to the Lenders, except only a relatively small

negotiated "carve-out" available for distribution to administrative and unsecured creditors.

Details of the "carve-out" were announced during the sale approval hearing (held on June 28,

2018). *See* June 28, 2018 Transcript. [D.I. 474].

21. In order to protect McKesson's property interest in the Disputed Funds, *i.e.*,

McKesson's Application Rights, the parties entered into a stipulation approved by a court order

[D.I. 592]. Under that stipulation, the Debtor segregated $6,932,816.40, the amount of the

Disputed Funds, and is holding those funds for the parties' benefit pending resolution of

McKesson's Disputed Rights under the Motion. To the extent this Court denies McKesson's

Motion, and that order becomes final, then the Disputed Funds, "as cash collateral of the

Lenders" will be paid to the Debtor, subject to the Lender's security interest. [D.I. 592-1, page 6

of 9]. In the near term, the Debtor is expected to file a plan of liquidation consistent with these

terms.

Appendix A154

22.     Thus, while the Debtor is ostensibly a party to the Motion, in truth it is merely a stakeholder for a group of lenders (collectively the "**Lenders**") who would reap any benefit from denial of enforceability of McKesson's Application Rights.  In addition to holding substantially all of the secured debt of the Debtor, certain of the Lenders are hold approximately 90% of the equity interest in the Buyer and as to the holder of the remaining 10%, McKesson understands certain of the Lenders are creditors holding security interests in that entity's assets.

## LEGAL ARGUMENT

### The Enforceability of McKesson's Application Rights are Governed by California Law.

23.     Section VII.b. of the Distribution Agreement provides that "[t]his Agreement will be governed by and construed in accordance with the laws of California, without regard to or application of conflict of law, rules or principles."  Said differently, if any party seeks to assert that under applicable nonbankruptcy law, the express language describing McKesson's Application Rights in the Distribution Agreement is anything other than fully enforceable in accordance with its terms, such assertion must be grounded in California law.  As to the impact of bankruptcy law, the analysis begins with *Butner*.

24.     As determined by *Butner v. United States*, 440 U.S. 48, 55 (1979):

> "Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.  Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' [Citation deleted].  The justifications for application of state law are not limited to ownership interests; they may apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property."

Appendix A155

25.     Unless, as said in *Butner*, ". . . some federal interest requires a different result,"
California law applies to construe the Distribution Agreement and define the rights and
obligations of the parties, including the enforceability of McKesson's Application Rights.  While
section 553 of the Bankruptcy Code imposes certain defined restrictions in order to fit into the
context of a bankruptcy, a non-debtor party's contractual rights are preserved under the
Bankruptcy Code, McKesson asserts that there is no federal interest that would impose a federal
gloss on the application of state law to these rights.  Recognizing that there are a large number of
cases to the contrary (which do not address the Supreme Court's clear guidance in *Butner* and
similarly-decided cases), McKesson maintains that the correct reading of section 553 is to
conclude that the section does not create any federal right of setoff and that it does not interfere
with McKesson's rights under California law and the enforceability of McKesson's Application
Rights.  *See generally Butner*, 440 U.S. at 54 n.9 (creditor's rights under state law may be
suspended only in the event of an "actual conflict with the system provided by [the Bankruptcy
Code]").

26.     It should also be noted the McKesson Agreements involve only a parent and a
wholly-owned subsidiary, each of which undertakes to support another entity (in this case, the
Debtor) by providing completely integrated services (*i.e.*, distribution of Product as compared
with management and logistical support for the Debtor's LoyaltyScript® Program).  In light of
current business structures, one can posit that in that context, if any federal interests are affected,
recognition of McKesson's Application Rights better serves the federal interest in this context of
patient care and safety.

27.     Finally, McKesson's Application Rights do not relate exclusively to common law
offset.  Far from it.  In fact, the provision grants to McKesson at least three separate rights,

Appendix A156

claims or defenses. The language of the Distribution Agreement grants to McKesson authority ". . . to set-off, recoup and apply any amounts owed . . ." Under the Distribution Agreement, McKesson has the authority (i) to set-off, (ii) to recoup, and (iii) to apply any amounts owed. These contract rights are not synonymous. As the Court is well aware, the right to set-off is different from the right to recoup, and different from generalized contract authority to apply amounts owed.

28.     As a result, without a clearly articulated federal interest that would be substantially and negatively impaired by recognition of McKesson's Application Rights, the Court should rely upon California law and allow those rights to be enforced.

### State Law Governs Mutuality and California Law Permits Express Agreements to Confirm the Nature of Parents and Subsidiaries.

29.     Because state law governs the right to setoff, and are preserved under section 553, controlling state law should be relied upon as to the conditions for setoff. "Mutuality of obligations is determined by state law." *In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006) (applying Texas law) (quoting *In re Czyzk*, 297 B.R. 406, 409 (Bankr. D.N.J. 2003)); *In re Sunset Aviation, Inc.*, 468 B.R. 641, 647 (Bankr. D. Del. 2011) ("the right of setoff requires mutuality between the debtor and the creditor *under the applicable state law*") (emphasis added); *In re Bill Heard Enters., Inc.*, 438 B.R. 745, 750 (Bankr. N.D. Ala. 2010) ("state law must be examined to determine whether mutuality exists"); *Levine v. Kenny (In re Flooring American, Inc.)*, 302 B.R. 403, 406 (Bankr. N.D. Ga. 2003) ("Whether mutuality exists is an issue of state law.") (applying Georgia law); *County of Orange v. County of Orange*, 183 B.R. 609, 615 (Bankr. C.D. Cal. 1995) ("Mutuality is generally an issue of state law."); *see generally In re Calore Exp. Co., Inc.*, 288 F. 3d 22, 43 (1st Cir. 2002) ("Setoff is a creature of the common law, and therefore in most cases a question of state law"); *In re MCB Fin. Grp., Inc.*,

Appendix A157

No. 10-11176-WHD, 2011 WL 8609454, at *4 (Bankr. N.D. Ga. Mar. 31, 2011) ("application of section 553 to preserve a right of setoff presupposes the existence of a valid, prepetition right of setoff, the source of *which must be applicable nonbankruptcy law*.") (emphasis added).[7]

30.    In the context of offset and similar transactions, courts look to section 553 of the Bankruptcy Code for guidance.  Section 553 in pertinent part provides:

> [e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, **this title does not affect** any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . 11 U.S.C. § 553(a). (emphasis added).

31.    Section 553 does not create a right of setoff, but merely preserves the right of setoff available under applicable state law.  The Supreme Court in *Citizen's Bank v. Strumpf*, 516 U.S. 16 (1995) said "[a]lthough no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy.  Here it is undisputed that, prior to the bankruptcy filing, petitioner had the right under Maryland law to set off  . . ." 516 U.S. at 18-19.  The Supreme Court also referenced section "553(a)'s general rule that the Bankruptcy Code does not affect the right of setoff . . ." 516 U.S. at 19.  *See also In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006).  Instead of creating a right of setoff, section 553 preserves for a creditor's benefit any setoff right that it may have under applicable nonbankruptcy law.  *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009) (hereinafter, "*Semcrude*").

32.    As the Third Circuit has recognized, "[s]etoff rights arise under the common law of equity.  *In re Garden Ridge Corp.*, 386 F. App'x 41, 43 (3d Cir. 2010).  Notably, the Third

---

[7]  As the Bankruptcy Code does not define the term "mutuality," state law governs the meaning of that term.  *See, e.g., Kaufman v. Chalk & Vermilion Fine Arts, LLC*, 31 F. App'x 206 , 208 (2d Cir. 2002) (noting that "[b]ecause the Bankruptcy Code does not define 'interests in property,' state law controls").

Appendix A158

Circuit cited page 409 of the *Cyzk* decision in support of the Third Circuit's statement that setoff rights arise under the common law. *Id.* (citing *Cyzk,* 297 B.R. at 409). On page 409, the *Czyk* court held that "[m]utuality of obligations is determined by state law."

33.     Here, the Distribution Agreement is governed by California law, and therefore, this Court must first look to the California Supreme Court to determine setoff rights, including mutuality. The State Supreme Court has articulated that if there is an express mutual agreement, then a corporate subsidiary can "be deemed a mutual debtor-creditor of the parent." *Prudential Reinsurance Co. v. Superior Court*, 3 Cal. 4th 1118, 1137 (Cal. 1992).

34.     The Distribution Agreement contains the requisite mutual agreement under *Prudential Reinsurance* such that McKesson Corporation and all of its corporate subsidiaries, including MPRS, are to be considered mutual so as to allow McKesson to "set-off, recoup, and apply any amounts owed." [Distribution Agreement at section VII.i]. The Distribution Agreement expressly references the parties at issue here – the wholly owned subsidiary of McKesson. The McKesson Application Rights do not involve any entity outside of the close family of entities that comprises the McKesson business enterprise and contemplates the modern reality of corporate structures where a corporation could bring all activities within a single corporate entity but for a variety of tax, liability, and historical considerations utilizes wholly owned subsidiaries for a variety of undertakings, especially in the context of the integrated services provided by the closely-related McKesson entities.

35.     Enforcing the McKesson entities' setoff rights under California is consistent with the holding of then Circuit Court Judge Stephen Breyer (now Justice Breyer) that *state* law, rather than *federal* law, governs setoff rights.

> The threshold question is whether the Bank's setoff rights are to be
> determined by state or federal law. The parties and the courts

Appendix A159

15

> below had proceeded on the assumption that Massachusetts law
> governs, but the Bank now raises the possibility that § 68 of the
> former Bankruptcy Act imposes a federal standard. Assuming that
> the question may be presented for the first time on appeal, *compare
> Dobb v. Baker*, 505 F.2d 1041, 1044 (1st Cir. 1974), with *Johnston
> v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir. 1979), we believe
> that the bankruptcy court and district court properly looked to the
> law of Massachusetts.  We are aware of no case holding that
> federal rather than state law governs pre-petition setoffs.

*In re Saugus Gen. Hosp., Inc.*, 698 F.2d 42, 44 (1st Cir. 1983); *see also In re Garden Ridge Corp.,* 386 F. App'x 41, 43 (3d Cir. 2010) ("Setoff rights arise under the common law of equity.").

36.     Then Circuit Judge Breyer also specifically recognized that parties are free to modify by contract state common law setoff right.  Specifically Judge Breyer declared as follows:  "The Bank's setoff rights are governed by Massachusetts' basic common-law setoff doctrines.  While the parties are free to modify these common-law setoff rules by contract, they have not done so here."  *Id.* at 44-45.

37.     In *Saugus General Hospital,* Judge Breyer was addressing section 68 of the former Bankruptcy Act of 1898.  That provision also required "mutuality" of debts.  *See* 11 U.S.C. § 68a (repealed 1978) ("in all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.").  The Supreme Court long ago interpreted section 68a as recognizing common law setoff, not creating a right of federal set off.  *See Cumberland Glass Mfg. Co. v. De Witt*, 237 U.S. 447, 455 (1915) ("This statute recognizes the nature of set-off, as established in common law and equitable procedure.").

38.     When Congress enacted section 553, it did not evidence any intent to change the law regarding the source of setoff rights.  Indeed, the language of section 553 disproves any such

Appendix A160

16

intent.  *See* 11 U.S.C. § 553(a) ("this title does not affect any right of a creditor to offset a mutual

debt owing by such creditor to the debtor that arose before the commencement of the case.").

Accordingly, the interpretation of section 68a is instructive when interpreting section 553 of the

Bankruptcy Code.  *See Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) ("When Congress amends

the bankruptcy laws, it does not write 'on a clean slate.'  Furthermore, this Court has been

reluctant to accept arguments that would interpret the Code, however vague the particular

language under consideration might be, to effect a major change in pre-Code practice that is not

the subject of at least some discussion in the legislative history."); *Pennsylvania Dept. of Public

Welfare v. Davenport*, 495 U.S. 522, 563 (1990) ("We will not read the Bankruptcy Code to

erode past bankruptcy practice absent a clear indication that Congress intended such a

departure."); *Kelly v. Robinson*, 479 U.S. 36, 44 and 46 (1986) (declaring that established pre-

Code practice "informs our understanding of the language of the Code"); *Midlantic Nat'l Bank v.

NJ Dept. of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is

that if Congress intends for legislation to change the interpretation of a judicially created

concept, it makes that intent specific.  The Court has followed this rule with particular care in

construing the scope of bankruptcy codifications.").

  39. Here, the parties have reaffirmed governing California common law by

contractually providing that the related McKesson entities should be treated as a single

counterparty for purposes of setting off their claims against the Debtor and the Debtor's debts to

the McKesson entities, all of which relate to an integrated product distribution and customer

loyalty program.

  40. Moreover, this result is consistent with California decisions finding a connection

between parents and subsidiaries.  *See*, *e.g. Dorel Industries, Inc. v. Superior Court*, 134 Cal.

Appendix A161

App. 4th 1267, 1275-76 (Cal. Ct. App. 2005) (finding parent subject to general jurisdiction in California through subsidiary). California courts have found a tight connection between parent and subsidiary in many different situations, including common scenarios such as for purposes of jurisdiction, *see id*., or to attach liability, *Las Palmas Assoc. v. Las Palmas Center Assoc.*, 235 Cal. App. 3d 1220, 1248-48 (Cal. Ct. App. 1991) (finding sister company liable for fraud of affiliate). The relationship of a parent and subsidiary can also create disqualifying conflicts of interest for California attorneys who do work for both parent and subsidiary. *Morrison Knudsen Corp. v. Hancock*, 69 Cal. App. 4th 223, 252-53 (Cal. Ct. App. 1999) (disqualifying an attorney because of the "close relationship" between corporate affiliates).

### <u>Section 553's Restrictions on Setoff Should be Limited to Those Integrating Setoff into the Context of Avoidance Actions.</u>

41.     McKesson acknowledges, of course, that section 553(a) imposes material restrictions on a non-debtor party's state law rights. For the most part, those restrictions relate to integrating setoff rights into the context of possible avoidance actions related to setoffs effectuated prepetition.[8] Such integration effectively limits common law offset as a way of avoiding otherwise avoidable prepetition transfers. *See, e.g., In re Elcona Homes Corp*., 863 F. 2d 483, 487 (7th Cir. 1988) (buying a debt in order to claim offset rights ". . . is plainly evasive and easily rebuffed. Indeed, it will normally violate 11 USC § 553(a)(3) which was added in 1978 to close a loophole that had allowed preferences in the form of set offs, and which forbids a set off where the debt was incurred within 90 days before bankruptcy, while the debtor was insolvent, and for the purposes of obtaining a set off against him.") The court in *In re Brook Farms*, 70 B.R. 368 (Bankr. E. D. Wisc. 1987), noted "[t]he enactment of § 553 was an expression of the Congressional intent sanctioning the exercise of setoff as a permissible

---

[8]  It is not a coincidence that section 553 is in the Bankruptcy Code with section 547 (Preferences) and section 548 (Fraudulent Transfers).

Appendix A162

preference under certain circumstances." 70 B.R. at 372-73. Some courts have expanded the

additional restrictions on a creditor seeking setoff and at times, McKesson posits that an overly

expansive view of the prepetition restrictions on setoff under section 553 flies in the face of both

applicable State law and the economic realities in today's increasingly complex business

environment (particularly where, as here, a creditor did not effectuate a prepetition setoff).

42. The impact of section 553 has been construed to impose restrictions to offset that

would, outside of a bankruptcy setting be perfectly enforceable. Those conditions have been

described as "well settled" (See, *e.g.*, *SemCrude* at 393) and McKesson acknowledges that there

are a large number of decisions that impose such limits. For example, a number of courts have

read section 553(a) to require that "[i]n order to effect a setoff in bankruptcy, courts construing

the Code have long held that the debts to be offset must be mutual, prepetition debts." *Semcrude*

at 393. *See, e.g.*, *Semcrude* at 393-94 ("Because of the mutuality requirement in section 553(a),

courts have routinely held that triangular setoffs are impermissible in bankruptcy. Moreover,

because each corporation is a separate entity from its sister corporations absent a piercing of the

corporate veil, a subsidiary's debt may not be set off against the credit of a parent or other

subsidiary, or vice versa, because no mutuality exists under the circumstances. Allowing a

creditor to offset a debt it owes to one corporation against funds owed to it by another

corporation—even a wholly-owned subsidiary—would thus constitute an improper triangular

setoff under the Code."); *In re Lehman Brothers Inc.*, 458 B.R. 134, 139 (Bankr. S.D.N.Y. 2011)

("Contrary to the assertion by UBS that section 553 of the Bankruptcy Code 'is derived from,

and preserves, common-law setoff rights, . . . the text of section 553 is not limited to common-

law setoff and by its plain wording applies whenever a creditor seeks to exercise *any* purported

setoff right—including one created by contract—in a case under the Bankruptcy Code."); *Sass v.*

Appendix A163

Barclays Bank PLC (*In re Am. Home Mortgage, Inc.*), 501 B.R. 44, 57 (Bank. D. Del., 2013) (concurring "entirely with Judge Shannon's decision [*Semcrude*]".)  McKesson is confident that the Lenders will refer to similar decisions.

43.    That said, McKesson asserts that the correct reading of section 553—under controlling Supreme Court precedent—does not lend itself to impose such requirements on what would otherwise be a perfectly enforceable contract right, especially if they are not related to setoff in the context of prepetition avoidance actions.  In fact, substantially all of the language of section 553 is on exactly that point:  to incorporate avoidance concepts and make those concepts applicable to common law setoffs.

### MPRS's Status as a Third Party Beneficiary Satisfies any Mutuality Requirement.

44.    There is no dispute that MPRS is a third party beneficiary of the Distribution Agreement.  Here, both McKesson Corp. and the Debtor intended that MPRS benefit from the provisions of the Distribution Agreement and, in particular, the provision that McKesson could apply amounts due to the Debtor against the amounts owed to MPRS.  Under California law, a third party qualifies as a beneficiary and a non-named party under a contract where the contracting parties must have intended to benefit that individual and such intent appears from the terms of the agreement.  *Brinton v. Bankers Pension Servs., Inc.* (1999) 76 Cal. App. 4th 550, 558; see also Cal. Civ. Code § 1559.  And, under California law, in order to be entitled to third party beneficiary status, there is no requirement that that the person be named in the contract. *Harper v. Wausau Ins. Corp.* (1997) 56 Cal. App. 4th 1079, 1086.

45.    As the third party beneficiary of the Distribution Agreement, MPRS is a party to that agreement and may sue for damages under that agreement.  This precise point has been

//

Appendix A164

recognized by the Judicial Council of California in its adoption the California Civil Jury

Instructions (the "**CACI**"). As set forth in the CACI:

> [*Name of plaintiff*] is not a party to the contract. However, [*name of plaintiff*] may be entitled to damages for breach of contract if [*he/she/it*] proves that [*insert names of the contracting parties*] intended for [*name of plaintiff*] to benefit from their contract.
>
> **It is not necessary for [*name of plaintiff*] to have been named in the contract.** In deciding what [*insert names of the contracting parties*] intended, you should consider the entire contract and the circumstances under which it was made.[9] (emphasis added).

46.     Thus, as a legally recognized party to the Distribution Agreement, MPRS stands

in a direct counter-contractual relationship with the Debtor on both contracts—the Distribution

Agreement and the Master Services Agreement. This satisfies any mutuality requirement for

effectuating setoff or application of funds. *See e.g. In re Bacigalupi, Inc.*, 60 B.R. 442, 446 (9th

Cir. BAP 1986) (applying California law, the Ninth Circuit Bankruptcy Appellate Panel stated

that a setoff claim 'cannot fail for lack of mutuality' where complaint in other acts alleges third-

party beneficiary status); *see also Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 194 F. Supp.

2d 378, 394-95 (D.N.J. 2002) (Exxon, as a third party beneficiary to a contract, can assert a

setoff defense and the setoff defense does not fail for lack of mutuality).

> **<u>Even if the Court were to Determine that Bankruptcy Law Controls the Enforceability of McKesson's Application Rights, the Bankruptcy Court Should Determine those Rights to be Fully Enforceable in Full Accordance with their Terms.</u>**

47.     The Distribution Agreement is to be "governed and construed in accordance with

the laws of the State of California, without regard to or application of conflict of law, rules or

principles." Distribution Agreement, section VII.a.

---

[9] The CACI is the product of a California Supreme Court-created panel, whose charge is to write instructions that are legally accurate and understandable to the average juror. The current-version of the CACI is available on-line at the following address: http://www.courts.ca.gov/partners/documents/caci_2018_edition.pdf . The California Model Jury Instruction for third-party beneficiary is attached hereto as <u>Exhibit A</u>.

Appendix A165

48.     But a review of the language of section VII.i, the basis for McKesson's

Application Rights, demonstrates that the parties intended not just common law offset, but to

allow each of the following remedies as each may be applicable:  (i) offset, (ii) recoupment, and

(iii) contractual application to claims owed by any of the McKesson affiliates against any

obligations owed by the Debtor.  It is noteworthy that the Debtor expressly authorized each of

McKesson's Application Rights two years before the Petition Date.  In other words, under the

controlling agreement, the parties agreed that each McKesson entity that is a creditor of the

Debtor may apply a credit against that obligation in order to "balance the books," so to speak.  At

this late date, if the Debtor or the Lenders assert that the provisions forming the basis of

McKesson's Application Rights were not an important and material element of the agreement,

such an assertion cannot be made with a straight face.

49.     McKesson anticipates that the Lenders will claim that McKesson is seeking to

rely upon common-law offset to assert what has been described as a "triangular" (and therefore

non-mutual) set off.   Both Delaware law and California law recognize the right of setoff

between two parties for mutual debts.  *See* 10 Del. C. § 8120; California Code of Civil Procedure

§ 431.70.  And in the Distribution Agreement, effective as of July 1, 2016 (more than two years

ago), McKesson's Application Rights were expressly reserved.  As McKesson's Application

Rights include, but are not limited to, common law offset, this Motion does not rely merely upon

common law offset rights.  Instead, McKesson asserts that under California law, the right of

contracting parties to provide for application of credits as described in McKesson's Application

Rights should be respected and control.

50.     The cases that criticize provisions that purport to assert a "triangular" setoff

among a debtor, a creditor and an affiliate (such as *SemCrude*) and those cases relying upon

Appendix A166

22

earlier decisions without meaningful analysis, are not controlling.  Those cases are governed not by state law, but by section 553(a) of the Bankruptcy Code, and rely upon a finding that the proposed offset does not meet the mutuality requirements of that section.

51.     But that line of cases is not controlling for at least two reasons.  First, in a number of instances, those cases dealt with a debtor and its affiliate, not a corporate creditor and its corporate affiliate.  And since there was no finding that the debtor and its affiliate were substantively consolidated or alter egos,[10] the Court could rely upon section 553(a) of the Bankruptcy Code.  Of course, the determinative facts applicable to the Motion do not include a debtor and its affiliate, but instead, a creditor and its corporate affiliate.  The second reason is that as set forth above, under controlling California law, a setoff involving a parent and a subsidiary is enforceable.

52.     It is also noteworthy that in *In re Garden Ridge Corp.*, 338 B.R. at 634, the bankruptcy court noted an agreement that includes an express provision to allow a "triangular" setoff between related entities can create the mutuality required for setoff.  Under exactly those circumstances, the parties in the instant case intended that the obligations owed by the Debtor to a McKesson affiliate would be available to apply against the obligations of another McKesson affiliate to the Debtor.

### Under Section 9404 of the California Commercial Code, All of the Lenders' Rights In the Debtor's McKesson-Related Accounts Receivable Are Subject to McKesson's Contractual Defenses.

53.     McKesson's Application Rights are expressly preserved by section 9404 of the California Commercial Code.  The statute provides that:

---

[10]  The record reflects that in *Semcrude*, the debtors' cases were consolidated for procedural purposes only.  399 B.R. at 390.

Appendix A167

[T]he rights of an assignee are subject to both of the following:

(1) All terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract.

(2) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee."

*See* Cal. Com. Code  § 9404(a).[11]

54.     Thus, a party assigned or otherwise taking a security interest in the Debtor's asset takes that security interest subject to all of McKesson's contractual rights and defenses, including claims enforceable as McKesson's Application Rights .  *See In re US Aeroteam, Inc.*, 327 B.R. 852, 870-71 (Bankr. S.D. Ohio 2005) (finding a bank takes a security interest subject to a pre-existing right to set-off).  Bankruptcy courts have not hesitated to apply section 9404 (and its old Article 9 predecessor, § 9-318) when analyzing contract rights similar to rights of offset.  *See In re Calore Express Co., Inc.*, 288 F. 3d 22, 45-47 (1st Cir. 2002) (determining relative rights in collateral well after the bankruptcy sale of those assets by applying UCC Article 9).

55.     The California Commercial Code lays out only three exceptions to application of section 9404, none of which apply here:  (1) the statute does not apply to health care receivables; (2) any claim of offset can only reduce the amount owed; and (3) the claims of offset cannot have been waived.  *See* Cal. Com. Code § 9404.  First, the asset in question is not a health care receivable and this exception does not apply.  *See* Cal. Com. Code § 9404(e).  Second, McKesson's Application Rights are only being asserted to apply the debt owed by the Debtor to satisfy the debt owed by McKesson, satisfying the requirement of section  9404(b).

---

[11]  As discussed, California law governs the Distribution Agreement, and any dispute regarding various obligations, and defenses to those obligations, would be interpreted under California law.

Appendix A168

56.     And since McKesson has gone to extraordinary lengths to insure that it never waived McKesson's Application Rights, any rights under the Distribution Agreement or any claims of offset, the third exception is likewise inapplicable.  On the contrary, in the May Stipulation and various pleadings, McKesson has already raised McKesson's Application Rights, and other issues of contractually and statutorily preserved offset rights, including before the Court.  At the June 28 hearing, McKesson argued to this Court that "McKesson would have, and still has, it's [sic] 9404 rights." (Transcript at 97:20-21).

57.     Consequently, McKesson's Application Rights and other contractual rights under the Distribution Agreement are protected by section 9-404 of the California Commercial Code. McKesson's Application Rights continue against third parties granted new security interests or otherwise assigned assets against which McKesson is entitled to apply its defenses.

58.     It should also be noted that this result should come as no surprise to the Lenders. Since 90% or more of the Debtor's US accounts receivable are related to the three principal national drug wholesalers, the Lenders would have had very little difficulty asking McKesson and the other wholesalers to waive their rights under section 9-404 of the Uniform Commercial Code.  The Lenders chose not to request a waiver, and instead made their credit decisions with the understanding that the overwhelming volume of the Debtor's US accounts payable were subject to the three wholesalers' defenses and counterclaims described in section 9-404.

59.     As of the Petition Date, McKesson owed the Debtor $6,932,816.40.  Also as of the Petition Date, the Debtor owed MPRS approximately $8.5 million under the Master Services Agreement.  Had this bankruptcy case not filed, McKesson would have been entitled to apply one debt to reduce the other obligation, as expressly agreed to between the parties, and as fully in accord with McKesson's Application Rights.  The Lenders, with full knowledge of McKesson's

Appendix A169

business dealings with the Debtor and McKesson's position as the Debtor's largest customer and account payor, opted to forego seeking to have McKesson waive its UCC Section 9-404 rights and defenses, and its Application Rights. Having made that lending decision, it would be grossly inequitable to allow the Lenders to use the Debtor's bankruptcy case as sword against McKesson. Stated another way, as between McKesson and the Lenders, the equities weigh heavily in favor of McKesson.

## NOTICE

60. Notice has been provided to the Debtor, the United States Trustee, and parties who have filed a notice of appearance in this case. McKesson submits that in light of the nature of the relief requested, no further notice need be provided.

## NO PRIOR REQUEST

61. McKesson has not made a prior request for the relief requested in this Motion in this or any other court.

## CONCLUSION

Based on the foregoing, McKesson respectfully requests the Court grant the Motion and enter an order substantially in the form attached hereto as <u>Exhibit B</u>: (i) authorizing McKesson to apply the obligations the Debtor owes MPRS under the Master Services Agreement against the obligations McKesson owes to the Debtor under the Distribution Agreement.; (ii) directing the Debtor to make payment in accordance with paragraph 5 of the May Stipulation; and (iii) such other and further relief as the Court may deem just and proper. The Lenders are not entitled to a windfall at the expense of McKesson, particularly when that windfall would not be available to the Lenders outside of bankruptcy.

Appendix A170

Dated: July 30, 2018     Respectfully submitted,
   Wilmington, Delaware

          REED SMITH LLP

By: */s/ Kurt F. Gwynne*     
     Kurt F. Gwynne (No. 3951)
     1201 Market Street, Suite 1500
     Wilmington, Delaware 19801
     Telephone: (302) 778-7500
     Facsimile: (302) 778-7575
     E-mail:  kgwynne@reedsmith.com

       and

     Jeffrey K. Garfinkle (admitted *pro hac vice*)
     Daniel H. Slate (admitted *pro hac vice*)
     Buchalter, A Professional Corporation
     18400 Von Karman Avenue, Suite 800
     Irvine, California 92612-0514
     Telephone: (949) 760-1121
     E-mail:  jgarfinkle@buchalter.com
        dslate@buchalter.com

     *Counsel for McKesson Corporation and McKesson*
     *Patient Relationship Solutions, a business unit of*
     *McKesson Specialty Arizona, Inc.*

Appendix A171

# EXHIBIT A

# Judicial Council of California
# Civil Jury Instructions

## CACI*

\* Pronounced "Casey"

As approved at the
November 2017 Judicial Council Meeting

1

Judicial Council of California

## Series 100–2500



**Judicial Council of California**
**Advisory Committee on Civil Jury Instructions**

Hon. Martin J. Tangeman, Chair

LexisNexis Matthew Bender
Official Publisher



This version provided by LexisNexis® Matthew Bender®, Official Publisher, 800-533-1637,
www.lexisnexis.com/bookstore, for public and internal court use

Appendix A173

## QUESTIONS ABOUT THIS PUBLICATION?

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call:

Andrew D. Watry, J.D. at ..................................................................................................................

Email: ................................................................................ andrew.watry@lexisnexis.com

Outside the United States and Canada, please call ........................ (973) 820-2000

For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at ..................................... (800) 833-9844

Outside the United States and Canada, please call ........................ (518) 487-3385

Fax Number ............................................................... (800) 828-8341

Customer Service Website ........................ http://www.lexisnexis.com/custserv/

For information on other Matthew Bender publications, please call

Your account manager or ......................................... (800) 223-1940

Outside the United States and Canada, please call ........................ (937) 247-0293

ISSN: 1549-7100
ISBN: 978-1-5221-4412-0 (print)

© 2017 by the Judicial Council of California. All rights reserved. No copyright is claimed by the Judicial Council of California to the Table of Contents, Table of Statutes, Table of Cases, or Index.

© 2017, Matthew Bender & Company, Inc., a member of the LexisNexis Group. No copyright is claimed by Matthew Bender & Company to the jury instructions, verdict forms, Directions for Use, Sources and Authority, User's Guide, Life Expectancy Tables, or Disposition Table.

CITE THIS PUBLICATION: Judicial Council of California Civil Jury Instructions (2018 edition)
Cite these instructions: "CACI No. _____."
Cite these verdict forms: "CACI No. VF-_____."

Editorial Office
230 Park Ave., 7th Floor, New York, NY 10169 (800) 543-6862
www.lexisnexis.com

(2017–Pub.1283)

This version provided by LexisNexis® Matthew Bender®, Official Publisher, 800-533-1637,
www.lexisnexis.com/bookstore, for public and internal court use

Appendix A174

# *Preface to CACI Updates*

---

This edition of CACI includes a number of additions and changes to the instructions, which were first published in 2003. In providing these updates, the Judicial Council Advisory Committee on Civil Jury Instructions is fulfilling its charge to maintain CACI. The committee is also striving to add instructions in new areas of the law and to augment existing areas.

The impetus for the revisions came from several sources including CACI users who detected changes in the law or who simply sought to do a better job of explaining the law in plain English. Responding to feedback from users is consistent with the Advisory Committee's goal to act as a vehicle for maintaining CACI as the work product of the legal community. We hope that our hundreds of contributors view our role in the same way and that they will continue to support us.

November 2017

Hon. Martin J. Tangeman
Court of Appeal, Second District
Chair, Advisory Committee on Civil Jury Instructions

---

**The Advisory Committee on Civil Jury Instructions welcomes comments. Send comments by e-mail to: civiljuryinstructions@jud.ca.gov**

Or you may send print comments by regular mail to:

Advisory Committee on Civil Jury Instructions—Attn. Bruce Greenlee
Legal Services Office
455 Golden Gate Avenue
San Francisco, CA 94102-3588

v

Appendix A175



**Judicial Council Advisory Committee on Civil Jury Instructions**

Hon. Martin J. Tangeman
Chair

Committee Members

| | |
|---|---|
| HON. SUZANNE R. BOLANOS | MR. MICHAEL A. KELLY |
| HON. ROBERT P. DAHLQUIST | HON. JAMES T. LATTING |
| HON. ELENA J. DUARTE | HON. MONICA MARLOW |
| MR. JONATHAN M. EISENBERG | MR. JULIAN W. POON |
| HON. JANET M. FRANGIE | HON. JAMES A. RICHMAN |
| HON. DONALD R. FRANSON, JR. | MR. TODD M. SCHNEIDER |
| MR. ROBERT A. GOODIN | MR. RICHARD L. SEABOLT |
| MR. MATTHEW HAWKINS | MS. CHRISTINE SPAGNOLI |
| HON. JUDY H. HERSHER | MS. MARY-CHRISTINE SUNGAILA |
| HON. RAYMOND J. IKOLA | HON. JOHN SHEPARD WILEY JR. |
| PROF. MARGARET Z. JOHNS | |

Administrative Director, Staff to the Judicial Council
MARTIN HOSHINO

Legal Services Office
Ms. Deborah Brown, Chief Counsel
Mr. Bruce Greenlee, Attorney

This version provided by LexisNexis® Matthew Bender®, Official Publisher, 800-533-1637,
www.lexisnexis.com/bookstore, for public and internal court use

Appendix A176

# *Judicial Council of California*

*Chair*
Hon. Tani G. Cantil-Sakauye

*Supreme Court*
Hon. Ming W. Chin

*Courts of Appeal*
Hon. Harry E. Hull, Jr.
Hon. James M. Humes

Hon. Douglas P. Miller

*Trial Courts*
Hon. Maria O. Anderson
Hon. C. Todd Botke
Hon. Stacy Boulware Eurie
Hon. Kevin C. Brazile
Hon. Kyle S. Brodie

Hon. Samuel K. Feng
Hon. Harold W. Hopp
Hon. Dalila Carrol Lyons
Hon. Gary Nadler
Hon. David M. Rubin

*Legislature*
Hon. Richard Bloom

Hon. Hannah-Beth Jackson

*State Bar*
Ms. Rachel W. Hill
Ms. Audra Ibarra
Mr. Patrick M. Kelly

Ms. Donna D'Angelo Melby
Ms. Gretchen Nelson

*Advisory Members*
Mr. Jake Chatters
Ms. Kimberly Flener
Hon. Scott M. Gordon
Hon. Patricia M. Lucas
Hon. Shama Kakim Mesiwala

Hon. Stuart M. Rice
Mr. Michael M. Roddy
Hon. Marsha G. Slough
Hon. Kenneth K. So
Ms. Andrea K. Wallin-Rohmann

*Secretary*
Martin Hoshino

The Judicial Council is the policymaking body of the California courts. Under the leadership of the Chief Justice and in accordance with the California Constitution, the council is responsible for ensuring the consistent, independent, impartial, and accessible administration of justice.

This version provided by LexisNexis® Matthew Bender®, Official Publisher, 800-533-1637, www.lexisnexis.com/bookstore, for public and internal court use

Appendix A177

# *Preface*

These instructions represent the work of a task force on jury instructions appointed by Chief Justice Ronald M. George in 1997. The task force's charge was to write instructions that are legally accurate and understandable to the average juror. The six-year effort responded to a perceived need for instructions written in plain English and the specific recommendation of the Blue Ribbon Commission on Jury System Improvement.

Jurors perform an invaluable service in our democracy, making important decisions that affect many aspects of our society. The Judicial Council instructions attempt to clarify the legal principles jurors must consider in reaching their decisions. The instructions were prepared by a statewide, broad-based task force consisting of court of appeal justices, trial judges, attorneys, academics, and lay people. They are approved by the Judicial Council as the state's official jury instructions under the California Rules of Court (see now Cal. Rules of Court, Rule 2.1050(a)). The Rules of Court provide that the use of these instructions is strongly encouraged (see now Cal. Rules of Court, Rule 2.1050(e)).

These instructions were prepared with a minimum of three steps: staff attorney drafts, subcommittee refinement, and full task force consideration. Initial drafts of the instructions were prepared by staff attorneys in the former Administrative Office of the Courts (now Legal Services Office) in San Francisco, primarily Lyn Hinegardner. Lawyers throughout the state provided subject-matter expertise and, in some cases, sets of instructions from which the task force began its drafting. These instructions were submitted to the legal community for comment and, in responding, hundreds of attorneys and judges provided valuable assistance. Several organizations, most particularly State Bar sections, provided invaluable input. A list of people and organizations who contributed to this effort follows; we apologize to those who have been omitted through oversight.

We are grateful to the publisher of this work. Representatives of LexisNexis Matthew Bender worked closely with us to prepare the jury instructions for publication. We appreciate their efficiency and courtesy.

We would also like to express our appreciation to our predecessor. The people of California and the legal community have been well served for over 60 years by BAJI, *California Jury Instructions, Civil, Book of Approved Jury Instructions*, written by a committee of the Superior Court of California, County of Los Angeles. That we have taken a very different approach to drafting of instructions does not detract from the historic importance of work done by the BAJI committee.

We believe that these instructions go a long way toward achieving the goal of a plain-English explanation of the law. These instructions, like the law, will be constantly changing. Change will come not only through appellate decisions and legislation but also through the observations and comments of the legal community. The Judicial Council Advisory Committee on Civil Jury Instructions, which has the responsibility of maintaining these instructions, welcomes your comments and suggestions for improvement.

September 2003

> James D. Ward, Former Associate Justice
> Court of Appeal, Fourth Appellate District, Division Two

This version provided by LexisNexis® Matthew Bender®, Official Publisher, 800-533-1637, www.lexisnexis.com/bookstore, for public and internal court use

Appendix A178

---

*Preface*

> Vice-Chair, Task Force on Jury Instructions
> Chair, Civil Instruction Section

This version provided by LexisNexis® Matthew Bender®, Official Publisher, 800-533-1637, www.lexisnexis.com/bookstore, for public and internal court use

**Judicial Council Task Force on Jury Instructions**
**Civil Instructions Subcommittee**

| | |
|---|---|
| Hon. James D. Ward, *Chair* | Hon. Carolyn B. Kuhl |
| Prof. Lee Campbell | Ms. Edith R. Matthai |
| Mr. William B. Chapman | Hon. Michael B. Orfield |
| Hon. H. Walter Croskey | Hon. Stuart R. Pollak |
| Hon. Barton C. Gaut | Mr. Tyler Pon |
| Ms. Janet M. Green | Hon. Ignazio J. Ruvolo |
| Hon. Joseph B. Harvey | Mr. Daniel U. Smith |
| Hon. Harry E. Hull, Jr. | Ms. Christine Spagnoli |
| Mr. Michael A. Kelly | Hon. Lynn O'Malley Taylor |

This version provided by LexisNexis® Matthew Bender®, Official Publisher, 800-533-1637,
www.lexisnexis.com/bookstore, for public and internal court use

Appendix A180

# 301.  Third-Party Beneficiary

---

[*Name of plaintiff*] **is not a party to the contract. However, [***name of
plaintiff***] may be entitled to damages for breach of contract if [he/she/it]
proves that [***insert names of the contracting parties***] intended for [***name of
plaintiff***] to benefit from their contract.**

**It is not necessary for [***name of plaintiff***] to have been named in the
contract. In deciding what [***insert names of the contracting parties***]
intended, you should consider the entire contract and the circumstances
under which it was made.**

---

*New September 2003*

## Directions for Use

This topic may or may not be a question for the jury to decide. Third-party
beneficiary status may be determined as a question of law if there is no conflicting
extrinsic evidence. (*Kalmanovitz v. Bitting* (1996) 43 Cal.App.4th 311, 315 [50
Cal.Rptr.2d 332].)

These pattern jury instructions may need to be modified in cases brought by
plaintiffs who are third-party beneficiaries.

## Sources and Authority

- Contract for Benefit of Third Person. Civil Code section 1559.

- A third party may qualify as a beneficiary under a contract where the
  contracting parties must have intended to benefit that individual and such intent
  appears from the terms of the agreement. (*Brinton v. Bankers Pension Services,
  Inc.* (1999) 76 Cal.App.4th 550, 558 [90 Cal.Rptr.2d 469].) However, "[i]nsofar
  as intent to benefit a third person is important in determining his right to bring
  an action under a contract, it is sufficient that the promisor must have
  understood that the promisee had such intent. No specific manifestation by the
  promisor of an intent to benefit the third person is required." (*Lucas v. Hamm*
  (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685].)

- "Traditional third party beneficiary principles do not require that the person to
  be benefited be named in the contract." (*Harper v. Wausau Insurance Corp.*
  (1997) 56 Cal.App.4th 1079, 1086 [66 Cal.Rptr.2d 64].)

- Civil Code section 1559 excludes enforcement of a contract by persons who are
  only incidentally or remotely benefited by the agreement. (*Lucas, supra,* 56
  Cal.2d at p. 590.)

- "Whether a third party is an intended beneficiary or merely an incidental
  beneficiary to the contract involves construction of the parties' intent, gleaned
  from reading the contract as a whole in light of the circumstances under which

81

Copyright Judicial Council of California

Appendix A181

it was entered. [Citation.]" (*Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1725 [33 Cal.Rptr.2d 291].)

• Restatement Second of Contracts, section 302, provides:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

This section has been cited by California courts. (See, e.g., *Outdoor Services v. Pabagold* (1986) 185 Cal.App.3d 676, 684 [230 Cal.Rptr. 73].)

• The burden is on the third party "to prove that the performance [it] seeks was actually promised." (*Garcia v. Truck Insurance Exchange* (1984) 36 Cal.3d 426, 436 [204 Cal.Rptr. 435, 682 P.2d 1100]; *Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 348–349 [87 Cal.Rptr.2d 856].)

### Secondary Sources

1 Witkin, Summary of California Law (10th ed. 2005) Contracts, §§ 685–706

13 California Forms of Pleading and Practice, Ch. 140, *Contracts*, §§ 140.83, 140.103, 140.131 (Matthew Bender)

5 California Points and Authorities, Ch. 50, *Contracts*, § 50.132 (Matthew Bender)

27 California Legal Forms, Ch. 75, *Formation of Contracts and Standard Contractual Provisions*, § 75.11 (Matthew Bender)

2 Matthew Bender Practice Guide: California Contract Litigation, Ch. 19, *Seeking or Opposing Recovery As Third Party Beneficiary of Contract*, 19.03–19.06

Copyright Judicial Council of California

Appendix A182

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | **Objections Due:**<br>**Hearing Date:** |

### DECLARATION OF ERIN BEESLEY
### IN SUPPORT OF MOTION FOR AN ORDER DETERMINING
### THAT McKESSON IS ENTITLED TO THE DISPUTED FUNDS

I, Erin Beesley, respectfully declare under penalty of perjury as follows:

1.       I am over the age of eighteen years.  For more than 10 years, I was employed at

US Oncology, which in 2010, was acquired by McKesson Corporation ("**McKesson Corp.**" and

together with McKesson Patient Relationship Solutions ("**MPRS**"), a business unit of McKesson

Specialty Arizona, Inc., a wholly owned subsidiary of McKesson Corp. "**McKesson**").  I am

now a Senior Director, Financial Planning and Analysis.  In that capacity and during that time, I

have been primarily responsible for the management of a number of the financial and accounting

aspects of the business relationship between MPRS and Orexigen Therapeutics, Inc. (the

"**Debtor**") particularly with respect to what is referred to as the "**LoyaltyScript® Program**" and

the distribution and the Debtor's sales efforts with respect to Contrave® (the "**Product**"), a drug

approved by the Food and Drug Administration for chronic weight management in certain adults.

2.       I make this declaration in support of the motion filed by McKesson seeking,

among other things, an order determining McKesson's entitlement to certain "Disputed Funds."

The following facts are known to me to be true of my own personal knowledge, except only

---

[1] The last four digits of the Debtor's federal tax identification number are 8822.  The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

Appendix A184

those facts set forth on information and belief, and as to those facts, I am informed and believe them to be true.  If called as a witness, I could and would testify competently to the facts set forth in this declaration.

3.  I am familiar with an agreement (as amended, the "**Distribution Agreement**") that defines the terms and conditions pursuant to which McKesson would distribute the Debtor's Product.  The Core Distribution Agreement by and between McKesson and the Debtor, was made effective as of July 1, 2016, and amended from time to time.  Under the Distribution Agreement, McKesson was authorized to operate as a distributor of healthcare products (defined in the Distribution Agreement as "the Product(s)") for the Debtor and provide certain core services related thereto.

4.  In the Distribution Agreement, the parties agreed that McKesson Corp. had certain rights to "set-off, recoup and apply amounts" owed between the Debtor and its affiliates on the one hand, and McKesson and its affiliates on the other.  Specifically, the parties agreed:

> "VII.  General
>        . . .
> Notwithstanding anything to the contrary in this Agreement, each of McKesson Corporation and its affiliates is hereby authorized to set-off, recoup and apply any amounts owed by it to Manufacturer's [the Debtor's] affiliates against any all [*sic*] amounts owed by Manufacturer or its affiliates to any of McKesson Corporation or its affiliates, without prior written notice[.]"

5.  I am also familiar with a series of agreements McKesson and the Debtor entered into an agreement entitled the "Master Service Agreement" entered into on or about July 15, 2016 entitled (the "**Master Services Agreement**") pursuant to which McKesson is to coordinate a program that facilitates the distribution and processing of the Debtor's extension of discounts off of the Debtor's pharmaceutical drug products through retail pharmacies (the "**LoyaltyScript®  Program**").  The Master Services Agreement was amended several times:  (i) the "First

Appendix A185

Case 18-10518-KG Doc 655 Filed 07/30/18 Page 3 of 4

Amendment Master Service Agreement" dated as of October 10, 2016; (ii) the Second Amendment Master Service Agreement" dated as of January 20, 2017; and (iii) the "Third Amendment Master Services Agreement" dated as of October 2, 2017.

6. On April 11, 2018, an order was entered [D.I. 176] that approved the McKesson Stipulation attached as Exhibit A thereto (the "**April Stipulation**") that addressed, among other things, the Debtor's obligations under the Master Services Agreement related to the processing of the Debtor's LoyaltyScript® Program.[2]

7. The LoyaltyScript® Program is further described in "Schedule A1—Schedule of Services for LoyaltyScript® Program for Contrave®" signed by the Debtor and MPRS and dated on or about July 25, 2016 ("**Schedule A1**"). In turn, Schedule A1 attaches a "Schedule of Fees" (the "**Fee Schedule**"). The prefatory paragraph of Schedule A1 provides:

> "This Schedule of Services A1 described the Services to be performed by McKesson . . . and [the Debtor] for the LoyaltyScript® Program for Contrave (the "Program"). This Schedule of Services and the attached Schedule of Fees (the "Schedule") are pursuant to the Master Services Agreement . . ."

As a result, both Schedule A1 and the Fee Schedule were entered into pursuant to the Master Services Agreement. Schedule A1 was amended several times: (i) the "First Amendment to Schedule of Services for LoyaltyScript® Program for Contrave®" dated on or about January 8, 2017; and (ii) the "Second Amendment to Schedule of Services for LoyaltyScript® Program for Contrave®" dated on or about November 16, 2017.

8. The Master Services Agreement and the Distribution Agreement are referred to as the "**McKesson Agreements**." Under the terms of the McKesson Agreements, McKesson provided product distribution, logistical support and other services for the Debtor. As of March

---

[2] The April Stipulation refers to the Master Services Agreement as the "Program Service Agreement" but it is the same agreement.

12, 2018 (the "**Petition Date**"), the Debtor was in default in its performance obligations under the McKesson Agreements.

9.      On May 18, 2018, an order was entered [D.I. 319] that approved the McKesson Stipulation attached as Exhibit A thereto (the "**May Stipulation**") [D.I. 319-1] that specifically addressed, among other things, the obligations arising under the Distribution Agreement.  Under the May Stipulation, subject to a reservation of offset and other rights, McKesson paid the Debtor on account of any prepetition amounts owed under the Distribution Agreement, approximately $3.666 million.

I declare under penalty of perjury, pursuant to section 1746 of title 28, United States Code, that the foregoing is true and correct to the best of my knowledge.  Executed this 30th day of July, 2018 at Scottsdale, Arizona.

_____
Erin Beesley

4

Appendix A187

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **Orexigen Therapeutics, Inc.**, | Case No. 18-10518 (KG) |
| Debtor.[1] | **Objection Deadline: August 21, 2018 at 4:00 p.m. (ET)**<br>**Re: Docket No. 654** |

### OPPOSITION TO  MOTION FOR AN ORDER DETERMINING THAT MCKESSON SPECIALTY ARIZONA IS ENTITLED TO THE DISPUTED FUNDS

The Baupost Group Securities, L.L.C., EcoR1 Capital Fund, L.P., EcoR1 Capital Fund Qualified, L.P., Biotechnology Value Trading Fund OS, LP, Biotechnology Value Fund LP, Biotechnology Value Fund II, LP, Investment 10, LLC, MSI BVF SPV LLC, and Roadrunner Co. (collectively, the "Noteholders") hereby file this opposition (the "Opposition") to McKesson Corporation's ("McKesson") and McKesson Patient Relationship Solutions', a business unit of McKesson Specialty Arizona, Inc. ("MPRS" and "McKesson Arizona") *Motion for an Order Determining that McKesson Is Entitled to the Disputed Funds* [Docket No. 654] (the "Motion"). In support of the Opposition, the Noteholders respectfully submit as follows.

### INTRODUCTION

1.      MPRS requests relief that courts regularly deny – to set off amounts owed to the Debtor by one of MPRS's affiliates against its claim against the Debtor, known as a "triangular" setoff.  Acknowledging that bankruptcy case law is uniformly contrary to its position, MPRS asserts, remarkably, that its attempted triangular setoff has "nothing to do with the . . . Bankruptcy Code." Motion ¶ 7.  MPRS is wrong.  The Motion has everything to do with the Bankruptcy Code, and under the well-settled law of this District, a triangular setoff is not permitted.

---

[1]      The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA, 92037.

2.      Prepetition, McKesson and the Debtor entered into a *Core Distribution Agreement* (the "Distribution Agreement") pursuant to which McKesson purchased and distributed the Debtor's weight loss drug Contrave®.  Also prepetition, McKesson Arizona, through its business unit MPRS, and the Debtor entered into a *Master Services Agreement* (the "Services Agreement"), pursuant to which MPRS managed certain retail discount programs for the Debtor.  It is undisputed that McKesson and McKesson Arizona are affiliated, but distinct, legal entities.

3.      As of the petition date, McKesson owed the Debtor approximately $6.9 million under the Distribution Agreement, and the Debtor owed MPRS approximately $8.5 million under the Services Agreement.  The following chart outlines the parties' relationships and claims:



4.      Pursuant to a series of stipulations approved by the Court, McKesson paid what it owed under the Distribution Agreement to the Debtor, MPRS reserved any rights to set off its claim up to the amount McKesson paid, and the Debtor reserved its right to contest MPRS's setoff claim on any basis.  MPRS now seeks to use a triangular setoff to claw back McKesson's payment.  Its basis for this is language in the Distribution Agreement stating that McKesson's "affiliates" may set off their claims against amounts McKesson owes the Debtor, *i.e.*, perform a "triangular"

Appendix A189

setoff.  The question put before the Court in the Motion is whether section 553(a) of the Bankruptcy Code gives effect to this language.

5.      It is settled law in this District that triangular setoffs are not permitted under Section 553(a) of the Bankruptcy Code, and that parties cannot create a right to perform one via in a prepetition contract.  *In re SemCrude, L.P.*, 399 B.R. 388, 393-94 (Bankr. D. Del. 2009) (Shannon, J.) ("Allowing a creditor to offset a debt it owes to one corporation against funds owed to it by another corporation—even a wholly-owned subsidiary—would thus constitute an improper triangular setoff under the Code.").[2]

6.      MPRS is understandably unhappy with its status as an unsecured creditor in this case.  But it impermissibly seeks to "cut the line" in not one but two ways.  One is to try to get paid ahead of all other general unsecured creditors via it triangular setoff claim.  The other is to cut ahead of the holders of the Debtor's Prepetition Secured Notes (as hereinafter defined) whose rights in the proceeds of their collateral – the funds at issue here – have priority over any setoff claim of MPRS.  In the Final DIP Order (defined below), the Court found that the liens securing the Prepetition Notes were not subject to "offsets, recoupments, defenses, impairments, claims, counterclaims or cross-claims of any kind or nature," a finding binding on MPRS, McKesson, and all other parties in interest in the case.  Final DIP Order ¶¶ 10, 42.  For this additional reason, the Motion should be denied.

---

[2]    Three of the other five bankruptcy judges in this District, including this Court, have cited (and agreed) with *SemCrude* on this point.  *In re Am. Home Mortgage Holdings, Inc.*, 501 B.R. 44, 56 (Bankr. D. Del. 2013) (Sontchi, J.); *see In re TSAWD Holdings, Inc.*, 565 B.R. 292,  301 (Bankr. D. Del. 2017) (Walrath, J.); *In re Direct Response Media, Inc.*, 466 B.R. 626, 658 (Bankr. D. Del. 2012) (Gross, J.).  These cases are discussed in greater detail below.

Appendix A190

3

**FACTUAL BACKGROUND**

**The Debtor, the Distribution Agreement, and the Services Agreement**

7.      The Debtor is a publicly-traded biopharmaceutical company that is focused on treating obesity and has commercialized a single pharmaceutical drug for weight management – Contrave® ("Product").  *Declaration of Michael A. Narachi in Support of First Day Relief* [Docket No. 3] ("Narachi Decl.") ¶¶ 8, 11.  In March 2016, the Debtor closed an offering of $165 million in 0% Convertible Senior Secured Notes due 2020 (the "Prepetition Secured Notes").  *Id.* ¶ 13. The Baupost Group Securities, L.L.C. and the other Noteholders hold a majority of the Prepetition Secured Notes.  *Id.*

8.      On June 9, 2016, McKesson and the Debtor entered into the Distribution Agreement.  *See Stipulation Between Debtor, McKesson Corporation and McKesson Patient Relationship Solutions, a Business Unit of McKesson Specialty Arizona, Inc.* [Docket No. 281-1] (the "May Stipulation") at 1 (stipulating to certain facts between the parties); *Stipulation Between Debtor, Certain Secured Creditors and McKesson Corporation Regarding Resolution of Certain Disputed Claims* [Docket No. 592-1] (the "July Stipulation") at 1.   Under the Distribution Agreement, McKesson  purchased the Product from the Debtor and distributed it to various pharmacies.  Motion ¶ 3; July Stipulation at 1.

9.      On July 5, 2016, MPRS and the Debtor entered into the Services Agreement.  May Stipulation at 1; *see Stipulation for Entry of Order Providing McKesson With Adequate Protection with Respect to the Debtor's LoyaltyScript® Program* [Docket No. 109-2] (the "April Stipulation").   Under the Services Agreement, MPRS managed the Debtor's LoyaltyScript® program for patients to have access to price discounts from retail pharmacies at the point-of-sale. Motion ¶ 3; July Stipulation at 3.

Appendix A191

10.    The Distribution Agreement states:[3]

> Notwithstanding anything to the contrary in this Agreement, each of McKesson Corporation and its affiliates is hereby authorized to set-off, recoup and apply any amounts owed by it to [the Debtor's] affiliates against any all [*sic*] amounts owed by [the Debtor] or its affiliates to any McKesson Corporation or its affiliates, without prior written notice.

Motion ¶ 4; July Stipulation at 3.

11.    As of the Petition Date (defined below): (1) McKesson owed the Debtor $6,932,816.40 under the Distribution Agreement ("McKesson Receivable"); and (2) the Debtor owed MPRS approximately $8.5 million under the Services Agreement ("MPRS Claim").[4]

**The Bankruptcy Case**

12.    On March 12, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. That same day, it filed a *Motion for Entry of Interim and Final Orders, (I) Approving Debtor-In-Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362, and 364, Fed. R. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105(a), 362, and 363 of the Bankruptcy Code; (III) Granting Adequate Protection and Super-Priority Administrative Claims; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 4] (the "DIP Motion"). The Debtor sought authority to obtain secured, super-priority postpetition financing of

---

[3]    McKesson did not attach or otherwise submit copies of the Distribution Agreement or the Services Agreement.

[4]    The amount of the MPRS Claim is unliquidated. McKesson asserts that the Debtor owed MPRS approximately $9.1 million as of the Petition Date, Motion ¶ 6, but later asserts that the Debtor owed MPRS approximately $8.5 million, *id.* ¶ 59. In the April Stipulation, the Debtor and McKesson Arizona stipulated that McKesson Arizona asserted a claim of approximately $9.1 million in connection with LoyaltyScript®. April Stipulation at 3. In the May Stipulation, McKesson agreed that MPRS held a pre-petition claim of approximately $8.5 million. May Stipulation at 3. The Debtor scheduled MPRS as holding two general unsecured claims for $267,269.34 (based on "Trade Payable") and $8,309,155.46 (based on "Savings Card"). *See Schedules of Assets and Liabilities* at 83-84 [Docket No. 287]. MPRS's proof of claim asserted a claim for "at least $8,564,075.68." *See* Claim No. 122, attached hereto as Exhibit A.

Appendix A192

up to $70,350,000 (the "DIP Loans" and the "DIP Liens"), which included: (i) up to $35,000,000 in new money loans; (ii) $35,000,000 of roll-up loans; and (iii) a $350,000 fee. DIP Motion ¶ 3. The Noteholders were among the lenders in the debtor-in-possession facility (the "DIP Lenders"). Schedule 1, *Debtor-in-Possession Credit and Security Agreement dated as of March 12, 2018* [Docket No. 4-1] (the "DIP Agreement").

13.     On March 27, 2018, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") [Docket No. 91]. McKesson Specialty Health is one of the three members of the Committee. *Id.* Following its appointment, the Committee actively addressed its concerns over the DIP Agreement. *See, e.g.*, Docket No. 130 (reservation of rights regarding DIP Motion, stating "[f]ollowing extensive discussions among the parties, the Committee, the Debtor, and the DIP Lenders, the parties have agreed to substantial modifications to the DIP Facility").

14.     On April 13, 2018, the Court entered a final order granting the DIP Motion [Docket No. 189] (the "Final DIP Order"). The Final DIP Order provided that the Prepetition Secured Notes were "secured by first priority, fully-perfected security interests in and liens on all of [the Debtor's] right, title and interest in, to and under the 'Pledged Collateral' as defined in the Security Agreement, dated as March 21, 2016" and that no "offsets, recoupments, challenges, objections, reductions, defenses, impairments, claims, counterclaims, or cross-claims of any kind or nature to any of the [Prepetition Secured Notes] by any person or entity exist . . . ." Final DIP Order at ¶ 10(a), (c)(i). The Final DIP Order further provided that the findings in the Final DIP Order, including those in Paragraph 10, "shall be binding upon all parties in interest in the Chapter 11 Case . . . except to the extent that (a) a party in interest with standing, has timely commenced an adversary proceeding or contested matter asserting any claims or cause of action against the

Appendix A193

Prepetition secured parties, objecting to the prepetition secured Parties' claims or liens, or challenging any of the admissions set forth in Paragraph 10 of this Final DIP Order." *Id.* ¶ 42.

15.     On March 16, 2018, the Debtor filed a motion (the "<u>Sale Motion</u>") seeking, among other things, approval of a sale of substantially all of its assets to a stalking horse purchaser (the "<u>Purchaser</u>") [Docket No. 70].[5]  On June 11, 2018, McKesson filed a limited objection [Docket No. 365] to the Sale Motion, which objection was withdrawn pursuant to the July Stipulation (as set forth below).  On June 28, 2018, the Court entered an order (the "<u>Sale Order</u>") approving the sale to the Purchaser [Docket No. 438].  The Sale Order authorized the Debtor to sell substantially all of its assets to the Purchaser (the "<u>Sale</u>") pursuant to the terms of the "<u>Asset Purchase Agreement</u>" (as amended from time to time, the "<u>APA</u>"), dated April 23, 2018.  *Id.*  The Sale closed on July 27, 2018 (the "<u>Closing Date</u>").[6]

16.     The Debtor anticipates filing a plan of liquidation that will establish a litigation trust vehicle to litigate certain estate causes of action, resolve disputed claims, liquidate the remaining proceeds from the Sale, and make distributions to creditors.  *Debtor's Motion for Entry of an Order Authorizing the Appointment of Thomas P. Lynch as the Debtor's Wind Down Officer* ¶ 8 [Docket No. 626].  It anticipates there will be an approximately 45 to 100 day period from the close of the Sale to the effective date of the Plan (the "<u>Effective Date</u>").  *Id.*  Distributions under the Plan will be funded principally by proceeds of the Sale ("<u>Sale Proceeds</u>").  *See id.*

---

[5]  McKesson and MPRS suggest that the Debtor is "merely a stakeholder" for certain of its lenders, who hold substantially all of the Debtor's secured debt.  Motion ¶ 22.  They also state that certain of the Debtor's lenders hold 90% of the equity interests in the Purchaser, and security interests in the assets of the entity holding the remaining 10%.  *Id.*  To be clear, the Noteholders filing this Motion do not have equity interests in the Purchaser.

[6]  Pursuant to the Final DIP Order, the Debtor was required to pay the DIP Obligations "[p]romptly upon" receipt of "net cash proceeds from any asset disposition of DIP Collateral."  Final DIP Order ¶ 37.  As discussed below, the July Stipulation required the Debtor to segregate the amount of the funds at dispute pending resolution of this Motion.  July Stipulation ¶ 3.

Appendix A194

**The Stipulations**

17.     McKesson and McKesson Arizona entered into three stipulations concerning the claims.

18.     **The April Stipulation[7]** – On April 3, 2018, the Debtor and McKesson Arizona entered into the April Stipulation.  The April Stipulation provided that McKesson Arizona would estimate the amount required each month to fund projected discounts, and would advise the Debtor via a monthly invoice (the "Reimbursement Invoice").  April Stipulation at 3.  It also provided that the most recent Reimbursement Invoice, which was dated March 12, 2018, was for $6.3 million, and that McKesson Arizona asserted a $9.1 million prepetition claim against the Debtor.  *Id.*  Pursuant to the April Stipulation, the Debtor made a payment of $6,027,155 for amounts remitted under the LoyaltyScript® program from the Petition Date through April 8, 2018.  *Id.* at 5.  The Debtor also agreed to make weekly payments of $1.675 million.  *Id.*  The April Stipulation was clear that no payments would be on account of the prepetition claim.  *Id.*  The Court entered an Order approving the April Stipulation on April 11, 2018 [Docket No. 176].

19.     **The May Stipulation[8]** – On May 8, 2018, the Debtor, McKesson, and MPRS entered into the May Stipulation.  The May Stipulation provided that the McKesson Receivable under the Distribution Agreement was $6,932,816.40 as of the Petition Date.  May Stipulation at 2.  According to the May Stipulation, McKesson made postpetition payments of $3,266,255.76 to the Debtor, but contended that the McKesson Receivable was subject to contractual setoff, and imposed an administrative hold on $3,666,560.54 of prepetition amounts owing to the Debtor.  *Id.*

---

[7]  McKesson and MPRS acknowledge that the April Stipulation related to only the Services Agreement.  *See* Motion at 5.

[8]  McKesson and MPRS acknowledge that the May Stipulation related to only the Distribution Agreement. *See* Motion at 7.

Appendix A195

Pursuant to the May Stipulation, McKesson agreed to make the $3,666,560.54 payment, which would be applied to, and satisfy, the McKesson Receivable. *Id.* at 4. McKesson and MPRS reserved all rights to seek to set off the MPRS Claim against the McKesson Receivable. *Id.* at 4-5. The Court entered an Order approving the May Stipulation on May 18, 2018 [Docket No. 319].

20.     **The July Stipulation** – On July 19, 2018, the Debtor, the Lenders, and McKesson entered into the July Stipulation. The July Stipulation authorized McKesson or MPRS to file this Motion, and required the Debtor to segregate $6,932,816.40 (the "Segregated Funds") to be held pending its resolution. Under the Final DIP Order, the Segregated Funds are cash collateral of the Prepetition Secured Noteholders. Final DIP Order ¶ 22. The Court entered an Order approving the July Stipulation on July 20, 2018 [Docket No. 592].

## ARGUMENT

21.     MPRS seeks to set off the MPRS Claim against the McKesson Receivable, thus receiving immediate payment from Sale Proceeds ahead of the holders of the Prepetition Secured Notes and other creditors. The Bankruptcy Code, however, does not authorize such relief. The MPRS Claim is asserted by MPRS under the July 2016 Services Agreement, which governed management of a discount program. The McKesson Receivable was owed by McKesson under the June 2016 Distribution Agreement, which governed purchase and distribution of the Product. McKesson Arizona, of which MPRS is part, and McKesson are distinct legal entities. As a result, the claims are not "mutual." Under Section 553(a) of the Bankruptcy Code, a creditor's right to set off is preserved only to the extent of mutual claims. 11 U.S.C. § 553(a) ("this title does not affect any right of a creditor to offset a *mutual* debt . . .) (emphasis added).

22.     MPRS's attempts to distance itself from the plain language of section 553(a) Bankruptcy Code are varied, but all must fail. The case law squarely holds that parties cannot contract around the limiting term "mutual" contained in section 553(a) of the Bankruptcy Code.

9

Appendix A196

MPRS's alternative arguments likewise lack merit.  Lastly, it is simply wrong that the MPRS purported setoff claim has priority over the Noteholders' interest in the Sale Proceeds.  Under the plain meaning of the Final DIP order, the liens securing the Prepetition Secured Notes were expressly protected from setoff or similar rights, giving the Noteholders priority over all of the Sale Proceeds, including the Segregated Funds.

**The McKesson Receivable and the MPRS Claim Lack Mutuality.**

23.     Bankruptcy Code section 553(a) provides that "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debt that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."

24.     Section 553 requires that "the offset debts must be mutual, prepetition debts."  *In re Sentinel Prods. Corp.*, 192 B.R. 41, 45 (Bankr. N.D.N.Y. 1996); *In re Westchester Structures, Inc.*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995).  Mutual debts are "due to and from the same person in the same capacity."  *Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 648 (2d Cir. 1991).  The burden of proof is on the party asserting the right to set off, *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006), and the mutuality requirement is "strictly construed against the party seeking set off."  *Sentinel*, 192 B.R. at 46.

25.     Here, MPRS seeks to setoff the MPRS Claim (which is based on the July 2016 Services Agreement and governs management of a discount program) against the McKesson Receivable (which was paid by McKesson pursuant to the June 2016 Distribution Agreement and governs purchase and distribution of the Product).  Numerous courts have held that such a setoff is impermissible under section 553.  *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009) ("Because of the mutuality requirement in section 553(a), courts have routinely held that

Appendix A197

10

triangular setoffs are impermissible in bankruptcy."); *see Matter of United Science of Am., Inc.*, 893 F.2d 720, 723 (5th Cir. 1990) ("The mutuality requirement is designed to protect against 'triangular' set-off; for example, where the creditor attempts to set off its debt to the debtor with the latter's debt to a third party."); *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 n.2 (2d Cir. 1989) ("[U]nder federal bankruptcy law, a subsidiary's debt may not be set off against the credit of a parent."); *In re Am. Home Mortg. Holdings, Inc.*, 501 B.R. 44, 56-57 (Bankr. D. Del. 2013) ("This Court concurs entirely with [*SemCrude*]."); *Sentinel*, 192 B.R. at 46 ("[A] subsidiary's debt may not be set off against the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances."); *In re Lehman Bros. Inc.*, 2011 WL 4553015, at *5 (Bankr. S.D.N.Y. Oct. 4, 2011) ("The clarity of [section 553(a)] is conclusive—mutuality quite literally is tied to the identity of a particular creditor that owes an offsetting debt. The right is personal, and there simply is no ability to get around this language.").

26. Nor can parties contract around the mutuality requirement, as MPRS argues. Two judges in this district have explicitly rejected that argument. *SemCrude*, 399 B.R. at 393 (Shannon, J.) ("non-mutual debts cannot be transformed into a 'mutual debt' under section 553 simply because a multi-party agreement allows for setoff of non-mutual debts between the parties to the agreement"); *Am. Home Mortg.*, 501 B.R. at 57 (Sontchi, J.) ("it is established that debts must be mutual to be setoff and parties cannot contract around this requirement"). Two other judges in this district, including this Court, have agreed with those holdings. *In re TSAWD Holdings, Inc.*, 565 B.R. 292, 301 (Bankr. D. Del. 2017) (Walrath, J.) (noting that courts cannot enforce contracts inconsistent with the UCC, and citing *SemCrude* for the proposition that non-mutual debts cannot be transformed into mutual debts by virtue of a contract); *In re Direct Response Media, Inc.*, 466 B.R. 626, 658 (Bankr. D. Del. 2012) (Gross, J.) (stating that savings clauses that attempt to contract

Appendix A198

around core provisions of the Bankruptcy Code are invalid, and citing *SemCrude* for the proposition that is "impermissible to allow parties to contract around the mutuality requirement of § 553"). Numerous other courts also agree. *See, e.g.*, *In re Arcapita Bank B.S.C.(c)*, 2014 WL 2109931, at *3-4 (Bankr. S.D.N.Y. May 20, 2014) ("triangular setoffs are commonly disallowed in bankruptcy due to a lack of mutuality [and] [t]he fact that the setoff was provided for by contract does not alter this conclusion"); *Lehman*, 2011 WL 4553015, at *7 ("The careful analysis in *SemCrude* is persuasive. There simply is no contract exception to section 553(a), because the statute itself does not allow for one.").

27.    Thus, the case law clearly demonstrates that MPRS is not entitled to setoff the MPRS Claim against the McKesson Receivable.

**MPRS's Arguments to the Contrary Lack Merit.**

28.    MPRS acknowledges that "there is considerable authority" that triangular setoffs are not permitted. Motion ¶ 7. Nevertheless, it argues that *SemCrude* and the cases that follow *SemCrude* do not have "meaningful analysis [and] are not controlling" for multiple reasons. It argues that: (1) California law controls rather than the Bankruptcy Code and California law permits triangular setoffs; (2) *SemCrude* and the cases were incorrectly decided and distinguishable on their facts; and (3) third party beneficiary status satisfies the mutuality requirement. Each of these arguments lack merit.

**The Bankruptcy Code Governs Setoff.**

29.    MPRS devotes a considerable portion of the Motion to the argument that California law, and not the Bankruptcy Code, governs setoff. It runs the argument gamut, first asserting that the Bankruptcy Code does not control at all, then that the Bankruptcy Code merely preserves state

Appendix A199

law setoff rights without more, and last that state law governs the mutuality requirement under section 553. Each of these arguments fail.

30. *First*, MPRS detours into an "interests test" choice of law analysis, overlooking the fact that adjudication its setoff claim turns directly on the interpretation of a federal statute, section 553(a) of the Bankruptcy Code. It asserts that the Bankruptcy Code "does not interfere with [its] rights under California law" and that no federal interests "would be substantially and negatively impaired" by permitting the triangular setoff. Motion ¶¶ 23-26, 28. It cites *Butner v. United States*, 440 U.S. 48, 55 (1979) for the uncontroversial proposition that property interests are created and defined by state law, but incorrectly argues that "there is no federal interest that would impose a federal gloss on the application of state law to [setoff] rights." Motion ¶ 25. To the contrary, setoff under section 553 is strictly construed because it creates a preference. *In re Chamblin*, 107 B.R. 122, 123 (Bankr. N.D. Tex. 1989) ("[B]ecause § 553 creates a permissible preference of one creditor over another, the provision must be strictly construed."); *see Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 57 (3d Cir. 1990) (stating that setoff "is at odds with a fundamental policy of bankruptcy, equality among creditors, because . . . .in effect, the creditor receives a 'preference.'"). Therefore, the argument that the Bankruptcy Code should not control because there is no "clearly articulated federal interest" is wrong.

31. *Second*, MPRS argues that section 553 does not create a right of setoff, but merely preserves whatever right exists under state law without more. Motion ¶¶ 31, 35-38. It fails to recognize, however, that the cases it cites explicitly state that section 553 imposes additional restrictions to the requirement of an existing right to setoff. *Citizen's Bank v. Strumpf*, 516 U.S. 16 (1995) ("Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, *with certain exceptions*, whatever right of setoff otherwise exists is preserved

13

Appendix A200

in bankruptcy"(emphasis added)); *SemCrude*, 399 B.R. at 393 ("[S]etoff is appropriate in bankruptcy only when a creditor both enjoys an independent right of setoff under applicable non-bankruptcy law, *and meets the further Code-imposed requirements and limitations set forth in section 553*"(emphasis added)); *Garden Ridge*, 338 B.R. at 632 (noting that a creditor must establish that "it has a right of setoff under nonbankruptcy law" *and* that "this right should be preserved in bankruptcy under § 553," and that "the granting or denial of the right to a setoff depends upon the terms of section 553, and not upon the terms of state statutes or laws.").

32.     MPRS also asserts that the Bankruptcy Code merely preserves state law rights to setoff because it continued the practices of former Bankruptcy Act, which merely preserved state law setoff rights.  Motion ¶¶ 35-38.  This argument fares no better because MPRS's cited cases only stand for the proposition that § 68a of the former Bankruptcy Act did not *expand* existing setoff rights.  *Cumberland Glass Mfg. Co. v. De Witt*, 237 U.S. 447, 455 (1915) ("The provision . . . does not enlarge the doctrine of set-off . . . ."); *In re Saugus Gen. Hosp., Inc.*, 698 F.2d 42 (1st Cir. 1983) ("It would be ironic were we to construe § 68 to place the Bank in a better position by virtue of the Hospital's bankruptcy than it would have occupied had the Hospital defaulted on its loan but been able to stay out of bankruptcy court.").  Those cases did not analyze the additional "restrictive language of  . . . the Bankruptcy Act . . . ."[9]  Thus, the argument that section 553 does nothing but preserve state law setoff rights is incorrect.

33.     *Third*, realizing that the first two arguments lack merit, MPRS pivots, arguing that the mutuality requirement in section 553(a) is governed by state law.  Motion ¶¶ 29-32, 35-38.  It asserts that because the Bankruptcy Code does not define the term "mutual," such term must be

---

[9]  Judge Shannon carefully and thoroughly analyzed former Bankruptcy Act arguments in *SemCrude*, holding that the cases recognizing a triangular setoff pursuant to a contract were decided under "state law or the common law of equitable receivership," not "the more restrictive language of either the Bankruptcy Act or Code."  *SemCrude*, 399 B.R. at 395.

Appendix A201

governed by state law.  *Id.* ¶ 29 & n.7.  This argument is mistaken.  When Congress does not define

a term, courts look at its ordinary meaning.  *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69

(2011) ("Because the [Bankruptcy] Code does not define 'applicable,' we look to the ordinary

meaning of the term.").  As explained in *SemCrude*, bankruptcy courts interpret the term "mutual"

to mean "due to and from *the same persons in the same capacity*" and because "mutuality is strictly

construed against the party seeking setoff," courts must give the term the narrow construction that

a party may only "collect in his own name against the debtor in his own right and severally."  399

B.R. at 396-97 (emphasis added).

34.     Accepting the idea that the term "mutual" is governed by state law would render

that term superfluous.  *Ransom*, 562 U.S. at 74 (rejecting interpretation of the term "applicable"

that would render it superfluous).  That is because section 553 *already* requires an existing setoff

right under state law.  *Carn v. Heesung PMTech Corp.*, 579 B.R. 282, 295 (M.D. Ala. 2017) ("[A]

creditor must have both an independent right of setoff under applicable non-bankruptcy law, and

further satisfy the additional requirements imposed under § 553(a)."); *In re Westchester Structures,*

*Inc.*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995) (stating that section 553 "preserves . . . any right

to setoff that the creditor had under applicable nonbankruptcy law . . . and adds additional

restrictions.").  MPRS would have the court define "mutual" in such a way that any party satisfying

the first requirement of section 553 (existing right to setoff under state law) would necessarily

satisfy the second (mutuality).  That construction is contrary to settled principles of statutory

interpretation.[10]

---

[10]  *Kaufman v. Clak & Vermilion Fine Arts, LLC*, 31 F. App'x 206, 208 (2002), which McKesson relies on,
stands for the unremarkable proposition that "interests in property," for the purposes of what property is included in
the estate, depends on state law.  *Kaufman* cites *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992), which in turn cited
*Butner* for the proposition that "property" is a "creature[] of state law."  Thus, *Kaufman* does not address statutory
interpretation—it addresses the concept that state law generally "determin[es] property rights in the assets of a
bankrupt's estate."  *Butner*, 440 U.S. at 54.

Appendix A202

35.    Further, the authorities cited for the proposition that mutuality is determined by state law are inapposite.  MPRS trumpets the fact that the courts in *In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006) and *In re Garden Ridge Corp.*, 386 F. App'x 41, 43 (3d Cir. 2010) cited *In re Czyzk*, 297 B.R. 406 (Bankr. D. N.J. 2003) for the proposition that "[m]utuality of obligations is determined by state law."  Motion ¶¶ 29-32.  But *Czyzk* is inapposite because it did not involve any triangular setoff—it involved a bank setting off its claim against a debtor against the debtor's claim against the bank.[11]  Moreover, one of the cases McKesson cites for the proposition that mutuality is determined by state law explicitly states that "courts apply federal bankruptcy precedent and rarely refer to state law to determine whether mutuality exists" and denied a setoff request because the county and county investment pool could not be treated as the same entity for mutuality purposes under section 553(a).  *In re County of Orange*, 183 B.R. 609, 615-17 (Bankr. C.D. Cal. 1995).[12]  For these reasons, MPRS's argument has no merit.

36.    Even if MPRS were correct that California law governed the meaning of the term "mutual", it does not provide authority demonstrating that triangular setoff by contract would even be permitted in California.  Motion ¶¶ 33-34, 39-40.  The only case cited to support its position is *Prudential Reinsurance Co. v. Superior Court*, 3 Cal. 4th 1118, 1137 (1992).  *Prudential* is not persuasive for at least two reasons.  *First*, it "involves specific provisions of the [California] Insurance Code, not general principles of mutuality and set-off."  *Resources Warehousing &*

---

[11]    Many of the other cited authorities are also inapposite because they do not involve triangular setoffs.  *In re Sunset Aviation, Inc.*, 468 B.R. 641 (Bankr. D. Del. 2011) (ruling on *nunc pro tunc* application of substantive consolidation order); *In re Bill Heard Enters., Inc.*, 428 B.R. 745 (Bankr. N.D. Ala. 2010) (bank could setoff its claim against debtor because bank owed debt to debtor and debtor was obligated to bank); *In re Calore Exp. Co., Inc.*, 288 F.3d 22 (1st Cir. 2002) (discussing waiver of setoff rights and court's equitable powers); *In re MCB Fin. Grp., Inc.*, 2011 WL 8609454, at *4 (Bankr. N.D. Ga. Mar. 31, 2011) (addressing whether non-matured debts can satisfy the mutuality requirement).

[12]    In another one of MPRS's cited cases, the court held that a principal did not have a preexisting right to setoff because the relevant agreement was between the debtor and the principal's corporation.  *In re Flooring Am., Inc.*, 302 B.R. 403, 406 (Bankr. N.D. Ga. 2003).

Appendix A203

*Consol. Servs. of Cal. v. Hatzlachh Supply, Inc.*, 45 F.3d 436 (Table), 1994 WL 711912, at *3 n.1 (9th Cir. Dec. 21, 1994); *see In re Liquidation of Home Ins. Co.*, 913 A.2d 712, 719 (N.H. 2006) (stating that *Prudential* addressed "whether reinsurance debts and credits generated between a reinsurer and the original insurer under the terms of their reciprocal contracts may be set off when the original insurer becomes insolvent"). *Second*, the language MPRS relies on is *dicta*. In *Prudential*, the court held that subsidiaries of a reinsurer were not principal reinsurers that had mutual reinsurance debts and creditors. It noted that "[a]ccordingly, we refuse to expand the section 1031 setoff of debts in the absence of an express mutual agreement that the subsidiary would be deemed a mutual debtor-creditor of the parent." 3 Cal. 4th at 1137. Thus, the language regarding an "express mutual agreement" was not implicated by the facts. Additionally, *Prudential*'s reference to "express mutual agreement" was followed by a citation to *In re Berger Steel Company*, 327 F.2d 401 (7th 1964), which Judge Walrath has explained did not actually create a contract exception to the mutuality requirement. *SemCrude*, 399 B.R. at 395.

37.     The remaining California cases do not address setoff, and are based on alter ego or similar findings.[13] Thus, MPRS has failed to demonstrate that it is entitled to setoff under California law. *Garden Ridge*, 338 B.R. at 632 (burden of proof on party asserting right to setoff).

**MPRS's Attempts to Limit Section 553 and Distinguish the Caselaw Fail.**

38.     MPRS next argues that section 553 does not apply because its restrictions "relate to integrating setoff rights into the context of possible avoidance actions related to setoffs

---

[13]     *Dorel Indus., Inc. v. Superior Court*, 134 Cal. App. 4th 1267, 1275-76 (2005) (parent subject to general jurisdiction in California under the representative services doctrine, which applies when a company's representative "provides services . . . sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services"); *Morrison Knudsen Corp. v. Hancock*, 69 Cal. App. 4th 223, 252-53 (1999) (attorney had conflict of interest with subsidiary based on substantial relationship between attorney and parent and evidence of unity of interests between parent and subsidiary); *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249-50 (1991) (alter ego findings under single business enterprise theory).

Appendix A204

effectuated prepetition."  Motion ¶ 41.  It contends that courts that "have expanded the additional restrictions on a creditor seeking setoff" have flown in the face of "both applicable State law and the economic realities in today's increasingly complex business environment."  *Id.*  It asserts that the only correct reading of section 553 "does not lend itself to impose such requirements" and argue that the caselaw is distinguishable.  *Id.* ¶¶ 43, 49-52.  It is incorrect.

39.     As an initial matter, merely because certain parts of section 553 address avoidance issues, that does not mean that section 553 is limited exclusively to avoidance actions.  Section 553 balances the competing interests of convenience and avoiding preferential payments.  *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995) (setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A'"); *Bevill, Bresler & Schulman*, 896 F.2d at 57 (stating that setoff "is at odds with a fundamental policy of bankruptcy, equality among creditors, because . . . .in effect, the creditor receives a 'preference.'").  Because MPRS will receive a preferential payment if it prevails, it must satisfy the requirements of section 553.

40.     More importantly, it is MPRS who "flies in the face of" the applicable law—the Bankruptcy Code—by "fail[ing] to engage in any analysis demonstrating that the [contract] exception actually fits within the statutory scheme."  *Lehman*, 458 B.R. at 142.  Thus, "[t]he careful analysis in *SemCrude* is persuasive. There simply is no contract exception to section 553(a), because the statute itself does not allow for one."  *Lehman*, 458 B.R. at 142.

41.     Further, the attempts to distinguish *SemCrude* and all of the other cases with similar holdings fall woefully short.  *First*, MPRS argues those cases are not controlling because they are governed by section 553(a) "and rely upon a finding that the proposed offset does not meet the mutuality requirements of that section."  Motion ¶ 50.  But that is exactly the flaw with the

18

Appendix A205

Motion—MPRS fails to engage with the Bankruptcy Code and expressly distances itself from section 553, the very same Code section that governs the relief it is seeking. *Second*, it argues that those courts relied on section 553(a) because a number of those cases involved a debtor and its affiliate rather than a creditor and its affiliate, and there was no alter ego or substantive consolidation finding. Motion ¶¶ 50, 51. This is a classic case of a distinction without a difference. Section 553(a), on its face, does not distinguish triangular setoffs based on which side of the transaction creates the triangle. For example, section 553(a)'s reference to "mutual" is not followed by "but only if it involves a debtor and its affiliates." And the curious references to alter ego findings prove why the Motion must fail. McKesson and MPRS are separate legal entities, who are certainly not claiming to be alter egos of one another.

## Third Party Beneficiary Status Does Not Establish Mutuality.

42. MPRS last suggests that it was a third party beneficiary of the Distribution Agreement, which negates the mutuality requirement. Motion ¶¶ 44-46. This argument is unpersuasive for two reasons.

43. *First*, MPRS cites only two cases for the third party beneficiary argument. But both *In re Bacigalupi, Inc.*, 60 B.R. 442, 446 (B.A.P. 9th Cir. 1986) and *Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 194 F. Supp. 2d 378, 394-95 (D. N.J. 2002) are inapposite. In *Bacigalupi*, the bankruptcy appellate panel held that the bankruptcy court should have granted relief from stay to allow a creditor to assert setoff as a counterclaim in a pending state court proceeding. 60 B.R. at 446. It explained that allegations in the state court complaint that the corporation was a third party beneficiary of a lease between the debtor and an individual were sufficient to allow the creditor to assert the setoff claim in state court. *Id.* In *Saudi Basic*, the court held that a third party had adequately pled third-party beneficiary status, and that it could not resolve factual questions on a

Appendix A206

Federal Rule of Civil Procedure 12(c) motion. Neither of the cases are like the facts here, where MPRS seeks immediate priority payment of a general unsecured claim based on an agreement between its affiliate McKesson and the Debtor.

44. *Second*, MPRS has not met its burden of factually demonstrating that it is a third party beneficiary. It has not filed the entire Distribution Agreement, instead quoting seven (7) lines that do not mention MPRS, MPRS's claim, the Services Agreement, or any other circumstances that would demonstrate the parties' intent. *Jones v. Aetna Casualty & Surety Co.*, 26 Cal. App. 4th 1717, 1725 (1994) ("Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered."). Nor does it acknowledge that the parties entered into the Distribution Agreement and Services Agreement at different times, and that they achieve separate things—the June 2016 Distribution Agreement governs purchase and distribution of the Product, while the July 2016 Services Agreement governs management of a discount program. Thus, assuming California law applies, McKesson has not satisfied its burden of proof. *Garden Ridge*, 338 B.R. at 632 (burden of proof on party asserting right to setoff); *Sentinel*, 192 B.R. at 46 (mutuality requirement is "strictly construed against the party seeking setoff").

**MPRS Does not Provide any Authority or Explanation Regarding Its Alleged Recoupment or "Application" Rights.**

45. MPRS argues that in addition to setoff, it has claims for recoupment and "contractual application to claims owed by any of the McKesson affiliates against any obligations owed by the Debtor." Motion ¶ 48. However, it does not provide any authority providing that "recoupment" or claimed rights "to apply any amounts owed" entitle it to immediate payment in full of the MPRS Claim from the Sale Proceeds.

Appendix A207

46.    In any event, recoupment does not apply when the claims arise under separate contracts and separate transactions. *In re University Med. Ctr.*, 973 F.2d 1065, 1079 (3d Cir. 1992) (recoupment "is the setting up of a demand arising from the same transaction as plaintiff's claim" and applies "where the relevant claims arise out of a single contract"); *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984) (in bankruptcy, recoupment doctrine applied where the claims "arise out of the same contract").  Here, the MPRS Claim is based on the July 2016 Services Agreement, under which MPRS managed the Debtors' discount program.  The McKesson Receivable, however, is based on the June 2016 Distribution Agreement, under which McKesson brought the Product from the Debtor and distributed it.  *University Med. Ctr.*, 973 F.2d at 1079 (the "fact that the same two parties are involved, and that a similar subject matter gave rise to both claims . . . does not mean that the two arose from the same transaction."); *see, e.g.*, *In re FormTech Indus., LLC*, 439 B.R. 352, 362-63 (Bankr. D. Del. 2010) (alleged recoupment did not arise out of the same transaction even where there was a single contract because the creditor's claim did not relate to delivered goods on which receivables were based, but rather to breach of future obligations, and thus creditor merely had claim for rejection damages).  And, "application rights," by its own terms, means a right to "apply" one debt against another—which is the same as the setoff which MPRS seeks but has no right to under the Bankruptcy Code.

### UCC 9-404 Does Not Put the MPRS  Claim Ahead of the Prepetition Secured Notes

47.    Last, MPRS argues that under California's Uniform Commercial Code, California Commercial Code § 9404, the Noteholders took their security interests subject to all of MPRS's contractual rights and defenses, which include claims related to its claimed "Application Rights." Motion ¶¶ 53-59.  It asserts that its Application Rights "continue against third parties granted new security interests."  *Id.* ¶ 57.  The argument lacks merit for at least two reasons.

Appendix A208

48.    *First*, the Noteholders pre-petition security interests arise by virtue of the Prepetition Secured Notes, pursuant to an indenture and security agreement dated March 21, 2016. DIP Agreement at 1; *see* Final DIP Order ¶ 10(a) (the Prepetition Secured Notes are "secured by first priority, fully-perfected security interests in and liens on all of [the Debtor's] right, title and interest in, to and under the 'Pledged Collateral' as defined in the Security Agreement, dated as March 21, 2016"). The Debtor entered into the Distribution Agreement on June 9, 2016, and the Services Agreement on July 5, 2016. April Stipulation at 1; May Stipulation at 1. Because the Noteholders' pre-petition security interest predates the Services Agreement and the MPRS Claim, the claimed Application Rights could not have existed when the Noteholders received their security interest. It does not make sense that the Noteholders' prepetition security interests would be subject to non-existent "Application Rights." *In re Printz*, 478 B.R. 876, 887 (Bankr. C.D. Ill. 2012) ("[Section] 9-404(a) does not provide Trainor's contractual setoff rights priority over CNH's prior perfected security interests."); *InfinaQuest, LLC v. DirectBuy, Inc.*, 18 F. Supp. 3d 959, 965 (N.D. Ind. 2014) (noting that "allowing a contractual set-off right created *after* a perfected security interest to take priority would allow an end-run around the contract granting the security interest.").

49.    *Second*, MPRS does not acknowledge the terms of the Final DIP Order on the priority of the Prepetition Secured Notes. The Final DIP Order included a finding that no "*offsets*, *recoupments*, challenges, objections, reductions, defenses, impairments, claims, counterclaims, or cross-claims of any kind or nature to any of the [Prepetition Secured Notes] by any person or entity exist . . . ." Final DIP Order ¶ 10(c)(1) (emphasis added). Further, the Court ordered that the DIP Liens constitute: 1) "valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and liens upon the DIP Collateral . . . ," *id.* ¶ 17; and 2) "valid, binding, continuing, enforceable, fully-perfected, first priority, priming DIP Liens upon the DIP Collateral

22

Appendix A209

subject to Lien as of the Petition Date, and which shall be senior to all Liens secured the Existing Primed DIP Secured Obligations," *id.* ¶ 19. The DIP Agreement defined "Lien" to include "restriction[s] of any kind." DIP Agreement at 11.

50. Further, neither McKesson nor MPRS nor any other party timely challenged these findings. The Final DIP Order provided that any party challenging any of the admissions in paragraph 10 was required to commence an adversary proceeding or contested matter by no later than May 28, 2018. *Id.* And, that if no such challenge was timely commenced, the findings in paragraph 10 "shall be binding and preclusive on . . . all . . . parties in interests in this chapter 11 case," the "Prepetition Liens and Prepetition Secured Obligation shall not be subject to subordination, counterclaims, set-off, defense, avoidance or any other or further challenge by any party in interest . . . ," and that "the repayment of any Prepetition Secured Obligations (including . . . by means of the Roll-Up Loans) in accordance with the terms of this Final DIP Order and the Prepetition Note Documents shall constitute an indefeasible payment and shall be final and binding for all purposes." *Id.*[14]

51. McKesson and MPRS had notice of the DIP Motion. *See Affidavit of Service* at 8, 11, & 23 [Docket No. 69]. McKesson Arizona acknowledged several terms of the interim DIP Order in the April Stipulation. April Stipulation at 4, 6. McKesson Specialty Health was a member of the Committee that was involved in "extensive discussions" that resulted in "substantial modifications to the DIP Facility" [Docket No. 130]. The Final DIP Order was also served on McKesson Arizona's counsel by email on April 13, 2018, and on McKesson Arizona, MPRS, and McKesson Specialty Health by first class mail on the same date [Docket No. 239]. Neither

---

[14] As noted above, the Debtor was required to pay the DIP Obligations "[p]romptly upon" receipt of "net cash proceeds from any asset disposition of DIP Collateral." Final DIP Order ¶ 37.

Appendix A210

McKesson nor MPRS filed any challenge. Thus, they are bound by the terms of the Final DIP Order. Thus, even if MPRS could have exercised a contractual triangular setoff (which it cannot), by operation of the Final DIP Order, the Prepetition Noteholders' claims and liens take priority.

[*Remainder of Page Left Intentionally Blank*]

Appendix A211

## CONCLUSION

WHEREFORE, for the reasons stated above, the Noteholders respectfully request that the

Court deny the Motion in its entirety.

Dated: August 21, 2018                Respectfully submitted,
       Wilmington, Delaware

**WHITEFORD, TAYLOR & PRESTON LLC**

*/s/ Aaron H. Stulman*
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Telephone: (302) 353-4144
Facsimile: (302) 661-7950
csamis@wtplaw.com
kgood@wtplaw.com
astulman@wtplaw.com


**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

Eric Winston
Bennett Murphy
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile: (213) 443-3100
ericwinston@quinnemanuel.com
bennettmurphy@quinnemanuel.com

*Counsel to Baupost Group Securities, L.L.C.,*
*EcoR1 Capital Fund, L.P.*
*EcoR1 Capital Fund Qualified, L.P.*
*Biotechnology Value Trading Fund OS, LP*
*Biotechnology Value Fund LP*
*Biotechnology Value Fund II, LP*
*Investment 10, LLC*
*MSI BVF SPV LLC*
*Roadrunner Co.*

Appendix A212

# EXHIBIT A

ORIGINAL

Fill in this information to identify the case:

Debtor 1    **Orexigen Therapeutics, Inc.**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  District of Delaware

Case number    **18-10518**

**RECEIVED**

JUN 1 3 2018

KURTZMAN CARSON CONSULTANTS

## Official Form 410

# Proof of Claim

☒ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

McKesson Specialty Arizona, Inc.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

✓ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

McKesson Specialty Arizona c/o Erin Beesley
Name

5701 N. Pima Road
Number    Street

Scottsdale                AZ          85250
City                State        ZIP Code

Contact phone   480-663-4088

Contact email   erin.beesley@mckesson.com

Where should payments to the creditor be sent? (if different)

(same as notice)
Name

_____
Number    Street

_____
City                State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

**4. Does this claim amend one already filed?**

✓ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on ___/___/_____
                                                                        MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

✓ No
☐ Yes. Who made the earlier filing? _____



Appendix A214

Official Form 410                    Proof of Claim



1810518180613000000000009

## Part 2:    Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☐ No<br>✓ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  4  8  7  5 |

| | |
|---|---|
| **7. How much is the claim?** | $_____ At least $8,564,075.67 . **Does this amount include interest or other charges?**<br>(See Attachment)<br>    ☐ No<br>    ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>LoyaltyScript® Agreement and Stipulation |

| | |
|---|---|
| **9. Is all or part of the claim secured?** | ✓ No<br>☐ Yes. The claim is secured by a lien on property.<br>    **Nature of property:**<br>    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>    ☐ Motor vehicle<br>    ☐ Other. Describe: _____<br><br>    **Basis for perfection:** _____<br>    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>    **Value of property:** $_____<br>    **Amount of the claim that is secured:** $_____<br>    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>    **Amount necessary to cure any default as of the date of the petition:** $_____<br><br>    **Annual Interest Rate (when case was filed)_____%**<br>    ☐ Fixed<br>    — Variable |

| | |
|---|---|
| **10. Is this claim based on a lease?** | ✓ No<br>— Yes. Amount necessary to cure any default as of the date of the petition. $_____ |

| | |
|---|---|
| **11. Is this claim subject to a right of setoff?** | ✓ No<br>— Yes. Identify the property: _____ |

RECEIVED

JUN 1 3 2018

Appendix A215

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

✓ No

Yes. *Check one:*

                                                         **Amount entitled to priority**

Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).      $_____

Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).      $_____

Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).      $_____

Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).      $_____

Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).      $_____

Other. Specify subsection of 11 U.S.C. § 507(a)(\_\_\_) that applies.      $_____

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

✓ I am the creditor.
— I am the creditor's attorney or authorized agent.
    I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
    I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   06 / 08 / 2018
                        MM / DD / YYYY

**RECEIVED**

**JUN 1 3 2018**

KURTZMAN CARSON CONSULTANTS

     *Erin Beesley*
     Signature

**Print the name of the person who is completing and signing this claim:**

Name      **Erin Beesley**
             First name                 Middle name                Last name

Title       **Sr. Director, Finance**

Company   **McKesson Specialty Arizona, Inc.**
                Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    **5701 N. Pima Road**
              Number       Street
              **Scottsdale**             **AZ**      **85250**
              City                         State      ZIP Code

Contact phone   **480-663-4088**          Email   **erin.beesley@mckesson.com**

Appendix A216

# Buchalter

1000 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90017
213.891.0700 Phone
213.896.0400 Fax

June 13, 2018

213.891.5444 Direct
dslate@buchalter.com

<u>HAND DELIVERED</u>

Orexigen Claims Processing Center
c/o KCC
2335 Alaska Ave.
El Segundo, CA 90245

      Re:  In Re Orexigen Therapeutics, Inc., USBK – Delaware
           Case No. 18-10518

Dear Sir/Madam:

      Enclosed are an original and two copies of McKesson Specialty Arizona, Inc.'s Proof of Claim in the above-referenced bankruptcy.  The deadline to file the Proof of Claim is Friday, June 15, 2018, 4:00 p.m. (ET).  Please immediately file the original, conform the two copies and return to our office via the messenger.  If you have any questions, please contact our office. Thank you.

                     Very truly yours,

                     BUCHALTER
                     A Professional Corporation

                     By

                     Debby Bodkin, Assistant to Daniel H. Slate

Enclosures

Appendix A217

Attachment to McKesson Proof of Claim

     McKesson Corporation, a Delaware corporation, on behalf of itself and its divisions, subsidiaries, and affiliates, including McKesson Specialty Arizona, Inc. (collectively, "**McKesson**") hereby submits this proof of claim (the "**Proof of Claim**") against Orexigen Therapeutics, Inc., a Delaware corporation, as debtor and debtor in possession in the Chapter 11 case filed in the United States Bankruptcy Court for the District of Delaware (Case No. 18-10518 (KG)) ("**Debtor**"). McKesson's claims against Debtor are as follows and based upon the following facts:

Basis for and Amounts of Claims

     1.     On March 12, 2018 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under chapter 11 of the title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). Debtor continues as a "debtor in possession" with all the rights, powers, and duties set forth in 11 U.S.C. § 1107.

     2.     McKesson and Debtor are parties to an agreement dated as of June 9, 2016 related to the purchase and distribution of Contrave® along with certain core services related thereto (the "**Distribution Agreement**"). McKesson and Debtor are also parties to an agreement dated as of July 15, 2016 related to the processing of Debtor's LoyaltyScript® (the "**LoyaltyScript® Agreement**" and together with the Distribution Agreement, the "**Agreements**") for patients to have the benefit of an array of discounts off the purchase price of Contrave® through retail pharmacies (the "**LoyaltyScript***x* **Program**"). Each of the Agreements contains confidentiality provisions. Debtor is in possession of a complete copy of each of the Agreements. Any party in interest seeking a copy of the Agreements should contact McKesson's counsel at the address listed below in the section entitled "Notices." McKesson reserves the right to withhold either of the Agreements from any requesting party in interest other than Debtor.

     3.     Under the terms of the LoyaltyScript*x* Program, patients are provided immediate discounts for the purchase of Contrave® at the point of sale, provided with a minimum of paperwork or delay. Debtor has acknowledged that the LoyaltyScript® Program is critically necessary for the success and viability of Debtor's business.

     4.     McKesson works with retail pharmacies to insure patients received discounts at the time of sale, and McKesson in turn reimburses the pharmacies for the discount using funds provided by Debtor for this reimbursement purpose (the "**Reimbursement Funds**"). McKesson provides Debtor a monthly invoice for the estimated reimbursement amount (the "**Reimbursement Invoice**"). Each Reimbursement Invoice directs payment be made within 10 days of the invoice date, and provides for a "Finance Charge" for late paid invoices. In addition to the obligations associated with the Reimbursement Funds, Debtor is responsible for payment of various fees and other costs associated with the LoyaltyScript*x* Program ("**Administrative Fees**").

Appendix A218

5.    Both before and after the Petition Date, Debtor failed to make payment with respect to the Reimbursement Invoices and Administrative Fees.

6.    On April 11, 2018, the Bankruptcy Court entered an order (Docket Entry No. 176) granting adequate protection to McKesson with respect to the continuation of the LoyaltyScript® Program. The Bankruptcy Court's order approved a stipulation between Debtor and McKesson (the "**LoyaltyScript® Stipulation**"). On May 18, 2018 the Bankruptcy Court entered an order [Docket No. 319] approving a stipulation between McKesson and Debtor (the "**Distribution Stipulation,**" and together with the LoyaltyScript® Stipulation, the "**Stipulations**").

7.    Pursuant to the Stipulations, McKesson and Debtor shall continue to perform under both of the Agreements. Debtor, pursuant to the LoyaltyScript® Stipulation, shall make weekly payments to replenish the Reimbursement Funds. The LoyaltyScript® Stipulation entitles McKesson to administrative priority under section 503 of the Bankruptcy Code for actual post-petition amounts incurred under the LoyaltyScript® Program and not repaid by the Reimbursement Funds.

8.    McKesson asserts a claim of $8,564,075.67 (the "**Pre-Petition Claim**") owed by Debtor arising from its pre-petition obligations under the LoyaltyScript® Agreement. This amount is comprised of: (1) unpaid pre-petition Reimbursement Invoices in the amount of $8,239,999.08; and (2) unpaid pre-petition Administrative Fees in the amount of $324,076.59.

9.    McKesson also asserts a claim entitled to administrative priority under section 503 of the Bankruptcy Code for unpaid post-petition Reimbursement Invoices and Administrative fees (the "**Post-Petition Claim**"). The amount of the Post-Petition Claim fluctuates in amount as McKesson continues to perform services under the LoyaltyScript® Agreement and Debtor makes payments to McKesson pursuant to the LoyaltyScript® Stipulation. If Debtor ceases to perform as required by the LoyaltyScript® Stipulation, McKesson reserves the right to amend the amount of the Post-Petition Claim.

10.   Attached is a spreadsheet summarizing McKesson's Pre-Petition and Post-Petition Claims (Exhibit A). McKesson's invoices and other documents substantiating the Proof of Claim are voluminous (collectively, the "**Supporting Documents**"). Upon written request to McKesson's counsel, and tender of the amount necessary to reimburse for costs, any party in interest may seek a copy of the Supporting Documents. Such written request should be sent to counsel's address listed in the section entitled "Notices." McKesson reserves the right to withhold the Supporting Documents from any requesting party in interest other than Debtor.

11.   Pursuant to the Distribution Stipulation, upon termination of the Distribution Agreement, McKesson may seek an order authorizing it to set off any outstanding McKesson's claims under the LoyaltyScript® Agreement against any claims by Debtor under the Distribution Agreement. McKesson, under the LoyaltyScript® Stipulation, may not set-off Debtor's pre-petition obligations with payments by Debtor of Reimbursement Funds in excess of Debtor's post-petition obligations.

Appendix A219

12.     Section VII(i) of the Distribution Agreement grants to McKesson an independent contractual remedy which expressly allows McKesson Corporation and its affiliates, without prior written notice, to set-off, recoup, or apply any amount owed to Debtor against all amounts owed by Debtor or its affiliates to McKesson Corporation or any of its affiliates.

## Distributions

13.     Any distributions on account of the Proof of Claim should be directed as follows:

McKesson Specialty Arizona, Inc.
Erin Beesley
5701 N. Pima Rd.
Scottsdale, AZ 85250

## Notices

14.     All notices with respect to this Proof of Claim should be sent to:

McKesson Specialty Arizona, Inc.
Erin Beesley
5701 N. Pima Rd.
Scottsdale, AZ 85250

With a copy to McKesson's counsel:

Jeffrey K. Garfinkle, Esq.
Buchalter, P.C.
18400 Von Karman Ave., Suite 800
Irvine, CA 92612
E-mail: jgarfinkle@buchalter.com

## Reservation of Rights

15.     To the extent any portion of the Post-Petition Claim is not allowed as an administrative expense claim against Debtor, McKesson asserts an unsecured claim for such amounts.

16.     In executing and submitting the Proof of Claim, McKesson is not in any manner or under any circumstances waiving: (a) any security interest it now has or may be determined to have at any time, (b) any claim, action, or cause of action it may have against Debtor or any other entity or person, including the right to assert different amounts from the amounts set forth herein, (c) any defense, offset, counter-claim or similar right or remedy it may now have or at any time have against Debtor or any other entity or person or with respect to any legal or equitable proceeding now existing or hereafter commenced.

Appendix A220

17.     As of the date of this Proof of Claim, the Agreements have been neither assumed nor rejected.  If the Agreements are rejected, McKesson reserves the right to assert additional unsecured claims arising or resulting from such rejection.  If the Agreements are assumed, McKesson reserves the right to assert additional cure amounts including, but not limited to, all attorneys' fees and costs (as permitted by law or equity).

18.     McKesson reserves the right to amend or supplement the Proof of Claim in any respect including the assertion, by proof of claim or other application to this Bankruptcy Court, for any amount that is or may become due under any of the various agreements, pursuant to court order or otherwise, and continuing costs, fees and expenses (including legal fees and disbursements) arising in relation to the claims asserted herein or any of the agreements and the assertion of an administrative expense priority and adequate protection for any such claim or claims.

19.     In submitting the Proof of Claim, McKesson is not waiving its rights to have any objections or challenges to this Proof of Claim resolved in accordance with the dispute resolution provisions of the Agreements, as appropriate.  Moreover, McKesson does not submit to the Bankruptcy Court's jurisdiction for resolving all matters related to the Proof of Claim but reserves all rights accordingly.

Appendix A221

## Exhibit A – Summary of Claims

*Pre-Petition Claim*

| Invoice Number | Type | Invoice Date | Invoice Amount |
|---|---|---|---|
| 7850733237 | Admin. | 01/14/18 | $ 968.00 |
| 7856689330B | Reimbursement | 02/15/18 | $ 527,451.91 |
| 7859592667 | Reimbursement | 03/06/18 | $ 2,901,991.07 |
| 7860510820 | Admin. | 03/06/18 | $ 21,969.20 |
| 7863159884 | Admin. | 03/15/18 | $ 23,458.60 |
| 7862905806 | Reimbursement | 03/15/18 | $ 3,079,366.80 |
| 7861187263 | Admin. | 03/15/18 | $ 91,801.89 |
| 7861187280 | Admin. | 03/15/18 | $ 103,006.76 |
| 7863483170A | Reimbursement | 03/29/18 | $ 1,731,189.30 |
| 7863488139A | Admin. | 03/29/18 | $ 13,140.60 |
| 7864219482A | Admin. | 03/30/18 | $ 69,731.54 |
| Administrative Fees Total | | | $ 324,076.59 |
| Pharmacy Reimbursement Total | | | $ 8,239,999.08 |
| **Pre-Petition Claim Total** | | | **$ 8,564,075.67** |

## CERTIFICATE OF SERVICE

I, Aaron H. Stulman, do hereby certify that on August 21, 2018, I caused a copy of the

foregoing **Opposition to Motion for an Order Determining That McKesson Specialty Arizona is**

**Entitled to the Disputed Funds** to be served on the parties listed on the attached in the manner

indicated.


*/s/ Aaron H. Stulman*
Aaron H. Stulman (No. 5807)


Appendix A223

10001002v1

Kurt F. Gwynne, Esq.
Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, DE 19801
**Hand Deliver**

Timothy Fox, Esq.
844 King Street
Lockbox 35
Wilmington, DE 19801
**Hand Deliver**

Jeffrey K. Garfinkle, Esq.
Daniel H. Slate, Esq.
Buchalter, A Professional Corporation
18400 Von Karman Avenue
Suite 800
Irvine, CA 92612-0514
**First-Class Mail**

Appendix A224

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor. [1] | **Hearing Date: Only if Required by the Court**<br>**Objections Due: August 21, 2018** |

## DEBTOR'S OBJECTION TO MCKESSON'S MOTION FOR AN ORDER DETERMINING THAT MCKESSON IS ENTITLED TO THE DISPUTED FUNDS

Orexigen Therapeutics, Inc. ("Orexigen" or the "Debtor") respectfully submits this objection (the "Objection") to *McKesson's Motion for an Order Determining that McKesson is Entitled to the Disputed Funds* [D.I. 654] (the "Motion") in the above-captioned matter. In further support thereof, the Debtor relies on the following documents which are incorporated by reference: (i) *Declaration of Michael A. Narachi in Support of First Day Relief* [D.I. 3] (the "First Day Declaration"), (ii) *Order Granting Debtor's Motion Pursuant to 11 U.S.C. §§ 361, 363, 503 and 105(A) for Authority to Enter Into a Stipulation Granting Adequate Protection to McKesson Specialty Arizona, Inc. and Its Affiliates* [D.I. 176] (Exhibit A thereto is the "April Stipulation"), (iii) *Order Granting Debtor's Motion Pursuant to 11 U.S.C. §§ 361, 363 and 105(A) for Authority to Enter Into a Stipulation with McKesson Corporation and McKesson Patient Relationship Solutions, a Business Unit of McKesson Specialty Arizona, Inc.* [D.I. 319] (Exhibit A thereto is the "May Stipulation"), (iv) *Order Approving Stipulation Between Debtor, Certain Secured Creditors and McKesson Corporation Regarding Resolution of Certain Disputed Claims* [D.I. 592] (Exhibit A thereto is the "July Stipulation"), and (v) *Declaration of Thomas P. Lynch in Support of Debtor's Objection to McKesson's Motion for an Order*

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

Appendix A225

*Determining that McKesson is Entitled to the Disputed Funds* (the "<u>Lynch Declaration</u>") (filed contemporaneously herewith).

<div align="center">

## PRELIMINARY STATEMENT[2]

</div>

1.  Movants attempt by the Motion to persuade the Court to take a far-flung legal journey over a landscape littered with inapposite authority and irrelevant arguments, leading the Court – they hope – to a destination where the triangular setoff relief requested will be granted. But the Court need not take even one step down this tortured path: settled and persuasive authority in this District under the *SemCrude* decision and others provides clear direction to dispose of the setoff relief requested in the Motion. And that direction is as follows: the mutuality required by section 553 cannot be supplied by a multi-party agreement contemplating a triangular setoff. Thus, setoff should not be permitted here.

2.  The facts are largely undisputed. Prepetition, Orexigen entered into the Distribution Agreement for distribution services related to its Product with McKesson Corp. Several weeks later, Orexigen retained MPRS, a separate legal entity from McKesson Corp., to administer a rebate program unrelated to the distribution of the Product, where customers purchasing the Product presented a rebate card at retail pharmacies and obtained a discount. MPRS provided these services to the Debtor through the LoyaltyScript® Agreement.

3.  Under the Distribution Agreement, McKesson Corp. operated as a distributor of the Product. As of the Petition Date, McKesson Corp. owed Orexigen $6,932,816.40. Under the LoyaltyScript® Agreement, Orexigen paid to MPRS reimbursements MPRS made to pharmacies for discounts extended to patients under the rebate card. MPRS contends that it has a prepetition

---

[2] Except as otherwise provided, all capitalized terms in this Preliminary Statement are defined in the Objection.

<div align="right">

Appendix A226

</div>

claim under the LoyaltyScript® Agreement of approximately $9.1 million. Movants[3] assert in the Motion that based on the contractual language of the Distribution Agreement, triangular setoff is permitted in this case.

4.    Movants' principal argument has been considered and soundly rejected by well-reasoned authority in this District and elsewhere. Although Movants are correct that McKesson Corp. must first hold a right to setoff under applicable law (state or federal), section 553 imposes an additional, express condition of mutuality that cannot be satisfied under the facts here. Movants' attempts to distinguish settled, persuasive decisions and rely on an inapposite Supreme Court case fall far short of the mark. They fail to cite any controlling or even relevant authority that would permit a triangular setoff under section 553.

5.    Movants also assert alternative theories that are equally unavailing – collapsing of corporate formalities and alleged third-party beneficiary status – to avoid the insurmountable obstacle of mutuality under section 553. These arguments have been decisively rejected by other bankruptcy courts. Nor can Movants establish the affirmative defense of recoupment – an assertion Movants make but fail to prove or even fully brief. Accordingly, the Motion should be denied.[4]

## JURISDICTION AND VENUE

6.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*

---

[3] McKesson Corp. and MPRS are referred to collectively as the "Movants."

[4] The Motion does not establish that MPRS has a claim in any exact amount or even in the approximate amount asserted, and fails to provide any evidence in support of this claim. The Debtor reserves the right to dispute that the claim is valid. Thus, even if the Court accepts Movants' setoff or recoupment arguments, Movants are not entitled to the Initial Disputed Funds since they have failed to prove the alleged amount owed by the Debtor to MPRS.

Appendix A227

dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

7.     On March 12, 2018 (the "Petition Date"), the Debtor commenced the above-captioned chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (as amended or modified, the "Bankruptcy Code") with the Court.

8.     The Debtor continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. As of the date of this Motion, no trustee or examiner has been appointed in the Chapter 11 Case.

9.     On March 27, 2018, the office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [D.I. 9].

10.     A detailed description of the circumstances leading to the commencement of the Chapter 11 Case and information regarding the Debtor's business is set forth in the First Day Declaration.

11.     On or about March 21, 2016, the Lenders[5] were granted a first-priority security interest in substantially all of the Debtor's current and future assets. *See* First Day Decl., ¶ 15; *see also* Orexigen Therapeutics, Inc., Quarterly Report Pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 (Form 10-Q), 14 (May 5, 2016).[6]

---

[5] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[6] A publicly filed copy of the document can be found at:
 https://www.sec.gov/Archives/edgar/data/1382911/000119312516579970/d174935d10q.htm.

Appendix A228

### A. The McKesson Corp. Distribution Agreement

12.     On or about June 9, 2016, McKesson Corporation ("McKesson Corp.") and Orexigen entered into that certain Core Distribution Agreement (as amended, the "Distribution Agreement"),[7] by which McKesson Corp. and Orexigen agreed, *inter alia*, that McKesson Corp. would operate as an authorized distributor of healthcare products (the "Product") for Orexigen and provide certain services with respect of distributing the Debtor's Product. May Stip., p. 1; Beesley Decl., ¶ 3. Specifically, McKesson Corp. provided services related to packing and shipping, regulating inventory levels, electronic reporting regarding distribution metrics, processing returns, and similar services typically related to distributing a product. *See* Distribution Agreement, § I.a. Under the Distribution Agreement, McKesson Corp. was required to pay Orexigen various fees. *Id.*, Attachment B.

13.     The Distribution Agreement also provides, in relevant part: "In the event [Orexigen] requires services . . . that McKesson Specialty can provide, McKesson Specialty will be given the opportunity to bid on providing these services to [Orexigen] at the time they may be put out for bid, along with any other competitor(s) that [Orexigen] may so choose." *Id.*, § VII.g.

14.     The Distribution Agreement further states that "each of McKesson Corporation and its affiliates is hereby authorized to set-off, recoup and apply any amounts owed by it to [Orexigen]'s affiliates against any [sic] all amounts owed by [Orexigen] or its affiliates to any of McKesson Corporation or its affiliates . . . ." *Id.*, § VII.i.[8]

---

[7] The Distribution Agreement is attached as **Exhibit A** to the Lynch Declaration.

[8] The Distribution Agreement also provides that California law governs its interpretation. *Id.*, § VII.b.

Appendix A229

**B. The MPRS LoyaltyScript® Agreement**

15. More than six weeks after the Distribution Agreement was executed, Orexigen and McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona, Inc. ("MPRS") entered into that certain Master Services Agreement dated as of July 15, 2016 (as amended and supplemented, the "LoyaltyScript® Agreement"). May Stip., p. 1; Beesley Decl., ¶ 5. The LoyaltyScript® Agreement provides that MPRS would develop a retail rebate program and provide processing of coupons for discounts off of the Product through retail pharmacies. It does not incorporate the Distribution Agreement and does not relate to distribution of the Product. *See generally* LoyaltyScript® Agreement.[9] It also does not confer any benefits on third parties. *Id.*, §12.1.

16. Instead, the LoyaltyScript® Agreement operated as a way for customers to receive rebates on the Product at the point of sale. *See* Apr. Stip., ¶ D. When the pharmacy was presented with a Product rebate card, the pharmacy confirmed with MPRS that the card was valid. Following approval from MPRS, the pharmacy allowed the discount at the point of sale and tracked the discounts it had honored. *See id.* Each pharmacy remitted to MPRS for reimbursement the discounts it had honored, and MPRS submitted the amount of the discounts to the Debtor for payment. *See id.* The Debtor paid to MPRS the cost of the rebate, which in turn, was paid to the pharmacy. *See id.*

17. Movants concede that MPRS and McKesson Corp. are separate legal entities. MPRS is a wholly owned subsidiary of McKesson Corp. Beesley Decl., ¶ 1.

**C. The Stipulations**

18. During the Chapter 11 Case, the Debtor, McKesson Corp. and MPRS negotiated stipulations with respect to each of the parties' rights and obligations regarding alleged amounts

---

[9] The LoyaltyScript® Agreement is attached as **Exhibit B** to the Lynch Declaration.

Appendix A230

owed by the Debtor to MPRS under the LoyaltyScript® Agreement and by McKesson Corp. to the Debtor under the Distribution Agreement.

19.     In the May Stipulation, "McKesson [Corp.] acknowledges that as of the Petition Date the outstanding payable to the Debtor totaled six million, nine hundred thirty two thousand, eight hundred sixteen dollars and forty cents ($6,932,816.40) in prepetition amounts arising under the Distribution Agreement" (the "<u>McKesson Distribution Receivable</u>").  May Stip., p. 2.  McKesson Corp. paid to the Debtor $3,266,255.76 on account of the McKesson Distribution Receivable.  *Id.*  McKesson also paid the additional $3,666,560.64 on which McKesson Corp. had placed an administrative hold and did not timely remit.  *Id.*  Accordingly, the McKesson Distribution Receivable was paid in full, but the issue of whether McKesson Corp. has a setoff right was preserved.  *Id.*, p. 3.

20.     Additionally, "MPRS asserts that it holds a prepetition claim against the Debtor in the amount of approximately $8.5 million under the LoyaltyScript® Agreement" (the "<u>MPRS Rebate Payable</u>").  *Id.*  However, in the April Stipulation and as alleged in the Motion, MPRS asserts that it is owed approximately $9.1 million.  Apr. Stip., ¶ G; Mot., ¶ 10.  The Motion contains no support for the actual amount of the alleged MPRS Rebate Payable.

21.     In the May Stipulation "McKesson [Corp.] and MPRS each assert that as of the Petition Date and thereafter, they have a contractual right to set off the [MPRS Rebate Payable] against the [McKesson Distribution Receivable]."  May Stip., p. 3.  The Debtor disputed this contention, and the parties agreed to brief the issue which resulted in the Motion.  *Id.*

22.     By the July Stipulation, the Debtor agreed to segregate $6,932,816.40 (the "<u>Initial Disputed Funds</u>") and is holding those funds to be distributed following resolution of the Motion.  July Stip., ¶¶ E, 3.

Appendix A231

23. By Order dated July 17, 2018, the Distribution Agreement and the LoyaltyScript® Agreement were deemed rejected immediately following the closing of the sale of substantially all of the Debtor's assets that occurred on July 27, 2018. *See* [D.I. 561]; [D.I. 640].

## ARGUMENT

24. Movants' principal contention in support of the Motion – that triangular setoff to which parties consent by agreement is permitted under Bankruptcy Code section 553 – has been soundly rejected by the United States District Court for the District of Delaware (the "District Court") in *Chevron Prods. Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 428 B.R. 590 (D. Del. 2010), upholding Judge Shannon's opinion in *In re SemCrude, L.P.*, 399 B.R. 388 (Bankr. D. Del. 2009). Judge Farnan held that "the mutuality required by Section 553 cannot be supplied by a multi-party agreement contemplating triangular setoff," noting that such conclusion "is not only consistent with the facts and applicable case law, but also with the general bankruptcy principles concerning the strict construction of mutuality against the party seeking setoff." *SemCrude*, 428 B.R. at 594. Based on meticulous analysis in this and similar decisions, any setoff relief sought by the Motion should not be granted.

25. Movants' alternative arguments are meritless. Movants argue to collapse (or, conveniently, blur the lines between) separate legal entities using theories that have been rejected by multiple courts and ignore basic corporate principles ingrained in the Bankruptcy Code. *See, e.g.*, *SemCrude*, 399 B.R. at 399 ("great weight of authority hold[s] that there is no reason for enlarging the right to setoff beyond that allowed in the Code.") (internal citations omitted). Further, Movants' assertion that McKesson Corp. can recoup funds it paid to the Debtor is fatally infirm because this defense lacks any factual or legal basis. *See Miller v. Zurich Am. Ins. Co. (In*

Appendix A232

*re WL Homes LLC)*, 563 B.R. 512, 518 (Bankr. D. Del. 2017) (recoupment is affirmative defense; as such, burden is on asserting party). Likewise, Movants' assertion that the California Commercial Code preserves contractual defenses is without merit because Movants cannot satisfy the timing requirement of the statute. *See* Cal. Com. Code § 9-404(a). Finally, to the extent that the Court accepts any of Movants' alternative arguments, Movants have not proven the amount of the MPRS Rebate Payable. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

**I.    Movants Cannot Satisfy the Requirements of Bankruptcy Code Section 553**

26.    The Court's analysis need only begin and end with the express provisions of the Bankruptcy Code applied to the present facts. Fundamentally, "when Congress has made its intent known through explicit statutory language, the courts' task [to interpret the statute] is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Section 553 provides, in relevant part,

> this title does not affect any right of *a creditor* to offset *a mutual debt* owing by *such creditor* to the debtor that *arose before the commencement of the case* under this title against a claim of *such creditor* against the debtor that *arose before the commencement of the case* . . . .

11 U.S.C. § 553(a) (emphasis added).

27.    There is no dispute that section 553 does not create a right of setoff, and so Movants must first demonstrate that McKesson Corp. has a right of setoff under applicable nonbankruptcy law and then overcome the additional restrictions of section 553. *SemCrude*, 399 B.R. at 393 (citing *Packaging Indus. Grp. Inc. v. Dennison Mfg. Co. Inc. (In re Sentinel Prod. Corp.)*, 192 B.R. 41, 45 (N.D.N.Y. 1996) ("section 553 'preserves for the creditor's benefit any setoff right that it may have under applicable nonbankruptcy law,' and '*imposes additional*

Appendix A233

*restrictions* on a creditor seeking setoff" that must be met to impose a setoff against a debtor in bankruptcy.") (emphasis added)); *Sass v. Barclays Bank PLC (In re Am. Home Mortg., Holdings, Inc.)*, 501 B.R. 44, 56 (Bankr. D. Del. 2013); *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006) ("To enforce a setoff right, 'a creditor must establish that (1) it has a right of setoff under nonbankruptcy law; and (2) this right should be preserved in bankruptcy under § 553.'") (internal citations omitted).

28.     McKesson Corp. may have a general right of setoff under California law, and the McKesson Distribution Receivable and MPRS Rebate Payable (to the extent proven) both arose prepetition. **But this does not end the analysis.** McKesson Corp. also must satisfy the statutory requirements for setoff under the Bankruptcy Code by establishing that "the debtor's claim against the creditor and the debt owed to the creditor [are] mutual." 11 U.S.C. § 553. Movants have failed to meet their burden to establish mutuality under controlling case law. *Garden Ridge*, 338 B.R. at 632 ("The burden of proof is on the party asserting the right to set-off."). Accordingly, any setoff relief must be denied.

A.     **The McKesson Distribution Receivable and the MPRS Rebate Payable are Not Mutual Debts**

29.     The McKesson Distribution Receivable and the MPRS Rebate Payable are not mutual debts, and for this reason McKesson Corp. has no valid setoff claim. "The additional restrictions imposed by section 553 are well-settled. In order to effect a setoff in bankruptcy, courts construing the [Bankruptcy] Code have long held that the debts to be offset must be mutual, prepetition debts." *SemCrude*, 399 B.R. at 393.

> The authorities are also clear that debts are considered 'mutual' only when 'they are due to and from the same persons in the same capacity.' Put another way, mutuality requires that 'each party must own his claim in his own right severally, with the right to

Appendix A234

> collect in his own name against the debtor in his own right and
> severally.'

*Id.* (internal citations omitted). The mutuality requirement aligns with an important policy behind setoff, which is to avoid "the absurdity of making A pay B when B owes A." *Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995) (internal quotation marks and citations omitted). The Bankruptcy Code requires "the strict construction of mutuality against the party seeking setoff." *SemCrude*, 428 B.R. at 594; *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d. 54, 57 (3d Cir. 1990) ("[S]etoff is at odds with a fundamental policy of bankruptcy, equality among creditors, because it permits a creditor to obtain full satisfaction of a claim by extinguishing an equal amount of the creditor's obligation to the debtor.") (internal quotation marks and citations omitted).

30.     The McKesson Distribution Receivable and the MPRS Rebate Payable are not mutual debts. Orexigen entered into two separate contracts with two separate legal entities: (1) the Distribution Agreement, executed by Orexigen and McKesson Corp. and (2) the LoyaltyScript® Agreement, executed by Orexigen and MPRS. *See* Beesley Decl., ¶¶ 3, 5. Movants admit that McKesson Corp. and MPRS are separate entities. *Id.*, ¶ 1.

31.     Under the Distribution Agreement, McKesson Corp. owes the Debtor $6,932,816.40. May Stip., p. 2. MPRS alleges that the Debtors owe approximately $8.5 million in prepetition obligations under the LoyaltyScript® Agreement. *Id.*, p. 3. As illustrated below, setoff here against the Debtor could only be triangular, which is impermissible under section 553. *See SemCrude*, 428 B.R. at 594.

Appendix A235



32.     Desperate to dodge the immutable obstacle of mutuality, Movants argue that because under California law an express agreement can confer mutuality between a parent and subsidiary, the Court should *only* consider California law when determining mutuality. Mot., ¶ 33. This argument has been wholly rejected by the District Court in *SemCrude* and numerous bankruptcy courts analyzing triangular setoffs under section 553.

33.     In *SemCrude*, the "thoroughly analyzed" Bankruptcy Court decision affirmed by the District Court, 428 B.R. 590 (D. Del. 2010), and widely cited as the contemporary, seminal case,[10] a creditor relying on a multi-party contractual agreement sought to setoff debts owed to one debtor with money due from another debtor – a triangular setoff. *SemCrude*, 399 B.R. at 391-92. The Court found the proposed setoff improper because it lacked mutuality required under the Bankruptcy Code. *Id.* at 392-93; *see also In re Lehman Bros.*, 458 B.R. 134, 141 (Bankr. S.D.N.Y. 2011) ("[T]riangular setoff is not (and never was) permitted under the

---

[10] **The Bankruptcy Court opinion in *SemCrude* has been cited with favor by courts sitting in eight of the eleven U.S. Circuit Courts of Appeal.** *See In re Taal*, 2016 Bankr. LEXIS 2013, No. 14-10163-JMD , at *37 (Bankr. D. N.H. May 16, 2016); *Lehman Bros.*, 458 B.R. at 140; *Am. Home Mortg.*, 501 B.R. at 56; *Mine Serv. Co v. James River Coal Co. (In re James River Coal Co.)*, 534 B.R. 666, 670 (Bankr. E.D. Va. 2015); *In re Eng. Motor Co.*, 426 B.R. 178, 189 (Bankr. N.D. Miss. 2010); *Sam's NA, Inc. v. U.S. Small Bus. Admin. (In re Sam's NA, Inc.)*, 2016 Bankr. LEXIS 3766, No. 13-90259-BHL-11, at *44 (Bankr. S.D. Ind. Oct. 19, 2016); *Steadfast Ins. Co. v. Woodside Group, LLC (In re Woodside Group, LLC)*, 2009 Bankr. LEXIS 4360, No. 6:08-bk-20682-PC, at *14 (Bankr. C.D. Cal. Dec. 30, 2009); *Edwards Specialties, Inc. v. Olive Props. (In re Edwards)*, 553 B.R. 902, 910 (Bankr. N.D. Ala. 2016).

Appendix A236

Bankruptcy Code."); *Matter of United Sciences of Am., Inc.*, 893 F.2d 720, 723 (5th Cir. 1990) ("The mutuality requirement is designed to protect against 'triangular' set-off; for example, where the creditor attempts to set off its debt to the debtor with the latter's debt to a third party."); *Elcona Homes Corp. v. Green Tree Acceptance, Inc.*, 863 F.2d 483, 486 (7th Cir. 1988) (Bankruptcy Code refers to "mutual" debt and "therefore precludes 'triangular' setoff."). Put simply, "[t]he mutuality required by Section 553 'cannot be supplied by a multi-party agreement contemplating a triangular setoff.'" *SemCrude*, 428 B.R. at 594 (internal citations omitted); *Cf. Burch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 658 (Bankr. D. Del. 2012) (citing *SemCrude* with favor; parties cannot contract around core provisions of the Bankruptcy Code).

34. Despite Movants' cursory assertion that *SemCrude* is inapposite because it involves one creditor seeking to setoff amounts between two debtors, the conclusion is no different where multiple affiliate creditors seek to setoff debts with respect to the same debtor. *See Am. Home Mortg.*, 501 B.R. at 50-51, 57; *Lehman Bros.*, 458 B.R. at 140. In fact, in *Sass v. Barclays Bank PLC (In re Am. Home Mortg., Holdings, Inc.)*, **Judge Sontchi rejected the very same argument Movants make here.** In *Am. Home Mort.*, the Court held that mutuality did not exist where a creditor sought to setoff its debts owed to the debtor with amounts owed by the debtor to one of the creditor's affiliates, and importantly, that the parties could not contract around the mutuality requirement. 501 B.R. at 57, 60.

35. Likewise, in *In re Lehman Bros.* the Bankruptcy Court for the Southern District of New York rejected altogether the argument made here by Movants that a creditor could setoff its debt owed to a debtor with the creditor's affiliate's payable. 458 B.R. at 140. There, the creditor argued that the debts between the creditor and the debtor, and the creditor's affiliate and the

Appendix A237

debtor, "should be viewed as mutual because of the express provision allowing [a creditor] to offset amounts owed to its affiliate, notwithstanding the fact that this affiliate is not a named party to the [contract providing for setoff]." *Id.* The court characterized the creditor's position as "collecting all affiliates under the same corporate umbrella and treating them as if they were a single counterparty" and found that

> [t]his attempt to override the independent status of [the creditor's affiliate] disregards a consistent pattern of authority prescribing that, **even where a setoff right exists under applicable state law, the Bankruptcy Code imposes its own strict requirements**[,] namely, that the debtor owes a pre-petition debt to the creditor, the creditor has a pre-petition claim against the debtor, and the debt and claim are mutual.

*Id.* (emphasis added). To punctuate the point, the court stated that "the allegedly mutual debts flunk the test that they must be 'in the same right and between the same parties, standing in the same capacity.'" *Id.* (internal citations omitted). Movants weakly argue that these cases are wrongly decided and suggest (with no support) that the strict requirements of section 553 should be limited to those cases arising in the context of prepetition avoidance actions. Mot., ¶ 43. *SemCrude* states the settled law in this jurisdiction, *Lehman Bros.* is highly persuasive, and Movants' arguments to the contrary fail. Triangular setoffs, even with contractual agreement of all parties, are not permissible under the Bankruptcy Code.

### B.     Nor Can Movants "Gin Up" the Mutuality Requirement Lacking Here

36.     Faced with persuasive case law rejecting their arguments in support of triangular setoffs, Movants dump into their bathtub of creative but meritless arguments inapposite state and federal cases in a last attempt to manufacture a basis for mutuality. Movants assert that the Supreme Court's discussion in *Butner v. United States*, 440 U.S. 48 (1979) controls this Court's analysis. Mot., ¶ 23. *Butner* is inapposite, as the decision only applies the noncontroversial legal

Appendix A238

principle that property interests are created and defined by state law. *Butner*, 440 U.S. at 55. **Critically, *Butner* did not address, refer to, or even mention section 553 or setoff rights at all**; it concerned a mortgagee's interest in the rents and profits generated by a property in a bankrupt estate. *Id.* at 54. The *Butner* Court found that state law applied to a mortgagee's interest in the rents and profits earned by a property in a bankrupt estate because "Congress ha[d] not chosen to exercise its power" to enact a statute that modified state law, and there was no compelling federal interest to warrant displacing state law. *Id.* at 54-56.

37.     In stark contrast to the relevant Bankruptcy Code provisions examined in *Butner*, however, Congress **has** chosen to exercise its power with respect to setoff in the bankruptcy context through the enactment of section 533. Section 553 mandates express conditions to the application of the right of setoff in bankruptcy (*i.e.*, mutuality and timing) that may not exist under state law. *See SemCrude*, 399 B.R. at 393 ("Section 553 'preserves for the creditor's benefit any setoff right that it may have under applicable nonbankruptcy law,' but 'imposes additional restrictions on a creditor seeking setoff' that must be met to impose a setoff against a debtor in bankruptcy.") (internal citations omitted), *aff'd*, 428 B.R. 590 (D. Del. 2010). Thus, *Butner* is neither applicable nor controlling regarding Movants' attempt to affect a triangular setoff.

38.     Nor does *Butner* require that the Court conduct a "federal interest" test as Movants suggest. Movants contend that *Butner* mandates that unless "some federal interest requires a different result," only state law applies to setoff rights in bankruptcy. Mot., ¶ 25. In that respect, Movants misconstrue the *Butner* decision where the Court considered a federal interest **only in the absence of express language from Congress** altering state law. *Butner*, 440 U.S. at 54. Moreover, Movants' misapprehension of *Butner* and misplaced reliance on only state

Appendix A239

law decisions regarding the application of setoff writes section 553 out of the Bankruptcy Code –
a notion that even *Butner* rejects. *See id.* at 54 n.9 ("The Federal Constitution, Article I, § 8,
gives Congress the power to establish uniform laws on the subject of bankruptcy throughout the
United States."). Because Congress expressly set forth additional requirements for setoff in the
bankruptcy context, the Court here need not even consider, let alone apply, a federal interest test.

39. Movants then endeavor to concoct mutuality under theories of collapsing
corporate entities and purported third-party beneficiary status. Both theories should be rejected
by this Court, just as other courts have done.

40. There is no dispute that McKesson Corp. and MPRS are separate legal entities.
Beesley Decl., ¶ 1. In accord with unanimous corporate law decisions, each corporate entity is
treated separately regardless of whether it is a subsidiary. *See United States v. Bestfoods*, 524
U.S. 51, 61-62 (1998) ("It is a general principle of corporate law deeply 'ingrained in our
economic and legal system' that a parent corporation . . . is not liable for the acts of its
subsidiaries."). The analysis is no different for purposes of mutuality required by section 553.
*See, e.g., SemCrude*, 399 B.R. at 393 ("[B]ecause each corporation is a separate entity from its
sister corporations absent a piercing of the corporate veil, 'a subsidiary's debt may not be set off
against the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under
the circumstances.'") (internal citations omitted); *see also In re Garden Ridge Corp.*, 386 F.
App'x 41, 44 (3d Cir. 2008) (mutuality not satisfied where record does not show two debtors
were alter egos of one another because they had "acted in disregard of their corporate
separateness").

41. Movants' reliance on "California decisions finding a connection between parents
and subsidiaries," Mot., ¶ 40, also does not establish mutuality under the Bankruptcy Code. *See
SemCrude*, 399 B.R. at 393; *see also Lehman Bros.*, 458 B.R. at 140 (holding setoff between

Appendix A240

creditor affiliates fails for mutuality); *HAL, Inc. v. United States (In re HAL, Inc.)*, 196 B.R. 159, 163 (9th Cir. BAP 1996) ("Thus, in the corporate context, it is well-established that one subsidiary may not set off a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary.") (internal citations omitted); *Depositors Trust Co. v. Frati Enter., Inc.*, 590 F.2d 377, 379 (1st Cir. 1979) ("It is well established that one subsidiary may not setoff a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary."); *Inland Steel Co. v. Berger*, 327 F.2d 401, 406 (7th Cir. 1964) (affirming finding that parent corporation may not setoff a debt owed from an entity to its subsidiary against a debt it owes to the same entity); *Garden Ridge*, 338 B.R. at 635-36 (collecting additional cases). Because McKesson Corp. and MRPS have not, in fact, been collapsed into one entity (and there is no basis on which to do so), each entity must stand on its own for purposes of a mutuality determination under the Bankruptcy Code.

42. Movants next try to fabricate mutuality by anointing MPRS with third-party beneficiary status under the Distribution Agreement, positing that MPRS "stands in a direct counter-contractual relationship with the Debtor on both contracts." Mot., ¶ 46. This argument also fails for purposes of section 553. Bankruptcy courts have held that a party's status as a third-party beneficiary (even where proven) does not satisfy mutuality of debt under section 553 because third-party beneficiaries lack the requirement that the creditor act in the "same capacity" under the definition of mutuality. *See, e.g., Louisiana, Office of Cmty. Dev. V. Celebrity Contrs., Inc. (In re Celebrity Contrs., Inc.)*, 524 B.R. 95, 111 (Bankr. E.D. La. 2014) (corporation cannot use status as third-party beneficiary under contract to create mutuality under section 553 because third-party beneficiaries do not act in same capacity as direct contractual counterparties); *In re J.A. Clark Mech., Inc.*, 80 B.R. 430, 433 (Bankr. N.D. Ohio 1987) (Setoff under section 553 fails

Appendix A241

for lack of mutuality because "[a]s third-party beneficiary, any right to recover would not be in the same right and capacity as the direct contractual obligation.").

43.     Each of the two cases cited by the Movants are readily distinguishable. In *In re Bacigalupi, Inc.*, a BAP held that the bankruptcy court should have allowed relief from stay to allow a creditor to assert setoff as a counterclaim in a pending state court proceeding. 60 B.R. 442, 446 (B.A.P. 9th Cir. 1986). In *Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, a patent case involving setoff outside of bankruptcy, the court held that a third party had adequately pled third-party beneficiary status, and that it could not resolve factual questions on a Federal Rule of Civil Procedure 12(c) motion. 194 F. Supp. 2d 378, 394-95 (D. N.J. 2002).

44.     And Movants have not proven that MPRS is a third-party beneficiary – they just say that MPRS is one because of the language in the Distribution Agreement generally preserving setoff. The Distribution Agreement does not confer, expressly or otherwise, any third-party beneficiary rights on MPRS; the contract simply notes that MPRS (assuming MPRS falls under the umbrella of "McKesson Specialty") may bid to provide services to the Debtor. Distribution Agreement, § VII.g. The Debtor was free to contract with any party, however, to provide these services. And the facts here compel the conclusion that only McKesson Corp., not MPRS, stands to benefit under Movants' theory: only McKesson Corp. benefits if the Distribution Receivable is setoff against the Debtor's obligation to pay the MPRS Rebate Payable, since MPRS's claim would be correspondingly reduced in a substantial amount with respect to this significant receivable.[11]

45.     Policy grounds also exist for the Court to reject the subsidiary and the third-party beneficiary theories of mutuality. To accept either would improperly and disproportionately

---

[11] McKesson Corp. cannot be a third-party beneficiary under the LoyaltyScript® Agreement, because §12.1 of that contract expressly precludes any third-party beneficiaries.

Appendix A242

confer on extended corporate families (such as McKesson Corp. and all its affiliates) enlarged rights not contemplated by the Bankruptcy Code. *See SemCrude*, 399 B.R. at 399 (great weight of authority holds "there is no reason for enlarging the right to setoff beyond that allowed in the Code.") (internal citations omitted). The priority scheme currently set forth in the Bankruptcy Code could be manipulated by creditors that have extended corporate families without recourse for other creditors. Corporate parents could require in all contracts all-encompassing setoff clauses referencing all of their affiliate entities to elevate their claims to the disadvantage of other creditors. That result is contrary to Congress's intent set forth in section 553 and the priority scheme generally. *See, e.g., id.* at 397 (noting with respect to Congressional intent, "[i]n articulating who must owe whom a debt to effect a setoff under section 553(a), Congress used a greater detail of precision than is seen in many other parts of the Code. This statutory language is of critical importance.").

46.     Movants' alternative arguments to contrive mutuality are baseless, without any support under the Bankruptcy Code. Thus, any setoff relief should be denied.

### C.    No Contractual Exception to Bankruptcy Code Section 553 Exists

47.     Movants' contention that under California law an "express mutual agreement" can deem a corporate subsidiary a "mutual debtor-creditor of the parent" is not relevant to the inquiry into whether McKesson Corp. has met the statutory requirements of section 553. *See* Mot., ¶ 33.

48.     The District Court has held that there is no contractual exception to the mutual debt requirement under the Bankruptcy Code. *SemCrude*, 428 B.R. at 594 ("[T]he mutuality required by Section 553 cannot be supplied by a multi-party agreement contemplating a triangular setoff"); *see also Lehman Bros.*, 458 B.R. at 142. ("There simply is no contract exception to 553(a), because the statute itself does not allow for one.").

Appendix A243

49.     Judge Shannon concluded that it would be improper to recognize a contractual exception absent a clear indication from the text of the Code because "the law is settled that the bankruptcy court, in the guise of 'doing equity,' has no power to enlarge setoff rights beyond the dimensions . . . explicitly required by the Code." *SemCrude*, 399 B.R. at 399 (internal citations omitted).  Moreover, the *SemCrude* Court's determination harmonizes with the overall policy underlying the Bankruptcy Code:

> One of the primary goals – if not the primary goal – of the Code is to ensure that similarly-situated creditors are treated fairly and enjoy an equality of distribution from a debtor absent a compelling reason to depart from this principle.  By allowing parties to contract around the mutuality requirement of section 553, one creditor or a handful of creditors could unfairly obtain payment from a debtor at the expense of the debtor's other creditors, thereby upsetting the priority scheme of the Code and reducing the amount available for distribution to all creditors.  Such a result is clearly contrary both to the text of the Code and to the principle of equitable distribution that lies at the heart of the Code.

*Id.*  Judge Shannon's analysis also was not predicated on the fact that there were two debtor entities and one creditor entity; rather, this well-reasoned opinion broadly concluded that mutuality must be strictly construed.  *Id.* at 396; *see also Lehman Bros.*, 458 B.R. at 140 (strictly construing mutuality and holding triangular setoff impermissible where creditor sought to setoff debt owed to debtor with creditor's affiliate's payable due from debtor).  Accordingly, Movants' attempt to distinguish the facts here based on the identification of the parties in the triangular setoff fails.  And, this same contract-based argument by Movants was soundly rejected by Judge Sontchi for the same policy reasons, among others.  *See Am. Home Mortg.*, 501 B.R. at 59-60 ("[W]hen a debtor is owed money and collects less due to offsets claimed by affiliates of its named contract-counterparty, the debtor's creditors are impacted by the reduction in amounts to be realized by the debtor's estate.").

Appendix A244

50.     Movants rely heavily on *In re Saugus Gen. Hosp., Inc.*, 698 F.2d 42 (1st Cir. 1983) to support their theory that parties can contract around mutuality. Mot., ¶¶ 35-37. *Saugus*, however, only dealt with whether setoff rights effectuated prepetition were valid under Massachusetts law, and whether setoff rights generally are determined by state law or federal law. 698 F.2d at 44 ("We are aware of no case holding that federal rather than state law governs pre-petition setoffs."). The court then recognized the "parties are free to modify these common-law setoff rules by contract, but they have not done so here." *Id.* at 45. The critical distinction in *Saugus*, however, was **whether a prepetition setoff could be avoided**, not whether the parties could contract around the requirements of section 553. *Id.* at 44. *Saugus* does not apply to the facts here – whether a triangular postpetition setoff is permitted under section 553.

51.     Movants also rely on *In re Garden Ridge Corp.*, 338 B.R. 627 (Bankr. D. Del. 2006), for the notion that "an agreement that includes an express provision to allow a 'triangular' setoff between related entities can create the mutuality required for setoff." Mot., ¶ 52. Contrary to Movants' argument, *Garden Ridge* did not hold that the purported contractual exception permitted triangular setoff. 338 B.R. at 636 ("This case does not present a permissible triangular setoff based upon an agreement between the related entities."). In *SemCrude*, Judge Shannon conducted a careful examination into the origin of the alleged contractual exception to triangular setoff. *See SemCrude*, 399 B.R. at 394-96. Referring specifically to *Garden Ridge*, among other cases, Judge Shannon concluded that "each and every one of these decisions have simply recognized [the contractual] exception in the course of denying the requested setoff or finding mutuality independent of the agreement . . . yet none actually permit[ed] a triangular setoff or address[ed] the merits of this purported [contractual] exception in a written opinion." *Id.* And Judge Peck concluded likewise: "the so-called contract exception . . . actually was created by a

Appendix A245

game of 'whisper down the lane' from decision to decision," *Lehman Bros.*, 458 B.R. at 142. *Garden Ridge* falls right into this bucket: the Court's language on the issue is only dicta; and, at bottom, even there the Court held that triangular setoff was not permitted. *Garden Ridge*, 338 B.R. at 636; *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 548 (2013) (declining to follow dicta in prior decision interpreting federal statute).

52.     But most importantly, even if *Garden Ridge* left open any possibility that parties could contract around the general prohibition of triangular setoff, Judge Farnan's *SemCrude* decision firmly closed that door. *See SemCrude*, 428 B.R. at 594 ("As the Bankruptcy Court correctly recognized, **the mutuality required by Section 553 cannot be supplied by a multi-party agreement contemplating a triangular setoff**.") (emphasis added).

## II.    McKesson Corp. Has No Valid Defense of Recoupment

53.     Pivoting away from their untenable setoff arguments, Movants float (without thorough supporting argument, required evidence, or relevant legal authority) the idea that McKesson Corp. has a defense of recoupment that would prevent collection of what it owed the Debtor. Mot., ¶¶ 4, 27. Recoupment does not exist under these facts and applicable law. "The Third Circuit distinguishes the right [of] set-off from the right of recoupment, although both permit a creditor that owes a debt to the debtor to reduce the amount of its debt by the amount of a debt owed by the debtor to the creditor, as the right to recoupment must arise out of the same transaction." *Casino Caribbean, LLC v. Money Ctrs. Of Am., Inc. (In re Money Ctr. of Am., Inc.)*, 565 B.R. 87, 106 (Bankr. D. Del. 2018). Specifically, "recoupment requires that the two debts arise from the same contract." *HHI Formtech, LLC v. Magna Powertrain USA, Inc. (In re FormTech Indus., LLC)*, 439 B.R. 352, 362 (Bankr. D. Del. 2010). Indeed, the Third Circuit has held in the bankruptcy context that

Appendix A246

> [a] mere logical relationship is not enough: the fact that the same
> two parties are involved, and that a similar subject matter gave rise
> to both claims, . . . does not mean that the two arose from the 'same
> transaction.'   Rather, both debts must arise out of a single
> integrated transaction so that it would be inequitable for the debtor
> to enjoy the benefits of that transaction without also meetings its
> obligations.

*In re Univ. Med. Ctr.*, 973 F.2d 1065, 1081 (3d Cir. 1992) (citations and internal quotation marks

omitted).  As the Court recently explained: "[u]se of this stricter standard for delineating the

bounds of a transaction in the context of recoupment is in accord with the principle that this

doctrine, as a non-statutory, equitable exception to the automatic stay, should be narrowly

construed."  *Casino Caribbean*, 565 B.R. at 106 (citing *Anes v. Dehart (In re Anes)*, 195 F.3d

177, 182 (3d Cir. 1999)).

       54.     Recoupment does not exist here, and not surprisingly, Movants make no serious

effort to persuade the Court otherwise.  The Distribution Agreement and LoyaltyScript®

Agreement are not the same contract and do not share the same counterparties.  *See* Beesley

Decl., ¶¶ 3, 5.  The contracts were executed over six weeks apart from one another.  More

importantly, the subject matter of each contract is separate and distinct.  The Distribution

Agreement governs the supply of the Debtor's Product through McKesson Corp. acting as the

distributor of the Product.  *See* Distribution Agreement, § I.a.  The LoyaltyScript® Agreement

concerns a specialized retail pharmacy rebate program administered by MPRS.  Apr. Stip., ¶ D.

Neither contract includes any language suggesting, let alone proving, that one exists only as a

consequence of the other or otherwise evidencing an integrated transaction.  Because these

separate contracts have distinct counterparties and subject matter (and, not surprisingly, were

executed weeks apart), the obligations cannot have arisen out of a single integrated transaction.

There is no evidence to the contrary.  *See e.g., Univ. Med. Ctr.*, 973 F.2d at 1080 (requiring that

the "creditor's claim arises out of the identical transaction as the debtor's"); *see also FormTech*,

Appendix A247

439 B.R. at 362 (rejecting creditor's argument to construe multiple contracts as a global agreement).  Therefore, the Court should not recognize any recoupment defense here.[12]

### III.   Movants Cannot Establish McKesson Corp.'s Claimed Rights under Section 9-404 of the California Commercial Code

55.   For the reasons set forth above, McKesson Corp. does not have a valid setoff right in bankruptcy.   However, if the Court concludes otherwise, Movants cannot prove that McKesson Corp.'s setoff rights are senior to the Lenders' secured claims under section 9-404 of the California Commercial Code ("Section 9-404").   To succeed on this claim, Movants must prove that when McKesson Corp. executed the Distribution Agreement in 2016, it did not have notice of the Lenders' secured claims. *See* Cal. Com. Code § 9-404(a).   Orexigen is a public company and filed numerous SEC filings describing, among other things, the Lenders' senior secured claims. *See e.g.*, Orexigen Therapeutics, Inc., Quarterly Report Pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 (Form 10-Q), 14 (May 5, 2016).   Having failed to satisfy the requirements of Section 9-404, even if the Court were to conclude that McKesson Corp. has a valid right of setoff or a defense of recoupment, the Court cannot find that McKesson Corp. has a senior right to the Initial Disputed Funds.

### IV.   Movants Have Not Proven the Amount of the MPRS Rebate Payable

56.   Lastly, the Motion contains no evidence in support of Movants' contention that MPRS has a claim of "approximately $9.1 million."   Mot., ¶ 6.   In fact, this contention contradicts MPRS's assertion in the May Stipulation that it has a claim of "approximately $8.5 million."   May Stip., p. 3.   MPRS has the burden to prove facts sufficient to support its claim.

---

[12] Movants apparently believe there exists yet a third path to recovery (other than setoff or recoupment) through a novel "right to apply" amounts owed to or owed by the Debtor as they deem appropriate. Mot., ¶ 27. No such right exists in common law or otherwise, as made clear by Movants' abject failure to provide the Court with any supporting legal authority for this new concept.  A "right to apply" is nothing more than application or administration of the right of setoff or the defense of recoupment.

Appendix A248

*Allegheny*, 954 F.2d at 173. To the extent the Court is inclined to accept any of Movants' arguments, neither setoff nor recoupment in any amount should be permitted since MPRS has failed to meet its burden of proof as to the actual amount of the MPRS Rebate Payable. The Debtor reserves all rights and defenses in connection therewith.

## CONCLUSION

57. For the foregoing reasons, the Debtor respectfully requests that the Court (i) deny the Motion in its entirety; (ii) order that the Initial Disputed Funds are property of the Debtor's estate, and (iii) grant such other and further relief as is just and proper.

Dated: August 21, 2018
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Richard S. Cobb (No. 3157)
Kerri K. Mumford (No. 4186)
Jennifer L. Cree (No. 5919)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: cobb@lrclaw.com
      mumford@lrclaw.com
      cree@lrclaw.com

*Conflict Counsel to the Debtor and Debtor-In-Possession*

Appendix A249

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor. [1] | |

### DECLARATION OF THOMAS P. LYNCH IN SUPPORT OF DEBTOR'S OBJECTION TO MCKESSON'S MOTION FOR AN ORDER DETERMINING THAT MCKESSON IS ENTITLED TO THE DISPUTED FUNDS

Thomas P. Lynch, Esquire, hereby declares, under penalty of perjury, as follows:

1.      I am the Chief Administrative Officer, General Counsel, and Secretary to Orexigen Therapeutics, Inc., the Debtor and Debtor-In-Possession.  I submit this declaration, upon my personal knowledge or upon information and belief as stated herein, in support of the *Debtor's Objection to McKesson's Motion for an Order Determining that McKesson is Entitled to the Disputed Funds* (the "Objection").[2]

2.      I understand that prepetition Orexigen entered into the Distribution Agreement with McKesson Corp.  A true and correct copy of the Distribution Agreement, as amended or modified, is attached hereto as **Exhibit A**.

3.      I also understand that prepetition Orexigen entered into the LoyaltyScript® Agreement with MPRS.  A true and correct copy of the LoyaltyScript® Agreement, as amended or modified, is attached hereto as **Exhibit B**.

---

[1] The last four digits of the Debtor's federal tax identification number are 8822.  The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

Appendix A250

{1210.001-W0052098.}

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of August, 2018.          /s/ Thomas P. Lynch
                                                  Thomas P. Lynch, Esquire

Appendix A251

## EXHIBIT A

**FILED UNDER SEAL**

## EXHIBIT B

**FILED UNDER SEAL**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor. | **Reply Due:  August 31, 2018**<br>**Hearing Date:  TBD** |

### McKESSON'S REPLY IN SUPPORT OF MOTION FOR AN ORDER DETERMINING THAT McKESSON IS ENTITLED TO THE DISPUTED FUNDS

McKesson Corporation ("**McKesson Corp.**" and together with McKesson Patient Relationship Solutions ("**MPRS**"), a business unit of McKesson Specialty Arizona, Inc., a wholly-owned subsidiary of McKesson Corp., "**McKesson**"), by and through the undersigned counsel, hereby replies to the following opposition pleadings:

(i) the "Opposition to Motion for an Order Determining that McKesson Specialty Arizona in Entitled to the Disputed Funds" [D.I. 697] ("**Lenders' Opposition**") filed by Baupost Group, L.L.C., *et al.* (collectively, the "**Lenders**"); and

(ii) the "Debtor's Objection to McKesson's Motion for an Order Determining that McKesson is Entitled to the Disputed Funds" [D.I. 698] ("**Debtor's Opposition**," and together with Lenders' Opposition, the "**Oppositions**") filed by Orexigen Therapeutics, Inc., debtor and debtor in possession (the "**Debtor**" and together with the Lenders, the "**Lender Parties**").

The Oppositions are with reference to McKesson's "Motion for an Order Determining That McKesson is Entitled to the Disputed Funds" [D.I. 654] (the "**Motion**").[1]   In reply to the Oppositions, McKesson respectfully responds as follows:

---

[1]  For consistency, McKesson uses the terms and phrases defined in the Motion.

Appendix A254

## INTRODUCTION

1.     In the Oppositions, the Lender Parties miss the whole point of the Motion.  They go on and on about the fact that there are a large number of published decisions that reach conclusions contrary to the relief requested in the Motion.  That is not disputed; to the contrary, McKesson admits it in the Motion.[2]  There is no question that there are many court decisions that have considered and rejected some of the arguments made in the Motion.  The question is, however, whether those decisions were based on proper application of controlling Supreme Court and Third Circuit precedent and governing principles.  Instead of addressing that question, the Lender Parties merely repeat the same undisputed point:  asserting over and over again that the relief requested in the Motion "has been soundly rejected" or words to that effect.  See, *e.g.*, Debtor's Opposition, ¶¶ 24, 25, 29, 32, 33, 34, 35, 36, 49, 51, and 52.  Repetition, even with volume, is not a substitute for correct analysis.

2.     The fundamental disconnect with the decisions relied on by the Lender Parties is that each of those decisions presumes that section 553 of the Bankruptcy Code includes substantive restrictions on otherwise legally enforceable creditors' state-law rights; restrictions that simply are not there.  Further, the case law-presumed substantive restrictions on such rights are constitutionally impermissible.

3.     The lead-in sentence in section 553(a) reads in part as follows:

"Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except . . ."

On its face then, section 553(a) says that it (and indeed all of title 11) does not affect certain described offset rights involving mutual debts that are not acquired in the preference period or

---

[2]  See, *e.g.*, paragraph 42 of the Motion [D.I. 654 at page 19 of 27].

Appendix A255

post-petition.[3]  Section 553(a) is absolutely silent on the impact it may have on any other equitable offset and application rights, such as McKesson's Application Rights, which are enforceable under California law.  Contrary to binding Supreme Court and Third Circuit precedent, the Lender Parties nevertheless read the prefatory language of section 553(a) as "explicit statutory language" that supports their position impairing the ability of a creditor to enforce offset rights that are enforceable under state law.

4.      The Lender Parties read section 553(a) as prohibiting every other kind of offset right other than those between a debtor and one creditor.  See, *e.g.*, paragraph 21 of Lenders' Opposition:  "Under Section 553(a) of the Bankruptcy Code, a creditor's right to set off is preserved only to the extent of mutual claims.  11 U.S.C. § 553(a) ('this title does not affect any right of a creditor to offset a *mutual* debt . . .) [*sic*] (emphasis added)."  *See* also paragraph 27 of Debtor's Opposition.  Fairly put, the Lender Parties seem to suggest that section 553(a) should be construed to read as follows:

> Any and all equitable rights of offset, whether or not such rights are enforceable under applicable state law, are void as to the debtor, except (i) only the right to offset debts that arose prepetition between the debtor and the original counterparty that have not been transferred by agreement or otherwise, and (ii) to the extent that—.

While the Lender Parties' interpretation provides a viscerally attractive "bright line" test for enforceable offset rights, simply put, that is not the language of section 553(a) nor a reasonable construction of the combination of words that comprise section 553(a).

5.      The Lender Parties make reference to an undisputed element of statutory construction.  Paragraph 26 of Debtor's Opposition quotes *English v. Gen. Elec. Co.*, 496 US 72 (1990), for the proposition that "when Congress has made its intent known through explicit statutory language, the courts' task [to interpret the statute] is an easy one."  McKesson, of

---

[3]  As set forth below, the legislative history supports the intent to "preserve" state law offset rights.

Appendix A256

course, does not dispute that proposition.  That said, McKesson wonders where in section 553(a) a reasonable reader can find the "explicit statutory language" that supports the reading the Lender Parties suggest.

6.      Instead, section 553(a) must be understood to mean what it says:  that title 11 does not affect any creditor's rights except only as expressly provided.  While the parties agree on that point, the Lender Parties repeatedly reference "express" provisions in section 553 that frankly are not "expressed" at all.  Except only the provisions in section 553(a)(1)-(3) (collectively, the "**Avoidance-Conforming Provisions**"), nothing in section 553 can be fairly construed to provide that the exercise of any offset rights are impaired at all.  Nowhere in section 553, for example, is it expressed that offset rights that are enforceable under state law are not enforceable in the context of a bankruptcy.  Without such an express provision, state law is determinative on issues that affect property rights, including what debts are considered "mutual."

7.      The preferred definition of the word "expressly" in www.Merriam-Webster.com is "explicitly."  So then the question is what is explicitly provided in section 553(a) that impairs the exercise of offset rights.  On that question, the parties are in substantial disagreement. Relying on the opinion of Judge Shannon, *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009) ("*SemCrude*"), the Lender Parties claim that section 553(a) expressly imposes a condition of exact "mutuality," between two entities even if a contract provision is fully enforceable under applicable state law.  Debtor's Opposition, ¶ 4.  There is no doubt that *SemCrude* makes that assertion, but there is substantial doubt as to whether that assertion is "expressly" found in section 553.

8.      In summary, McKesson asserts that section 553(a) has been widely understood for a proposition that while it may be attractive as a simple, clear distinction between enforceable

Appendix A257

and unenforceable offset rights, does not stand up to scrutiny. Instead of the understanding followed by many court decisions, McKesson suggests that the words in section 553(a) should be read and understood to mean what they say; that title 11 does not affect any right of offset enforceable under applicable state law, including a right of a creditor to offset a mutual debt as long as both obligations are prepetition. The only exception to the previous statement is with regard to the Avoidance-Conforming Provisions in section 553(a)(1)-(3).

9.      With all of this said, the correct analysis under controlling Supreme Court and Third Circuit precedent is whether there is "mutuality" under the <u>state</u> law governing the contractual relationships between the parties. *See e.g.*, *In re Garden Ridge Corp.*, 338 BR 627, 633 (Bankr. D. Del. 2006) ("Mutuality of obligations is determined by state law."). Here, that state law is California. And, under i) controlling California Supreme Court precedent, ii) the express contractual terms between the Debtor and McKesson, and iii) California's third part beneficiary law, there is mutuality. As a result, McKesson is entitled to utilize its Application Rights.

## LEGAL ARGUMENT

10.     In the Motion, McKesson makes several points. First, McKesson's Application Rights are property rights and enforceable under applicable California law. As such, the Supreme Court in *Butner v. United States*, 440 U.S. 48, 55 (1979) ("**Butner**") instructs as follows:

    i.    "Property interests are created and defined by state law." [4]

    ii.    "Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

---

[4]  Lenders' Opposition called this principle "uncontroversial" (Lenders' Opposition, ¶ 30), and indeed it should be. Yet, the Lender Parties proceed to present a substantial controversy as to the application of that principle.

      iii.    "Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'"

11.     In the Motion, McKesson argues that these principles from *Butner* govern the analysis of section 553(a) and particularly its impact on McKesson's Application Rights. Specifically, McKesson asserts that (i) McKesson's Application Rights are enforceable under California law; (ii) those rights are enforceable against a debtor in a bankruptcy case unless a federal interest requires a different result; and (iii) such enforcement serves to provide uniform treatment of property interests in both the state and federal courts, reduce uncertainty, discourage forum shopping and prevent, in this case, the Lenders from receiving a windfall.

12.     The Debtor, on the other hand, suggests that *Butner* should be limited to its facts, and limited only to a secured creditor's interest in rents. The Debtor called it "critical" that that *Butner* did not mention section 553 or setoff rights, emphasizing that point in boldface.[5] *Butner's* governing principles are far broader. While acknowledging that Congress had the constitutional ability to define the secured creditor's rights with respect to rents, the Supreme Court noted that Congress did exactly that with reference to provisions invalidating certain security interests as fraudulent, or as improper preferences over general creditors. 440 U.S. 48, 54. Apart from these provisions, however, *Butner* noted that Congress has generally left the determination of all types of property rights in the assets of a debtor's estate to state law. *Id.*

13.     Contrary to the Lender Parties' plea for an extremely limited reading of *Butner*, the Supreme Court and the Third Circuit have adopted an expansive view. One example of this expansive view is *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000). At issue in *Raleigh* was not

---

[5] Debtor's Opposition, ¶ 37.

Appendix A259

an interest in any specific asset of the debtor; rather, it was the extent of a claim. Specifically, the *Raleigh* court addressed the question of whether nonbankruptcy law determined the burden of proof on a tax claim. In ruling that state law governs the burden of proof, the *Raleigh* court made the following pronouncements: "Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. [citing *Butner*] **The 'basic federal rule' in bankruptcy is that state law governs the substance of claims** [again citing *Butner*]" (internal citations omitted) (emphasis added). 530 U.S. at 20. See also *Nobleman v. American Savings Bank*, 508 U.S. 324 (1993). In *Nobleman* case, the Supreme Court underscored the expansive application of *Butner* in addressing the question of whether a chapter 13 plan could bifurcate an undersecured home mortgage. The *Nobelman* Court cited *Butner* in ruling that "[i]n the absence of a controlling federal rule," state law determines property rights. Id. at 329.

14. The Third Circuit has cited *Butner* and applied an expansive reading of its "state law" language in the following cases:

    (i)    *In re Nejberger*, 934 F.2d 1300 (3d Cir. 1991 (as to whether a liquor license is a property interest under Pennsylvania law);

    (ii)    *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enterprises, Inc.*, 960 F.2d 366 (3d Cir. 1992)) (whether contract balances owed by state and municipal agencies constitute trust funds under New Jersey law);

    (iii)    *Commerce Bank v. Mt. View Vill.*, 5 F.3d 34 (3d Cir. 1993) ("The property interests of mortgagor and mortgagee are created and defined by state law.") (citing *Butner* and applying Pennsylvania law to rights of mortgagors);

Appendix A260

(iv)     *First Indem. of Am. Ins. Co. v. Modular Structures* (*In re Modular Structures*), 27 F.3d 72 (3d Cir. 1994) (whether funds held are property of the estate by analyzing contract performance under New Jersey law);

(v)      *West Virginia State Dep't of Tax & Revenue v. IRS* (*In re Columbia Gas Transmission Corp.*), 37 F.3d 982 (3d Cir. 1994) (The court determining a property tax obligation under West Virginia law) (citing *Butner*):

(vi)     *First Fidelity Bank, N.A. v. Jason Realty, L.P.* (*In re Jason Realty, L.P.*), 59 F.3d 423 (3d Cir. 1995) (Citing *Butner*, the court looked to New Jersey law to determine that assignment of rents passes title to the assignee);

(vii)    *Integrated Solutions v. Serv. Support Specialties*, 124 F.3d 487 (3d Cir. 1997) (The court used *Butner* as part of the reasoning to find that a trustee lacked authority to assign state law tort claims (the transfer of the relevant claims is prohibited under New Jersey law));

(viii)   *Krebs Chrysler-Plymouth, Inc. v. Valley Motors*, 141 F.3d 490 (3d Cir. 1998) (Relying on *Butner*, the court used Pennsylvania law to determine that franchises are an interest in property);

(ix)     *O'Dowd v. Trueger* (*In re O'Dowd*), 233 F.3d 197 (3d Cir. 2000) (Determining that whether a malpractice claim was property of the estate by determining the date the litigation claim accrued under New Jersey law) (citing *Butner*);

(x)      *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233 (3d Cir. 2001) (Applying Pennsylvania law under *Butner* to determine that "ordinary contract rights" are property interests);

Appendix A261

(xi)     *1st 2nd Mortgage Co. of N.J., Inc. v. Ferandos* (*In re Ferandos*), 402 F.3d 147 (3d Cir. 2005) (Defining "real property" pursuant to New Jersey state law (citing *Butner*))*;*

(xii)    *Sovereign Bank v. Schwab*, 414 F.3d 450 (3d Cir. 2005) (Property interest of mortgagor and mortgagee defined by Pennsylvania state law);

(xiii)   *In re Brannon*, 476 F.3d 170 (3d Cir. 2007) (Determining tenancy in the entirety under Pennsylvania law) (citing *Butner*);

(xiv)    *In re Kane*, 628 F.3d 631 (3d Cir. 2010) (Citing a D.N.J. case (which cites *Butner*), the court looked to New Jersey law to determine interest in equitable distribution of marital property after a divorce);

(xv)     *Majestic Star Casino, LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), 716 F.3d 736 (3d Cir. 2013) (Citing *Butner*, the court found an overriding federal interest in determining whether an entity is a corporation (because of tax revenue implications), and applied the Internal Revenue Code, not state law); and

(xvi)    *In re Ruitenberg*, 745 F.3d 647 (3d Cir. 2014) (Finding no conflict with New Jersey law as to determination of interest in marital property, the court "thereby disregards the rule of *Butner*").

This litany of Third Circuit cases, all of which applied *Butner* principles in a wide variety of situations, proves that the teachings of *Butner* are given a very expansive reading, contrary to the positions advanced by the Lender Parties.

15.     While admittedly dealing with different property rights, the factual lead-in parallels between *Butner, Raleigh,* and the present Motion are striking.  Like in *Butner* and *Raleigh*, Congress has the ability to define creditor's rights with respect to offset, and in section

Appendix A262

553(a), like in *Butner*, Congress invalidated certain provisions, but expressly limited enforcement in order to fit within the provisions of generally applicable avoidance actions. Congress could have expressly defined certain creditors' rights and claims as unenforceable in bankruptcy, but it did not generally so provide. Instead, it determined that certain enforcement activities are invalid (such as fraudulent transfers and avoidable preferences). As discussed further below, any argument that section 553(a) generally furthers a "federal interest" requiring a federal definition of "mutual" is belied by the legislative history, which actually evidences (with exceptions irrelevant here) congressional intent to "preserve" rights of setoff under section 553.

16.     Instead of approaching the issues through the Supreme Court's lens of *Butner* and *Raleigh*, the courts cited by the Lender Parties have adopted the "bright line" test as detailed in *SemCrude*. With all due respect, the presumptions underlying the *SemCrude* analysis do not meet the requirements under *Butner* and *Raleigh*. Except only with respect to the Avoidance-Conforming Provisions, nowhere in section 553 is there an "express" provision impairing a creditor's offset rights. The Supreme Court noted in *Citizens Bank v. Strumpf*, 516 U.S. 16 (1995) that "[s]ection 553(a), in turn, sets forth a general rule, with certain exceptions, that any right of setoff that a creditor possessed prior to the debtor's filing for bankruptcy is not affected by the Bankruptcy Code." 516 U.S. at 20. As a result, enforceable state law remedies, including McKesson's Application Rights, must be recognized and enforced.

**Reply to Debtor's Opposition.**

The Debtor Has No Standing to Oppose the Motion.

17.     With regard to the Debtor, the first question that comes up is whether it has standing to oppose the Motion. As provided in paragraph 4 of the July Stipulation, approved by an order entered on July 20, 2018 [D.I. 592], to the extent an order is entered that denies the

Appendix A263

Motion, upon that order becoming a Final Order, ". . . the Disputed Funds, as cash collateral of the Lenders, shall be paid to the Debtor . . ." Since the Lenders are substantially undersecured, and the Debtor has sold its business operations, the Debtor has no real economic interest in the Disputed Funds.[6] It would appear that the only reasons the Debtor's Opposition was filed were to i) placate the Lenders, who directly or indirectly own or control the Debtor, and ii) give the Lender Parties a second bite at the apple. That said, for the most part, the Debtor's Opposition ignores the substance of the arguments in the Motion, and merely repeats what is acknowledged in the Motion, to wit, there are many decisions that have denied the relief requested.

The Debtor Fails to Reference Applicable State Law.

18.     First, using many florid descriptive phrases, the Debtor goes on at length on the acknowledged fact that there is substantial authority that supports the position of the Lender Parties. That fact alone is both admitted and not determinative. What is determinative is whether controlling law is well-reasoned. The Debtor did not address that question, and instead merely repeats references to numerous cases that presume that the language in section 553(a) was sufficiently "express" as to determine unenforceable a number of creditor rights that, under applicable nonbankruptcy law, would have been enforceable.

Without Regard to Applicable State Law, the Debtor Presumes that Contractual Offset Provisions Cannot Be Enforceable.

19.     The second assertion in Debtor's Opposition is comparable, choosing to ignore any analysis that supports the exercise of setoff involving contractual set off transactions with a

---

[6]   The obvious question is why is the Debtor advocating for the Lenders. The Lenders have already agreed to the carveout for the other creditors, including unsecured creditors. A ruling in favor of McKesson simply reduces the Lenders' recovery on their secured claim, without any impact to the other remaining creditors. On the other hand, a ruling in favor of McKesson reduces the aggregate amount of unsecured creditors and thereby increases the ultimate recovery by other unsecured creditors. Given these facts and circumstances, the Debtor's decision to advocate for the Lenders must be questioned.

Appendix A264

parent and wholly-owned subsidiary, and instead stating that "setoff to which parties consent by agreement . . . has been soundly rejected . . ."[7]  Debtor's Opposition, ¶ 24.

20.    In reply, McKesson notes that the Court must apply California law.  That law recognizes as enforceable contractual setoff provisions involving the non-debtor corporate parent and its wholly-owned subsidiary.  In the Motion, McKesson cited the controlling California Supreme Court decision of *Prudential Reinsurance Co. v. Superior Court*, 3 Cal. 4th 1118 (1992) ("***Prudential***") for the proposition that an express, mutual agreement that an affiliate would be deemed a mutual debtor-creditor of a parent and would be sufficient to support offset by an affiliate against a third party (*i.e.*, "mutuality").  *Ibid*. at 1137.

21.    Nothing in section 553 expressly voids contractual provisions, such as McKesson's Application Rights, and as they are enforceable under California law as "mutual debts," they must be recognized and enforced within a bankruptcy case.

<u>Again, the Debtor Presumes that a Third-Party Beneficiary Cannot Claim Offset Rights</u>.

22.    As to the third assertion in Debtor's Opposition, the Debtor conflates several concepts, but again relies on section 553 to determine that MPRS, as a wholly-owned subsidiary of McKesson, could not effectively assert an offset as an intended third-party beneficiary of the Distribution Agreement.  The Debtor again does not rely on the controlling law of California but instead relied entirely on section 553 and the cases that have erroneously determined that section 553 imposes a separate, federal requirement of mutuality to determine whether a claim of offset is enforceable.  The Debtor references "theories that have been rejected by multiple courts and ignore basic corporate principles ingrained in the Bankruptcy Code."  Debtor's Opposition, ¶ 25.

---

[7]  On this point, it is noteworthy that while the Debtor claims that offset by agreement has been "soundly rejected," a case cited by the Lenders, *InfinaQuest, LLC v. DirectBuy, Inc*., 18 F. Supp. 3d 959 (N.D. Ind., 2012) dealt with two separate agreements, each involving offsets by agreement, and the enforceability of such provisions was determinative but not even questioned in the opinion.  This case is discussed in greater detail below.

Appendix A265

McKesson replies by noting that under *Butner*, *Raleigh* and their progeny, the Court is required to apply controlling, applicable California law governing "mutuality" and "third party beneficiary," and that the basic corporate principles ingrained in California law govern whether, for the purposes of offset, the wholly-owned subsidiary of a non-debtor parent is entitled to exercise setoff as an intended third-party beneficiary. *Ibid*.

23.     The Debtor argues that the "Distribution Agreement does not confer, expressly or otherwise, any third-party beneficiary rights on MPRS." Debtor's Opposition, ¶ 44. But the Debtor fails to address paragraph VII.i, the paragraph that provided to McKesson's affiliates, including MPRS, the right of offset as evidencing such rights.[8] Then, to compound the misunderstanding, the Debtor claims that if MPRS were to exercise offset rights any such benefit would inure only McKesson, the parent, and not the subsidiary, since MPRS's claim against the Debtor would be reduced. Debtor's Opposition, ¶ 44. Setting aside relevancy for the moment, the Debtor's argument just falls flat. MPRS's claim would be reduced, of course, because it would be paid or otherwise credited from funds payable by McKesson.

24.     Finally, the Debtor argues that the Court should deny MPRS third-party beneficiary status for policy reasons, asserting (in conclusory fashion) that it would "confer on extended corporate families . . . enlarged rights not contemplated by the Bankruptcy Code." Debtor's Opposition, ¶ 45. Once again, the Debtor argues that the Bankruptcy Code should dominate the corporate relationships among a parent and its subsidiaries. But, as the Supreme Court has made clear state law governs this issue (*i.e., Butner* and *Raleigh*). And, if Congress does not agree with this result, it is free to amend the Bankruptcy Code.

---

[8]  It is notable that the Debtor does not offer any evidence that MPRS was not an intended third party beneficiary of the Application Rights provision of the Distribution Agreement at the time this agreement was entered into. But, if the Lender Parties truly dispute MPRS's capacity as an intended third-party beneficiary of the relevant provisions of the Distribution Agreement, then this is a disputed factual issue which cannot be resolved at this time.

Appendix A266

The Debtor Argues Erroneously that the Motion Seeks Recoupment.

25.    The final point the Debtor tries to make is odd.  It is even more curious that the Lenders also argue the same point.  Referencing two paragraphs in the Motion (paragraphs 4 and 27), the Debtor devotes almost two pages in the Debtor's Opposition (pages 22-24) and the Lenders another page (pages 20-21 in the Lenders' Opposition) to argue that McKesson cannot assert recoupment as a defense.  So it is clear:  McKesson does not assert recoupment as a defense.

26.    The only reason the word recoupment is even mentioned in the Motion is because the word "recoup" is in paragraph VII.i of the Distribution Agreement, the paragraph that memorializes McKesson's Application Rights.  Under the Distribution Agreement, McKesson's Application Rights include, among other creditor rights, the right to recoup.  But again, that does not mean that McKesson believes it is entitled to recoup under the circumstances described in the Motion.  In fact, McKesson does not claim that recoupment has anything whatsoever to do with the rights it seeks to enforce in the Motion except only that it is part of the rights that are described as McKesson's Application Rights which, under California law, are enforceable.

27.    In sum, Debtor's Opposition asserts that section 553:  (i) expressly alters state law and that without reference to California law, governs the enforceability of McKesson's Application Rights; (ii) is determinative on any question of mutuality by way of a third-party beneficiary; and (iii) prevents the efficacy of an express mutual agreement (such as the Distribution Agreement) that provides for McKesson's Application Rights.  The Debtor's assertions are reliant entirely on the strength of the assessment that section 553 provides the "explicit statutory language" that directs that all equitable offset claims are void unless they meet some amorphous mutuality test (which is not codified in any Federal statute).  To the contrary,

Appendix A267

and as stated in the Motion, properly decided case law holds that "mutuality"—which is not defined in the Bankruptcy Code—is determined exclusively under state law. *See, e.g., In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006) ("Mutuality of obligations is determined by state law.") (applying Texas law) (quoting *In re Czyzk*, 297 B.R. 406, 409 (Bankr. D.N.J. 2003)); *In re Sunset Aviation, Inc.*, 468 B.R. 641, 647 (Bankr. D. Del. 2011) ("the right of setoff requires mutuality between the debtor and the creditor *under the applicable state law*") (emphasis added); *Levine v. Kenny* (*In re Flooring America, Inc.*), 302 B.R. 403, 406 (Bankr. N.D. Ga. 2003) ("Whether mutuality exists is an issue of state law.") (applying Georgia law).[9] Here, controlling California case law and third party beneficiary law provides the requisite mutuality.

**Reply to the Lenders' Opposition.**

28.    In some respects, the Lenders' arguments are comparable to those asserted by the Debtor, and such instances will not be addressed at length. The Lenders grouped their comments into two broad categories. First, the Lenders raise a number of assertions based on the position that section 553(a) controls any issues related to offset. The second broad category of arguments from the Lenders take more of a scattershot approach, and raise several unconnected arguments, such as: (i) recoupment, (ii) the effect of California Commercial Code section 9404; and (iii) the impact of the terms of the order approving the DIP Loan (which has been paid in full and no longer exists).

29.    As to the first category, and the Lenders' arguments based on the position that section 553(a) controls any issues related to offset, the Lenders go so far as to declare that "**[t]he Bankruptcy Code Governs Setoff**." Lenders' Opposition, page 12 (emphasis in the original).

---

[9]  As the Bankruptcy Code does not define the term "mutuality," state law governs the meaning of that term. *See, e.g., Kaufman v. Chalk & Vermilion Fine Arts, LLC,* 31 F. App'x 206 , 208 (2d Cir. 2002) (noting that "[b]ecause the Bankruptcy Code does not define 'interests in property,' state law controls").

Appendix A268

That is certainly the argument relied upon by a number of court decisions but, as articulated in the Motion, is not consistent with *Butner*, *Raleigh* and the plethora of cases holding that *state law* determines "mutuality" as a term not defined in the Bankruptcy Code. It should also be noted that under section 506(a)(1), "[a]n allowed claim of a creditor secured with a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff . . ." As offset is akin to a creditor holding a secured claim, any attempt to read into the Bankruptcy Code a statutory interpretation that effectively wrests the value of that secured claim away from the creditor must be unambiguously grounded in binding authority.[10]

30. To support their assertion that section 553(a) controls, the Lenders claim: (i) section 553 is supported by a "clearly articulated federal interest," referencing the claim that offset *per se* creates a preference. Lenders' Opposition, ¶ 30; (ii) section 553 imposes additional restrictions over and above the Avoidance-Conforming Provisions described in section 553(a)(1), (2) and (3) which McKesson agrees are requirements introduced in section 553(a) so that offset rights fit within the avoidance expectations of the Bankruptcy Code; (iii) section 553(a) introduces an additional requirement of "mutuality" as a federally-construed concept that ignores state law;[11] and (iv) if "mutuality" is to be evaluated based on state law, the Motion fails to provide persuasive authority that California law would allow McKesson's Application Rights. As set forth below, in each instance, the Lenders' arguments fall short.

---

[10]  Because of the express inclusion of setoff within Section 506(a), the principles enunciated in *Butner* and *Raleigh* apply with equal force to setoff rights.

[11]  In this position, the Lenders also ignore the numerous cases that uniformly state that "Mutuality of obligations is determined by state law." *In re Garden Ridge Corp.*, 338 BR at 633; *In re Czyzk*, 297 B.R. at 409. See also the other cases cited in paragraph 29 of the Motion.

Appendix A269

31.    After the first scattershot arguments, the second broad category of claims in the Lenders' Opposition assert several other arguments, each of which is similarly wrong or irrelevant:  (a) a third party beneficiary cannot meet the mutuality requirement for offset (just wrong under California law); (b) the Motion seeks recoupment (again, simply wrong);[12] (c) under California Commercial Code section 9404, the Lenders' interests are senior in time, and therefore, impermeable from any argument from McKesson (asserting that the Lenders' senior security interest entitles the Lenders to greater rights than those available to the Debtor); and (d) somehow the fact that the court-approved DIP Loan was found to be "free and clear" of counterclaims, defenses, etc. precludes McKesson's assertion of offset rights, even though the DIP Loan has been extinguished as paid in full.

Section 553(a) Is Not Supported By a Clearly Defined Federal Interest and Therefore Should Not Be Understood to Affect Property Rights that Are Enforceable under California Law.

32.    Under *Butner* and *Raleigh*, in order to modify otherwise applicable state law respecting property interests and the claim allowability, a federal statute must set forth a clearly defined federal interest.  Without such, then state law governs the scope and application of the property interest.  The Lenders assert that ignoring applicable state law, and elevating section 553 to the position of exercising complete control over offset rights would prevent "preferences" and would preserve equality among creditors.  Lenders' Opposition, ¶ 30.  It is true that section 553(a) imposes restrictions on the exercise of offset rights acquired in the 90 days prior to the petition date or post-petition for purposes of setoff.  Such limitations are Avoidance-Conforming Provisions intended to prevent preferential or post-petition acquisition of setoff rights.  Compare 11 USC § 553(a)(1)-(3) and (b)(1), all of which are preference-related provisions.    The Avoidance-Conforming Provisions are not at issue in the situation presented in the Motion.

---

[12]  As to this nonissue, this Reply addressed it above, and will not discuss it further.

Appendix A270

33.     Any argument that section 553(a) furthers a "federal interest" requiring a *federal* definition of "mutuality" is belied by the legislative history, which actually evidences congressional intent to "preserve" (with preference-type restrictions irrelevant here) in bankruptcy rights of setoff under section 553.  The Senate Report accompanying section 553 explains that "[t]his section [553] *preserves*, with some changes, the right of setoff in bankruptcy cases."  S.Rep. No. 95-989, 95th Cong., 2d Sess., at 91 (1978) (emphasis added), reprinted in 1978 U.S.C.C.A.N. 5787, 5877.

34.     Moreover, the policy of equality among creditors in bankruptcy applies only to creditors who are similarly situated.  Equality is not applicable, for example, if one creditor has been granted rights different from another creditor, and those rights come into play to modify any entitlement to distributions.  The relief requested in the Motion is based on express provisions in agreements among the affected parties (both California-headquartered corporations) that were agreed to and enforceable under applicable state law (California).  The policy of equality among creditors does not extend so far as to require that such provisions be ignored, especially where Congress has indicated its contrary intent in the legislative history accompanying section 553 to "preserve" rights of setoff.  Indeed there are many contract provisions that have an impact that can effectively differentiate among creditors.  Presumably the Lenders do not suggest that all such contract provisions are void due to non-codified and amorphous "public policy" reasons.

Section 553(a) Introduces Additional Requirements, But Only As Expressly Proscribed in the Avoidance-Conforming Provisions of Section 553(a)(1), (2) and (3).

35.     There is no doubt that section 553(a) affects the right to exercise setoff of a debt preferentially acquired in the 90-day preference period or post-petition for purposes of setoff.  The Avoidance-Conforming Provisions in section 553(a)(1)-(3) impose clear and express

Appendix A271

- 18 -

restrictions on the use of claims preferentially obtained in the 90-days prior to the bankruptcy filing or post-petition for purposes of setoff.  Such restrictions are irrelevant here, and the Objectors do not contend otherwise.

36.    The Lenders, however, assert that section 553 also requires a federal gloss on "mutuality" even though under *Butner* and *Raleigh*, the concept of "mutuality" is not expressly defined in the Bankruptcy Code.  The Lenders argue that the cases correctly holding that state law governs "mutuality" are irrelevant.  For example, the Lenders attempt to reject *In re Czyzk*, 297 B.R. 406 (Bankr. D. N.J., 2003) because that case involved only a one-to-one offset claim.  There is no basis to assume that the state law-based analysis with regard to mutuality undertaken by *Czyzk* would be different when a proposed offset is something other than one-to-one.

<u>Section 553(a) Does Not Introduce "Mutuality" as a Federally-Construed Restriction to an Offset Right That Is Otherwise Fully Enforceable Under California Law.</u>

37.    The Lenders are wrong for several reasons.  First, the concept of "mutuality" is integral to the enforceability of offset rights under state law.  The Motion refers to a number of cases in which "mutuality" was determined solely based on state law.  See, Motion, ¶¶ 29 and 30.  The Lenders argue that those decisions are distinguishable because they do not involve offset rights through consensual contract provisions or third party beneficiary.  Lenders' Opposition, ¶ 35.  Nowhere in any of the frequently-cited cases relied upon by the Lenders is there a citation to a case relying upon the state law of California.  There are no California-reliant cases cited by *SemCrude*.  In addition, the court in *In re Lehman Bros*., 458 B.R. 134 (Bankr. S.D. N.Y. 2011) does not cite to any decision that relies on California state law.  Even if California state law is unique in respect of offset by agreement or as an intended third party beneficiary, that in no way excuses a court from following the principles laid out in *Butner* and

Appendix A272

*Raleigh*.  As set forth below, under settled California law, offset rights under consensual agreement or by third party beneficiary are fully enforceable.

<u>Under California law, McKesson's Application Rights Are Fully Enforceable</u>.

38.  California authority supports the assertion that McKesson's Application Rights are enforceable by way of contract or an intended third party beneficiary.  In either situation, California law recognizes that the right of offset is enforceable on the basis there are mutual parties and debts.

<u>Contract Provisions are Effective to Allow for Offset</u>.

39.  As to enforcement by way of contract provisions, in the Motion, McKesson relies on *Prudential*.  In *Prudential*, the California Supreme Court directly stated that if there is an express agreement, then a corporate subsidiary can "be deemed a *mutual* debtor-creditor of the parent."  3 Cal 4th at 1137 (emphasis added).  The McKesson Application Rights plainly fall within "mutuality" as determined in *Prudential*.  Nevertheless, the Lenders argue there are two reasons why this California Supreme Court decision does not control.  The Lenders are wrong on both counts.

40.  First, the Lenders try to distinguish *Prudential* as reliant upon certain provisions of the California Insurance Code and not general principles of mutuality and offset.  Lender's Opposition, ¶ 36.  What the Lenders fail to mention, however, is that those so-called specific insurance provisions were, in fact, patterned after the federal Bankruptcy Act of 1898.  As noted in *Prudential*, "[s]ection 1031 [of the California Insurance Code] allows the setoff of all mutual debts and creditors in the course of liquidation proceedings and is patterned after the federal Bankruptcy Act of 1898 . . . [citations deleted].  The federal . . . provisions were in turn derived

Appendix A273

from the equitable right of setoff established in 17th Century England and later adopted in early federal court cases allowing equitable setoff in the insurance context." 3 Cal 4th at 1123-24.

41. The Lenders' second attempt to distinguish *Prudential* is to argue that the language quoted in the Motion is *dicta*. Lenders' Opposition, ¶ 36. In *Prudential*, the California Supreme Court denied plaintiffs' attempt to expand offset rights among affiliated entities when there was no express mutual agreement to so provide, but acknowledged that offset among affiliated entities was proper, with an "express mutual agreement." 3 Cal 4th at 1137.

42. The Lenders also cite *In re County of Orange*, 183 B.R. 609 (Bankr. C.D. Cal. 1995) to support its position that closely-related entities (the County itself and the "Orange County Investment Pools" (the "**OCIP**")) did not meet the "mutuality" requirement. Lenders' Opposition, ¶ 35. The facts involved in the County of Orange case are as different as night and day from the facts and issues involving the Motion. Notably, there were no contract provisions between the County of Orange and the OCIP comparable to the McKesson Application Rights.

43. Further, the Lenders failed to disclose is that in the *County of Orange* case, at the same time that relief from stay was denied,[13] the Court dismissed the OCIP as a debtor, after determining that "the OCIP had outstanding accounts for 190 participants aggregating approximately $7.6 billion. These funds were invested and managed by the Treasurer for the benefit of the participants." *In re County of Orange*, 183 B.R. 594, 599 (Bankr. C.D. Cal 1995). The *County of Orange* court determined that the OCIP "is a creation of the County and the Treasurer. It is an investment vehicle formed by the County and administered by the Treasurer to receive, commingle, invest, hold, account for and distribute funds of the participants who are authorized by state law to deposit their excess funds with the Treasurer." 183 B.R. at 602. It

---

[13] Actually four days later.

Appendix A274

could hardly be argued that the OCIP is a wholly-owned subsidiary of the County of Orange or that its relationship is in any other way comparable to that of McKesson and MPRS.

Offset Rights as a Third Party Beneficiary.

44. As to satisfaction of the "mutuality" requirement by a third party beneficiary, the Motion establishes that under California law an intended third party beneficiary has the right to sue for damages arising from breach of the agreement inuring to its benefit (such as the setoff provisions of that agreement). *See, e.g. In re Bacigalupi, Inc*., 60 B.R. 442, 446 (9th Cir. BAP 1986) (applying California law, the Ninth Circuit Bankruptcy Appellate Panel stated that a setoff claim "cannot fail for lack of mutuality" where complaint alleges third-party beneficiary status); *see also Saudi Basic Industries Corp. v. ExxonMobil Corp.*, 194 F. Supp. 2d 378, 394-95 (D.N.J. 2002) (Exxon, as a third party beneficiary to a contract, can assert a setoff defense and the setoff defense does not fail for lack of mutuality).

45. Again, the Lenders seek to distance this case from those decisions by noting factual distinctions that are without a difference. The Lenders seem to suggest that despite California state law to the contrary, any effort to assert offset as a third party beneficiary is *per se* void. The Lenders are wrong. California law enforces mutuality and setoff rights that run in favor of third party beneficiaries to a setoff agreement.

Under Section 9404 of the California Commercial Code, the Lenders' Rights in the Debtor's Accounts Receivable Are Subject to McKesson's Contractual Defenses.

46. As set forth in the Motion, under section 9404 of the California Commercial Code, any rights of the Lenders as assignee of the Debtor's accounts receivable, are subject to any defenses and claims that McKesson may assert. The Lenders rely upon the terms of the Final DIP Order for the proposition that any offset or other claims sought to be asserted by McKesson as an account debtor of the Debtor have been washed away, and that the terms of the Final DIP

Appendix A275

- 22 -

Order immunize the Lenders (for their pre-petition security interest) from any impediment that might be raised to question the validity and amount owed by every account debtor. The Lenders' argument is wrong on many levels. McKesson is not aware of any court decision that holds that a DIP order effectively waives account debtor defenses, making a debtor's books and records the indisputable and unquestioned determinant as to a debtor's accounts receivable.

47. In opposition, the Lenders reference two cases, both of which have facts that are substantially different than those involving in this case.

48. In *In re Printz*, 478 B.R. 876 (Bankr. C.D. Ill. 2012), two creditors each asserted priority over the claims of the other. One creditor (called "Trainor"), a grain elevator company, released its UCC lien over the debtor's crops at the request of CNH, the other creditor, a lender. Trainor then filed a new one in order to make it clear that CNH's security interest was prior. CNH's senior security interest was not disputed. Trainor, however, then bought farm products from the debtor but did not pay for them, and instead asserted first that it was a "buyer in the ordinary course of business" under the Food Security Act of 1985 and therefore entitled to take possession of the farm products free of CNH's security interest. On that point, the court ruled in favor of Trainor, but went on to determine that Trainor took possession not just of the farm products, but also the proceeds of sale of CNH's security interest. As to the proceeds, Trainor was required to make payment. 478 B.R. at 887. What appeared to be determinative in this case were the steps taken by Trainor to take back what it had agreed to give up, *i.e.*, the priority of CNH's lien rights.

49. The second case cited by the Lenders is *InfinaQuest, LLC v. DirectBuy, Inc.*, 18 F. Supp. 3d 959 (N.D. Ill. 2014). In the Lenders' Opposition, the Lenders first quote dicta

Appendix A276

- 23 -

from this case[14] but fail to disclose that the quoted language was determined by that court, in the next sentence, to be "inapplicable." 18 F. Supp. 3d at 964. In that case, JDB owed DirectBuy under the terms of a franchise agreement, and owed Beta under the terms of a financing agreement. DirectBuy and Beta are sister entities, both wholly-owned subsidiaries of another entity. 18 F. Supp. 3d at 961.

50. Under an agreement with JDB, DirectBuy and its affiliates (including Beta) had the right to apply or offset. 18 F. Supp. 3d at 963. And in an agreement with JDB, Beta and its affiliates (including DirectBuy) had the right to hold and apply any payments due to JDB with respect to any indebtedness due to Beta, DirectBuy or any of their affiliates. *Ibid*. So under each of the franchise agreement and the financing agreement, JDB consented to offset rights to be exercised by any affiliate of DirectBuy or Beta. And nowhere in the decision is there any suggestion that these two offsets by agreement are anything but fully enforceable.

51. JDB also entered into an agreement with InfinaQuest granting a security interest in JDB's receivables. When JDB became insolvent, InfinaQuest sought to recover in advance of Beta and DirectBuy. The court ruled in favor of Beta and DirectBuy because, among other reasons, "[t]he set-off provision is a term of the Franchise Agreement, and—as an assignee— InfinaQuest took its security interest subject to that provision." 18 F. Supp. 3d at 965. Further, the Court added that ". . . this analysis is consistent with the common law maxim . . . (no one can give what he does not have) since JDB's interest in the account was subject to DirectBuy's contractual set off." *Ibid*.

52. So each of the cases relied upon by the Lenders actually supports the relief requested by McKesson in the Motion.

---

[14] Citing to page 965 of the decision, instead of the correct page, 964.

Appendix A277

53.    Nevertheless, the Lenders argue under the terms of the Final DIP Order, any account debtor and any other entity asserting a counterclaim against its obligation to the Debtor has waived each such claim, offset, etc.  Lenders' Opposition, ¶ 49.  As set forth, the Final DIP Order included a finding that no "offsets, recoupments, challenges, objections, reductions, defenses, impairments, claims, counterclaims, or cross-claims of any kind or nature to any of the [Prepetition Secured Notes] by any person or entity exist . . ."  Final DIP Order ¶ 10(c)(1).

54.    The Lenders, however, misinterpret the Final DIP Order because no McKesson entity seeks to assert a right of offset to any liability on account of the Prepetition Secured Notes.  Neither of the two McKesson entities is liable on such notes.

55.    In addition, the Lenders ignore Judge Walrath's ruling in *In re Reichold Holdings, US, Inc.*, 556 BR 107, 111 (Bankr. D. Del. 2016), that "[t]he function of a lien is to secure a debt; once that debt is repaid, the lien and the rights of the lien-holder terminate."  The findings referenced by the Lenders were in support of the DIP Loan which has been fully repaid.  Thus, the Lenders' rights under the Final DIP Order have terminated.

### CONCLUSION

Based on the foregoing, McKesson respectfully requests the Court grant the Motion and enter an order substantially in the form attached to the Motion as Exhibit A:  (i) authorizing McKesson to apply the obligations the Debtor owes MPRS under the Master Services Agreement against the obligations McKesson owes to the Debtor under the Distribution Agreement.; (ii) directing the Debtor to make payment in accordance with paragraph 5 of the May Stipulation; and (iii) such other and further relief as the Court may deem just and proper.

Appendix A278

The Lenders should not be awarded a windfall at the expense of McKesson, particularly when that windfall would not be available to the Lenders outside of bankruptcy.

Dated: August 31, 2018          Respectfully submitted,
Wilmington, Delaware

                               REED SMITH LLP

                        By:  */s/ Kurt F. Gwynne*
                               Kurt F. Gwynne (No. 3951)
                               1201 Market Street, Suite 1500
                               Wilmington, Delaware 19801
                               Telephone:  (302) 778-7500
                               Facsimile:  (302) 778-7575
                               Email:  kgwynne@reedsmith.com

                                       and

                               Jeffrey K. Garfinkle (admitted *pro hac vice*)
                               Daniel H. Slate (admitted *pro hac vice*)
                               Buchalter, A Professional Corporation
                               18400 Von Karman Avenue, Suite 800
                               Irvine, California 92612-0514
                               Telephone:  (949) 760-1121
                               Email:  jgarfinkle@buchalter.com
                                       dslate@buchalter.com

                               *Counsel for McKesson Corporation and*
                               *McKesson Patient Relationship Solutions, a*
                               *business unit of McKesson Specialty*
                               *Arizona, Inc.*

Appendix A279

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

                                      .    Chapter 11
 3    IN RE:                          .
                                      .    Case No. 18-10518 (KG)
 4    OREXIGEN THERAPEUTICS, INC.     .
                                      .
 5                                    .    Courtroom No. 3
                                      .    824 North Market Street
 6                                    .    Wilmington, Delaware 19801
                                      .
 7                                    .
                        Debtors.      .    October 24, 2018
 8    . . . . . . . . . . . . . . . . .    11:00 A.M.

 9                       TRANSCRIPT OF HEARING
                  BEFORE THE HONORABLE KEVIN GROSS
10                 UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12
      For the Debtors:          Robert Dehney, Esquire
13                              Andrew Remming, Esquire
                                Jose Bibiloni, Esquire
14                              MORRIS NICHOLS ARSHT & TUNNELL LLP
                                1201 N. Market Street, 16th Floor
15                              P.O. Box 1347
                                Wilmington, Delaware 19899-1347
16


17


18
      Audio Operator:          Electronically Recorded
19                             by Ginger Mace, ECRO

20    Transcription Company:   Reliable
                               1007 N. Orange Street
21                             Wilmington, Delaware 19801
                               (302)654-8080
22                             Email:  gmatthews@reliable-co.com

23

24    Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.
25
```

Appendix A280

```
 1   APPEARANCES (Continued):

 2   For the Debtors:          Christopher Donoho, III, Esquire
                               Christopher Bryant, Esquire
 3                             John Beck, Esquire
                               HOGAN LOVELLS US LLP
 4                             875 Third Avenue
                               New York, New York 10022
 5
                               - and -
 6
                               Kerri Mumford, Esquire
 7                             LANDIS RATH & COBB LLP
                               919 North Market Street
 8                             Wilmington, Delaware 19801

 9   For Baupost Group         Bennett Murphy, Esquire
     Securities, LLC:          QUINN EMANUEL URQUHART & SULLIVAN
10                             865 S. Figueroa Street, 10th Floor
                               Los Angeles, California 90017
11
     For McKesson Specialty    Jason Angelo, Esquire
12   Arizona Inc.:             REED SMITH LLP
                               1201 Market Street, Suite 1500
13                             Wilmington, Delaware 19801

14                             - and -

15                             Jeffrey Garfinkle, Esquire
                               BUCHALTER LAW FIRM
16                             18400 Von Karman Avenue, Suite 800
                               Irvine, California 92612
17

18

19

20

21

22

23

24

25
```

Appendix A281

Case 1:18-cv-01873-GEG-5 Document 16 Filed 01/30/19 Page 285 of 375 PageID #: 381
Case 18-10518-KG    Doc 804    Filed 10/25/18    Page 3 of 68

3

1                                    INDEX

2                                                                PAGE

3
    #5)  McKesson's Motion for an Order Determining That McKesson is
4   Entitled to The Disputed Funds (D.I. 653, filed 7/30/18

5
    **ARGUMENT:**                                            **4 – 66**
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:18-cv-01873-CFC-Document 16-5 Filed 01/30/19 Page 286 of 375 PageID #: 382
Case 18-10518-KG    Doc 804    Filed 10/25/18    Page 4 of 68

4

 1           (Proceedings commence at 11:04 a.m.)

 2           (Call to order of the Court)

 3               THE COURT:  Good morning everyone.  Thank you.

 4    You may be seated.  We've got an interesting argument ahead

 5    of us don't we, Mr. Remming?

 6               MR. REMMING:  We do.

 7               THE COURT:  Good morning.

 8               MR. REMMING:  Good morning, Your Honor; Andrew

 9    Remming for the Company.

10               THE COURT:  Yes, sir.

11               MR. REMMING:  It's a pleasure to be in front of

12    Your Honor.

13               THE COURT:  Good to have you here.

14               MR. REMMING:  Thank you.

15               We are working off of the agenda that we filed at

16    docket item 794.

17               THE COURT:  Yes.

18               MR. REMMING:  There are five items on that agenda.

19    The first two are omnibus claim objections and Your Honor

20    previously entered orders on those.  We thank you for that.

21               THE COURT:  That's right.

22               MR. REMMING:  The second two items are fee

23    application matters and Your Honor also entered orders on

24    those two.  On behalf of all the retained professionals I

25    thank you for your consideration.

Case 1:18-cv-01873-GFC-Document 16 Filed 01/30/19 Page 287 of 375 PageID #: 383
Case 18-10518-KG Doc 804 Filed 10/25/18 Page 9 of 68

5

```
 1              THE COURT:  Absolutely.  I did review them
 2    carefully and I reached the conclusions that I did.
 3              MR. REMMING:  Thank you, Your Honor.
 4              THE COURT:  Yes.
 5              MR. REMMING:  The fifth item is being handled by
 6    conflict's counsel and I'll cede the podium.
 7              THE COURT:  All right.  Thank you, Mr. Remming.
 8              MR. REMMING:  Thank you.
 9              THE COURT:  Mr. Garfinkle, good morning.
10              MR. ANGELO:  Quickly, Your Honor.  Good morning.
11              THE COURT:  Yes.  Good morning.
12              MR. ANGELO:  It's a pleasure to be in front of
13    you.  Jason Angelo of Reed Smith --
14              THE COURT:  Yes, sir.
15              MR. ANGELO:  -- and Mr. Jeffrey Garfinkle.  I will
16    cede the podium to him.
17              THE COURT:  Thank you.  Good to see you.
18              Mr. Garfinkle, you're back.
19              MR. GARFINKLE:  I am, Your Honor.  It's a pleasure
20    to be back.
21              THE COURT:  Good to have you back.
22              MR. GARFINKLE:  Thank you.  Jeff Garfinkle,
23    Buchalter, for McKesson and McKesson Specialty Arizona.
24              THE COURT:  Yes.
25              MR. GARFINKLE:  Your Honor, I know the court is
```

Appendix A284

Case 1:18-cv-01873-GFC Document 16 Filed 01/30/19 Page 288 of 375 PageID #: 384
Case 18-10518-KG Doc 804 Filed 10/25/18 Page 6 of 68

6

1   familiar with the briefs so I --

2           THE COURT:  Yes, I've read them.

3           MR. GARFINKLE:  -- won't belabor the facts.  I

4   think the court is familiar the debtor is holding roughly 6.9

5   million.  This motion involves those funds.

6           THE COURT:  I don't think there's much dispute on

7   the facts, is there?

8           MR. GARFINKLE:  No.

9           THE COURT:  No.

10          MR. GARFINKLE:  Other than whether McKesson

11  Specialty Arizona is a third-party beneficiary of the

12  distribution agreement.  On that point I'd just like to just

13  point out one additional item that wasn't specifically

14  referenced in the brief.

15          THE COURT:  Okay.

16          MR. GARFINKLE:  Attached to the declaration of

17  Thomas Lynch are the agreements.  They were filed under seal.

18          THE COURT:  Yes.

19          MR. GARFINKLE:  And in those agreements, one is

20  the core distribution agreement and the other is the

21  marketing of the loyalty agreement.  I want to turn to the

22  core distribution agreement just to point out one item so the

23  court is aware of it.

24          THE COURT:  Okay.

25          MR. GARFINKLE:  In Section 7 of the core

1  distribution agreement it is the section titled "General."

2  And throughout the argument there are three relevant portions

3  of that section of the agreement.  Number one is the choice

4  of law.

5          THE COURT:  Yes.

6          MR. GARFINKLE:  We have a California debtor, based

7  in San Diego, contracting with McKesson Corporation, based in

8  San Francisco, and they chose California law to govern their

9  contract.

10          THE COURT:  Yes.

11          MR. GARFINKLE:  That is in Section 7(b).

12          Interestingly, in 7(g), which is not really

13  addressed in the brief, it is certainly part of the record,

14  and I'll read it for the record.

15          "In the event manufacturer, Orexigen, requires

16          services, i.e. distribution, pharmacy, marketing

17          or logistics that McKesson Specialty can provide,

18          McKesson Specialty will be given the opportunity

19          to bid on providing those services to Orexigen at

20          the time they may be put out for bid along with

21          any other competitors that Orexigen so choose."

22          Okay.  So, basically, McKesson had the right to

23  bid for logistics.  It's a pharmacy manufacturer.  As the

24  court may recall with Cardinal, Cardinal was doing their

25  logistics.  It's a very interesting business and industry as

1    the court has witnessed.  I think it's the first pharma case

2    that the court has had in my recollection, but Cardinal was

3    providing logistics; meaning that they provided the packaging

4    and getting the product to McKesson at its distribution

5    centers.  So, they were providing services, but McKesson was

6    providing the marketing services.

7                THE COURT:  Yes.

8                MR. GARFINKLE:  Basically, the coupons which

9    doctors would -- Orexigen would hand-out to patients to,

10   otherwise, induce them to take Contrave.

11               Lastly, is the section of the contract which is at

12   issue here, is Section (i) and that is the section which

13   allows McKesson or its affiliates to setoff, recoup or apply.

14   Basically, a netting at some point.

15               Now, I am quite familiar with all the case law in

16   this circuit and elsewhere --

17               THE COURT:  SemCrude, Lehman Brothers; yes.

18               MR. GARFINKLE:  I was not involved in the

19   arguments in any of them.

20               THE COURT:  Okay.

21               MR. GARFINKLE:  I did not have a chance on behalf

22   of McKesson or any of my other clients to suggest that the

23   analytical framework that those courts employed was

24   inconsistent with the Supreme Court's teachings in Butner and

25   Rowley, and I believe they are for the reasons that we put in

Appendix A287

Case 1:18-cv-01873-CFC Document 16-2 Filed 01/30/19 Page 291 of 375 PageID #: 387
Case 18-10518-KG Doc 804 Filed 10/25/18 Page 9 of 68

9

1  our briefs that the court, as dictated by Butner and Rowley

2  must undertake a State law analysis.  That is consistent with

3  the definition of mutuality which almost all the courts

4  including the Garden Ridge case and others within this

5  district say to determine mutuality we look to State law.

6           So, let's throw-out this hypothetical to the

7  court.  Let's say tomorrow the California Legislature defines

8  mutuality in a parent corporate setting -- in the corporate

9  setting to include all affiliates.  We define mutuality in

10  that sense.

11           THE COURT:  Yes.

12           MR. GARFINKLE:  Then the court would be under

13  Butner and Rowley, and would be bound by that determination

14  in our view.

15           Now, the Supreme Court, mostly in diversity cases,

16  has instructed lower courts when they are required to

17  interpret State law to do a predictive analysis.  Predict how

18  the State Court would, otherwise, rule on the analysis.  I'm

19  not going to belabor the court and burden the court with all

20  the case law; it's certainly easily obtainable as to the

21  standards, but the starting point in that predictive analysis

22  is the state's highest court.

23           THE COURT:  Right.

24           MR. GARFINKLE:  In this case the California

25  Supreme Court.  Interestingly, I can't speak to any other

Appendix A288

1   state beyond California, California has actually -- the

2   Supreme Court has addressed this issue, albeit in an

3   insurance liquidation, modeled after the 1898 Act.  And they

4   addressed the question of whether affiliated corporations

5   could set-off in the absence of a written agreement or some

6   sort of agreement that allows the netting, or mutual setoff

7   or whatever you want to call it.

8           The Supreme Court in California in the <u>Prudential</u>

9   <u>Reinsurance</u> case made clear in the absence of a written

10  agreement you can't do it, but if there is an agreement, in

11  the limited situation of affiliated corporations, then you

12  can.

13          THE COURT:  Isn't that dicta?

14          MR. GARFINKLE:  It is dicta, but for a predictive

15  analysis it's the only guidance the court has as to how a

16  California Court would rule on this.  So, I would suggest to

17  the court that even though it is dicta under the standards

18  the Supreme Court has done for predictive decision-making by

19  the Trial Courts as to State law that the court must abide by

20  that.

21          Generally, when we're looking at predictive

22  analysis of how a State Court would rule we start with the

23  Supreme Court, and then you go to the intermediate level

24  Appellate Courts and then to other State Courts.  That's the

25  guidance that the Supreme Court has had.

1    At this point the only case it provided the court

2  and the only case that we're aware of is the <u>Prudential</u>

3  <u>Reinsurance</u> case.  So, at this point, in light of that

4  guidance by the California Supreme Court, the analytics are

5  that if there is an agreement among the parties, which

6  includes a parent and subsidiary corporation to allow for the

7  setoff then there is mutuality.

8    So, once you get to that point there is mutuality

9  then this becomes a very simple issue.  We have a contract,

10  we have a payable at 6.9 million against which McKesson

11  Specialty Arizona is owed well in excess of that; 8.5

12  roughly.

13    THE COURT:  All right.

14    MR. GARFINKLE:  So, that money goes to McKesson.

15  McKesson can keep that money and however they do it

16  internally at accounting can drop it down to a subsidiary

17  through an internal accounting process.

18    Now, when we look at <u>SemCrude</u>, when we look at

19  <u>American Home Mortgage</u>, when we look at <u>Lehman Brothers</u> you

20  will not see any reference whatsoever to any State law.

21    THE COURT:  That's right.

22    MR. GARFINKLE:  None.  It's as if they make this

23  pronouncement we look to mutuality to determine State law and

24  then never do it.  They never engage in the analysis that

25  <u>Butner</u> and <u>Rowley</u> require.  And once you engage in that

Case 1:18-cv-01873-CFC Document 16-1 Filed 01/30/19 Page 294 of 375 PageID #: 390
Case 18-10519-KG Doc 804 Filed 10/25/18 Page 12 of 68

12

1   analysis then in this limited case McKesson prevails.  Its

2   entitled to the 6.9 million just as it would have been

3   outside of bankruptcy.

4           On that point I want to emphasize something and

5   almost concede a point.  At the end of the day the other

6   creditors of this estate aren't getting that money.  The only

7   money is going to Baupost and the lenders.  Who by the way,

8   Baupost is one of McKesson's -- this is all public record.

9   Baupost just happens to be one of McKesson's largest

10  shareholders through an affiliate.  So, it's kind of an

11  interesting dynamic here with Baupost, but anyway.

12          If McKesson gets the 6.9 million we concede that

13  Baupost and the lenders can still sue McKesson under whatever

14  theory of conversion or whatever theory in State Court or

15  Federal Court that they want to do outside of bankruptcy.

16  You improperly got that money, you shouldn't have set it off.

17  We have senior rights vis-à-vis that money.  McKesson

18  concedes that they have all those rights.  Those rights

19  should be preserved and if they want to go prosecute McKesson

20  in some sort of conversion action or other lien priority

21  dispute outside of bankruptcy they are free to do so.

22          We think we will prevail under 9404.  If Baupost

23  wanted to underwrite this loan and fully aware that the

24  debtor only had three primary vendors -- buyers.  They

25  represent 90 percent of their revenue source.  They were

Case 1:18-cv-01873-CFC Document 16 Filed 01/30/19 Page 295 of 375 PageID #: 391
Case 18-10518-KG Doc 804 Filed 10/25/18 Page 13 of 68

13

1   fully aware of these contracts.  They were fully aware of the

2   setoff rights or should have been.  And if they wanted

3   McKesson to waive those rights, or Cardinal or

4   AmerisourceBergen to waive those rights -- again, as I

5   mentioned, it's part of the record in the bankruptcy case.

6   Cardinal is providing logistic services and was owed a

7   considerable amount of money at the outset of this case.

8   This was an issue that they had as well.

9           Certainly anyone lending to a pharma company,

10  doing asset based lending, is fully aware of the nature of

11  this industry and how the wholesalers, McKesson, Cardinal and

12  AmerisourceBergen, have multiple relationships with the

13  pharma companies and there's always a netting going on at

14  multiple different levels both within the contract itself.

15          By way of example McKesson uses outside vendors to

16  deliver products and they can pass those products through to

17  services.  They use internal accounting processes.  All that

18  is happening on a daily and hourly basis under these

19  contracts. And if the lenders did not want that netting to

20  occur then they could have asked for that waiver consistent

21  with 9404.  I don't know how McKesson would have reacted if

22  that request had been made, but it was never made and

23  McKesson never waived its rights under 9404 and its defenses.

24          I think I've addressed most of the points.  I'm

25  happy to address one -- let me point out one other thing.

 1  When we look at this there are two statutes at play here.

 2              THE COURT:  Yes.

 3              MR. GARFINKLE:  We have 553 --

 4              THE COURT:  Right.

 5              MR. GARFINKLE:  -- which we've talked about and

 6  506(a).  Those are the only two statutes in the bankruptcy

 7  code that contain the word setoff.  506(a) says it is a --

 8  you have a secured claim for the amount of your setoff right

 9  subject to 553.

10              THE COURT:  Right.

11              MR. GARFINKLE:  So, it's a secured claim.  Again,

12  we go back to the circular issue that once you have a secured

13  claim, and you determine the amount of that secured claim or

14  the extent of that secured claim you then put yourself within

15  Butner and Rowley and that whole Supreme Court analytical

16  framework that is required.  That is applied with the same

17  force to 553.

18              Again, 553, as we pointed out very aptly in our

19  reply brief, does not contain any express provisions that

20  have now found their way into the rulings of SemCrude, this

21  whole doctrine of somehow that setoff under the bankruptcy

22  code is judicially created and is not found within the

23  statute.  There are lots of provisions of the bankruptcy code

24  which give parties preferred rights.

25              The Supreme Court in Butner and Rowley continue

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 297 of 375 PageID #: 393
Case 18-10519-KG Doc 804 Filed 10/23/18 Page 15 of 58

15

1   that recognition by saying that unless it's expressly set

2   forth in the bankrutpcy code that all State law rights will

3   exist in bankrutpcy.  Nothing in the language of 553 changes

4   that.  So, all those words about what's expressly there we

5   challenge all the parties, I have copies of 553 with me, show

6   me where in that statute that that doctrine is set forth. It

7   doesn't exist.

8          So, in the absence of express language we're back

9   to <u>Rowley</u> and <u>Butner</u> and the analytical framework to apply

10  State law and the <u>Prudential Reinsurance</u> case.  Again, that

11  is the only case that's on point.  It's the only predictive

12  analysis of how a California Court would rule on this issue.

13  We would suggest to the court that it is required to follow

14  that decision.

15          THE COURT:  So, Mr. Garfinkle, your point is that

16  if the courts in <u>SemCrude</u> and <u>Lehman Brothers</u> had properly

17  decided the case, if you had been there arguing those cases,

18  that the court would have come out perhaps with a different

19  result?

20          MR. GARFINKLE:  I'd have to look at the State law

21  --

22          THE COURT:  That's right.

23          MR. GARFINKLE:  -- of those dates for which we

24  don't have any guidance from.  In fact, when I looked at

25  <u>SemCrude</u> and all of the cases that are widely cited,

1  <u>SemCrude</u>, <u>American Home</u>, I couldn't even find which state

2  would be applied.

3          THE COURT:  There were various cases in <u>SemCrude</u>.

4          MR. GARFINKLE:  I understand, but I couldn't find

5  -- <u>SemCrude</u> was, I think that was Chevron.  I don't know what

6  choice of law was in their contracts.  I just don't know.

7          Here we are clear, we have California law.  None

8  of the cases that we were able to find addressed California

9  law.  In fact, when I looked at the 553 Case Law in

10  triangular setoff, what is called triangular setoff --

11          THE COURT:  Yes.

12          MR. GARFINKLE:  -- there's not a case that even

13  cross-references <u>Butner</u> or <u>Rowley</u>.

14          THE COURT:  Right.

15          MR. GARFINKLE:  I'm curious to know why that

16  argument was never made by somebody, but it's always been

17  there since the Supreme Court issued <u>Butner</u> several decades

18  ago, but I wasn't there, I didn't get a chance to argue it

19  and there's no controlling authority within the Third Circuit

20  that says one way or the other.  So, I would suggest in the

21  absence of controlling Third Circuit Law the court has to

22  apply the Supreme Court's requirements and tests as set forth

23  in <u>Butner</u> and <u>Rowley</u>.

24          THE COURT:  Okay.  All right.

25          MR. GARFINKLE:  I will answer any other questions

Appendix A295

Case 1:18-cv-01873-CFC   Document 16-0   Filed 01/30/19   Page 299 of 375 PageID #: 395
Case 18-10512-KG   Doc 804   Filed 10/25/18   Page 17 of 68

17

1   the court may have.

2         THE COURT:  No.  Thank you, Mr. Garfinkle.  Thank

3   you for your argument.  And the briefing was very fine.

4         MR. GARFINKLE:  Yes.  Thank you.

5         THE COURT:  Good morning.

6         MS. MUMFORD:  Good morning, Your Honor; Kerri

7   Mumford from Landis Rath & Cobb.  Your Honor, we're special

8   counsel to the debtors.

9         THE COURT:  Yes.

10         MS. MUMFORD:  Your Honor, the issue before you is,

11   frankly, very straight-forward.  Can you contract around the

12   mutuality requirement of the bankruptcy code?  And there is

13   express language in the bankrutcy code that says no.  You

14   don't need to break new law here, Your Honor.  Several

15   courts, including those in this district, have looked at this

16   same issue raised by the movants and concluded after

17   extensive and thorough analysis that Bankruptcy Code Section

18   553 does not have a triangular setoff contractual exception.

19         Judge Farnan says it quite clearly,

20         "The mutuality requirement required by Section 553

21         cannot be supplied by a multi-party agreement

22         contemplating a triangular setoff."

23         Your Honor, what's not straight-forward here is

24   the convoluted arguments McKesson is raising in front of Your

25   Honor to steer away from this controlling law.  Your Honor,

1   they suggested in their briefs that,

2               "The resolution of the issues raised in this

3               motion has nothing to do with the debtor, the

4               bankruptcy code, the terms and conditions under

5               the DIP facility provided to the lenders or the

6               terms of the debtor of the sales assets."

7               That's in their motion at Paragraph 7.

8               THE COURT:  Yes.

9               MS. MUMFORD:  Your Honor, they're saying that this

10  has nothing to do with the bankruptcy code or the debtor.

11  The question before Your Honor is whether McKesson, who owes

12  the debtor in excess of $6 million dollars, can set-off its

13  subsidiary alleged claim against the debtor.  The only way

14  they can set that off is under Section 553 of the Bankruptcy

15  Code.  Your Honor, the analysis begins and ends with Section

16  553 of the Bankruptcy Code.

17              Your Honor, they don't address this in any

18  meaningful way other then what they just said is that these

19  judges got it wrong.  Your Honor, they did not get it wrong.

20              Your Honor, you are correct that the facts are not

21  disputed, but I do just want to highlight them because as I

22  go through my analysis I do think that they are important to

23  distinguish.

24              THE COURT:  Okay.

25              MS. MUMFORD:  Your Honor, as we all agree, there's

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 301 of 375 PageID #: 397
Case 18-10518-KG   Doc 804   Filed 10/25/18   Page 19 of 68

19

1  a distribution agreement.  That agreement is between McKesson

2  and the debtor.

3            THE COURT:  Right.

4            MS. MUMFORD:  Your Honor, in that agreement it

5  gives the right of MPRS to bid to provide the loyalty script

6  services.  It does require it.  It does not say that they are

7  automatically entitled to it.  And six weeks after they

8  entered into that distribution agreement the debtor and its

9  McKesson Patient Relation Services, a business unit of

10  McKesson Specialty Arizona, counsel referred to it as

11  McKesson Specialty Arizona, I refer to it as MPRS, entered

12  into that rebate program which we refer to as the loyalty

13  script.  McKesson has agreed that MPRS is a separate legal

14  entity from McKesson.  That is in their Beazley declaration

15  at Paragraph 1.

16            Your Honor, McKesson is not a creditor of the

17  debtor.  MPRS has asserted a claim in this case, Your Honor,

18  but they provided Your Honor with no factual support in

19  support of that claim.  When the objectors raised this it was

20  not raised either in their reply today or in front of Your

21  Honor.

22            Your Honor, it is McKesson who is seeking to set

23  off MPRS's alleged claim against the debtor.  None of that is

24  disputed.

25            THE COURT:  A non-creditor.

Appendix A298

Case 1:18-cv-01873-CFC  Document 16-0  Filed 01/30/19  Page 302 of 375  PageID #: 398
Case 18-10512-KG   Doc 804   Filed 10/25/18   Page 20 of 58

20

1            MS. MUMFORD:  A non-creditor.

2            Your Honor, so I think I was challenged and so I

3    will go directly to Section 553 and I'll point Your Honor to

4    the express language that supports our argument.

5            THE COURT:  All right.

6            MS. MUMFORD:  Your Honor, Section 553 states, and

7    I'll quote,

8                    "This title does not affect any right of a

9                    creditor to offset a mutual debt owing by such

10                   creditor to the debtor that arose before the

11                   commencement of the case under this title against

12                   a claim of such creditor against the debtor that

13                   arose before the commencement of this case."

14           Again, Your Honor, McKesson, non-creditor, seeking

15   to set off MPRS's alleged claim.

16           THE COURT:  Yes.

17           MS. MUMFORD:  There is no mutual debt, Your Honor.

18   The MPRS claim arises under the loyalty script agreement.

19   McKesson's debtor owes McKesson under the distribution

20   agreement.  Those debts aren't mutual.

21           So, how does McKesson try to get around this

22   express language, Your Honor.  First, they say it's not

23   express.  It is.  Your Honor, I think we can all agree that

24   the language that they're citing to, including Garden Ridge,

25   Garden Ridge actually says, you know, yes they take one quote

1  and it says you look to State law to determine mutuality, but

2  the fact that the courts look to mutuality is because you

3  have to have a setoff right under State law to begin the

4  analysis.  I don't think any of the parties dispute that.  I

5  don't think Your Honor disputes that.

6          THE COURT:  No.

7          MS. MUMFORD:  That is not the end of the analysis.

8  That is why <u>SemCrude</u> doesn't talk about it, that's why

9  <u>American Home Mortgage</u> doesn't talk about it, but, Your

10 Honor, I will get there in a moment.  <u>Lehman Brothers</u>

11 directly talks about it and they actually argue that New York

12 State Law applies.

13         Your Honor, what McKesson is actually asking you

14 to do is read out express provisions of the bankrutpcy code.

15 They suggest 553 is,

16         "Absolutely silent on the impact it may have on

17         other equitable offset and application rights."

18         That is reply Paragraph 3.  And argues to Your

19 Honor that,

20      `    "Section 553's restrictions on setoff should be

21         limited to those integrating setoff in the context

22         of avoidance actions, i.e. only those provisions

23         in (a)(1) through (a)(3)."

24         Your Honor, they then ask Your Honor, as they

25 suggested prior, Your Honor, that the cases that are directly

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/18 Page 304 of 375 PageID #: 400
Case 18-10512-KG Doc 804 Filed 10/23/18 Page 22 of 68

22

1   on point,

2           "Do not stand-up to scrutiny."

3           And this court shall rule that,

4           "Title 9 does not affect any offset enforceable

5           under applicable State law including the right of

6           a creditor as long as both obligations are

7           prepetition."

8           Your Honor, I certainly get why McKesson is

9   arguing that.  I certainly understand why they want that to

10  be the fact.  They want Your Honor to strip these provisions

11  of the bankruptcy code but that's not what the code says.

12  Sections (a)(1) through (3) and the prepetition requirement

13  are not the only exceptions in 553.  It requires the right of

14  a creditor to offset to be respect the mutual debt owed to

15  the debtor by such creditor.

16          Your Honor, Judge Shannon even noted that the

17  precise language here, the terminology of creditor and mutual

18  debt are far more precise then you see in other provisions of

19  the code.  So, what McKesson is asking Your Honor to do is

20  just strip the language, creditor and mutual debt out of the

21  code all together based on State contractual law.

22          Your Honor, I would just propose where does that

23  end?  Can you contract around the prepetition requirement?

24  Can you contract around the priority scheme and the code all

25  together?  Of course not, Your Honor, and that's why you have

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 305 of 375 PageID #: 401
Case 18-10512-KG Doc 804 Filed 10/23/18 Page 23 of 58

23

1  this compelling State arguments to the contrary.

2          Your Honor, I'd be happy to dive into the analysis

3  of the code and the analysis that Judge Sontchi and Judge

4  Peck did with respect to there's a contractual exception, but

5  I think that's been fully briefed.

6          THE COURT:  It has, yes.

7          MS. MUMFORD:  And, Your Honor, I think we say in

8  our brief, but I do want to note that it's not just those

9  three courts.  Several courts have spoken on this, Your

10 Honor; the Fifth Circuit, the Seventh Circuit, the Ninth

11 Circuit BAP, Judge Walter of the Southern District of Ohio,

12 Judge Williams of the Northern District of Ohio, Judge

13 Altenburg Central District of Illinois, Judge Dreier District

14 of Minnesota.  All of those courts and judges have held that

15 the mutuality requirement required by Section 553 cannot be

16 supplied by a multi-party agreement contemplating a

17 triangular setoff.

18          THE COURT:  But none of those courts address the

19 argument that Mr. Garfinkle has made, is that right?  The

20 application of Butner to this matter or if it applies.

21          MS. MUMFORD:  Your Honor, they -- I will -- I

22 think I will quote to you directly from Lehman Brothers

23 because, yes, the same exact argument that McKesson is

24 raising here was raised there.

25          THE COURT:  Okay.

Appendix A302

Case 1:18-cv-01873-CFC  Document 16-0  Filed 01/30/19  Page 306 of 375 PageID #: 402
Case 18-10512-KG   Doc 804   Filed 10/25/18   Page 24 of 68

24

1          MS. MUMFORD:  Whether under New York State Law,

2   New York State Law permits a triangular setoff.  They argued

3   the same facts.  It's the same party scenario; parent

4   subsidiary seeking to set off against singular debtor.  Your

5   Honor, they don't address it because Butner doesn't apply

6   here.  Butner stands for the simple proposition that the

7   court looks to State law to determine property rights.

8          THE COURT:  Yes.

9          MS. MUMFORD:  What McKesson completely ignores,

10  Your Honor, is that Butner also says that Congress has the

11  ability to act.  If Congress did not exercise its power to,

12          "Fashion any such rule."

13          Your Honor, has a rule here; its Bankruptcy Code

14  Section 553 and the express provisions regarding a

15  creditor/debtor relationship.

16          Your Honor, like I said, Lehman Brothers is, I

17  think, particularly instructive to Your Honor and it

18  addresses the State law issue that Your Honor has questioned.

19  Your Honor, this is 458 B.R., Pages 140 to 141.  Your Honor,

20  according to -- this is all quote.

21          "According to UBS the debts between LBI and UBS

22           securities should be viewed as mutual because of

23           the express provision allowing UBS to offset

24           amounts owed to its affiliate, notwithstanding the

25           fact that this affiliate is not a named party to

Case 1:18-cv-01873-CFC Document 16-6 Filed 01/30/19 Page 307 of 375 PageID #: 403
Case 18-10518-KG Doc 804 Filed 10/25/18 Page 25 of 68

25

1       the agreement.  The theory is that the contract

2       supplies a required mutuality by collecting all

3       affiliates under the same corporate umbrella and

4       treating them as if they were a single

5       counterparty.  This attempt to override the

6       independent status of UBS Securities disregards a

7       consistent pattern of authority describing that

8       even where a setoff right exists under applicable

9       State law the bankruptcy code imposes its own

10      strict requirements, namely that the debtor owes a

11      prepetition debt to the creditor, the creditor has

12      a prepetition claim against the debtor, and the

13      debtor and claim are mutual."

14      Your Honor, I will skip the internal quotations.

15  Going on,

16      "The argument advanced by UBS fails because the

17      allegedly mutual debts flunk the test that they

18      must be in the same right, and between the same

19      parties standing in the same capacity."

20      Your Honor, the same argument raised by McKesson,

21      "UBS also asserts that because it was free to

22      contract with LBI for triangular setoff rights

23      under New York law and because the parties

24      intended for these rights to be valid and

25      enforceable even in bankruptcy the court should

1          honor the agreement and allow the triangular

2          setoff.  This argument is neutralized by the plain

3          language of Section 553.  Section 553 expressly

4          preserves the right of a creditor to offset a

5          mutual debt owing by such creditor to the debtor

6          against a claim of such creditor against a debtor.

7          The clarity of this language is conclusive.

8          Mutuality, quite literally, is tied to the

9          identity of a particular creditor that owes an

10         offsetting debt.  The right is personal and there

11         simply is no ability to get around this language.

12         Parties may freely contract for triangular

13         setoffs, but not in derogation of these mandates

14         of the bankrutpcy code."

15      Your Honor, I don't think that we could be lucky

16   to find anymore language that is directly on point.  It is

17   the exact argument that McKesson is raising here.  Judge

18   Peck, just like Judge Sontchi, Judge Farnan, Judge Shannon

19   have all held that first step look to State law to determine

20   whether or not there is a right of setoff that includes

21   whether, you know, mutuality is implicit in setoff and then

22   you look to the express provisions of the bankruptc code.

23   McKesson is not a creditor here and, therefore, they cannot

24   assert a setoff right.

25      THE COURT:  Yes.

Case 1:18-cv-01873-CFC  Document 16-0  Filed 01/30/19  Page 309 of 375 PageID #: 405
Case 18-10512-KG   Doc 804   Filed 10/25/18   Page 27 of 68

27

1      MS. MUMFORD:  Your Honor, I already talked about

2   Butner.

3      Your Honor, with respect to Prudential McKesson is

4   now arguing that they agree that with the objectors that its

5   dicta.  That is certainly not what they argued in their

6   brief.  They repeatedly refer to it as controlling Supreme

7   Court precedent. It is dicta, Your Honor.  It does not stand

8   for the general proposition under State law that there is an

9   exception to the mutuality agreement that allows for parties

10  to contract and for a triangular setoff.

11     Your Honor, I think it's also important to note

12  that this language that their relying to, this dicta

13  language, it refers to Berger.

14     THE COURT:  Yes.

15     MS. MUMFORD:  And Berger is the case where when

16  you boil down, as Judge Shannon did in SemCrude, is the

17  genesis of this so-called contractual exception to mutuality.

18  And as Judge Shannon did in Berger and I won't do for Your

19  Honor because I know Your Honor is familiar with that

20  opinion, the cases that Berger relied on do not actually

21  stand for that proposition and there never was a finding of a

22  triangular setoff permitted under the bankruptcy code.

23     Your Honor, I also think its noteworthy since they

24  rely so heavily on Prudential now noting that its dicta is

25  that Prudential, itself, suggests that a parent cannot offset

1  a subsidiaries debt.  Then the dicta is where they say we

2  won't do so unless an agreement otherwise.

3          The Supreme Court of California is recognizing

4  that that is an exception, Your Honor; as an exception to the

5  general rule that you cannot have a triangular setoff.

6  McKesson doesn't argue that to Your Honor.  They just say

7  that under California State law it's allowed.  They haven't

8  cited one case that stands for that proposition.

9          Your Honor, it's quite extraordinary that they say

10  that all these judges, the Fifth Circuit, the Seventh

11  Circuit, the Ninth Circuit BAP all got it wrong and that they

12  have this right under California law that there's this

13  exception under California law, but yet haven't provided Your

14  Honor any guidance as to where Your Honor can rely on that

15  exception.

16          Your Honor, they didn't address it in their brief,

17  but I do think it's important for, at least, completeness of

18  the record to go through some of the other arguments that

19  McKesson raised in their motion.

20          THE COURT:  Fine.  Yes.

21          MS. MUMFORD:  Your Honor, they argue that there is

22  no federal interest regarding setoff in bankruptcy.  Again,

23  Your Honor, I think Judge Shannon says it better than I ever

24  could.

25          "One of the primary goals, if not the primary

Case 1:18-cv-01873-CFC Document 16-6 Filed 01/30/19 Page 311 of 375 PageID #: 407
Case 18-10512-KG Doc 304 Filed 10/25/18 Page 29 of 68

29

1          goal, of the code is to ensure that similarly

2          situated creditors are treated fairly and enjoy an

3          equality of distribution from a debtor absent a

4          compelling reason to depart from this principal.

5          By allowing parties to contract around the

6          mutuality of Section 553 one creditor or a handful

7          of creditors could unfairly obtain payment from a

8          debtor at the express of the debtor's other

9          creditors, thereby upsetting the priority scheme

10         of the code and reducing the amount available to

11         the distribution of all creditors.  Such a result

12         is clearly contrary to both the text of the code

13         and to the principal of equitable distribution

14         that lies in the heart of the code."

15    Your Honor, even if Butner was the sole case that

16 should apply here I think it's very clear that there is a

17 federal interest here.  The whole code is premised and the

18 tenant is equal treatment around creditors.  All of the case

19 law notes that setoff is an exception to that, an

20 extraordinary exception and it should be strictly construed.

21    Your Honor, again, third-party beneficiary. I'm

22 not sure I understood counsel's argument that pointing out to

23 the provision where it says that MPRS has the right to bid

24 for these services.  The debtor actually points that out in

25 their objection and says that that does not give it a right

1   for third-party status, beneficiary status.

2            Your Honor, this is a dispute of fact.  McKesson

3   hasn't provided any facts in front of Your Honor.  And

4   curiously note that the debtor -- I'll quote their reply.

5            "It is noticeable that the debtor does not offer

6            any evidence that MPRS was not an attentive third-

7            party beneficiary."

8            Of course, its McKesson's burden to do this not

9   ours.

10           THE COURT:  Right.

11           MS. MUMFORD:  And then they go onto note, Your

12   Honor, that this is a fact dispute that cannot be resolved at

13   this time.  Well, Your Honor, we're here.  It was their

14   argument that they're a third-party beneficiary.  This is the

15   time to prove that up.

16           Your Honor, the third-party beneficiary argument

17   is quite convoluted in itself.  Essentially, what McKesson is

18   arguing is that because MPRS is a third-party beneficiary

19   under the distribution agreement it could make a claim for a

20   breach under that distribution agreement that somehow

21   establishes McKesson's right to offset MPRS's alleged claim

22   under the loyalty scripts agreement.  Your Honor, that is

23   mental gymnastics that I'm not sure I follow, but there is

24   nothing, no case cited, that confers third-party beneficiary

25   status to get around the express mutuality requirements under

Appendix A309

Case 1:18-cv-01873-CFC Document 16 Filed 01/30/19 Page 313 of 375 PageID #: 409
Case 18-10512-KG Doc 804 Filed 10/25/18 Page 31 of 68

31

1   the bankruptcy code.

2         Your Honor, a couple of last quick points that

3   were raised in the motion.

4         THE COURT:  Yes.  Take your time, Ms. Mumford.

5         MS. MUMFORD:  McKesson argues that because

6   California law recognizes,

7         "A connection between parents and subsidiaries,"

8         McKesson and all of its affiliates should be

9         treated as a single counterparty for purposes of

10         settling their claims against the debtor."

11         Your Honor, that's in their motion in Paragraphs

12   39 and 40.

13         Again, Your Honor, I can certainly understand why

14   McKesson does not want to pay the debtor the money that it

15   owes, but this is one of the more shocking arguments raised

16   by McKesson.  All of its subsidiaries can and should be claps

17   under State law so they can exercise setoff rights.

18         THE COURT:  Am I correct that McKesson has paid

19   the debtor?

20         MR. GARFINKLE:  Yes, Your Honor.

21         THE COURT:  The $6.9 million dollars?

22         MR. GARFINKLE:  Can I answer that, Your Honor.

23         THE COURT:  How about when it's your turn.  I'll

24   give you another chance.

25         MS. MUMFORD:  Your Honor, it was paid and the

Case 1:18-cv-01873-CFC Document 16-9 Filed 01/30/19 Page 314 of 375 PageID #: 410
Case 18-10512-KG Doc 804 Filed 10/23/18 Page 32 of 68

32

1    money is being held from sale proceeds.

2              THE COURT:  Right.

3              MS. MUMFORD:  Such issue is being determined.

4              THE COURT:  Right.

5              MS. MUMFORD:  Your Honor, there is, obviously, no

6    California law, State Court law, law in this jurisdiction

7    that stands for the proposition that corporations should be

8    collapsed so that one party can set-off its subsidiaries

9    claim.

10              Your Honor, McKesson argues in their reply,

11              "The debtor has no standing to oppose this

12              motion."

13              I am confident that Your Honor will agree with me

14    that the debtor has standing here; although, I have to say,

15    Your Honor, I am curious as to whether you've ever heard that

16    argument.  I, myself, have not heard it in 17 years of

17    practice, but Section 1109 expressly gives the debtor

18    standing and we can be heard on this issue.

19              Lastly, Your Honor, I just wanted to address the

20    reply and the allegations in connection with recoupment.

21    Your Honor, McKesson suggests that it is "odd" that the

22    debtor addressed recoupment in its objection and "even more

23    curious that the lenders also argued the same point."

24              Your Honor, it's not odd or curious because the

25    motion, itself, defines McKesson's application rights as the

1   right to setoff, recoup and apply amounts under the

2   distribution agreement.  That's at motion Paragraph 4.  Your

3   Honor, they go again and expressly ask this court to enforce

4   the distribution agreement in accordance with its terms

5   seeking to,

6           "Allow each of the following remedies as each may

7           be applicable; offset, recoupment and contractual

8           obligation to claims."

9           Motion Paragraph 4.  Your Honor, they did waive

10  that argument in their replay and I wouldn't typically raise

11  it, Your Honor, but I do think raising it before Your Honor

12  and using the language odd and curious when the objectors

13  responded is indicative of what McKesson is doing here.  It's

14  their slate of hand arguments that have no application in law

15  of in fact, and all of these arguments should be rejected,

16  Your Honor.

17          McKesson doesn't get to pick and choose what

18  Sections of 553 apply.  _Butner_ does not require the court to

19  ignore the express language of Section 553 and, Your Honor,

20  even if it did it expressly states that if there is a federal

21  interest the court should look to bankruptcy law.

22          THE COURT:  Right.

23          MS. MUMFORD:  Your Honor, I don't think that there

24  is anyone here that will dispute that one of the paramount

25  interests in the bankruptcy code is similarly situated

Appendix A312

Case 1:18-cv-01873-CFC  Document 16-6  Filed 01/30/19  Page 316 of 375 PageID #: 412
Case 18-10512-KG  Doc 804  Filed 10/25/18  Page 34 of 68

34

1    creditors treated similarly.

2                  THE COURT:  It was a mouthful.

3                  MS. MUMFORD:  It was a mouthful.

4                  Your Honor, I respectfully submit, notwithstanding

5    McKesson's assertion that all Your Honor's colleagues got it

6    wrong those persuasive authorities is consistent with the

7    express language of the bankruptcy code and McKesson's motion

8    should be denied.

9                  THE COURT:  All right.

10                 MS. MUMFORD:  Does Your Honor have any questions?

11                 THE COURT:  Thank you, Ms. Mumford.  I don't have

12   any questions for you.  You made a very thorough argument.

13   Thank you.

14                 MS. MUMFORD:  Thank you, Your Honor.

15                 THE COURT:  Mr. Murphy, good morning still.

16                 MR. MURPHY:  It is good morning, Your Honor.

17   Happy to be here.

18                 THE COURT:  Good to have you here, Mr. Murphy.

19                 MR. MURPHY:  Just on that the court's -- well, for

20   the record Bennett Murphy of Quinn Emanuel for the secured

21   noteholders shown in our papers who are also DIP lenders or

22   were DIP lenders before they were repaid --

23                 THE COURT:  Yes.

24                 MR. MURPHY:  -- under the DIP facility and in both

25   contexts comprise a majority of the noteholders and lenders.

Appendix A313

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 317 of 375 PageID #: 413
Case 18-10512-KG Doc 804 Filed 10/23/18 Page 35 of 68

35

1        Your Honor, simply put the relief sought by

2   McKesson Corporation today is not available under Section

3   553.  Sometimes it is a good idea before an argument to

4   actually go back and read the entire statutory provision one

5   more time.  I did.  Here's what it says; this title,

6                "Does not affect any right of a creditor to offset

7                a mutual debt owing by such creditor that arose

8                before the commencement of the case under this

9                title against a claim of such creditor that arose

10               before the commencement of the case."

11       I'm going to start with the words that are easy to

12  wiz by which this title does not effect.  Then it goes onto

13  say what the right is that is not effected and erect some

14  limitations as to what right is not effected.  Well, the

15  negative proposition there is the right is effected unless

16  these criteria are all satisfied.

17       The bankruptcy code does effect State law rights

18  of creditors, how those rights are implemented, how they are

19  applied in the course of a restricting proceeding and it

20  isn't just Section 553.  When I get to the <u>Butner</u> case I'll

21  say more about that.

22       THE COURT:  Okay.

23       MR. MURPHY:  Moving past those first five words,

24  and I don't want to belabor the point, but some of those I

25  count six things that have to follow and I think they've got

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 318 of 375 PageID #: 414
Case 18-10512-KG Document 804 Filed 10/25/18 Page 36 of 68

36

1   three.  There is a party that's asserting a right to offset;

2   that's McKesson Corporation.

3           THE COURT:  Right.  Which is not a creditor.

4           MR. MURPHY:  There is a debt owing by that party,

5   the party who wishes to assert, and that's the $6.9 million

6   dollar debt.  By the way, Your Honor, the procedural setting

7   today was agreed to by the parties.

8           THE COURT:  Okay.

9           MR. MURPHY:  That is that the funds were paid by

10  McKesson, both sides reserving all of their rights including

11  rights that I'll address earlier under the -- later, rather,

12  under the DIP order.  Then when the closing happened the

13  noteholders and the company said, well, we'll keep you status

14  quo, basically, by setting aside the amount of money that you

15  say you have a setoff right too.

16          THE COURT:  Okay.

17          MR. MURPHY:  So, continuing.  So, we do have a

18  debt that's owed by McKesson.  There is a claim against which

19  McKesson wants to assert a right of setoff.  Here are their

20  problems.  Firstly, as noted, the party that's asserting the

21  right to setoff is not a creditor.  Secondly, that the right

22  of setoff is not based on a claim of such creditor, meaning

23  of McKesson.  It is based, instead, on a claim of another

24  entity; MPRS as we've called it.  And lastly, and this is the

25  last point, that it isn't mutual.  In other words, they fail

Case 1:18-cv-01873-CFC Document 16-1 Filed 01/30/19 Page 319 of 375 PageID #: 415
Case 18-10512-KG Doc 804 Filed 10/25/18 Page 37 of 58

37

1  before they even get to the mutual requirement that has been

2  addressed by the case law.

3  　　　　Now, the McKessons', and I use the plural, say

4  that none of this matters; an agreement reached beforehand.

5  Well, the ability to setoff under that agreement, which may

6  or may not be fully enforceable under State law, let's say it

7  is, is effected by Section 553 in the manner that we have

8  identified.  It is effected because the courts have

9  recognized throughout that the definition of setoff that was

10 used by Justice Scalia in the <u>Citizens Bank vs. Strumpf</u> case

11 is the one that ought to apply.  That case is the famous

12 administrative freeze case that says where there is a

13 perfectly clear right of setoff that as a bank, as a

14 depository institution, has a debt to the debtor on its

15 deposit account, but the debtor also has a debt going the

16 other way under a loan that that bank can freeze pending

17 request for relief from the automatic stay, preserving the

18 status quo; something that was in doubt before, ain't in

19 doubt now.

20 　　　　THE COURT:  That is a mutual.

21 　　　　MR. MURPHY:  Well that is exactly right.  And that

22 is how Justice Scalia defined what setoff is.

23 　　　　And here's the quote.

24 　　　　THE COURT:  Yes.

25 　　　　MR. MURPHY:  This is at 516 U.S. 18.

1           THE COURT:  Okay.

2           MR. MURPHY:  The decision but 16 (indiscernible).

3           THE COURT:  All right.

4           MR. MURPHY:  "Setoff allows entities that owe each

5    other money to apply their mutual debts against each other,

6    thereby avoiding the absurdity of making A pay B when B owes

7    A."

8           THE COURT:  Right.

9           MR. MURPHY:  Well, the McKesson's have a problem.

10   There's a party C that's intruded into this picture.

11          THE COURT:  Yes.

12          MR. MURPHY:  And for all they do to try to

13   overcome that problem, the fact is that it's the Scalia

14   definition that shows up precisely in the cases that reject

15   the triangular setoff theory where there's a contract.

16          A, B, B, A triangular, there's a -- that's not A

17   and B.  There's somebody else; therefore, it's a problem.

18   And, therefore, 553 does affect the right of setoff.  It

19   means you can't enforce it.

20          Now, I would submit that actually triangular

21   setoff is an oxymoron; that setoff by definition doesn't

22   involve a party C.  And that simply is the proposition that

23   the courts have recognized.

24          THE COURT:  That's right.

25

Case 1:18-cv-01873-CFC   Document 16-0   Filed 01/30/19   Page 321 of 375 PageID #: 417
Case 18-10510-KG   Doc 804   Filed 10/25/18   Page 39 of 68

39

1          MR. MURPHY:  And the rejection of this contractual

2   setoff notion has been uniform. And it's independent of, you

3   know, the fact that a setoff right, such as may exist under

4   state law, doesn't survive Section 553 unless you meet those

5   criteria is independent under the case law of whether there

6   is a contract between B and C that says, in this case, you

7   can use an affiliate's obligation.  It's independent of the

8   closeness of A and C in the corporate organization chart.

9   And it's independent of whether A might be a third-party

10  beneficiary of the agreement between B and C.

11         There's no law that says any of those things

12  change the result under 553 if the right of the claims right

13  of setoff is effective and, here, it's just not available

14  under Section 553.

15         THE COURT:  If Mr. Garfinkle is right and we don't

16  apply 553 based upon Butner, and we have this agreement in

17  place, doesn't that enforce his position?

18         MR. MURPHY:  Well let's address -- let me address

19  a few --

20         THE COURT:  And I didn't mean to interrupt your

21  argument.

22         MR. MURPHY:  I always called it Butner but your

23  Judge, so I want to call it Butner for the rest of my

24  argument.

25

1              THE COURT:  Butner, okay.  I'm sorry.  Butner is

2     fine.  Butner is fine.

3              MR. MURPHY:  Well, either way.

4              But flipping ahead to my discussion.  It's not a

5     setoff case.  But it's a very interesting one and I think it

6     actually undoes their argument completely.

7              THE COURT:  Okay.

8              MR. MURPHY:  This is an act -- this involves a

9     chapter Roman Numeral XI under the act.

10             THE COURT:  Right.

11             MR. MURPHY:  And I had to read this very

12    carefully, but apparently one could begin a case, file a

13    chapter Roman XI plan without being adjudicated a bankrupt,

14    but that would come later.

15             And, of course, now in our filing of the petition

16    is the adjudication.

17             THE COURT:  Right.

18             MR. MURPHY:  And there is a bankruptcy case

19    commenced.  But, here, there was a phase in which there was a

20    Chapter 11 plan filed, but the debtor hadn't been adjudicated

21    bankrupt.

22             What was at issue was the question of the rights

23    of a mortgagee and the rents that's earned on real property.

24    And before the debtor was adjudicated bankrupt, the

25    bankruptcy court had appointed an agent to collect the rent.

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 323 of 375 PageID #: 419
Case 18-10519-KG   Doc 804   Filed 10/23/18   Page 41 of 68

41

1          THE COURT:  Okay.

2          MR. MURPHY:  Now, it was state law there and it

3   still is in most states that a mortgagee's rights to rents

4   due require perfection, in some fashion, by possession,

5   typically by a receiver that the rights to rents, that's when

6   the receiver takes possession of the rent and that's when the

7   mortgagee's rights apply.

8          Now before the adjudication, as I mentioned, there

9   was an agent appointed. The bankruptcy court said that that

10  was enough.  And under North Carolina law, a bankruptcy court

11  appointed agent was the same thing as a receiver; hence,

12  later when the debtor was adjudicated all those rents were

13  part of the mortgagee's collateral.

14         District Court agreed.  Court of Appeal said, no.

15  Under North Carolina law, an agent is not the same as a

16  receiver.  Then it goes up to the Supreme Court.  And the

17  first thing that Justice Stevens says is, we are not going to

18  decide today whether the Court of Appeals correctly applied

19  North Carolina law.  That's not why we're here.

20         We're here because these other circuits, the

21  Seventh and, I'm going to say this carefully, the Third had

22  made a mistake and we're going to reconcile the law of the

23  circuits.  Here's the mistake that Justice Stevens said they

24  made.

25         THE COURT:  Yes.

Case 1:18-cv-01873-CFC Document 16-1 Filed 01/30/19 Page 324 of 375 PageID #: 420
Case 18-10512-KG Doc 804 Filed 10/23/18 Page 42 of 68

42

 1          MR. MURPHY:  Firstly, the act was silent.  Now,

 2  counsel, like Ms. Mumford, the act was silent as to this

 3  question of what kind of possession, if any, needed to be in

 4  place before rents became collateral.

 5          Those two circuits had said it doesn't matter that

 6  under a federal equitable principle, it would be unfair to

 7  require any possession to have taken place before

 8  adjudication because the stay is in place.  And, therefore,

 9  it's just not fair to say this important thing of whether a

10  stream of rents becomes collateral or not should depend on

11  something you're stayed from doing.

12          Okay.  Those circuits law was overturned by

13  Justice Stevens, holding not that the Bankruptcy Code or the

14  Bankruptcy Act, in that case, can't do this, but because

15  courts can't do it.  They can't apply an equitable general

16  principle to override the requirement of possession by

17  perfection -- I'm sorry; perfection by possession the stream

18  of rents.

19          That was the law.  In 1994, when the Bankruptcy

20  Code was amended, it was amended in Section 552(b)(2) to

21  provide that a stream of rents is collateral, regardless of

22  whether a state law requirement is of possession has been

23  satisfied.

24          THE COURT:  Okay.

25

Case 1:18-cv-01873-CFC  Document 16-0  Filed 01/30/19  Page 325 of 375 PageID #: 421
Case 18-10512-KG  Doc 804  Filed 10/25/18  Page 43 of 68

43

 1          MR. MURPHY:  In other words, the right is

 2    affected.  It's affected clearly by a federal statute.  Under

 3    McKesson, the McKesson's oral view of Butner, Section

 4    552(b)(2) is unenforceable as well.

 5          THE COURT:  Yes.

 6          MR. MURPHY:  But, of course, it's enforceable.

 7    And, of course, Section 553 is enforceable because whatever

 8    the state law rights are, there can be language in the

 9    Federal Bankruptcy Code that tells you, Your Honor, what you

10    should do with them.  And what every bankruptcy judge should

11    do with them.

12          And the rule under Section 553 has consistently

13    been recognized to have a federal limiting concept in it.

14    The federal limiting concept says if you want to have a right

15    to setoff that is not affected by the Bankruptcy Code, like

16    same as the Bankruptcy Code affects all these other rights,

17    and you want to have a right of setoff that's not affected by

18    the Bankruptcy Code, it's got to be mutual.  It's got to

19    involve a debt of the creditor who has the claim.

20          THE COURT:  Yes.

21          MR. MURPHY:  Those things have to be satisfied.

22          You know, there are two cases that are cited in

23    the moving papers with some, I would submit dicta that the

24    mutual element is a matter of -- we look to state law to find

25    out what that is as opposed to Justice Scalia.  And I don't

Case 1:18-cv-01873-CFC Document 16-6 Filed 01/30/19 Page 326 of 375 PageID #: 422
Case 18-10512-KG   Doc 804   Filed 10/25/18   Page 44 of 58

44

 1  think either of the courts actually said that.  I want to

 2  make that clear.

 3          One is <u>Gordon Ridge</u>.  This is where Judge Baxter,

 4  sitting in this district, that took me back.

 5          THE COURT:  Yes.  I remember Judge Baxter.

 6          MR. MURPHY:  Yes, sir.

 7          This case does not involve a contractual setoff

 8  right at all.  It had to do with whether two debtors, the

 9  open jaw was at that end of the relationship, not that there

10  were two entities, two McKesson's here, but two debtors.

11  Whether those debtors should be collapsed by reason of Texas

12  alter ego law.

13          And, in fact, Judge Baxter said the conditions for

14  Texas alter ego law aren't met so any -- that case is, you

15  know, easier to distinguish went the wrong from their

16  standpoint.

17          And, similarly, under <u>Sunset Aviation</u>, there was a

18  -- this is where Judge Walsh looked at the fact that two

19  debtors during the case had been substantively consolidated.

20  And, again, the open jaw was on the debtor's side.

21          And he concluded that you don't relate back

22  substantive consolidation to collapse a transaction and

23  create mutuality.  But neither of these has anything to do

24  with a contractual setoff.

25

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 327 of 375 PageID #: 423
Case 18-10512-KG Doc 804 Filed 10/25/18 Page 45 of 68

45

1          And, importantly, you know, when you have a party

2    such as McKesson just arguing so strongly that state law

3    applies and the bankruptcy, you think that they'd have some

4    state law for you.  They really don't.

5          Prudential --

6          THE COURT:  Yes, that's it.

7          MR. MURPHY:  Let me just -- it is different.  And

8    they've acknowledged it.  Let me read you the holding from

9    that case.  And this is 3 Cal.4th 1118 at 1143.

10         Conclusion:

11         "Once the commissioner" --

12         And that's the insurance commissioner of

13   California.  That's an elective position, by the way.

14         "declared Mission" --

15         That's the primary insurer --

16         -- "insolvent, Prudential Reinsurance" --

17         The reinsurer.

18         -- "had a legal statutory right to setoff unearned

19              premiums against the amount it owed Missions.  In

20              other words, the reinsure owes money in the

21              unearned premiums to setoff."

22         THE COURT:  Yes.

23         MR. MURPHY:  Here's the clincher.  The mere fact

24   that a liquidator was appointed did not impair or affect that

25   right.

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 328 of 375 PageID #: 424
Case 18-10512-KG Doc 804 Filed 10/23/18 Page 46 of 68

46

1    So, the fact that the primary insurer went into a

2    state insolvency proceeding didn't change the statutory right

3    and the regulatory scheme involving insurers and reinsurers.

4    Okay.  What has that got to do with an alleged triangular

5    setoff contract?

6           Simply put, nothing.

7           Now, when -- it's important to go back to the -- I

8    know there were three stipulators in the case.  I mentioned

9    the third one which was when the money from the proceeds were

10   of sale were set aside.  But the ones the preceded and

11   there's one with NPRS and there was one with McKesson.

12          The one with McKesson did represent a big benefit

13   to the estate.  And it was an important thing.  And my

14   clients were involved and they appreciated that McKesson

15   agreed to put the funds into the estate while reserving its

16   rights.

17          THE COURT:  Yes.

18          MR. MURPHY:  Cash flow in a bankruptcy case is

19   very important.

20          THE COURT:  Absolutely.

21          MR. MURPHY:  When the DIP facility was put in

22   place -- well, here's a question.

23          The reservation of rights by all parties was

24   complete.  And we have indicated in our papers, and there's

25   really not much response, a detailed response at all from

Case 1:18-cv-01873-CFC Document 16-1 Filed 01/30/19 Page 329 of 375 PageID #: 425
Case 18-10512-KG Doc 804 Filed 10/25/18 Page 47 of 68

47

1   McKesson that, in fact, under the terms of the DIP facility

2   the receivable that my clients lent against, the same

3   receivable, the $6.9 million which at the time of the DIP

4   facility hadn't been paid --

5            THE COURT:  That's right.

6            MR. MURPHY:  -- that receivable is granted as

7   collateral to my clients and the other DIP lenders, and it

8   was granted -- our clients were granted a first-priority lien

9   superior to any right of setoff.  And that is in Your Honor's

10  order.

11           That was done on full notice to McKesson.

12  McKesson had an opportunity to object, and they did not.

13  This isn't a gotcha at all.  Why was that there?

14           From a business standpoint, there was no assurance

15  that McKesson would ever pay $6.9 million dollars.  The DIP

16  facility that was agreed to had, in fact, interim

17  availability that was designed to cover the cash flow

18  shortage from McKesson.

19           As I mentioned, they're really important here.

20  They distributed a whole lot of the product.  And when you

21  distribute the product, that means the oxygen, the money that

22  makes this company survive, pay its employees, was McKesson's

23  money that they might withhold.  The DIP lender said if that

24  happens, we're going to make money available right up front

25  to cover the shortfall that you might have from McKesson.

Case 1:18-cv-01873-CFC  Document 16-1  Filed 01/30/19  Page 330 of 375 PageID #: 426
Case 18-10511-KG  Doc 804  Filed 10/25/18  Page 48 of 68

48

1          And, ultimately, the $35 million-dollar facility

2     was put in place to make sure that there would be adequate

3     cash for the entirety of the case.  Well, it was as bargain

4     for a right by the DIP lenders that McKesson's receivable

5     would be its collateral without regard to any setoff or

6     recoupment or defenses whatsoever.

7          Now, Your Honor, I've been in plenty of case where

8     -- in this building, many of them -- a DIP facility is

9     proposed and a party believes its setoff rights might be

10    affected, appears and objects.

11         THE COURT:  Yes.

12         MR. MURPHY:  And, you know, there would have been

13    maybe some work and maybe we would have had that 6.9 advance

14    then, you know, as a resolution of an objection to the DIP

15    facility.  And we might have advanced this whole process of

16    stipulation to keep the company alive and keep their rights

17    preserved.

18         But the reservation of rights was totaled.  There

19    was no objection to the DIP order.  It's a final order.  And

20    by its own language says the rights of the DIP lenders were

21    superior to McKesson's.

22         THE COURT:  Isn't that the answer, in your view,

23    to the issues involved here today?

24         MR. MURPHY:  Sure.  But it's good to have more

25    than one answer.

Case 1:18-cv-01873-CFC  Document 16-6  Filed 01/30/18  Page 331 of 375 PageID #: 427
Case 18-10512-KG  Doc 804  Filed 10/25/18  Page 49 of 68

49

1          THE COURT:  Sure.

2          MR. MURPHY:  And what I would suggest to the

3   meaning of this is that, you know, there's an opportunity to

4   stand up and be heard before this court always.

5          THE COURT:  Absolutely.

6          MR. MURPHY:  You are always available.

7          THE COURT:  Yes.

8          MR. MURPHY:  And if there had been a need to

9   reserve these rights that the rights would have been reserved

10  by a proper objection.

11         Unless we adjudicated -- there's that word again -

12  - unless we resolved all of the issues regarding setoff at

13  the DIP hearing, which I don't think we would have -- same as

14  we didn't at the sale hearing.  And we could have done that

15  too, right?

16         THE COURT:  Yes.

17         MR. MURPHY:  But here we are today.

18         But, look, I don't think that you need that.

19  Quite frankly, you need that an interpretation of the DIP

20  order.  You know, I think its crystal clear.  I don't know

21  how you get around it.  But the fact is that the clear

22  language of the Bankruptcy Code, whatever the order.  I think

23  the order is clear too.

24         But the Bankruptcy Code, Congress, same as it did

25

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 332 of 375 PageID #: 428
Case 18-10512-KG    Doc 804    Filed 10/25/18    Page 50 of 58

50

 1   with 552(b)(2) tells you that the claim right of setoff is
 2   affected by the Bankruptcy Code.  It's affected by being
 3   eliminated because the claimed right of setoff is not based
 4   on the mutual obligation where the debt is owed by the
 5   creditor who has the claim.  That's what 553 requires.
 6            And unless you meet the requirements, Federal law
 7   says that your setoff is not available.
 8            THE COURT:  Okay.
 9            MR. MURPHY:  With that, unless there are
10   questions.
11            THE COURT:  No, thank you, Mr. Murphy.  Thank you,
12   sir.
13            All right, yes.  Mr. Garfinkle.
14            MR. GARFINKLE:  Let me go in reverse order.
15            First, as to the DIP loan argument, Your Honor.
16            THE COURT:  Yes.
17            MR. GARFINKLE:  Mr. Murphy is not here
18   representing the DIP lender.  The DIP's been paid off as part
19   of the sale proceeds.
20            THE COURT:  Right.
21            MR. GARFINKLE:  We're dealing with the debtor's
22   prepetition secured lender who doesn't enjoy the protections
23   that were afforded the DIP lender.  So, all this argument
24   about the protections the DIP lender, it's a red herring.
25            And I go back to paragraph 55 of our reply, Judge

Case 1:18-cv-01873-CFC  Document 16-6  Filed 01/30/19  Page 333 of 375 PageID #: 429
Case 18-10512-KG   Doc 804   Filed 10/25/18   Page 51 of 68

51

1  Walrath's decision in <u>Reichhold</u> which follows McKesson's

2  victory at the Sixth Circuit in <u>Phar-Mor</u>, which I argued and

3  convinced them not to apply <u>Dairy Mart</u> and <u>Dana</u> as to what

4  reclamation and Judge Walrath finally applied it within this

5  District.

6          She made the note, once the DIP loan is paid,

7  poof, it no longer exists.  All the rights -- actual words in

8  her decision, poof -- all those rights no longer exist.

9          THE COURT:  That's right.  Yeah.

10          MR. GARFINKLE:  All this stuff about DIP loans and

11  setoff, waivers, red herring.  And we made that point in our

12  reply brief and it applied with equal force now -- poof.

13          The argument that was made -- and I want to go

14  back to the -- about 553.  First is an argument made that

15  McKesson is not a creditor.

16          Wrong -- dead wrong.

17          I direct the court's attention to the core

18  distribution agreement.  On the petition date, McKesson was a

19  creditor.  And I give the court the just recent agreement

20  which is in front of the court, part of the record.  There's

21  a fee schedule that talks about how pharmaceutical

22  distribution actually works and gets compensated.

23          McKesson buys the products.

24          THE COURT:  Yes.

25          MR. GARFINKLE:  But the manufacturer pays McKesson

Appendix A330

Case 1:18-cv-01873-CFC   Document 16-6   Filed 01/30/19   Page 334 of 375 PageID #: 430
Case 18-10511-KG   Doc 804   Filed 10/25/18   Page 52 of 68

52

1    to distribute that product.  And there's a fee schedule as

2    attached as Exhibit B to the core distribution agreement

3    which sets forth different fees that McKesson charges

4    Orexigen over time.

5              So, when the petition was filed the net amount,

6    the net amount was $6.9 million.  It was not just for

7    purchases, but there was a netting, even within that number.

8    And that's reflected in the first stipulation that was

9    entered into early in the case.

10             I'm not going to go into the entire fee schedule

11   on the record.  It's confidential.  But it's there.

12             THE COURT:  Right, right.

13             MR. GARFINKLE:  So, McKesson was a creditor.

14             Now, let's turn to 553 because that seems to be

15   the central focus of the argument.

16             553 has a preparatory clause, Except as otherwise

17   provided in this section and in sections 362 and 363, this

18   title does not affect.  Okay.  But it does not say -- it does

19   not say that other netting setoff or recoupment is prohibited

20   under the Bankruptcy Code.  All it says is what it does not

21   affect.

22             Now Congress could have written this statute much

23   differently. It could have said all setoffs are prohibited.

24   It could have said X, Y, Z setoffs are prohibited.  It

25   didn't.  Let's make that clear what this language says.

Case 1:18-cv-01873-CFC Document 16-6 Filed 01/30/19 Page 335 of 375 PageID #: 431
Case 18-10512-KG   Doc 804   Filed 10/25/18   Page 53 of 68

53

1        It says these aren't, but there's a whole subset

2   of other setoffs and other rights which aren't affected.  And

3   this turns into what are McKesson's and McKesson's Specialty

4   Arizona's property rights on the petition date.  What were

5   its rights on the petition date under Butner?

6        And I've heard a lot of discussion about how

7   Butner came to be, but we're still left with the language of

8   Butner which is quoted in our motion.

9        THE COURT:  Yes.

10        MR. GARFINKLE:  We quote it because it's so apt

11   and applicable and it's been cited in and applied almost

12   twenty times by the Third Circuit in decisions. And I can't

13   speak to how many bankruptcy -- we didn't go through all the

14   bankruptcy court decisions.

15        But we just said let's look at the Third Circuit

16   and how they applied the teachings of this.  Property

17   interest are created and defined by state law.  Unless some

18   federal interest requires a different result, there's no

19   reason why such interest should be analyzed differently

20   simply because interested parties involved in a bankruptcy

21   proceeding.

22        THE COURT:  Well isn't the federal interest the

23   distribution to creditors?

24        MR. GARFINKLE:  Possibly yes, but possibly no.

25   There's lots of situations where creditors are preferred in

Case 1:18-cv-01873-CFC Document 16-1 Filed 01/30/19 Page 336 of 375 PageID #: 432
Case 18-10518-KG Doc 804 Filed 10/25/18 Page 54 of 58

54

1  bankruptcy.  We have situations where contracts are assumed.

2  We have critical vendor motions.  We have -- there's a whole

3  host of issues that are temporal in nature where creditors

4  get benefits that are, otherwise, not set forth in the code.

5          But this is a property right that McKesson

6  enjoyed.  And when I say McKesson, McKesson's, McKesson and

7  its affiliates.

8          THE COURT:  Right.

9          MR. GARFINKLE:  Enjoyed pre-bankruptcy.

10          We contracted property rights.  Had this company

11  not gone into bankruptcy and defaulted on its distribution --

12  on its obligations under the royalty agreement, McKesson

13  would have netted.  That right exists both in the

14  distribution agreement and it exists in Section 3.4 of the

15  royalty agreement.  It's in both.  Both agreements had this

16  netting concept out there.  And this should not come as a

17  surprise to other creditors who are transacting with the

18  debtor.

19          They always knew as Mr. Murphy so aptly said when

20  they were negotiating the DIP loan, they knew that McKesson

21  was buying 40 percent of the debtor's product that had 40

22  percent of the receivables.  They knew McKesson was out there

23  and was going to have cost amounts that are going to be owed

24  including under the distribution agreement for distribution

25  services.  And they factored it into their borrowing

Case 1:18-cv-01873-CFC  Document 16-0  Filed 01/30/19  Page 337 of 375  PageID #: 433
Case 18-10512-KG  Doc 804  Filed 10/25/18  Page 55 of 58

55

1  calculations.  None of this comes as a surprise to the

2  creditors.

3        Now, at the end of the day, while we said the

4  debtor doesn't have standing here, at the end of the day, the

5  debtors not getting his money.  This money is going to the

6  lenders.  It's not going to the debtor and the other

7  creditors.  If there was some sort of sharing arrangement,

8  perhaps, that would apply.  But that's not the case here.

9        It's the lenders who are getting the windfall.

10  Let me be clear about that.  We strongly believe that 9404

11  gives us a protection, vis-à-vis, the lenders, should they

12  ever bring an action saying you improperly netted.

13        We had perfected first.  You knew of our

14  perfection, or constructively knew, and you couldn't do that.

15  And our response was no.  California law in Prudential

16  Reinsurance says we can.  And you're subject to that.

17        We had a contractual right.  You knew of our

18  contractual right. That's a property interest under 506(a),

19  it's under Butner, and we prevail in that scenario.

20        And, again, who's the loser here?  It's the lender

21  who is getting the same situation it was pre-bankruptcy that

22  it gets post-bankruptcy.  Otherwise, they're getting the

23  windfall of bankruptcy.  That's not fair to McKesson.

24        So, this question about equality of distribution

25  or things, it doesn't exist in this case.  Th lender has

Case 1:18-cv-01873-CFC Document 16-1 Filed 01/30/19 Page 338 of 375 PageID #: 434
Case 18-10512-KG Doc 804 Filed 10/25/18 Page 56 of 68

56

1    agreed to a carve-out.  It's on the record.  We cited the

2    transcript where they have agreed to a carve-out to pay in

3    this, otherwise, insolvent estate a fund to pay creditors.

4    That's done.  Done.  Everything else that comes out of this,

5    it's there's.

6          What we're suggesting to the court is that Butner

7    and Rowley, which wasn't cited by any of the parties, because

8    Rowley is subsequent to an act case.  Rowley was an

9    application of burdens of proof for tax claims in saying

10   we're going to look to state law and that we have Nobleman

11   following on that which the Chapter 13 bifurcation of an

12   under-secured mortgage, again applying the Butner principles

13   in a different context.

14         All these are McKesson's property interest.  And

15   those need to be preserved and protected.  And none of the

16   cases that are out there have addressed this situation.

17   None.

18         And I've read Lehman and I know Lehman applied to

19   New York law, but they didn't look at it from a property

20   interest standpoint under Butner.  And I think everyone

21   concedes that.  And that's the doctrine and where the court

22   needs to go in our opinion.

23         And, again 553 does not change that result.  It

24   does not articulate a federal -- using the words -- a federal

25   interest.  Because if there was a federal interest, Congress

1   would have written into 553 that prohibits these types of

2   transactions.

3           Certainly, the Seven Circuit's decision in, I

4   think, the Barger Steel case was well-known.  And although

5   Judge Sontchi has kind of dived down to suggest that that may

6   not have been the correct reading of that, certainly in 1964.

7   when that decision was issued.  It was fourteen years before

8   the Bankruptcy Code was enacted in 1978 and the drafts of the

9   Code could have written around that scenario had they wanted

10  to change 553 read differently, or put in a provision into

11  362 or 363 that would, otherwise, prohibit this property

12  right that McKesson enjoys.

13          So, with that, Your Honor, I'm happy to address

14  any other questions the court may have.

15          THE COURT:  I don't.  (inaudible)

16          MR. GARFINKLE:  I will say this because I did

17  mention this.  When I argued Phar-Mor, again, to the Sixth

18  Circuit, which is the Reichhold decision, I was faced with a

19  number of decisions out there -- Dana, Dairy Mart, which had

20  all held that the floating lien on inventory trumps the

21  reclamation right.

22          And the bankruptcy court said you're looking at

23  this wrong.  I wasn't involved in none of these decisions.

24  Let me give you a different analytical framework.

25          And, ultimately, the bankruptcy court in the Sixth

Appendix A336

Case 1:18-cv-01873-CFC Document 16 Filed 01/30/19 Page 340 of 375 PageID #: 436
Case 18-10518-KG    Doc 804    Filed 10/25/18    Page 58 of 58

58

1    Circuit agreed with me and Judge Walrath had the independence

2    to say, you know, the other courts they've looked at it, but

3    I'm going to look at it afresh.  I'm going to look at it

4    through a different lens.

5             And I hope the court will take this opportunity to

6    say that SemCrude, and a well-reasoned decision, but they may

7    not have been argued with the full extent of the law.  And

8    with that, McKesson rests, Your Honor.

9             THE COURT:  All right.

10            MR. GARFINKLE:  Let me -- I'm sorry; one other

11   thing about third-party beneficiary.

12            THE COURT:  Yes.

13            MR. GARFINKLE:  Because it was raised here.

14            Clearly, McKesson is a third-party beneficiary.

15   We provided the court actually, we thought it would be

16   helpful with the California model jury instructions about

17   third-party beneficiary law.  This is not a, per se,

18   convoluted argument.  This, again, goes to McKesson property

19   rights.

20            McKesson is a third-party beneficiary of the

21   contract.

22            THE COURT:  Right.

23            MR. GARFINKLE:  Outside of bankruptcy, it would

24   have been able to go into court, had there been demand by

25   Orexigen, to say pay us this money.  And McKesson actually

Appendix A337

1  would have had the right to go in and say no, no, no, no, no.

2          Both contracts have a netting.  Both contracts --

3  3.4, a royalty agreement; 7(i) of the core distribution

4  agreement.  We're a third-party beneficiary of the core

5  distribution agreement.  That's our property right.  The

6  money comes to us.  It's our money.

7          And that's the point we're getting at here in

8  terms of why there is this mutuality within the context of

9  553 because of the recognition under California law of third-

10  party beneficiary.  And we cited a couple of cases that go to

11  this point that you can satisfy mutuality under the third-

12  party beneficiary doctrine.  And that's where we were getting

13  at on that, Your Honor.

14          THE COURT:  All right.

15          MR. GARFINKLE:  Thank you.

16          THE COURT:  Thank you, Mr. Garfinkle.

17      (participants conferring regarding audio)]

18          THE COURT:  Maybe it's just too far.  Is that

19  better?

20          THE CLERK: Yes.

21          THE COURT:  That's better.  Okay.  Good. Thank

22  you.

23          Ms. Mumford, yes.

24          MS. MUMFORD:  Your Honor, I'm sitting here and I'm

25  reminded of that commercial where they go in after vacation

1    and the woman has all these pictures up on her wall saying

2    with a little like on here.  And her friend her goes.  Your

3    Honor, that's not this works.  That's not how any of this

4    works.

5            And looking at everybody else, so confused because

6    they're saying this is how it is.  And the other party is

7    sitting there going that's not how this works.  Your Honor,

8    everything that McKesson said is not how it works.  The

9    Bankruptcy Code is clear.

10           Let's start with their now claim that they are, in

11   fact, a creditor.

12           THE COURT:  Yes.

13           MS. MUMFORD:  The Bankruptcy Code defines

14   creditor.  The term creditor means, An entity that has a

15   claim against the debtor that arose at the time of or before

16   the petition date for relief concerning the debtor.

17           They admitted in their argument, Your Honor, that

18   that amount has been paid.

19           THE COURT:  Yes.

20           MS. MUMFORD:  They are now seeking a right of

21   setoff.  They are no longer a creditor.  They don't have a

22   right to payment.

23           It's very simple, Your Honor, they can put any

24   bells and whistles that are on it.  McKesson is not a

25   creditor.  They are not owed anything from the debtor's

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 343 of 375 PageID #: 439
Case 18-10512-KG Doc 804 Filed 10/25/18 Page 61 of 68

61

1  estates.

2            THE COURT:  Were they ever owed anything from the

3  debtor's estate?  I don't know.

4            MS. MUMFORD:  Your Honor, I do think they were

5  owed de minimis amounts for services, but those have been

6  paid.

7            THE COURT:  Okay.

8            MS. MUMFORD:  And I'm looking at my client who's

9  agreeing.

10            THE COURT:  All right.

11            MS. MUMFORD:  Your Honor -- I'm sorry, Your Honor,

12  I'm looking at the wrong page.

13            They're not a creditor.  They cannot say that

14  they're a creditor now in connection with 553 of the

15  Bankruptcy Code.

16            Your Honor, we asked the question whether there's

17  a federal interest.  The response was possibly yes, possibly

18  no.  Your Honor, I think we need to start giving meaning to

19  the words in the Code meaning in all the jurisprudence in

20  front of Your Honor.  There absolutely is a federal interest

21  here.

22            It is crystal clear.  I'm sure, Your Honor, we

23  could cite hundreds, if not thousands, of cases that stand

24  for the proposition that similar -- creditors should be

25  treated similarly under the Bankruptcy Code.

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 344 of 375 PageID #: 440
Case 18-10512-KG Doc 804 Filed 10/25/18 Page 62 of 68

62

1          Now, there's sancrosanctum (ph), Your Honor; the

2  priority of the Bankruptcy Code.  Just because here the

3  lenders are senior to McKesson or NPRS as a general unsecured

4  creditor doesn't change that analysis.  Butner has nothing to

5  do with this case, Your Honor.  Congress spoke.  They enacted

6  Section 553.

7          Your Honor, I'm not going to go through the Butner

8  analysis again.  Mr. Murphy did it far better than I did.

9  But it doesn't apply here.  And there's no separate lens that

10 Your Honor needs to look at through a state law analysis.

11         Lehman Brothers is directly on point.  All of

12 these so-called exceptions have to rely on state law because

13 they're soundly rejected under bankruptcy court and Supreme

14 Court authority.  So, to say that none of them looked at it

15 through this lens ignores the argument altogether.  There has

16 to be an exception.  That exception is not found in the

17 expressed terms of the Bankruptcy Code.  It's not found in

18 the Supreme Court's decision which was referenced to Your

19 Honor before saying that mutuality requires A owes B and B

20 owes A, right, Your Honor.

21         So, to say that none of these decisions dealt at

22 all with state law, that's the only place where you would

23 find such an exception. And that exception does not exist

24 under jurisprudence.  It does not exist under Bankruptcy

25 Section 553.

Appendix A341

1          And, Your Honor, with respect to the third-party

2     beneficiary, again, there is a lot of we's, us, McKesson.

3     Frankly, I'm not sure who they were referring to, Your Honor,

4     but they have not established that NPRS is a third-party

5     beneficiary under the distribution agreement.

6          I think I heard them say that McKesson is a third-

7     party beneficiary.  In fact, Your Honor, the LoyaltyScript

8     services has express language which is why they do not cite

9     to it that expressly says there is no third-party

10    beneficiaries in this agreement.  And, here, McKesson is

11    seeking to write the payment under the LoyaltyScript

12    agreement and, instead, they have to reverse it and say no,

13    it's NPRS doing it under the distribution agreement because

14    they're a third-party beneficiary.

15         They're not.  McKesson is the one who is seeking

16    the right of setoff.  McKesson is clearly not a creditor.

17    They are not owed anything here today.  Counsel can come up

18    and say to Your Honor that they are a creditor, but they're

19    completely ignoring, not only in this instance, but every

20    instance of their argument, the expressed provisions of the

21    Bankruptcy Code.

22         THE COURT:  Thank you, Ms. Mumford.

23         Mr. Murphy, yes.

24         MR. MURPHY:  Yes, Your Honor, I have just, I think

25    it's three quick points with clarification, if I may.

Case 1:18-cv-01873-CFC Document 16 Filed 01/30/19 Page 346 of 375 PageID #: 442
Case 18-10512-KG Doc 804 Filed 10/25/18 Page 64 of 68

64

1    You know the idea that 553 should spell out what

2    the federal interest is, why Congress put the word mutual in

3    there is sort of interesting.  I think Your Honor identified

4    it, and it's very clear.  And that is the principal of

5    creditors, like situated creditors receiving like treatment.

6        THE COURT:  Yes.

7        MR. MURPHY:  The difference could not be starker

8    here.  If this triangular setoff, again a contradiction in

9    terms, that's been rejected so roundly is somehow given life

10   after death, the result will be that NPRS, which is an

11   unsecured creditor for $8.5 million, a claim that has not

12   been allowed and adjudicated by the court.

13       It's a, I think, point the debtor raised that's

14   still not clear, but it's NPRS that would receive a hundred

15   percent payment on like all of the other unsecured creditors

16   who would receive nothing except the settlement amount, if

17   the settlement is approved, which we hope it would be, with

18   the unsecured creditors committee.  The unsecured creditors

19   will receive only what's been allocated by the secured

20   noteholders who have received just cents on the dollar as

21   first priority secured creditors.

22       THE COURT:  Sure.

23       MR. MURPHY:  That have agreed to resolve issues in

24   the challenge period, under the DIP order.  By the way, their

25   rights didn't go away under the DIP order either, I don't

1    think, so that's still -- that's a federal interest.  It's

2    between zero and a hundred, and it couldn't be clearer.

3           And so, I don't see why, like the other provisions

4    of the Bankruptcy Code, where courts look at it and conclude

5    what the interest is that somehow in 553 Congress should have

6    laid out an order, you know, said there would be interest.

7           And, two, on the DIP loan, look maybe I wasn't

8    clear, but the security interest superior, first lien

9    security interest superior to setoff was also given as

10   replacement lien to the noteholders as noteholders.  And I

11   don't know if that matters, but it is true. And those rights

12   exist today to secure the diminution collateral value from,

13   among other things, what's before the court today.

14          THE COURT:  Yes.

15          MR. MURPHY:  So, I don't think that it's quite so

16   easy to dispose of or for McKesson to dispose of the problem

17   it created for itself by not stepping up to reserve its

18   rights when the DIP was before the court.

19          And I understand -- and this question are they a

20   creditor or not.  Well, remember the statute says not only

21   that they need to be a creditor, but that they need -- that

22   the mutual debt is owed to the creditor --

23          THE COURT:  To the creditor, yes.

24          MR. MURPHY:  -- it's claim.  And NPRS is a

25   creditor to whom the claim is owed.  So, the mutual debt is

Case 1:18-cv-01873-CFC  Document 16-1  Filed 01/30/19  Page 348 of 375 PageID #: 444
Case 18-10512-KG  Doc 804  Filed 10/25/18  Page 66 of 68

66

1  not of that creditor.

2         But, again, look the -- it's their burden.  If

3  they want to show that they're a creditor, they needed to

4  come before you today.  It's always the -- the Courts are

5  clear it's the burden of the party claiming setoff, again,

6  because it's this on zero to a hundred percent difference.

7         It's their burden to say we're a creditor.  What

8  I'm advised is that while they may have been owed prepetition

9  amounts under the stipulations that brought us today that was

10  all paid. So that's been netted out and resolved -- oh, I

11  shouldn't use the word netted out, but that was resolved in

12  the stipulations that are before the court.

13         Okay.  Finally, on this question of third-party

14  beneficiary, again, you'd think if they're working so hard to

15  tell you look at California law as to whether third-party

16  beneficiary gives rise to a triangular setoff, you'd think

17  there'd be something there.  And we heard today, well, that's

18  more hand waving.  There is no case cited by California court

19  in their pleadings for that proposition.

20         There is this odd ball Ninth Circuit BAP case that

21  has to do with litigation trust established in a Chapter 7.

22  The landlord -- you know, the lease for delicatessen was in

23  the husband's name and the wife and the husband and the deli

24  were all in Chapter 7.  I don't know, nothing to do with

25  this case.  So, they don't have anything there either.

Case 1:18-cv-01873-CFC Document 16-0 Filed 01/30/19 Page 349 of 375 PageID #: 445
Case 18-10519-KG Doc 804 Filed 10/25/18 Page 67 of 68

67

1          So, thank you, Your Honor.

2          THE COURT:  All right.  Mr. Garfinkle, it's your

3   motion, if you want the last word, you've got it.

4          MR. GARFINKLE:  I think the court heard enough ad

5   --

6          THE COURT:  And I've read a lot, obviously, and I

7   want to go back and do some more reading because this is a

8   decision that, I think, requires a written opinion and not

9   ruling from the bench.  And it certainly is a serious matter

10  and the court takes it very seriously.  And I will issue an

11  opinion.

12         So, I'm going to reserve decision.  I don't think

13  it's the kind of decision that ought to come quickly from the

14  bench.  And I don't think it requires, you know, an immediate

15  decision as well.

16         So, I appreciate the arguments.  I appreciate the

17  briefing.  It was all excellent.  And it gave me some

18  thoughts, and I'll share them with you in the opinion.  And I

19  thank you very much.

20        (A Chorus of Thank you, Your Honor)

21         THE COURT:  Safe travel, everyone and good day to

22  you.

23        (Proceedings conclude at 12:23 p.m.)

24

25

1                          CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6    /s/Mary Zajaczkowski                    October 25, 2018
     Mary Zajaczkowski, CET**D-531
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OREXIGEN THERAPEUTICS, INC., | ) | Case No. 18-10518 (KG) |
| | ) | |
| Debtor. | ) | **Re: D.I. 654** |
| | ) | |

## OPINION

The Court is ruling on McKesson Corporation's ("McKesson") and its wholly owned subsidiary McKesson Patient Relationship Solutions' ("MPRS") Motion for an Order Determining that McKesson is Entitled to the Disputed Funds (the "Motion") (D.I. 654). McKesson seeks to affect a setoff under section 553 of the Bankruptcy Code.[1] Specifically, McKesson asks to offset its $6,932,816.40 debt to the Debtor under the Core Distribution Agreement ("Distribution Agreement") based on the Debtor's approximately $9,100,000[2] debt to MPRS under the Master Services Agreement ("Services Agreement"). For the reasons that follow, the Court finds that McKesson is seeking a triangular setoff which is prohibited in bankruptcy due to the lack of mutuality. An enforceable contractual right allowing a parent and its subsidiary corporation to affect a

---

[1] 11 U.S.C. §§ 101—1532.

[2] McKesson argues the Debtor owes MPRS approximately $9,100,000. Motion, ¶ 6. However, the Noteholders and Debtor instead claim the Debtor owes MPRS approximately $8,500,000. Opposition to Motion for an Order that McKesson Specialty Arizona [MPRS] is Entitled to the Disputed Funds ("Debtor's Opposition") ¶ 3 (D.I. 697); Debtor's Opposition, ¶ 20 (D.I. 698). The papers present a dispute as to the amount of MPRS's claim pursuant to the Services Agreement. The amount of MPRS's debt is not dispositive of the merits of the Motion. Therefore, the Court proceeds with the $9,100,000 figure based on the Motion. The Court is not deciding the amount of the Debtor's debt to MPRS and will address that issue separately should the issue later arise.

Appendix A348

prepetition triangular setoff under state law does not supply the strict mutuality required in bankruptcy. The Court will therefore deny the Motion for the reasons that follow.

### BACKGROUND

The material facts are relatively undisputed. The Debtor was[3] a biopharmaceutical company that manufactured Contrave®, a drug that treats obesity. Declaration of Michael A. Narachi ("Narachi Dec."), D.I. No. 3, ¶¶ 8, 11. The United States Food and Drug Administration approved Contrave® in 2014. *Id.* ¶ 8. Prepetition, the Debtor entered into two agreements relevant here: one with McKesson, and one with MPRS. Declaration of Erin Beesley ("Beesley Dec."), D.I. No. 655, ¶ A-3-5. McKesson is the parent corporation and MPRS is its subsidiary corporation. Beesley Dec. ¶ 1. It is undisputed that McKesson and MPRS are legally distinct entities.

On June 9, 2016, effective June 1, 2016, the Debtor entered into the Distribution Agreement with McKesson, which contemplated that McKesson would purchase and distribute Contrave® to various pharmacies in the United States. The parties agreed that California law would control the terms of the agreement:

---

[3] On June 28, 2018, the Court entered an Order (I) Approving the Sale of Substantially All Assets of the Debtor Free and Clear of Liens, Encumbrances, Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief (D.I. 438). On July 27, 2018, the sale closed. (D.I. 640). Post-closing, the Debtor is expected to file a plan of liquidation. Motion, ¶ 21; *see also* Debtor's Motion for Entry of an Order Authorizing the Appointment of Thomas P. Lynch as the Debtor's Wind Down Officer, ¶ 8 (D.I. 626) ("The Debtor anticipates filing a plan of liquidation . . . [to] liquidate the remaining proceeds from the Sale and make distribution to creditors.").

Appendix A349

VII. General

. . .

b. This Agreement will be governed by and construed in accordance with the laws of California, without regard to or application of conflict of law, rules or principles.

Motion, ¶ 23. More pertinently, the parties agreed that McKesson had certain rights, including a right to set off debts owed between the Debtor and its affiliates against debts owed between McKesson and its affiliates:

VII. General

. . .

i. Notwithstanding anything to the contrary in this Agreement, each of McKesson Corporation and its affiliates is hereby authorized to **set-off**, recoup and apply any amounts owed by it to Manufacturer's [the Debtor's] affiliates against any all [*sic*] amounts owed by Manufacturer or its affiliates to any of McKesson Corporation or its affiliates, without prior written notice[.]

Motion, ¶ 4 (emphasis added) (citation omitted). As of the petition date, McKesson owed the Debtor $6,932,816.40 under the Distribution Agreement.  Motion, ¶ 16.

On July 15, 2016, the Debtor entered into the Services Agreement with MPRS, which contemplated that MPRS would manage the Debtor's LoyaltyScript® program. Beesely Dec. ¶ 5.  The LoyaltyScript® program enabled patients to receive price discounts on Contrave® from retail pharmacies. MPRS would pay the retail pharmacies and patients for the Contrave® price discounts and other services under the LoyaltyScript® program. Consequently, the Debtor would reimburse MPRS. The Services Agreement does not incorporate or relate to the Distribution Agreement; they are wholly distinct. As

Appendix A350

of the petition date, the Debtor owed MPRS approximately $9,100,000 (see footnote 2, *supra*).

On March 12, 2018, the Debtor voluntarily filed a petition for relief under Chapter 11. Thereafter, the Debtor, McKesson, and MPRS entered into three stipulations that culminated in the Motion at issue here. On April 11, 2018, the Court entered an order approving a stipulation between the Debtor and MPRS (the "April Stipulation") (D.I. 176-1). The April Stipulation provided, *inter alia*, that: the Debtor would pay MPRS the sum of $6,027,155 on account of the post-petition reimbursements MPRS remitted under the LoyaltyScript® program (*Id.*, Ex. 1, at ¶ 1); the Debtor would make weekly payments of $1,675,000 to MPRS (*Id.*, at ¶ 2); but none of the foregoing payments would apply to MPRS's prepetition claim (*Id.*, at ¶ 1); and MPRS holds a prepetition claim of approximately $9,100,000 against the Debtor under the Services Agreement (*Id.*, at ¶ G).

On May 18, 2018, the Court entered an order approving a stipulation between the Debtor, McKesson and MPRS (the "May Stipulation") (D.I. 319-1). The May Stipulation provided, *inter alia*, that as of the petition date, McKesson owed the Debtor $6,932,816.40 under the Distribution Agreement (*Id.*, at 2). Post-petition, the Debtor paid McKesson $3,266,255.76 on account of such debt but reserved its right to offset the entire $6,932,816.40 amount (*Id.*). McKesson agreed to pay the remaining $3,666,560.64 satisfying its entire prepetition obligation under the Distribution Agreement subject to preservation of its setoff right concerning the debt owed to MPRS against McKesson's debt to the Debtor (*Id.*, ¶¶ 2, 4, and 5).

4

Appendix A351

On July 20, 2018, the Court entered an order approving a stipulation between the Debtor, McKesson, and the Lenders[4] (the "July Stipulation") (D.I. 592-1). The July Stipulation provided, *inter alia*, that McKesson would be allowed to file the Motion at issue here (*Id.*, ¶ 2); and the Debtor would segregate $6,932,816.40 (the "Disputed Funds") pending resolution of McKesson's Motion (*Id.*, ¶ 3).

On July 30, 2018, pursuant to the terms of the July Stipulation, McKesson filed the Motion at issue along with the Declaration of Erin Beesley in Support of Motion for an Order Determining that McKesson is Entitled to the Disputed Funds (D.I. 655). On August 21, 2018, the Noteholders[5] filed their opposition to the Motion in which McKesson sought a ruling that McKesson Specialty Arizona ("MPRS") was entitled to the disputed funds (D.I. 697). On the same day, the Debtor filed the Debtor's Objection to the Motion (D.I. 698) along with the Declaration of Thomas P. Lynch in Support of Debtor's Objection to the Motion.  (D.I. 699). On August 31, 2018, McKesson filed McKesson's Reply (D.I. 710). On October 24, 2018, the Court heard oral argument from McKesson/MPRS, the Debtor, and the Noteholders on the Motion. The Motion has been fully briefed and was well argued. Thus, the Motion is ripe for the Court's decision.

---

[4] The Lenders consist of the following entities: Baupost Group Securities, L.L.C.; EcoR1 Capital Fund, L.P.; and EcoR1 Capital Fund Qualified L.P (D.I. 592, at 1).

[5] The Noteholders consist of the following entities: Baupost Group Securities, L.L.C.; EcoR1 Capital Fund, L.P.; Biotechnology Value Trading Fund OS, LP; Biotechnology Value Fund LP; Biotechnology Value Fund II, LP; Investment 10, LLC; MSI BVF SPV LLC; and Roadrunner Co. (D.I. 697).

Appendix A352

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to enter a final order pursuant to 28 U.S.C. §§ 1334(b), 157(a), and (b)(1). Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

## DISCUSSION

Setoff is a contractual or equitable right that "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)). The Bankruptcy Code's Section 553(a) does not create a federal right of setoff but merely recognizes such party's right under state law. *Id.* Section 553(a) "sets forth a general rule, **with certain exceptions**, that any right of setoff that a creditor possessed prior to the debtor's filing for bankruptcy is not affected by the Bankruptcy Code." *Id.* at 20 (emphasis added). Section 553(a) states in relevant part, that:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a **creditor** to offset a **mutual debt owing by such creditor** to the debtor that arose before the commencement of the case under this title **against a claim of such creditor** against the debtor that arose before the commencement of the case . . . .

(Emphasis added).

Whether a party has a setoff right under section 553 is a twofold inquiry. <u>First</u>, the party seeking setoff must acquire such right prepetition under applicable nonbankruptcy law. *In re Lehman Bros. Inc.*, 458 B.R. 134, 139 (Bankr. S.D.N.Y. 2011) ("'section 553 . . .

6

Appendix A353

preserve[s] any right of setoff that may exist under applicable nonbankruptcy law.'") (quoting *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010) (citation omitted); accord *In re Am. Home Mortgage, Holdings, Inc.*, 501 B.R. 44, 55 (Bankr. D. Del. 2013) (citation omitted). <u>Second</u>, once a party establishes its setoff right, that party must then "meet[] **the further code-imposed requirements and limitations** set forth in section 553." *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009) (citing *Packaging Indus. Grp. Inc. v. Dennison Mfg. Co. Inc. (In re Sentinel Prod. Corp. Inc.)*, 192 B.R. 41, 45 (N.D.N.Y. 1996)) (emphasis added).

### <u>Setoff Right Under Applicable Nonbankruptcy Law</u>

The parties do not dispute that McKesson had a prepetition setoff right pursuant to section VII.i. of the Distribution Agreement. Because the Debtor and the Noteholders do not dispute McKesson's prepetition setoff right under California law, the Court proceeds with the assumption that McKesson had such right.

### <u>Section 553(a) Analysis</u>

McKesson must now meet the further requirements of Section 553(a) that: (1) the party seeking setoff must be a "creditor;" and (2) that party must have a "mutual debt" where that party's debt to the debtor arose prepetition and that party's claim against that same debtor arose prepetition.

### **"Creditor" under Section 553(a)**

Section 101(10)(A) defines a "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." Under section 101(5)(A), a "claim" is a "right to payment." In the Motion, McKesson seems to

7

Appendix A354

assume it is a creditor. In their objections, the Debtor and the Noteholders did not extensively argue that McKesson is not a creditor. However, during oral argument, the Debtor made the argument that McKesson was not. *See* Tr. of Hr'g on Oct. 24, 2018 (D.I. 804, at 19-20) ("Ms. Mumford:[6] . . . Again, Your Honor, McKesson, [a] non-creditor, [is] seeking to set off MPRS's alleged claim.")). The Noteholders made the same argument. (*Id.*, at 36) ("Mr. Murphy:[7] . . . Firstly, as noted, the party that's asserting the right to setoff is not a creditor.")). Unsurprisingly, McKesson opposed such view. (*Id.*, at 51) ("Mr. Garfinkle:[8] . . . First is an argument made that McKesson is not a creditor. Wrong – dead wrong. I direct the court's attention to the core distribution agreement. On the petition date, McKesson was a creditor.")).

Distilling the merits, McKesson asserts it is a creditor because, as of the petition date, it had a $6,932,816.40 claim against the Debtor under the Distribution Agreement. However, the Debtor and the Noteholders contend McKesson is not a creditor because pursuant to the May Stipulation, McKesson paid off this debt to the Debtor, thus extinguishing its claim. (D.I. 804, at 31) ("The Court: Am I correct that McKesson has paid the debtor? Mr. Garfinkle: Yes, Your Honor. The Court: The $6.9 million dollars? . . . Ms. Mumford: Your Honor, it was paid and the money is being held from [the] sale proceeds.")); (*Id.*, at 36) ("Mr. Murphy: That is that the funds [the $6.9 million] were paid by McKesson . . .")).

---

[6] Ms. Mumford is the Debtor's counsel.

[7] Mr. Murphy is the Noteholders' counsel.

[8] Mr. Garfinkle is McKesson's and MPRS's counsel.

8

Appendix A355

"[C]ourts have held that a setoff cannot exist when the creditor pays the debt because '[o]nce a debt is paid it is no longer owed, and therefore the required mutual debts do not exist.' *United States v. Morris (In re McCormick),* 1993 WL 246001, at *2 (D. Kan. 1993); *Nat'l Bank of Boaz v. Royal Crown Bottling Co. of Boaz, Inc. (In re Royal Crown Bottling Co. of Boaz, Inc.),* 29 B.R. 52, 54 (Bankr. N.D. Ala. 1981) (any right of setoff 'was a right which could be exercised only before [payment of the] sum to the trustee, which is another way of saying that this payment by [the bank] extinguished any such right which it might have had.')." *In re Reliance Acceptance Grp., Inc.,* 2000 WL 33712305, at *3 (Bankr. D. Del. Dec. 6, 2000). McKesson no longer had a "claim" against the Debtor when it paid the Debtor $6,932,816.40 under the Distribution Agreement. At that time, McKesson, lacking a "claim," could not be a "creditor" under section 101(10)(A) and thus section 553(a).

The court's decision by Judge Walsh in *Reliance Acceptance* is not entirely fatal to McKesson. There, the issue was whether Williams had a setoff right against Reliance after paying off his debt. Judge Walsh opined: "it seems clear to me that Williams lost his right to assert a setoff when he voluntarily paid his loan to Reliance in full. By paying his indebtedness Williams extinguished his liability to Reliance. . ." *Id.* However, Judge Walsh determined that Williams' repayment was voluntary and not at the direction of a bankruptcy court order or at a bankruptcy trustee's request. *Id.* He qualified his holding by finding that "a creditor's right to assert setoff may survive [where] there is no intent to extinguish[] the underlying liability which gives rise to the requisite mutuality of obligation. *See, e.g., In re Public Serv. Co. of New Hampshire v. New Hampshire Elec. Coop.,*

9

Appendix A356

*Inc. (In re Public Serv. Co. of New Hampshire)*, 884 F.2d 11, 13 (1st Cir. 1989) (payment of indebtedness pursuant to a bankruptcy court judgment does not render the creditor ineligible to seek setoff where creditor otherwise asserted and maintained its rights)." *Id.*[9]

McKesson's position is saved by the May and July Stipulations. The May Stipulation provides that McKesson's payment in satisfaction of the Distribution Agreement is subject to its preservation of its setoff right as to the entire Disputed Funds. (D.I. 319-1, ¶¶ 2, 4, and 5). The July Stipulation provides for the segregation of the Disputed Funds so McKesson/MPRS can file the Motion at issue. (D.I. 592-1, ¶¶ 2 & 3). McKesson agreed to pay off its debt to the Debtor and thereby extinguish its claim only because it could preserve its setoff right, reserve its ability to file the Motion, and have the Disputed Funds segregated. Given the factual posture, McKesson would likely not have paid off its entire prepetition debt under the Distribution Agreement but for such reservation of rights. While this case can be distinguished from *Reliance Acceptance* because McKesson did not intend to extinguish its debt by stipulation as opposed to a bankruptcy court order or at the direction of the bankruptcy trustee, the Court finds that Judge Walsh's overarching point in *Reliance Acceptance* is well-taken.

For those reasons, the Court finds that McKesson *may* have been a "creditor." Although the parties did dispute whether McKesson was a "creditor," they gave short-shrift in their papers to the issue compared to the mutuality arguments which the Court discusses below. They did not fully brief this issue. It is only fair to consider McKesson

---

[9] It is important to observe that in *Reliance Acceptance*, Judge Walsh wrote of the "requisite mutuality of obligation." The requirement of mutuality is discussed below.

Appendix A357

to be a "creditor" given the May and July Stipulations without which the Court would not deem McKesson to be a creditor.

### Mutuality under Section 553(a)

Once a party has a prepetition setoff right under applicable nonbankruptcy law, that party must then meet "[t]he additional restrictions imposed by section 553 [which are] well-settled." *SemCrude*, 339 B.R. 393 (citing *Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 738-39 (Bankr. S.D.N.Y. 1995)). The plain language of Section 553(a) only allows a creditor to offset a "mutual debt." There is no statutory definition of "mutuality" or a "mutual debt" under the Bankruptcy Code. However, state[10] and federal courts have found to a fare-thee-well that debts are "'mutual' only when 'they are due to and from the same persons in the same capacity.'" *Id.* (citing *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d. Cir. 2002) (citing *Westchester Structures*, 181 B.R. at 740)); *Lehman Bros.*, 458 B.R. at 140 (citing *Lines v. Bank*

---

[10] *See, e.g., In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006) (citing among other Texas cases *Mullen v. Cheatham*, 1999 WL 1095917, at *3 (Tex. App. 1999) ("Under Texas and Federal law, '[m]utuality of obligation exists when debts are owing between the same parties in the same right or capacity.'"); *In re Czyzk*, 297 B.R. 406, 409 (Bankr. D.N.J. 2003) ("In New Jersey, obligations are mutual where the debts involve the same parties standing in the same capacities.") (citation omitted). Moreover, McKesson's chief case is: *Prudential Reinsurance Co. v. Superior Court*, 842 P.2d 48 (Cal. 1992). There, the California Supreme Court dealt with setoff under Insurance Code section 1031. As established above the line, setoff under state and federal law garner the same mutuality requirement and, in turn, identical definitions of mutuality. After all, "[s]ection 1031 allows the setoff of all mutual debts and credits in the course of liquidating proceedings and is patterned after the federal Bankruptcy Act of 1898 (11 U.S.C. § 108, repealed and reenacted as 11 U.S.C. § 553), and an identical New York statute that has been adopted by several states." *Id.* at 50. Indeed, the California Supreme Court explicitly said "[t]he key to setoff is the requirement of mutuality. Justice Benjamin Cardozo defined mutuality as follows: '[t]o be mutual, [the debts] must be due to and from the same persons in the same capacity.' . . . '[S]uch debts must exist between the same persons or entities in order to establish mutuality of identities.'" *Id.* at 53 (citations omitted).

11

Appendix A358

*of Am. Nat'l Trust & Sav. Ass'n*, 743 F. Supp. 176, 183 (S.D.N.Y. 1990) (internal quotation marks and citations omitted) ("The Bankruptcy Code does not define mutuality, but courts consistently find debts to be mutual only when they are 'in the same right and between the same parties, standing in the same capacity.'")); *In re Garden Ridge Corp.*, 338 B.R. 627, 634 (Bankr. D. Del. 2006) (citing *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036 (5th Cir. 1987) ("'For mutuality to exist, each party must own his own right severally, with the right to collect in his own name against the debtor in his own right and severally.'"); *see also Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398-99 (9th Cir. 1996) (same); *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1537 (10th Cir. 1990) (same).

Under section 553(a), "mutuality is strictly construed against the party seeking setoff." *SemCrude*, 399 B.R. at 396 (citation omitted); *Garden* Ridge, 338 B.R. at 634 (citation omitted) (same); *In re Am. Home Mortgage Holdings, Inc.*, 501 B.R. 44, 56 (2013) (citation omitted) (same). Moreover, the creditor seeking setoff has the burden of proof on the mutuality requirement. *Garden Ridge*, 338 B.R. at 632 (citing *In re Lason, Inc.*, 314 B.R. 296, 305 (Bankr. D. Del. 2004); *In re Bennett Funding Grp., Inc.*, 212 B.R. 206, 212 (2d Cir. BAP 1997)); *see also Lehman Bros.*, 158 B.R. at 140 (citation omitted) (same). The Bankruptcy Court's sound discretion governs the allowance of a setoff. *Garden Ridge*, 338 B.R. at 632 (citing *In re Cont'l Airlines*, 218 B.R. 324, 328 (D. Del. 1997) (citing *United States, Internal Revenue Service v. Norton*, 717 F.2d 767, 772 (3d Cir. 1983)) (additional citations omitted)).

Here, under the foregoing authorities, McKesson does not have a mutual debt under section 553(a). As of the petition date, McKesson owed the Debtor $6,932,816.40

Appendix A359

and the Debtor owed MPRS approximately $9,100,000. Post-petition, McKesson paid the debt in its entirety. Now, McKesson seeks to claw back its payment through a triangular setoff. A triangular setoff is a setoff between an affiliate of a contractual party and the counter-contractual party. McKesson's argument is that because the Debtor owes MPRS in excess of the amount of the Disputed Funds under the Services Agreement, section 553(a) enables McKesson to set off the MPRS claim against McKesson's payment under the Distribution Agreement. However, McKesson runs into fatal contrary bankruptcy precedent. A triangular setoff is impermissible under section 553(a) without mutuality. In *SemCrude*, Judge Shannon's explanation is instructive and the Court agrees:

> Because of the mutuality requirement in section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy; *See, e.g., Matter of United Sciences of Am., Inc.*, 893 F.2d 720, 723 (5th Cir. 1990) ('The mutuality requirement is designed to protect against 'triangular' set-off; for example, where the creditor attempts to setoff debt to the debtor with the latter's debt to a third party.'); *In re Elcona Homes Corp. (Green Tree Acceptance, Inc.)*, 863 F.2d 483, 486 (7th Cir. 1988) (holding that the Code speaks of 'mutual debt' and 'therefore precludes 'triangular' set offs').

*SemCrude*, 339 B.R. at 393. The District Court agreed and affirmed Judge Shannon. *See In re SemCrude, L.P.*, 428 B.R. 590, 594 (D. Del. 2010) ("As the Bankruptcy Court correctly recognized, the mutuality required by Section 553 'cannot be supplied by a multi-party agreement contemplating a triangular setoff.'") (citation omitted).

Furthermore, McKesson is the parent corporation and MPRS is its subsidiary corporation. They are legally distinct entities. Thus, their corporate structure poses another issue preventing McKesson from affecting a triangular setoff. The Court wholly agrees with Judge Shannon's assessment on this point:

Appendix A360

Moreover, because each corporation is a separate entity from its sister corporations absent a piercing of the corporate veil, a 'subsidiary's debt may not be set off against the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances.' *Sentinel Products Corp.*, 192 B.R. [41,] 46 [(N.D.N.Y. 1996)] (citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 n. 2 (2d Cir. 1989)). Allowing a creditor to offset a debt it owes to one corporation against funds owed to it by another corporation—**even a wholly-owned subsidiary**—would thus constitute an improper triangular setoff under the Code.

*Id.* at 393-94 (emphasis added).[11] McKesson recognizes this problem as it cites *SemCrude* and *Lehman Bros.* for propositions that setoff under section 553(a) requires a mutual debt and that triangular setoffs are improper under the Bankruptcy Code. *See* Motion, ¶ 42 ("McKesson is confident that the Lenders will refer to similar decisions."); *McKesson's Reply in Support of Motion for an Order Determining that McKesson is Entitled to the Disputed Funds* (the "Reply"), ¶ 1 (citing its Motion in the footnote, from which the Court just quoted) ("[The Lender Parties] go on and on about the fact that there are a large number of published decisions that reach conclusions contrary to the relief requested in the Motion. That is undisputed; to the contrary, McKesson admits it in the Motion."). However, McKesson mistakenly contends that those decisions were not based "on proper controlling Supreme Court and Third Circuit precedent and governing principles." *Id.*

Mutuality is defined under state law. *Garden Ridge*, 338 B.R. at 633 (citing *In re Czyzk*, 297 B.R. 406, 409 (Bankr. D. N.J. 2003)); *In re Sunset Aviation*, 468 B.R. 641, 647 (Bankr. D. Del. 2011) ("[T]he right of setoff requires mutuality between the debtor and

---

[11] Note that in *SemCrude*, Judge Shannon dealt with three debtors and one creditor. The creditor sought to set off a debt it owed to one debtor against a claim against another debtor. Here, we have two creditors and one debtor. However, this minor distinction in form does not alter the substance of the law.

14

Appendix A361

the creditor under the applicable state law."). However, several state and federal courts consistently define "mutual debt" or "mutuality" uniformly. In a nutshell, McKesson argues that when a creditor seeks to affect a setoff, the Bankruptcy Court's inquiry must begin and end with state law. That is, state law determines whether a creditor has a setoff right and also governs whether mutuality exists. Thus, McKesson's view that because California law governs the Distribution Agreement and California, according to McKesson, allows for an agreement between a parent and subsidiary to supply the requisite mutuality the latter needs to "be deemed a mutual debtor-creditor of the parent," a triangular setoff is permitted under section 553(a). Motion, ¶ 15 (citation omitted). For the following reasons, the Court rejects McKesson's argument as a matter of law and policy.

McKesson's point of departure is a precedential bankruptcy case, *Butner v. United States*, 440 U.S. 48, 55 (1979). *Butner* held that state law, not a federal law or a rule of equity, determined whether a security interest in property extends to rents and profits derived from the property. *Id.* at 48. *Butner* is eminent for its proposition that state law rights are respected in bankruptcy absent a contrary bankruptcy rule or policy. In its analysis, the Supreme Court explained with the oft-cited language:

> **Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.** Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a 'windfall merely by reason of the happenstance of bankruptcy.'

Appendix A362

*Id.* at 55 (emphasis added) (citation omitted).

The Court agrees that McKesson had a prepetition setoff right. McKesson, lacking the mutuality requirement, uses *Butner* to support its assertion that its Distribution Agreement under California law permits a triangular setoff in bankruptcy. McKesson relies on a California Supreme Court case, *Prudential Reinsurance Co. v. Superior Court*, 842 P.2d 48 (Cal. 1992). Extraordinarily, McKesson relies on one sentence, which is *dicta*:[12] "Accordingly, we refuse to expand the section 1031 setoff of debts in the absence of an express mutual agreement that the subsidiary would be deemed a mutual debtor-creditor of the parent (See, e.g., *In re Berger Steel Company* (7th Cir. 1964) 327 F.2d 401; *Black & Decker Mfg. Co. v. Union Trust Co.* (1936) 53 OhioApp. 356 [4 N.E.2d 929].)." *Id.* at 60.

In *Prudential Reinsurance*, the California Supreme Court held in the affirmative concerning "whether reinsurance debts and credits generated between a reinsurer and the original reinsurer, under the terms of their reciprocal reinsurance contracts, may be set off pursuant to section 1031 [of the Insurance Code], when the original insurer becomes insolvent." *Id.* at 50 & 52. Most aptly, the court explained "the key to setoff

---

[12] At oral argument, McKesson agreed that it relies on dicta from *Prudential Reinsurance*. "The Court: Isn't that dicta? Mr. Garfinkle: **It is dicta**, but for a predictive analysis it's the only guidance the court has as to how a California Court would rule on this." Tr. of Hr'g on Oct. 24, 2018, at 10, lines 13-16 (D.I. 804) (emphasis added). The Court finds this argument unavailing for **three reasons**. **First**, it is dicta because the language McKesson cites is not necessary to the holding. *Friedman's Liquidating Trust v. Roth Staffing Cos. (In re Friedman's Inc.)*, 738 F.3d 547, 552 (3d. Cir. 2013) (When statements are not germane to a court's analysis, the language is dicta and not binding). The Court declines to do a "predictive analysis" or give stronger weight to the cited dicta in *this case* in light of the two next countervailing reasons. **Second**, as reiterated above the line, California aligns with the majority of state and federal courts defining mutuality. **Third**, as the Court will discuss below, section 553(a) imposes *additional restrictions* on a creditor's ability to setoff, which nullifies McKesson's entire *Butner* argument as a matter of bankruptcy law and policy.

Appendix A363

16

[under Insurance Code section 1031] is the requirement of mutuality, under which the debts must be due to and from the same persons in the same capacity." *Id.* at 53. Moreover, the California Court held that the debts must be mutual in three respects: (1) "the debts must be owed contemporaneously with, or prior to issuance of, the liquidation order;" *id.* (citation omitted) (2) **"such debts must exist between the same persons or entities in order to establish mutuality of identities;"** *id.* (emphasis added) (citation omitted) and (3) "setoff can occur only between persons or entities of equal capacity." *Id.* (citation omitted). Thus, despite McKesson's reliance on *Prudential Reinsurance*, California defines mutuality consistently with the authorities the Court relies upon.

Moreover, the dicta McKesson relies upon cites to an inapposite Seventh Circuit case, *In re Berger Steel Co.*, 327 F.2d 401 (7th Cir. 1964) and an inappropriate Ohio Court of Appeals case, *Black & Decker Mfg. Co. v. Union Trust Co.*, 4 N.E.2d 929 (Ohio Ct. App. 1936). In *SemCrude*, Judge Shannon analyzed *Berger Steel* and explained it did not provide a contractual exception to mutuality. The Court agrees and adopts that analysis. In *Berger Steel*, the court dealt with whether "a party attempting to effect a triangular setoff, and contending that an oral agreement between it and two other parties created sufficient mutuality of amounts owing and owed to make a triangular setoff proper between the parties under the Bankruptcy Act." *SemCrude*, 39 B.R. at 395 (citing *Berger Steel*, 327 F.2d at 404). The Seventh Circuit found no such agreement existed and rejected the argument. *Id.* (citing *Berger Steel*, 327 F.2d at 404-05). While the Seventh Circuit found that some cases allowed a contractual right of triangular setoff, such rights derived from "state law or the

17

Appendix A364

common law of equitable receivership, and none [] were decided under the more restrictive language of either the Bankruptcy Act or the Code." *Id.*

In *SemCrude*, the court found that the Seventh Circuit did not "address[] the broader question of whether a triangular setoff was permissible under the Bankruptcy Act if a contract signed by the parties to the proposed setoff contemplated such a remedy." *Id.* However, the court read *Berger Steel* and its progeny to allow an "exception to the strict mutuality requirement [] in the Bankruptcy Act." *Id.* The Bankruptcy Court of the Southern District of New York (Judge Peck) also adopted Judge Shannon's analysis of *Berger Steel*. In fact, no court has "actually permit[ed] a triangular setoff or address[ed] the merits of this purported exception in a written opinion as it relates to section 553(a)." *SemCrude*, 399 B.R. at 396. Any section 553(a) mutuality exception via contract was merely "created by a game of 'whisper down the lane' from decision to decision." *Lehman Bros.*, 458 B.R. at 142. In sum, the plain language of section 553(a) is clear and there is no contractual exception to mutuality. *Id.*

McKesson cites to *Black & Decker* in support of its attempt to establish mutuality. However, that case is inapposite for two reasons. First, it dealt with setoff outside of bankruptcy. Second, the court allowed a parent to "set off the accounts of its subsidiary corporations in an insolvent bank against its debt to such bank" because the parties intended that the parent and its subsidiaries were treated as one corporation. *Black & Decker*, 4 N.E.2d at 929. Here, McKesson is the parent and MPRS is its subsidiary, and it is undisputed that they are legally distinct entities.

Appendix A365

McKesson also argues that *Butner*'s "federal interest" exception is inapplicable here. Specifically, McKesson "asserts that there is no federal interest that would impose a federal gloss on the application of state law to these [setoff] rights . . . . [T]he correct reading of section 553 is to conclude that the section does not create any federal right of setoff and it does not interfere with McKesson's rights under California law." Motion, ¶ 25. The Court disagrees.

Congress in enacting section 553(a) recognized a federal interest. The statutory language is the point of departure for statutory interpretation. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 388 (2013). "[W]here . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *SemCrude*, 399 B.R. at 398 (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). When statutory language is clear, "judicial inquiry is complete." *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991).

Here, section 553(a) is unambiguous in providing that a "mutual debt" must be "owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case" subject to certain exceptions. However, none of those exceptions state or imply a multi-party contractual exception exists to the mutuality requirement allowing a triangular setoff. *See* Section 553(a)(1)-(3) and (b). A contractual exception to mutuality would be incongruent with the express provision of section 553(a). McKesson is the *creditor* seeking to offset a debt of $6,932,816.40 it owes to the Debtor that

Appendix A366

arose prepetition under the Distribution Agreement against a $9,100,00 claim of MPRS against the debtor that arose prepetition. Statutorily speaking, that cannot happen.

Furthermore, section 553(a) aligns with the fundamental bankruptcy policy of ensuring similarly-situated creditors receive an equal distribution from the debtor's estate. If parties can contract around section 553(a)'s mutuality requirement, a creditor could receive a greater distribution than other equal-footed creditors and thus dilute the entire estate to the detriment of all creditors. *SemCrude*, 399 B.R. at 399. Mutuality is the lynchpin of setoff under section 553(a). Thus, the cases the Court relies upon, *SemCrude* and *Lehman Bros.*, are not inconsistent with *Butner*. The Court refuses to read a contractual exception to strict mutuality allowing for triangular setoff in the face of contrary bankruptcy precedent and policy.[13]

### Third-Party Beneficiary

McKesson argues that the contractual third-party beneficiary doctrine provides it with the required mutuality. A third-party beneficiary to a contract is a party who directly or incidentally benefits from a contract between two other parties. *See*, *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 336-37 (S.D.N.Y. 2005). McKesson's argument is that MPRS is a third-party beneficiary of the Distribution Agreement and "[t]hus, as a legally recognized party to the Distribution Agreement, MPRS stands in a direct counter-

---

[13] The District Court in affirming *SemCrude* agreed: "This conclusion [concerning triangular setoffs] is not only consistent under the facts and applicable case law, but also with general bankruptcy principles concerning the strict construction of mutuality against the party seeking setoff. In addition, the Court concludes that the Bankruptcy Court correctly determined that a 'contract exception' to the mutuality requirement does not exist based upon the plain language of Section 553 . . . [because] the primary goal of the Bankruptcy Code is to ensure equal and fair treatment among similarly situated creditors." *SemCrude*, 428 B.R. at 594.

Appendix A367

contractual relationship with the Debtor on both contracts—the Distribution Agreement and the Master Services Agreement. This satisfies any mutuality requirement for effectuating setoff." Motion, ¶¶ 44-46 (citations omitted). The Court once again disagrees.

McKesson cites two cases for the proposition that a third-party beneficiary to a contract has the requisite mutuality for setoff under section 553(a). Both are inapposite. First is *In re Bacigalupi, Inc.,* 60 B.R. 442, 446 (9th Cir. BAP 1986). McKesson only provides a mere parenthetical referring to the Ninth Circuit Bankruptcy Appellate Panel's statement that a setoff claim 'cannot fail for lack of mutuality' where complaint alleges third-party beneficiary status. Motion, ¶ 46 (citing *Bacigalupi,* 60 B.R. at 446). However, the panel only found that the bankruptcy court abused its discretion in refusing to modify relief from stay to allow a creditor to plead setoff under a state court proceeding. *Bacigalupi,* 60 B.R. at 447. Moreover, while the panel referenced mutuality, it did not examine setoff in the bankruptcy context or hold that third-party beneficiary status is an exception to the strict application of mutuality under section 553(a).

The second case which McKesson cites is *Saudi Basic Indus. Corp. v. Exxonmobil Corp.,* 194 F. Supp. 2d 378 (D.N.J. 2002). McKesson provides a mere parenthetical stating "Exxon, as a third[-]party beneficiary to a contract, can assert a setoff defense and the setoff defense does not fail for lack of mutuality." Motion, ¶ 46. The quoted language is misleading. *Saudi* did not deal with section 553(a). The district court held, *inter alia,* that Exxon's third-party beneficiary status was sufficiently pled, but the third-party status for setoff purposes could not be resolved on a motion brought pursuant to Federal Rule of Civil Procedure 12(c). *Saudi,* 194 F. Supp. 2d at 394-95.

Appendix A368

Some bankruptcy courts have rejected third-party beneficiary status as sufficient to create mutuality under section 553(a). *See State of Louisiana v. Celebrity Contractors, Inc. (In re Celebrity Contractors, Inc.)*, 524 B.R. 95, 110-11 (Bankr. E.D. La 2014) (finding that mutuality under section 553 requires the off-setting obligations to be held by the same parties in the same capacity and thus the latter is not met where the "State's debt to Celebrity is owed not in Celebrity's corporate capacity . . . but rather in its capacity as a third-party beneficiary . . . to the State's debt to homeowners . . ."); *see also In re J.A. Clark Mech., Inc.*, 80 B.R. 430, 433 (Bankr. N.D. Ohio 1987) ("CWRU's alleged status as third-party beneficiary of the contract . . . would not satisfy the mutuality requirement. As third-party beneficiary, any right to recover would not be in the same right and capacity as the direct contractual obligation . . . [s]etoff on this basis, is, accordingly, inappropriate."). The Court recognizes that the third-party beneficiary doctrine is contrary to the strict mutuality requirement.

As a matter of policy, McKesson's third-party beneficiary status argument is just as unavailing as its attempt to distort *Butner* in interpreting California law as legalizing a contractual exception to mutuality in bankruptcy. If there were a contractual third-party beneficiary status exception, parties would merely add language intending that a third-party be a third-party beneficiary of a contract allowing for triangular setoff. The Court refuses to open the door to such circumvention of the Bankruptcy Code. Thus, the Court rejects McKesson's third-party beneficiary status argument.

Appendix A369

## California Commercial Code Section 9404

Section 9404 of the California Commercial Code states in relevant part, that:

(a) Unless an account debtor has made an enforceable agreement not to assert defenses or claims . . . the rights of an assignee are subject to both of the following:
   (1) All terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract.
   (2) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

McKesson argues that section 9404 preserves its setoff right and affords it priority over all of the Lenders' secured claims. Any prepetition or post-petition "party assigned or otherwise taking a security interest in the debtor's asset takes that security interest subject to all of McKesson's contractual rights . . . including [its setoff] rights." Motion, ¶ 54. As the Court extensively analyzed above, McKesson lacks the required mutuality for setoff in bankruptcy. Regardless of whether McKesson's section 9404 argument is meritorious, such argument does not supply the requisite mutuality for section 553(a). Thus, the Court finds this argument unavailing.

Appendix A370

## CONCLUSION

For the foregoing reasons, the Court finds that McKesson, even if it was a creditor, did not have a mutual debt where its debt to the debtor arose prepetition and its claim against that same debtor arose prepetition. The Court further finds that McKesson's argument that there is a contractual exception to section 553(a)'s mutuality requirement under California law allowing for triangular setoff is not persuasive in light of highly persuasive precedent, section 553(a)'s plain language, and the Bankruptcy Code's policy. McKesson is correct that *Butner* provides that state law creates and defines property rights, but *Butner* is also clear that a federal interest may require a different result. Setoff under section 553(a) is a case in point. McKesson's use of *Butner* in a creative attempt to convolute a well-settled bankruptcy issue created a pause but it cannot carry the day. Accordingly, the Court denies the Motion and will issue an Order.

Dated:   November 13, 2018 

KEVIN GROSS, U.S.B.J.

Appendix A371

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OREXIGEN THERAPEUTICS, INC., | ) | Case No. 18-10518 (KG) |
| | ) | |
| Debtor. | ) | **Re: D.I. 654** |
| | ) | |

## ORDER

McKesson Corporation and McKesson Patient Relationship Solutions filed a

Motion for an Order Determining that McKesson is Entitled to the Disputed Funds (the

"Motion") by way of a setoff under Bankruptcy Code Section 553.  For the reasons the

Court provided in the accompanying Opinion,

IT IS HEREBY ORDERED that the Court denies the Motion.


Dated:  November 13, 2018

KEVIN GROSS, U.S.B.J.


Appendix A372